UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ROGER EMERSON, MARY EMERSON, ROBERT CAPLIN and MARTHA J. GOODLETT, Individually and On Behalf of All Others Similarly Situated, | : : : : Civil Action No. 17-cv-02565 (ADS)(GRB) : : |
| Plaintiffs, | : : |
| v. | : **ORAL ARGUMENT REQUESTED** : |
| MUTUAL FUND SERIES TRUST, CATALYST CAPITAL ADVISORS LLC, NORTHERN LIGHTS DISTRIBUTORS LLC, JERRY SZILAGYI, TOBIAS CALDWELL, TIBERIU WEISZ, BERT PARISER, ERIK NAVILOFF and EDWARD WALCZAK, | : : : : : : |
| Defendants. | : : |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR JOINT
MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................. 1

BACKGROUND FACTS ........................................................................................... 3

ARGUMENT ............................................................................................................. 4

I.     APPLICABLE LEGAL STANDARDS. ......................................................... 4

II.    PLAINTIFFS FAIL TO ALLEGE ANY MISSTATEMENTS OR OMISSIONS ............ 5

    A.  The Offering Documents Fully Disclosed The Fund's Investment Strategy ................ 5

        1.  The Fund Disclosed That It *Could* Write "Uncovered" Call Options. .................. 5
        2.  The Fund Disclosed That It *Did* Write "Uncovered" Call Options. ...................... 8
        3.  The Fund's "Uncovered" Call Options Fully Complied With The Requirements Of The Offering Documents And The 1940 Act. ................................................................................ 10
        4.  The Fund Warned Of The Risks Associated With Its Strategy. ........................... 11

    B.  Plaintiffs' Allegations Of Misstatements And Omissions Are Insufficient ............... 12

        1.  Statements Regarding The Fund's Use Of "Uncovered" Call Options. .............. 13
        2.  Statements Regarding Market Correlation. ............................................ 15
        3.  Statements Regarding The Fund's Risk Controls. ................................... 18
        4.  Statements Regarding The Fund's Past Performance. ............................... 19
        5.  Statements Regarding Derivatives and Leverage Risk. ............................. 20

III.   PLAINTIFFS' CLAIMS ARE UNTIMELY. .................................................... 21

IV.  PLAINTIFFS FAIL TO ALLEGE THAT THE INDIVIDUAL DEFENDANTS AND CATALYST ADVISORS ARE STATUTORY SELLERS UNDER § 12 ............. 21

V.   PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION UNDER *STATE STREET*. ........................................................................................ 25

VI.  PLAINTIFFS DO NOT ADEQUATELY ALLEGE CONTROL UNDER §15. ............. 29

    A.  Plaintiffs Have Not Alleged Actual Control By Edward Walczak .......................... 30

    B.  Plaintiffs Have Not Alleged Actual Control By Catalyst Advisors .......................... 31

CONCLUSION ........................................................................................................ 32

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................... 4

*ATSI Communs, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ......................... 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................... 4

*Burke v. Dowling*, 944 F. Supp. 1036 (E.D.N.Y. 1995) .............................................. 23

*Citiline Holdings, Inc. v. iStar Financial Inc.*, 701 F. Supp. 2d 506 (S.D.N.Y. 2010) ........... 22, 23

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705 (S.D.N.Y. 2013) ...................................................................................................................... 23

*Clark v. Nevis Capital Mgmt., LLC*, 04 Civ. 2702 (RWS), 2005 US Dist. LEXIS 3158 (S.D.N.Y. Mar. 2, 2005) ............................................................................................. 27

*Dodds v. Cigna Sec., Inc.*, 12 F.3d 346 (2d Cir. 1993) ................................................ 21

*Dorchester Investor v. Peak Intern. Ltd.*, 134 F. Supp. 2d 569 (S.D.N.Y. 2001) ........ 24

*Dura Pharms., Inc. v. Broudo,* 544 U.S. 336 (2005) .................................................... 26

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759 (2d Cir. 1991) ....... 13

*In re Alliance North American Gov't Income Trust, Inc. Sec. Litig.*, 95 Civ. 0330 (LMM), 1996 U.S. Dist LEXIS 14209 (S.D.N.Y. Sept. 27, 1996) ............................................ 17

*In re Britania Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404 (S.D.N.Y. 2009) ................ 28

*In re Deutsche Telekom AG Sec. Litig.,* 00 Civ. 9475 (SHS), 2002 U.S. Dist. LEXIS 2627 (S.D.N.Y. Feb. 20, 2002) ........................................................................................... 30

*In re Global Crossing, Ltd. Sec. Litig.*, 02 Civ. 910 (GEL), 2005 U.S. Dist. LEXIS 16228 (S.D.N.Y. Aug. 8, 2005) ............................................................................................. 29

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429 (S.D.N.Y. 2003) ......................................................................................................................... 28

*In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, 03 Civ. 8208 (RO), 2006 U.S. Dist. LEXIS 20758 (S.D.N.Y. Apr. 18, 2006) ...................................................... 27

*In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347 (2d Cir. 2010) .................. 22

*In re New York Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466 (E.D.N.Y. 2006) ......... 5, 21

*In re ProShares Tr. Sec. Litig.*, 728 F.3d 96 (2d Cir. 2013) .................................. 15, 16

*In re Salomon Smith Barney*, 441 F. Supp. 2d 579 (S.D.N.Y. 2006) .......................... 27

*In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152 (S.D.N.Y. 2012) ....... 31

*In re State Street Bank and Trust Co. Fixed Income Funds Invs. Litig.*, 774 F. Supp. 2d 584 (S.D.N.Y. 2011) .................................................................................. 25, 26, 28, 29

*In re Van Wagoner Funds*, 382 F. Supp. 2d 1173 (N.D. Cal. 2004) ........................... 27

*In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352 (S.D.N.Y. 2009) ........................ 26

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148 (2d Cir. 2003) ..................... 15

*Lehman Bros. Mortg.-Backed Sec. Litig.*, 603 F.3d 167 (2d Cir. 2011) ........................................ 29

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) ................................. 25, 29

*Mabon, Nugent & Co. v. Borey*, 127 B.R. 727 (S.D.N.Y. 1991) ................................... 23

*McKenna v. Smart Techs. Inc.*, 11 Civ. 7673 (KBF), 2012 U.S. Dist. LEXIS 47134 (S.D.N.Y. Apr. 3, 2012) ...................................................................................... 23

*Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540 (S.D.N.Y. 2017) ............................ 15

*Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2 (2d Cir. 1996) ................................... 13, 16, 19

*Pahmer v. Greenberg*, 926 F. Supp. 287 (E.D.N.Y. 1996) ............................................ 23

*Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998) ........................... 25

*Pinter v. Dahl*, 486 U.S. 622 (1988) .............................................................. 22, 23

*Pollack v. Laidlaw Holdings, Inc.*, 90 Civ. 5788 (DLC), 1995 U.S. Dist. LEXIS 5909 (S.D.N.Y. May 3, 1995) ........................................................................................ 24

*S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) ....................................... 30

*Trustees of Laborers Union Local No. 1298 of Nassau & Suffolk Ctys. Ben. Funds v. A to E, Inc.*, 64 F. Supp. 3d 435 (E.D.N.Y. 2014) ........................................................ 4

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 16-cv-08507 (AJN), 2017 U.S. Dist. LEXIS 127283 (S.D.N.Y. July 26, 2017) ....................................................... 18

*Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124 (2d Cir. 1989) ........................ 23

*Xiang v. Inovalon Holdings*, 245 F. Supp. 3d 635 (S.D.N.Y. 2017) ............................................ 23

*Young v. Nationwide Life Ins. Co.*, 183 F.R.D. 502 (S.D. Tex. 1998) ........................................ 27

*Youngers v. Virtus Investment Partners Inc.*, 195 F. Supp. 3d 499 (S.D.N.Y. 2016) ...... 29, 30, 31

**Statutes**

15 U.S.C. § 77k .................................................................................................. 5, 25, 26

15 U.S.C. § 77*l* ................................................................................................. 5, 25, 26

15 U.S.C. § 77m ........................................................................................................ 21

15 U.S.C. § 80 ............................................................................................................. 7

**Treatises**

D. Geffen, "*A Shaky Future for Securities Act Claims Against Mutual Funds,*" Vol. 37
Securities Regulation Law Journal 20 (Spring 2009) ................................................ 27

**Regulations**

44 F.R. 25128 ............................................................................................................. 8

44 F.R. 25132 ............................................................................................................. 8

**Appendices**

Appendix A ........................................................................................................ passim

Appendix B .................................................................................................... 9, 21, 22

Appendix C ....................................................................................................... 10, 11

Defendants Mutual Fund Series Trust (the "Trust"), Catalyst Capital Advisors, LLC ("Advisors"), Northern Lights Distributors, LLC ("Northern Lights"), Jerry Szilagyi, Tobias Caldwell, Tiberiu Weisz, Bert Pariser, Erik Naviloff, and Edward Walczak respectfully submit this Memorandum of Law in support of their Joint Motion to Dismiss the Amended Complaint under Federal Rule of Civil Procedure 12(b)(6).

## PRELIMINARY STATEMENT

This putative class action was commenced in April 2017, shortly after the Catalyst Hedged Futures Strategy Fund (the "Fund"), a publicly traded mutual fund, lost more than 15% of its net asset value ("NAV") in February 2017.  Plaintiffs seize on that drawdown to manufacture claims that since November 1, 2014, the Fund's Offering Materials misrepresented its investment objective and the risks of its strategy.  History proves otherwise.  The Fund's investment objective is to provide "capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market."  For 11 years, the Fund and its predecessor produced largely positive returns in rising markets, flat markets and declining markets, and protected capital against market crashes like that in 2008.  *See* Declaration of Jacob A. Englander, Exhibit ("Ex.") CC:



| Annual Returns (%) | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HFXAX | 52.5 | 4.3 | 50.2 | 12.4 | 10.2 | 16.4 | 10.9 | -3.3 | 7.7 | 7.8 | 5.8 |
| S&P 500 TR | 15.8 | 5.5 | -37.0 | 26.5 | 15.1 | 2.1 | 16.0 | 32.4 | 13.7 | 1.4 | 12.0 |

Of course, no investment is risk-free, and the Fund occasionally experienced large drawdowns that were disclosed to investors (*e.g.*, a loss of 9.37% in 1Q 2007, *see* Ex. A at 44,

and "more than 8%" in 4Q 2014, Ex. M at 26).  These periodic drawdowns were offset by the largely stable returns in all markets.  In early 2017, a perfect storm of unprecedented market conditions challenged the Fund's complex strategy and contributed to the 15% drawdown.

Statistical measurements (R-squared and beta) demonstrate that since inception, the Fund's correlation to the market was extremely low as was its volatility—exactly as described in the Fund's Offering Documents.  These statistics were disclosed in the Fund's Fact Sheets.  *See* Exs. U-DD.  Investors—the overwhelming majority of whom invested through sophisticated financial advisors—benefitted from returns that were not strictly tied to market performance, and were protected when markets crashed.  In 2016, independent fund rating agency Lipper designated the Fund a "Lipper Leader" with a rating of five out of five for "capital preservation." Ex. EE.  Thus, the Fund's strategy was consistent with its stated investment objective.

Plaintiffs' misleading attempt to re-cast the Fund's complex options trading strategy as "low-risk" and "conservative"—simply so they can knock it down—should be rejected.  As set forth in Section II, *infra*, the Fund accurately described its investment objective, trading strategy and the many risks of investing, including the possibility of "potentially unlimited losses."  Its portfolio was publicly disclosed, and anyone interested in the Fund's strategy knew that its written call options were not fully hedged or "covered."  The reality is that a large drawdown does not mean that the Fund's Offering Documents were misleading.  Plaintiffs cannot allege facts showing any material misrepresentations or omissions in the Offering Documents, and their claims should be dismissed.  Plaintiffs' claims also should be dismissed because:

- They are time-barred, as disclosures in 2014 showed that the Fund's portfolio did not consist of the fully "covered" written call options that Plaintiffs claim they expected (p. 22);

- They fail to adequately allege that the Individual Defendants and Advisors were "statutory sellers" who solicited purchases in the Fund.  Bare-bones allegations that they signed the registration statement and conclusory allegations of solicitation do not suffice (pp. 22-25);

2

- They cannot show loss causation under Sections 11 and 12 (pp. 25-30); and

- There is no predicate liability and no legally sufficient allegations that Defendants Walczak and Advisors controlled the Trust, the Fund, or the Offering Documents (pp. 30-32).

## BACKGROUND FACTS

Defendant Mutual Fund Series Trust is an investment company registered under the Investment Company Act of 1940.  Amended Complaint ("AC"), ¶ 28.  The Fund is one of several "series" of mutual funds within the Trust, and its shares are offered pursuant to a Registration Statement filed with the Securities & Exchange Commission ("SEC").  AC ¶¶ 39, 42.  The contents of the Registration Statement are closely regulated by the SEC.  Each year, the Trust files an amendment to the Registration Statement that contains an updated Prospectus, Summary Prospectus and Statement of Additional Information ("SAI") covering each of the series funds within the Trust.  AC ¶¶ 42-44.  These documents contain detailed disclosures regarding the funds' investment objectives, fees and expenses, principal investment strategies, investment restrictions, risks of investing in the funds and other important information.  *Id.*  The Trust also files annual and semi-annual reports, which are incorporated by reference and deemed to be part of the Trust's Registration Statement, containing (i) letters to shareholders that update them on the funds' activities, and (ii) listings of each fund's portfolio holdings.  AC ¶ 43.  Every quarter, the Trust also files on Form N-Q detailed listings of each fund's portfolio holdings.  AC ¶ 44.  All of these documents are publicly available, including through the SEC's website.  The registration statements, prospectuses, SAIs, annual and semi-annual reports, Forms N-Q and periodic Fact Sheets are referred to herein as the "Offering Documents."  AC ¶ 46.

The Trust is governed by a board of trustees, comprised of Jerry Szilagyi (who is also the Trust's President and the CEO of Advisors), and independent trustees Tobias Caldwell, Tiberiu

Weisz and Bert Pariser.  AC ¶¶ 32-35.  Erik Naviloff is the Trust's Treasurer.  AC ¶ 36. Northern Lights serves as the Fund's distributor.  AC ¶ 30.  Pursuant to a management agreement that is approved annually by the Trust's board, Advisors serves as advisor to the Fund, and Edward Walczak is the portfolio manager responsible for the day-to-day management of the Fund's assets.  AC ¶¶ 29-37.  Walczak employed the same strategy when managing the Fund's predecessor from its inception in 2005 to its conversion to a publicly traded mutual fund in 2013.  AC ¶ 49.

## ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint must be dismissed.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

In deciding a motion to dismiss, a court may consider not only the facts stated on the face of the complaint, but also those contained in documents "incorporated in the complaint by reference," like the Offering Documents here.  *Trustees of Laborers Union Local No. 1298 of Nassau & Suffolk Ctys. Ben. Funds v. A to E, Inc.*, 64 F. Supp. 3d 435, 438 (E.D.N.Y. 2014) (Spatt, J.); *see also ATSI Communs, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (courts "may consider . . . legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit").

## II.     PLAINTIFFS FAIL TO ALLEGE ANY MISSTATEMENTS OR OMISSIONS.

Here, the Amended Complaint should be dismissed because Plaintiffs fail to allege any material misstatements or omissions in the Offering Documents—the core element of claims under Sections 11 and 12 of the Securities Act.  *See* 15 U.S.C. §§ 77k, 77*l*; *In re New York Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 476, 484 (E.D.N.Y. 2006) (Spatt, J.) (dismissing complaint where plaintiffs failed to allege facts showing a material misrepresentation).

### A.     The Offering Documents Fully Disclosed The Fund's Investment Strategy.

Plaintiffs' principal allegation is that the Offering Documents were misleading because they failed to disclose that the Fund was writing a substantial volume of "uncovered" call options on Standard & Poor's 500 Index futures contracts ("S&P Futures"), which allegedly "subjected the Fund to unlimited losses."  AC ¶ 11.  But this claim is based on a deeply flawed reading of the Offering Documents.  In truth, the Offering Documents fully disclosed the Fund's investment strategy, the risks associated with that strategy, and the details of the Fund's options portfolio— including the "uncovered" call options that Plaintiffs disingenuously claim were hidden.

#### 1.     The Fund Disclosed That It *Could* Write "Uncovered" Call Options.

According to Plaintiffs, the Offering Documents provided that the Fund could write call options "only if they are covered," which Plaintiffs allege means that "the Fund either owns the underlying security or has an absolute and immediate right (such as a call with the same or a later expiration date) to acquire that security."  AC ¶¶ 60-63.  But that is simply not true.

First, nothing in the Prospectus required the Fund to write call options only if they are "covered" by a purchase of the underlying security or an offsetting call option.  For example, the "Principal Investment Strategies" section stated:  "the Fund invests primarily in long and short call and put options on Standard & Poor's 500 ("S&P) Index futures contracts and in cash and cash equivalents, including high-quality short-term . . . fixed income securities such as U.S.

Treasury securities."   Appendix A (Appendix of Relevant Disclosures, citing corresponding Exhibits) ("App. A") at 1.  This expressly authorized the Fund to sell call options on S&P Futures (a "short call" means the sale of a call), *without imposing any restrictions on what kinds of call options the Fund could sell.*  It certainly did not require that the Fund write only "covered" call options.

Similarly, the "Investment Restrictions" and "Other Investment Policies" sections of the Fund's Statement of Additional Information ("SAI") contained no language that prohibited the Fund from writing "uncovered" call options.  *See* App. A at 1-3.  These sections of the SAI did identify several investment restrictions that were "fundamental policies" of the Fund, but they did *not* require the Fund to write only call options that were "covered."  *Id.*

The "Additional Information About Investments and Risks" section of the SAI added supplemental policies for certain types of investments by the Fund.  Under one such policy, the Fund "may purchase or sell futures contracts or options thereon"—including "stock index futures contracts . . . or options thereon," such as the call options on S&P Futures at issue here—*either* if the Fund's liability is "covered" by an offsetting position, *or* if the Fund "segregat[es] liquid assets equal to the Fund's liability on the futures contract or option thereon, which are adjusted daily to equal the current market value of [the] Fund's liability on the futures contract or option." App. A at 5-6 ("Futures Contracts").  In other words, so long as the Fund segregated liquid assets each day that matched the current market value of its written call options on S&P Futures, it was *not* obligated to "cover" its call options with a purchase of the underlying futures contracts or offsetting call options.  Similar language appeared in the SAI for other investment types as well. *See* App. A at 4 ("Stock Index Options": call options on stock indexes permissible if "the Fund arranges with its Custodian to segregate cash or other liquid assets equal in value to the exercise

liability of the call option adjusted daily to the option's current market value"), 3-4 ("Options on

Securities": call options on stocks permissible if "the Fund has segregated liquid assets equal to

the exercise liability of the option that are adjusted daily to the option's current market value").

As the SAI noted, these policies were "required by the 1940 Act."  App. A at 5-6

("Futures Contracts").  Under Section 18(f) of the Investment Company Act of 1940 (the "1940

Act"), investment companies are generally not allowed to issue or sell any "senior security,"

which is defined as "any bond, debenture, note or similar obligation or instrument constituting a

security and evidencing indebtedness."  15 U.S.C. § 80a-18(f)(1), (g).  Because a fund's sale of

options could potentially qualify as the issuance of a "senior security," the SEC has provided

guidance (in a policy statement and various no-action letters) on how this rule applies to different

types of instruments.  In the *Dreyfus Strategic Investing & Dreyfus Strategic Income* no-action

letter in 1987, the SEC addressed this rule in the context of the sale of call options on futures

contracts:

> In Release 10666, the Commission discussed potential senior security and leveraging problems arising from certain fund trading practices.  The release sets forth means by which funds can eliminate these problems . . . through *the segregation of fund assets*. . . .
>
> For short positions in futures or forward contracts, *sales of call options*, and short sales of securities, *a fund may establish a segregated account . . . with cash or certain liquid assets that . . . equal the market value of the instruments or currency underlying the* futures or forward contracts, *call options*, and short sales. . . .
>
> In addition, a fund that engages in . . . sales of call options need not segregate fund assets if it "covers" these positions in the following ways. . . .
>
> A fund selling a call option on a futures or forward contract may cover [a] by entering into a long position in the same contract at a price no higher than the strike price of the call option. . . .  [b] by owning the instruments or currency underlying the futures or forward contract. . . .  [or] [c] by holding a separate call option permitting it to purchase the same futures or forward contract. . . .

Ex. I (*Dreyfus* no-action letter, June 22, 1987) at 3 (emphasis added).  Thus, pursuant to the SEC

guidance, a fund selling call options on futures contracts may comply with Section 18(f) *either*

by segregating liquid assets equal to the market value of the options *or* by "covering" the position with a purchase of the underlying futures contact or an offsetting call option.

This rule makes sense.  Because these trading practices involve "substantial leveraging" and "gains and losses from these transactions can be extremely large relative to invested capital," the use of "segregated accounts . . . would limit the investment company's risk of loss."  SEC Release No. IC-10666, 44 F.R. 25128, 25132 (Apr. 27, 1979).  Although segregating assets does not eliminate the downside risk of a call option, it "will function as a practical limit on the amount of leverage which the investment company may undertake," and "assure the availability of adequate funds to meet the obligations arising from such activities."  *Id*.  As the market value of the options changes, a fund must shift its amount of segregated liquid assets accordingly, but it is never required to purchase the underlying security or an offsetting call option.

In short, Plaintiffs' allegation that the Fund could only write call options that were "covered" by a purchase of the underlying security or an offsetting option is inconsistent with both the Offering Documents and the law.  To the contrary, the Fund was expressly *permitted* to write "uncovered" call options on S&P Futures, so long as it segregated liquid assets equal to the current market value of the options—which, as explained below, is exactly what the Fund did.

## 2.      The Fund Disclosed That It *Did* Write "Uncovered" Call Options.

Plaintiffs' allegation that the Fund's "uncovered" call options on S&P Futures were not disclosed is also baseless.  In fact, the Fund plainly and repeatedly disclosed the nature and extent of its call options, and investors knew that many of these options were not "covered."

As Plaintiffs expressly concede in the Amended Complaint, the Fund issued a public disclosure every quarter that published *an itemized list of every single investment and option in the Fund's portfolio*.  *See* AC ¶¶ 69-83.  These schedules were titled "Portfolio of Investments," and were included in the Fund's Annual Reports, Semi-Annual Reports, and Form N-Q filings,

all of which were incorporated by reference into the Offering Documents.  *See, e.g.*, App. A at 7; AC ¶¶ 43-44.  Each schedule was divided into categories such as "Call Options Written," "Put Options Written," "Call Options Purchased," "Put Options Purchased," and "Short-Term Investments," and listed every outstanding asset and option held or written by the Fund as of the reporting date.  App. A at 7-10.  For each option, the schedule identified:  (a) the number of options held or written; (b) the expiration date; (c) the exercise price; and (d) the current market value.  *Id*.  They also included additional charts that tracked the number of options written by the Fund during the reporting period, including how many new options were written, how many were exercised or expired, and how many were outstanding at the end of the period.  *Id*.

These comprehensive "Portfolio of Investments" schedules disclosed precisely what Plaintiffs now claim was omitted.  First, they disclosed that the Fund was writing call options on S&P Futures without purchasing the underlying S&P Futures contracts.  If the Fund was only writing "covered" call options, these schedules also would have included all of the underlying S&P Futures contracts that were being used to "cover" the options.  But they never did, because the Fund did not purchase the underlying S&P Futures contracts.  *See* App. A at 7-10; AC ¶ 65.  As a result, investors indisputably knew that the Fund was writing "uncovered" call options.

Second, the schedules disclosed that the Fund was writing far more call options on S&P Futures than it was purchasing, such that each written option was not being offset by a corresponding purchased option.  As Plaintiffs acknowledge, each "Portfolio of Investments" schedule reported the exact quantity of outstanding written options and purchased options each quarter, and showed that "the number of written call options vastly outnumbered the amount of purchased options."  AC ¶ 74; *see also id*. ¶¶ 73, 76, 80; Appendix B (Call Options Purchased vs. Call Options Written) ("App. B").  Because this disparity was apparent on the face of the

schedules, it was perfectly clear that the Fund was not offsetting every written option with a purchased option, and thus the Fund was writing many "uncovered" call options.

Simply put, Plaintiffs' allegation of "an undisclosed uncovered call[] options strategy," AC ¶ 114, is refuted by the Offering Documents.  Indeed, Plaintiffs openly admit that their own review of these schedules revealed "large numbers of uncovered written call options," essentially conceding that the Fund's "uncovered" call options were disclosed.  *Id*. ¶ 70.

### 3.   The Fund's "Uncovered" Call Options Fully Complied With The Requirements Of The Offering Documents And The 1940 Act.

The "Portfolio of Investments" schedules also show that the Fund was in compliance with the requirements of the Offering Documents and the 1940 Act.  As detailed above, the Fund was permitted to write "uncovered" call options on S&P Futures so long as it held segregated liquid assets equal to the market value of the options.  The schedules demonstrate that the Fund always maintained liquid assets (such as U.S. Treasury Notes and money market funds) that far exceeded the market value of its written call options on S&P Futures, and thereby satisfied the requirements of the Prospectus, SAI, and applicable law.  *See* Appendix C ("Portfolio Total Assets and Liabilities," demonstrating the Fund's liquid assets vs. market value of call options written, as disclosed in quarterly schedules) ("App. C").  For instance:

- As of December 31, 2014, the Fund's written call options on S&P Futures were a liability of approximately $26.7 million, yet the Fund held over *$376 million* in money market funds;

- As of December 31, 2015, the Fund's written call options on S&P Futures were a liability of approximately $8.2 million, yet the Fund held roughly *$99.5 million* in U.S. Treasury Notes and *$1.8 billion* in money market funds;

- As of March 31, 2016, the Fund's written call options on S&P Futures were a liability of approximately $221.8 million, yet the Fund held nearly *$1.2 billion* in U.S. Treasury Notes and *$1.1 billion* in money market funds; and

- As of December 31, 2016, the Fund's written call options on S&P Futures were a liability of approximately $550.1 million, yet the Fund held nearly *$1.8*

*billion* in U.S. Treasury Notes and *$1.4 billion* in money market funds. App. C at 1-4; *see also*. App. A at 7-10.  The schedules also noted that "all or a portion of" certain liquid assets were "segregated as collateral for options written."  App. A at 9.

As Appendix C illustrates, the Fund's liquid assets far exceeded the market value of its written call options on S&P Futures *in every quarter at issue in the Amended Complaint*.  As such, the Fund was fully complying with the Prospectus, SAI, and 1940 Act throughout the relevant period.  This served as an important limit on the Fund's leverage and risk exposure:  at any given time, the liquid assets available to satisfy any obligations that might arise on the Fund's "uncovered" call options were many times the current market value of those call options.

### 4.      The Fund Warned Of The Risks Associated With Its Strategy.

The Offering Documents also contained extensive disclosures warning investors of the risks associated with the Fund's strategy.  First, Plaintiffs allege that the Fund's "uncovered" call options "exposed the Fund to potentially unlimited losses."  AC ¶¶ 2, 8.  But Plaintiffs ignore a risk disclosure in the Prospectus titled "Options Risk," which explicitly warned:  "There are risks associated with the sale and purchase of call and put options. . . .  *If unhedged, a Fund's written calls expose the Fund to potentially unlimited losses*."  App. A at 10 ("Options Risk") (emphasis added).  Thus, not only did the Fund disclose that it was writing a substantial amount of "uncovered" call options, it also made clear that those options could potentially expose the Fund to "unlimited losses."  *See also id*. ("As writer of an option, the Fund[] . . . retains the market risk of an unfavorable change in the price of the security underlying the written option.").  Of course, the potential for "unlimited" losses was only theoretical; such losses could only occur if the S&P 500 continued to rise (to infinity) and the Fund did nothing to mitigate further losses.

Plaintiffs also allege that the Fund failed to disclose that its "uncovered" call options caused it to be exposed to significant losses in "rapidly rising equity markets."  AC ¶ 115.  But

11

the Fund's potential exposure to rapidly rising markets was plainly disclosed.  For example, in both the 2015 and 2016 Annual Reports—which Plaintiffs themselves cite in the Amended Complaint, *see* AC ¶ 104—the Fund disclosed that "volatility patterns . . . directed the Fund predominately toward call option spreads that provide upside price exposure [*i.e.*, exposure to rising equity markets] with limited downside risk."  App. A. at 10-11.  As a result, rapid market increases (especially in a low volatility market) could expose the Fund to higher losses:

- In its 2015 Annual Report, the Fund discussed a "short term parabolic price advance" in the market that caused a significant drawdown for the Fund.  The market had risen "more than 10% in the space of 5 weeks," which equated to an annualized return of over 160%.  The Fund explained:  "*Because the Fund is consciously positioned to accept upside risk in exchange for eliminating most downside exposure, this is the worst scenario for our strategy*."

- In its 2016 Annual Report, the Fund described a similar pattern, where "the S&P experienced 10-15% snap back rallies within a 4-6 week period," which again caused significant drawdowns for the Fund.  As before, the Fund explained:  "*Because the Fund is consciously positioned to accept upside risk in exchange for eliminating most downside exposure, this is the worst scenario for our strategy*."

App. A at 10-12 (emphases added).  The Offering Documents further disclosed that the Fund "typically enters positions that will profit from a controlled market advance or from the volatility expansion that typically accompanies a market decline."  *Id*. at 10-11.  In other words, investors clearly knew that the Fund's strategy generally yields returns in either a "controlled market advance" or a "market decline," but could potentially suffer losses in a rapidly rising equity market.  *Id*.  The Fund's historical performance also bore this out:  for example, when the market crashed in 2008, the Fund was up 50.03%; when the market rapidly rose in 2013 (before the putative class period), the Fund experienced a modest drawdown of 3.33%.  *See* Ex. A at 44.

### B.     Plaintiffs' Allegations Of Misstatements And Omissions Are Insufficient.

Against this backdrop, it is clear that Plaintiffs have failed to allege any misstatements or omissions in the Offering Documents.  On a motion to dismiss, the "central issue" is "not

whether the particular statements, taken separately, were literally true, but whether defendants'
representations, taken together and in context, would have misled a reasonable investor about the
nature of the [securities]."  *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).
Here, the Offering Documents were not misleading as a matter of law.

### 1.        Statements Regarding The Fund's Use Of "Uncovered" Call Options.

First, Plaintiffs have failed to allege any misstatements or omissions in the Offering
Documents regarding the Fund's writing of "uncovered" call options.  *See* AC ¶¶ 133-42.  As
detailed above, the Fund clearly disclosed that it could write "uncovered" call options on S&P
Futures if it segregated liquid assets equal to the current market value of the written options, and
then it disclosed that it had done exactly that.  Where "the prospectus states exactly the 'fact' that
[plaintiff] contends has been covered up," Section 11 and 12 claims must be dismissed.  *I. Meyer
Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.*, 936 F.2d 759, 762 (2d Cir. 1991).

Plaintiffs attempt to support their theory by grossly mischaracterizing two provisions of
the Offering Documents.  First, Plaintiffs cite the "Options on Securities" section of the SAI.
*See* AC ¶ 62.  But—as the very language quoted by Plaintiffs makes clear—that section only
applies to "call options . . . *on stocks*."  *Id.* (emphasis added); App. A at 3-4.  The Offering
Documents are clear that the Fund does not invest in "stocks"; rather, it invests in cash
equivalents and "long and short call and put options on [S&P Futures]."  App. A at 1.  Moreover,
even if this section did apply (and it does not), Plaintiffs fail to include all of the relevant
language:  "A Fund may write only call options that are 'covered' *or for which the Fund has
segregated liquid assets equal to the exercise liability of the option that are adjusted daily to the
option's current market value*."  App. A at 3-4; *see also id.* (contrasting "the writing of naked or
uncovered options, which the Funds will not do *unless the Fund arranges to have its Custodian*

*segregate sufficient cash or liquid assets as described above*") (emphases added).   Thus, this disclosure actually refutes Plaintiffs' position, as it confirms that the Fund could write "uncovered" call options if it segregated the appropriate amount of liquid assets.

Next, Plaintiffs cite one variation of the "Options Risk" disclosure, which read:

<div style="margin-left:2em">

Options Risk.  . . . . *As the seller (writer) of a covered call option*, the Fund assumes the risk of a decline in the market price of the underlying security below the purchase price of the underlying security less the premium received, and gives up the opportunity for gain on the underlying security above the exercise option price.

</div>

AC ¶ 63; App. A at 13 (emphasis added).  Plaintiffs then argue that this disclosure "indicated that the Fund did not invest in uncovered calls because investors were advised only of the risks of writing covered call options."  AC ¶ 63.  But this argument fails for several reasons.

First, this language was merely a risk disclosure that referenced "covered" call options.  It did not even remotely suggest that the Fund was prohibited from writing "uncovered" call options.  Second, this risk disclosure cannot supersede the detailed descriptions of the Fund's investment strategy and policies found throughout the Prospectus and SAI, all of which clearly *permitted* the Fund to write "uncovered" call options if it segregated sufficient liquid assets.  *See* App. A at 3-4.  Third, Plaintiffs ignore the subsequent "Options Risk" disclosure later in the Prospectus, which explicitly warned:  "There are risks associated with the sale and purchase of call and put options. . . .  *If unhedged, a Fund's written calls expose the Fund to potentially unlimited losses*."  *Id*. at 10 (emphasis added); *see also id*. at 13 ("Hedging Risk":  "The Fund is not required to use hedging and may choose not to do so").  This put investors on notice that the Fund could write "unhedged" call options, and that such options could potentially expose the Fund to substantial risks.

Plaintiffs also try to downplay the comprehensive "Portfolio of Investments" schedules by arguing that the "uncovered" call options were "not readily apparent to retail investors" and

required "a financial expert's analysis" to discover them.  AC ¶ 70.  But that is absurd, as the fact that the options were not "covered" was obvious on the face of the disclosures.  No financial sophistication or expert analysis was required; even a cursory review of the schedules would reveal that the Fund was writing call options on S&P Futures without "covering" by purchasing the underlying S&P Futures contracts or offsetting call options.  *See supra*, at 9-11.  (The "hypothetical stress tests" allegedly run by Plaintiffs are a red herring, as they were not necessary to discover that the Fund was writing "uncovered" call options.  AC ¶¶ 71, 75, 77.)

In any event, it is well-settled that the law does "not [] attribute to investors a child-like simplicity," but rather "presume[s] that a reasonable investor can comprehend the basic meaning of plain-English disclosures."  *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013); *cf. LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) (describing "reasonable investor" in securities case as one "of ordinary intelligence").  For instance, Plaintiffs suggest that the number of written call options (compared to the number of purchased call options) was somehow obscured.  *See* AC ¶¶ 70-71.  But every single option on the schedule, both written and purchased, had a quantity listed alongside it—all Plaintiffs had to do was add up the totals.  Where "simple arithmetic computation based on the information disclosed would have revealed" the supposed omission, nothing further is required.  *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 547-48 (S.D.N.Y. 2017).

For these reasons, Plaintiffs' allegations regarding the Fund's "uncovered" call options— which underlie the entire Amended Complaint—are wholly unsupported and should be rejected.

## 2. <u>Statements Regarding Market Correlation.</u>

Next, Plaintiffs allege that the Offering Documents were misleading when they stated that the Fund's "strategy does not depend on a prediction of equity market direction, and is

designed to produce returns that are not correlated with equity market returns." AC ¶¶ 123-32. According to Plaintiffs, the Fund "actually took massive directional bets against U.S. stock market indexes," and as a result its performance was "highly correlated, in the negative, to a rapidly rising equity market." AC ¶¶ 11, 127. These allegations fail as a matter of law.

First, as detailed above, the Offering Documents fully and repeatedly disclosed that it was writing "uncovered" call options on S&P Futures, and expressly warned investors that a rapidly rising equity market was "the worst scenario for our strategy," because "the Fund is consciously positioned to accept upside risk in exchange for eliminating most downside exposure." App. A at 11-12. In short, "[t]he prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed." *Olkey*, 98 F.3d at 3 (dismissing Section 11, 12 claims); *see also In re ProShares Tr. Sec. Litig.*, 728 F.3d at 102 (dismissing Section 11 claims where "the relevant prospectuses adequately warned the reasonable investor of the allegedly omitted risks").

Second, Plaintiffs' claim is undercut by their own allegations. In the Amended Complaint, Plaintiffs cite a graph that supposedly illustrates that the Fund's performance was highly correlated to the S&P 500. AC ¶¶ 86, 115. But the graph actually shows the opposite. Although there are a handful of periods where there seems to be some negative correlation between the Fund and the S&P 500, overall the graph demonstrates that there is no consistent pattern of correlation between the Fund and the U.S. equity market. In some periods, the Fund moved in the same direction as the S&P 500; in other periods, it moved in the opposite direction. For example, while Plaintiffs have marked a few instances where the S&P 500 increased and the value of the Fund decreased (the blue boxes below), there are several other instances where the Fund either increased or stayed the same (the red boxes below, added by Defendants):



Thus, Plaintiffs' own graph fails to support their claim that the Fund "took massive directional bets" against the S&P 500 and was "highly correlated" to the U.S. equity market.

Third, objective statistical analysis further demonstrates the low correlation between the Fund's performance and the S&P 500. As disclosed in its Fact Sheets (which Plaintiffs incorporate by reference, *see* AC ¶¶ 45, 55, 126, 131), the Fund's "R-squared"—a statistic that measures the correlation between a portfolio and its benchmark—was very low. App. A at 14. Under industry standards, any R-squared under 40% indicates "low correlation between the portfolio's returns and the benchmark's returns." Ex. FF (Morningstar: R-squared <40% is "low"). Here, the Fund's R-squared against the S&P 500 was *just 7%* between 2005 and 2017, which indicated extremely low correlation for over a decade. App. A at 14. This refutes Plaintiffs' market correlation allegations and confirms that the Fund did "produce returns that are not correlated with equity market returns." *Id.* at 1.

Fourth, Plaintiffs focus heavily on the Fund's stated "investment objective," which was "capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market." App. A at 1; AC ¶¶ 124, 126. As courts have held, however, "[t]he investment objective announces the goal of the Fund, rather than a promise to investors." *In re Alliance North American Gov't Income Trust, Inc. Sec. Litig.*, 95 Civ. 0330

(LMM), 1996 U.S. Dist LEXIS 14209, at *12 (S.D.N.Y. Sept. 27, 1996).  Such "general, forward looking statements" merely "express[] goals," "not . . . guarantees," and thus "are not actionable under the securities laws." *Id*.

In other words, although the Fund's *goal* was to generate returns that were not correlated with the market, it did not promise investors that it would *always* avoid market correlation, or that it was immune to changes in market conditions.  To the contrary, the Fund warned investors it was exposed both to "Market Risk" ("[o]verall stock market risks may also affect the value of the Fund") and "Index Risk" ("[i]f the derivative is linked to the performance of an index, it will be subject to the risks associated with changes in that index").  App. A at 13.  Similarly, although the Fund's *objective* was "capital preservation in all market conditions," it warned that "there is no guarantee that the Fund will achieve its objective," "and you could lose money on your investment in the Fund."  *Id*. at 1, 12.  Plaintiffs also fail to mention that the Fund generally *did* achieve its objective:  its Lipper rating for capital preservation was 5 out of 5 at the end of 2016.  Ex. EE; *see U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 16-cv-08507 (AJN), 2017 U.S. Dist. LEXIS 127283, at *32 (S.D.N.Y. July 26, 2017) ("financial ratings . . . are the types of documents of which the Court may take judicial notice").  Because Plaintiffs cannot identify any false or misleading statements regarding market correlation, these allegations fail to state a viable claim.

### 3.     <u>Statements Regarding The Fund's Risk Controls</u>.

Plaintiffs next allege that the Fund's statements that it "employs strict risk management procedures" and "places a strong focus on risk management" were misleading.  AC ¶¶ 143-52.

These allegations are also insufficient.  As an initial matter, Plaintiffs fail to allege any facts suggesting that the Fund did not actually employ the "risk management procedures" that it

said it did in the Offering Documents.  The challenged disclosure stated that the Fund utilized "an extensive historical database of stock index price movement," "various technical analyses including studies of price, volume, momentum and sentiment," "evaluat[ions] [of] market volatility and other technical behavior," and "sophisticated options analysis software," among other risk controls.  App. A at 14.  Plaintiffs do not offer any facts at all to support an inference that any of this was untrue or misleading, and that alone is grounds for dismissal.

In effect, Plaintiffs' real allegation is that the Fund's risk controls were inadequate because they failed to protect against losses from "uncovered" call options.  But the Offering Documents never promised that the Fund's risk controls were perfect.  Instead, the Fund merely stated that these risk controls existed, and were "*intended to* provide consistency of returns and to mitigate the extent of losses"—it did not guarantee that these risk controls would always prevent losses.  *Id.* (emphasis added).  Plaintiffs cannot assert a Section 11 or 12 claim simply by pointing to subsequent losses and concluding that such losses necessarily mean that the Fund's "strict risk management procedures" must have been misstated.  Such "fraud by hindsight" claims are routinely dismissed:  "To show misrepresentation, the complaint must offer more than allegations that [the Fund's risk controls] failed to perform as predicted."  *Olkey*, 98 F.3d at 8.

### 4.    Statements Regarding The Fund's Past Performance.

Plaintiffs also allege that the Fund made misstatements about its past performance, by including financial results "that pre-dated its existence as a mutual fund, and covered the period when it existed as a hedge fund" named Harbor Assets, LLC.  AC ¶¶ 153-57.  As early as the November 2014 Prospectus, however, the Fund's past performance data was accompanied by a note that specifically identified the range of results that came from Harbor Assets, and cautioned that Harbor Assets was not subject to the same legal requirements as registered mutual funds:

> The prior performance shown below is for the Fund's predecessor limited company (Harbor Assets, LLC) from December 15, 2005 through August 29, 2013 and Class A shares of the Fund beginning August 30, 2013. . . . From its inception through August 29, 2013, the predecessor limited liability company was not subject to certain investment restrictions, diversification requirements and other restrictions of the 1940 Act . . . which, if they had been applicable, might have adversely affected the Fund's performance.

App. A at 15. Over and over again, the Offering Documents disclosed the portion of its past performance data that related to Harbor Assets, which enabled investors to make an informed assessment of the significance and reliability of the data. *See id.* at 16. As such, Plaintiffs cannot point to a single material fact that was omitted or misleading.

### 5. Statements Regarding Derivatives and Leverage Risk.

Finally, Plaintiffs allege that the Fund "failed to make specific risk disclosures concerning the risks associated with trading derivative securities, including the inherent leverage embedded in such securities." AC ¶ 158. To support this, Plaintiffs cite specific risk disclosures titled "Derivatives Risk" and "Leverage Risk" that the Offering Documents made with respect to other Catalyst Funds, but not this Fund. *Id.* But Plaintiffs are focused on form over substance. Although the "Derivatives Risk" and "Leverage Risk" disclosures were not applicable to this Fund, the substance of those disclosures was indisputably included in other disclosures that did apply to the Fund. *See* App. A at 12-13 ("Futures Risk," which expressly warned of "leverage risk," *i.e.*, "a small percentage of assets invested in futures can have a disproportionately large impact on the Fund" and "could cause the Fund to lose more than the principal amount invested"), 13 ("Options Risk"), 4-5 ("Risks of Options on Stock Indexes"), 5-6 ("Futures Contracts"), 6-7 ("Stock Index Futures"). Moreover, the Fund's Fact Sheets disclosed that "the use of leveraging can magnify the potential for gain or loss and amplify the effects of market volatility on the Fund's share price." Exs. U-DD. Investors were therefore aware of all the relevant risks, and nothing in the Offering Documents was misleading.

In sum, the Offering Documents fully disclosed the Fund's investment strategy and the risks associated with it, and Plaintiffs fail to allege any facts that suggest otherwise.  As a result, Plaintiffs' Section 11 and 12 claims should be dismissed.  *See In re New York Cmty. Bancorp, Inc. Sec. Litig.*, 448 F. Supp. 2d at 482 ("Plaintiffs cannot now claim they were unaware of the 'real' investment plan when that plan was based on disclosed facts").

## III.   PLAINTIFFS' CLAIMS ARE UNTIMELY.

Even if Plaintiffs could allege a material misstatement in the Offering Documents (and they cannot), any such claims would be time-barred.  Under Section 13 of the Securities Act, Plaintiffs were required to assert their claims "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  Here, however, Plaintiffs should have discovered the alleged misstatements years ago, as the Fund's quarterly "Portfolio of Investments" schedules clearly disclosed that the Fund was writing a substantial amount of "uncovered" call options as early as 2014.  *See* App. B.  Similarly, the Fund warned that a rapidly rising market was "the worst scenario for our strategy" by no later than 2015.  App. A at 11.  Thus, because Plaintiffs did not file this action until April 2017—more than one year after they reasonably should have discovered the alleged misstatements—their Securities Act claims are untimely.  *See Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 351-52 (2d Cir. 1993) (dismissing complaint as untimely where offering documents disclosed the alleged omissions more than one year before action filed).

## IV.   PLAINTIFFS FAIL TO ALLEGE THAT THE INDIVIDUAL DEFENDANTS AND CATALYST ADVISORS ARE STATUTORY SELLERS UNDER § 12.

Under Section 12(a)(2) of the Securities Act, a plaintiff may bring suit against "statutory sellers," a term that the Supreme Court has limited to those who have either "(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a

security, motivated at least in part by a desire to serve his own financial interest or those of the securities' owner." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010) (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).  Plaintiffs do not, and cannot, allege that the Individual Defendants or Advisors transferred title of the Fund's shares to investors.

As to the second prong of the *Pinter* analysis, Plaintiffs attempt to impose Section 12 liability on the Trustee Defendants and Defendant Naviloff by alleging merely that "Defendants were sellers and offerors and/or solicitors of purchasers of the shares of the Fund offered pursuant to the Registration Statements, Prospectuses and other Offering Documents and were motivated by a desire to serve their own financial interests or those of the Fund or Catalyst Advisors."  AC ¶ 178.  But mimicking the language of *Pinter* is no substitute for substantive allegations.  And the Amended Complaint simply lumps all of the defendants together and summarily concludes that their "actions of solicitation included participating in the preparation of the false and misleading Prospectuses and participating in marketing the shares of the Fund to investors."  AC ¶ 179.  These vague, conclusory allegations lack any detail and fall short of stating a claim.

As to the Individual Defendants, the only "acts of solicitation" or "participation in marketing" are allegations that the Trustees (Szilagyi, Caldwell, Weisz and Pariser) and Naviloff signed each of the Fund's Registration Statements.  AC ¶¶ 32-36.  However, district courts in the Second Circuit (which has yet to opine on this issue) have dismissed outright Section 12 claims against defendants who merely signed a registration statement, holding that such defendants are *not* statutory sellers.  *See, e.g.*, *Citiline Holdings, Inc. v. iStar Financial Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010).  In *Citiline*, Judge Sullivan noted that "[e]very Court of Appeals to

have considered the issue . . . has held that an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)." *Id*. at 647.  He further explained that:

> [w]hile Section 11 expressly imposes liability upon every signer of the registration statement...Section 12 does not do so.  Plaintiffs' position would render this distinction a nullity and is, in any event, inconsistent with [the Supreme Court's] statement that Congress did not intend to impose liability under Section 12 for mere participation in unlawful sale transactions.

*Id*.  More recently, other courts have adopted Judge Sullivan's sound logic.  *See Xiang v. Inovalon Holdings*, 245 F. Supp. 3d 635, 645 (S.D.N.Y. 2017); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 720 (S.D.N.Y. 2013); *McKenna v. Smart Techs. Inc.*, 11 Civ. 7673 (KBF), 2012 U.S. Dist. LEXIS 47134, at *49-50 (S.D.N.Y. Apr. 3, 2012).

Plaintiffs do not allege that the Individual Defendants or Advisors had any contact whatsoever with any Plaintiffs or investors, much less were directly involved in soliciting sales of the Fund.  And Plaintiffs' conclusory allegations that the Individual Defendants and Advisors "participated" in the preparation of the offering materials and in marketing shares to investors (AC ¶ 179) similarly fail to support Section 12 liability.  In *Pinter*, the Supreme Court held that Congress did not intend to "impose express liability for mere participation in unlawful sales transactions" under Section 12.  486 U.S. at 650; *Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124, 1126-27 (2d Cir. 1989) (applying the § 12(1) analysis in *Pinter* to § 12(a)(2), and holding that collateral participants in a transaction who do not directly participate in the sale are not statutory sellers); *see Mabon, Nugent & Co. v. Borey*, 127 B.R. 727, 734-35 (S.D.N.Y. 1991) ("participation in causing the sale to take place . . . is insufficient" to impose Section 12 liability) (internal citation omitted); *Pahmer v. Greenberg*, 926 F. Supp. 287, 307-08 (E.D.N.Y. 1996) (Section 12 claims dismissed because defendants were not statutory sellers, despite allegations that they assisted in the preparation of offering memoranda and made misrepresentations to induce investments); *Burke v. Dowling*, 944 F. Supp. 1036, 1064

(E.D.N.Y. 1995) (Section 12 claims dismissed against bank, despite allegations that it provided "substantial assistance" in drafting the subject PPMs, which alone did not render it a statutory seller).  These cases demonstrate that general allegations of "participating" in the offering or marketing of shares are insufficient as a matter of law.  Here, the Amended Complaint lacks any specific allegations tying the Individual Defendants or Advisors to the solicitation of sales.

Plaintiffs' allegation that Defendants Advisors and Walczak were responsible for the management of the Fund is also insufficient.  *See* AC ¶¶ 29, 37.  Under Section 12, management of a Fund "do[es] not demonstrate that [defendants] solicited the sale of [its shares]," even if the defendants allegedly misled plaintiffs with respect to the offering.  *See Dorchester Investor v. Peak Intern. Ltd.*, 134 F. Supp. 2d 569, 580 (S.D.N.Y. 2001) (allegations that the CEO/board chair's name appeared frequently in the Prospectus and was "the person upon whom the success of the [Fund] depended" did not establish that defendant was an "offeror, seller or solicitor" and therefore failed to satisfy the pleading requirements of Section 12).

Similarly, acting in an advisory role does not make a party a "statutory seller" under Section 12 either.  Rather, an adviser can be considered a statutory seller only if it *also* has the power and authority to sell the notes at issue, and acts for both its own benefit and the benefit of the issuer.  *See Pollack v. Laidlaw Holdings, Inc.*, 90 Civ. 5788 (DLC), 1995 U.S. Dist. LEXIS 5909, *44-45 (S.D.N.Y. May 3, 1995) (adviser also alleged to have, *inter alia*, the power to sell the subject securities).  Here, Plaintiffs have not, nor could they, plausibly allege that Advisors had the power to sell shares in the Fund.  Advisors was "responsible for formulating the Fund's investment policies, making ongoing investment decisions and engaging in portfolio transactions."  AC ¶ 29.  None of these allegations involve the solicitation of investors, and none supports Section 12 liability.

Plaintiffs Section 12(a)(2) claims against all Defendants are fatally defective, and should

be dismissed as a matter of law.

## V.      PLAINTIFFS FAIL TO ALLEGE LOSS CAUSATION UNDER *STATE STREET*.

Plaintiffs' claims also fail because they cannot show that their losses were "caused" by

purported misrepresentations about the Fund's investment objective, investment strategies or risk

disclosures.  Although Plaintiffs need not allege loss causation under Sections 11 and 12(a)(2),

Sections 11(e) and 12(b) make the *absence* of loss causation an affirmative defense:

> [I]f a defendant proves that any portion or all of such damages represents other than
> the depreciation in value of such security resulting from such part of the registration
> statement, with respect to which liability is asserted, not being true or omitting to
> state a material fact required to be stated therein or necessary to make the statements
> therein not misleading, such portion of or all such damages shall not be recoverable.

15 U.S.C. § 77k(e); *accord id.* § 77*l*(b); *In re State Street Bank and Trust Co. Fixed Income*

*Funds Invs. Litig.,* 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011) (dismissing Section 11 and

12(a)(2) claims because defendants showed that a decline in mutual fund's share price could not

be "caused" by misrepresentations in offering materials).  A complaint should therefore be

dismissed if a defendant can "prove that it is apparent on the face of the complaint that the

alleged loss is not causally connected to the misrepresentations at issue."  *Id.*; *Pani v. Empire*

*Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir. 1998) (absence of loss causation may be raised

by motion to dismiss if the defense appears on the face of the complaint).  That is the case here.

To determine if loss causation exists, courts in this Circuit look at whether the purported

misstatements "concealed something from the market that, when disclosed, negatively affected

the value of the [Fund's share price]."  *State Street*, 774 F. Supp. at 590, quoting *Lentell v.*

*Merrill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir. 2005).  Although *Lentell* addressed the loss

causation standard under Rule 10b-5, courts have held that the standard under Sections 11 and

12(a)(2) is the same "except that the defendants bear the burden of negating causation." *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 360 (S.D.N.Y. 2009). Section 11 damages "are not recoverable to the extent that they represent amounts 'other than the depreciation in *value* of such security *resulting from* such part of the registration statement . . . not being true or omitting to state a material fact.'" *State Street*, 774 F. Supp. at 593 (emphasis in original), citing 15 U.S.C. § 77k(e), § 77*l*(b). The misstatements themselves must cause the plaintiffs' losses, not some other "tangle of factors," including "changed economic circumstances." *Dura Pharms., Inc.* v. *Broudo,* 544 U.S. 336, 343 (2005). In the context of Securities Act damages, "it is crucial that there be a revelation of the concealed risk and that the revelation cause a depreciation in the value of the security." *State Street*, 774 F. Supp. at 593.

Here, Plaintiffs allege—without support—that the Fund's offering materials misleadingly depicted the Fund as a "low-risk" investment, and that its trading practices were "contrary to the stated objective" and the Fund's "investment strategy," which Plaintiffs describe as a "covered call option strategy." AC ¶¶ 3-9. In reality, the Offering Documents never described the Fund as "low-risk," and (as detailed above) the Fund's investment strategy *never* required "covered" call options. Even if it had, however, these alleged misrepresentations did not artificially inflate the value of the Fund's shares, and the Fund's share prices did not drop upon any disclosure of the Fund's "true" trading practices. That is because unlike an ordinary share of stock traded on an open market, the value of a mutual fund share is calculated according to a statutory formula— the fund's net asset value ("NAV")—that is derived solely from the value of the fund's underlying investments:

> [T]he value of a mutual fund share is calculated according to a statutory formula.
> Share price is a function of "Net Asset Value," the pro-rata share of assets under
> management, minus labilities such as fees.

*In re Morgan Stanley and Van Kampen Mut. Fund Sec. Litig.*, 03 Civ. 8208 (RO), 2006 U.S. Dist. LEXIS 20758, at *35-36 (S.D.N.Y. Apr. 18, 2006); *see also In re Salomon Smith Barney*, 441 F. Supp. 2d 579, 590 (S.D.N.Y. 2006) (a mutual fund's share price is a function of NAV). The Fund's NAV is calculated each day by totaling the values of the Fund's assets (principally securities and cash or cash equivalents), then subtracting the Fund's aggregate liabilities (*e.g.*, fees payable to service providers).  The Fund's per-share NAV "is simply the fund's NAV divided by the total number of shares that the fund has outstanding that day."  D. Geffen, "*A Shaky Future for Securities Act Claims Against Mutual Funds*," Vol. 37 Securities Regulation Law Journal 20, at *23-24 (Spring 2009).

Thus, the price of "shares in a mutual fund . . . [is] unaffected by alleged misrepresentations and omissions concerning the fund itself."  *Clark v. Nevis Capital Mgmt., LLC*, 04 Civ. 2702 (RWS), 2005 US Dist. LEXIS 3158, at *56 (S.D.N.Y. Mar. 2, 2005) (citing *Young v. Nationwide Life Ins. Co.,* 183 F.R.D. 502, 510 (S.D. Tex. 1998) (a fund's share price "is not affected by alleged misrepresentations or omissions," but rather "is determined by the value of all the underlying securities it holds at a given time, and the fund price fluctuates with the price of those underlying securities."));  *In re Van Wagoner Funds,* 382 F. Supp. 2d 1173, 1188 (N.D. Cal. 2004) (same).

Here, none of the alleged misstatements regarding the Fund's investment objective or strategy caused the Fund's NAV (and thus its share price) to be artificially inflated.  The NAV accurately reflected the value of the Fund's investments at all times—there are no allegations to the contrary.  Plaintiffs essentially concede this by alleging that the Fund's NAV declined by roughly 15% *before* the alleged misstatements became apparent:  "More than **$600 million** of Fund value evaporated in a matter of days.  The massive *losses in NAV began to reveal* that

contrary to its stated investment objectives and risk disclosures, the Catalyst Futures Fund had taken out massive option contracts that effectively "shorted" the S&P 500. . . ." AC ¶ 14 (emphasis in original). This confirms that Plaintiffs' losses occurred because of a decrease in the value of the Fund's underlying assets, and were not "caused" when the alleged misstatements were revealed. Courts dismiss Securities Act claims for lack of loss causation when a significant portion of the decline in the share price occurred before the alleged corrective disclosure. *See In re Britania Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 418-19 (S.D.N.Y. 2009); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 289 F. Supp. 2d 429, 437 (S.D.N.Y. 2003).

*State Street* is directly on point. There, as here, plaintiffs alleged that a mutual fund's offering documents misrepresented (i) the description and/or objectives of the Fund; (ii) the Fund's exposure to certain risky assets; and (iii) the risks of investing in the Fund. *See* 774 F. Supp. 2d at 585. In moving to dismiss, State Street argued that no possible loss causation existed on the face of the complaint because the price of a mutual fund's shares is not determined by market securities trading, but by a fund's NAV. *Id.* at 590. Because the NAV is a statutorily defined formula and is not artificially inflated by any statements in a registration statement or prospectus, "alleged misrepresentations regarding a fund's investment objective and holdings . . . can have no effect on a fund's share price." *Id.* The plaintiffs disagreed, and argued that the fund's investment objective downplayed the risks of investing in the fund, and when those risks "materialized" it caused a commensurate decline in the fund's NAV. *See id.* at 591.

Although the court noted that "Plaintiff's theory . . . is not without support in the case law," citing certain district court rulings from other Circuits, it nonetheless concluded that dismissal of the claims was proper because of "the plain language of sections 11(e) and 12(a)(2), which requires a connection between the alleged material misstatement and a diminution in the

security's value." *State Street,* 774 F. Supp. 2d at 595.  Relying, in part, on the Second Circuit's decision in *Lentell,* 396 F. 3d at 173, the court held that "where the NAV does not react to any of the misstatements in the Fund's prospectus, no connection between the alleged material misstatement and a diminution in the security's value has been *or could be* alleged. Accordingly, plaintiffs' [Section 11, 12 and 15] claims . . . must be dismissed." *State Street,* 774 F. Supp. 2d at 596 (emphasis added).  For the same reasons, Plaintiffs' Section 11 and 12 claims should be dismissed here.

## VI.     PLAINTIFFS DO NOT ADEQUATELY ALLEGE CONTROL UNDER §15.

Liability under Section 15 requires both "a primary violation of the Securities Act by the controlled person and control of the primary violator." *Youngers v. Virtus Investment Partners Inc.*, 195 F. Supp. 3d 499, 523 (S.D.N.Y. 2016).  Plaintiffs have not sufficiently alleged either.

First, as detailed herein, Plaintiffs have failed to plead a primary securities violation, and for this reason alone their Section 15 claim fails against all Defendants.  Second, Plaintiffs allege in conclusory fashion that "[e]ach of the defendants named herein was each a culpable participant in the violations of §§11 and 12(a)(2)."  AC ¶ 187.  Although it is unclear whether Section 15 requires "culpable participation," *see, e.g.*, *Lehman Bros. Mortg.-Backed Sec. Litig.,* 603 F.3d 167, 186 (2d Cir. 2011), a plaintiff must at a minimum allege "that the defendant had '[a]ctual control over the wrongdoer and the transaction in question.'" *Youngers*, 195 F. Supp. 3d at 524; *In re Global Crossing, Ltd. Sec. Litig.*, 02 Civ. 910 (GEL), 2005 U.S. Dist. LEXIS 16228, at *38 (S.D.N.Y. Aug. 8, 2005) ("To be liable as a control person, the defendant must actually possess, in fact, rather than in theory, the ability to direct the actions of the controlled person.")  In other words, Plaintiffs must show that "the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the

ownership of voting securities, by contract, or otherwise." *Id*. (citing *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996)).  Plaintiffs' conclusory allegations fall far short of these standards.

### A.    Plaintiffs Have Not Alleged Actual Control By Edward Walczak.

The primary violations asserted by Plaintiffs are that the Fund's Offering Materials were misleading.  Thus, to plead control person liability, Plaintiffs must allege that Walczak had actual control over the individuals or entities responsible for the registration statement, prospectuses, or solicitation of investors.  They have not done so.  Instead, Plaintiffs allege only that Walczak is "the portfolio manager of the Fund and responsible for its day-to-day management and the investment of Fund assets" AC ¶ 37, and "was a control person of the Fund by virtue of his position as a director, Trustee and/or senior officer of the Fund, the Trust or Catalyst Advisors [and] had a series of direct and/or indirect business and/or personal relationships with other Trustees, directors and/or officers . . . of the Fund."  AC ¶ 185.

But such conclusory allegations of control fail as a matter of law.  *See In re Deutsche Telekom AG Sec. Litig.,* 00 Civ. 9475 (SHS), 2002 U.S. Dist. LEXIS 2627, at *9 (S.D.N.Y. Feb. 20, 2002).  Without more, "boilerplate allegations that a party controlled another based on officer or director status are insufficient." *Youngers,* 195 F. Supp. 3d at 524.  Moreover, the Fund's registration statement and prospectus are issued by the Trust, and there are no allegations that Walczak was a director or officer of the Trust—because he was not.  *See* Exs. E at 27-30, F at 27-30, G at 26-30, H at 27-31 (listing directors and officers of the Trust).  Nor are there cognizable allegations that Walczak had any control over the statements made in the Fund's Offering Documents.  The vague allegation that Walczak "had a series of direct and/or indirect business and/or personal relationships with other Trustees, directors and/or officers and/or major shareholders of the Fund" says nothing about control, actual or otherwise, over any wrongdoer.

Moreover, "[t]he mere exercise of influence ... is not sufficient to establish control." *Youngers,* 195 F. Supp. 3d at 524.  Lacking any specific allegations to suggest that Walczak controlled any entity responsible for the alleged misstatements, the Section 15 claim against him must be dismissed.

### B.   Plaintiffs Have Not Alleged Actual Control By Catalyst Advisors.

Plaintiffs have likewise failed to plead actual control by Advisors.  Plaintiffs allege that Advisors "is the investment advisor for the Fund" and "is responsible for formulating the Fund's investment policies, making ongoing investment decisions and engaging in portfolio transactions."  AC ¶ 29.  As to "control," Plaintiffs assert that "Catalyst Advisors managed and controlled the business affairs of the Fund and was a control person of the Fund," and offer the same generic, inadequate allegations asserted against Walczak.  *Compare* AC ¶ 186 *with* ¶ 187.

As discussed above, this "formulaic boilerplate is insufficient to support a reasonable inference" that Advisors controlled either the Trust or its public disclosures.  *Youngers*, 195 F. Supp. 3d at 526.  In *Youngers*, the court dismissed control person claims against a fund's advisers and subadvisers because mere influence over the investment *strategy* of a fund does not constitute the type of control required under Section 15.  *Id*. ("Plaintiffs' allegation that [the advisers and subadvisers] caused Virtus Trust to adopt the AlphaSector strategy adds nothing because the 'matter[] at issue' is the misstatements contained in the registration statement and marketing documents, not the adoption of the AlphaSector strategy.").  Without more, including factually sufficient allegations that Advisors "signed, drafted, approved, confirmed or ordered or encouraged [others] to sign a misleading statement," Plaintiffs' Section 15 claim against Advisors is insufficient as a matter of law and must be dismissed.  *See id*. (citing *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 167 (S.D.N.Y. 2012)).

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Amended

Complaint be dismissed with prejudice in its entirety.

Respectfully submitted,

LAZARE POTTER GIACOVAS &
MOYLE LLP

By:     /s/ James F. Moyle
        James F. Moyle
        Jacob A. Englander
        875 Third Avenue, 28th Floor
        New York, NY 10022
        (212) 758-9300
        jmoyle@lpgmlaw.com
        jenglander@lpgmlaw.com

        *Attorneys for Defendants Mutual Fund
        Series Trust, Catalyst Capital Advisors,
        LLC, Jerry Szilagyi, and Erik Naviloff*

BLANK ROME LLP

By:     /s/ Michelle Gitlitz
        Michelle Gitlitz
        405 Lexington Avenue
        New York, NY 10174
        (212) 885-5068
        mgitlitz@blankrome.com

        *Attorneys for Defendants Tobias Caldwell,
        Tiberiu Weisz, and Bert Pariser*

GOODWIN PROCTER LLP

By:     /s/ Brian C. Devine
        Mark Holland
        Brian C. Devine
        620 Eighth Avenue
        New York, NY 10018
        (212) 813-8800
        mholland@goodwinlaw.com
        bdevine@goodwinlaw.com

        *Attorneys for Defendants Northern Lights Distributors, LLC*


ZILIAK LAW, LLC

By:     /s/ Zachary J. Ziliak
        Zachary J. Ziliak
        141 W. Jackson Blvd., Ste 4048
        Chicago, IL 60604
        (312) 462-3350
        zachary@ziliak.com

        *Attorneys for Defendant Edward Walczak*