# EXHIBIT E

**STATEMENT OF ADDITIONAL INFORMATION**
**November 1, 2014**

**MUTUAL FUND SERIES TRUST**

**Catalyst Small-Cap Insider Buying Fund**
Class A: CTVAX  Class C: CTVCX  Class I: CTVIX

**Catalyst Hedged Insider Buying Fund**
*formerly Catalyst Strategic Insider Fund*
Class A: STVAX  Class C: STVCX Class I:STVIX

**Catalyst Insider Buying Fund**
Class A: INSAX  Class C: INSCX Class I: INSIX

**Catalyst Insider Long/Short Fund**
Class A: CIAAX Class C: CIACX Class I:CIAIX

**Catalyst Activist Investor Fund**
Class A: AIXAX Class C: AIXCX Class I: AIXIX

**Catalyst Insider Income Fund**
Class A: IIXAX  Class C: IIXCX  Class I: IIXIX

**Catalyst Absolute Total Return Fund**
Class A: ATRAX  Class C: ATRCX   Class I: ATRFX

**Catalyst Event Arbitrage Fund**
Class A: CEAAX  Class C: CEACX  Class I: CEAIX

**Catalyst Hedged Futures Strategy Fund**
Class A: HFXAX Class C: HFXCX  Class I: HFXIX

**Catalyst/SMH High Income Fund**
Class A: HIIFX  Class C: HIICX Class I: HIIIX

**Catalyst/SMH Total Return Income Fund**
Class A: TRIFX  Class C: TRICX Class I: TRIIX

**Catalyst/Groesbeck Growth of Income Fund**
Class A: CGGAX  Class C: CGGCX  Class I: CGGIX

**Catalyst/Groesbeck Aggressive Growth Fund**
Class A: GROAX   Class C: GROCX  Class I: GROIX

**Catalyst/MAP Global Total Return Income Fund**
Class A: TRXAX  Class C: TRXCX  Class I: TRXIX

**Catalyst/MAP Global Capital Appreciation Fund**
Class A: CAXAX  Class C: CAXCX Class I: CAXIX

**Catalyst/Lyons Hedged Premium Return Fund**
Class A: CLPAX Class C: CLPCX Class I: CLPFX

**Catalyst/Lyons Tactical Allocation Fund**
Class A: CLTAX Class C: CLTCX Class I: CLTIX

**Catalyst Dynamic Alpha Fund**
*formerly Catalyst/CP Core Equity Fund*
Class A: CPEAX Class C: CPECX Class I: CPEIX

**Catalyst/Princeton Floating Rate Income Fund**
Class A: CFRAX Class C: CFRCX Class I: CFRIX

**Catalyst Macro Strategy Fund**
Class A: MCXAX   Class C: MCXCX   Class I: MCXIX

**Catalyst/EquityCompass Buyback Strategy Fund**
Class A: BUYAX  Class C: BUYCX Class I: BUYIX

17605 Wright Street
Omaha, Nebraska 68130

This Statement of Additional Information ("SAI") is not a prospectus. It should be read in conjunction with the Prospectus of the Catalyst Small-Cap Insider Buying Fund (the "Small-Cap Insider Buying Fund"), Catalyst Hedged Insider Buying Fund (the "Hedged Insider Fund"), Catalyst Insider Buying Fund (the "Insider Buying Fund"), Catalyst Insider Long/Short Fund (the "Insider Long/Short Fund"), Catalyst Activist Investor Fund (the "Activist Investor Fund"), Catalyst Insider Income Fund (the "Insider Income Fund"), Catalyst Absolute Total Return Fund (the "Absolute Total Return Fund"), Catalyst Event Arbitrage Fund (the "Event Arbitrage Fund"), Catalyst Hedged Futures Strategy Fund (the "Hedged Futures Strategy Fund"), Catalyst/SMH High Income Fund (the "High Income Fund"), Catalyst/SMH Total Return Income Fund (the "TRI Fund"), Catalyst/Groesbeck Growth of Income Fund (the "GOI Fund"), Catalyst/Groesbeck Aggressive Growth Fund (the "Aggressive Growth Fund"), Catalyst/MAP Global Total Return Income Fund (the "Global TRI Fund"), Catalyst/MAP Global Capital Appreciation Fund (the "Global Appreciation Fund"), Catalyst/Lyons Hedged Premium Return Fund (the "Hedged Premium Return Fund"), Catalyst/Lyons Tactical Allocation Fund (the "Tactical Allocation Fund"), Catalyst Dynamic Alpha Fund (the "Dynamic Alpha Fund"), Catalyst/Princeton Floating Rate Income Fund (the "Floating Rate Income Fund"), Catalyst Macro Strategy Fund (the "Macro Strategy Fund") and the Catalyst/EquityCompass Buyback Strategies Fund (the "Buyback Strategies Fund"), (each, a "Fund" and, collectively, the "Funds") (each, a

"Fund" and collectively, the "Funds") dated November 1, 2014. Each Fund is a separate series of the Mutual Fund Series Trust ("Trust"), an open-end management company organized as an Ohio business trust.  The Small-Cap Insider Buying Fund's, Hedged Insider Buying Fund's, Insider Buying Fund's, Insider Long/Short Fund's, Event Arbitrage Fund's, Hedged Futures Strategy Fund's, High Income Fund's, TRI Fund's, GOI Fund's, Catalyst/MAP Global TRI Fund's, Global Appreciation Fund's, Hedged Premium Return Fund's, Tactical Allocation Fund's, Dynamic Alpha Fund's, Floating Rate Income Fund's, Macro Strategy Fund's and Buyback Strategy Fund's Annual Reports to shareholders for the period ended June 30, 2014 are incorporated herein by reference.  This SAI has been incorporated in its entirety into the Prospectuses. Copies of the Prospectuses, Annual and Semi-Annual Reports may be obtained at no charge from the Trust by writing to the above address or calling 1-866-447-4228.

2

## TABLE OF CONTENTS

| | |
|---|---|
| MUTUAL FUND SERIES TRUST | 4 |
| INVESTMENT RESTRICTIONS | 5 |
| OTHER INVESTMENT POLICIES | 5 |
| ADDITIONAL INFORMATION ABOUT INVESTMENTS AND RISKS | 6 |
| DISCLOSURE OF PORTFOLIO HOLDINGS | 26 |
| TRUSTEES AND OFFICERS | 27 |
| PRINCIPAL SHAREHOLDERS | 33 |
| ADVISOR AND SUB-ADVISORS | 62 |
| CODE OF ETHICS | 76 |
| TRANSFER AGENT, FUND ACCOUNTING AGENT AND ADMINISTRATOR | 76 |
| COMPLIANCE SERVICES | 80 |
| CUSTODIAN | 80 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 81 |
| COUNSEL | 81 |
| DISTRIBUTOR | 81 |
| ADDITIONAL COMPENSATION TO FINANCIAL INTERMEDIARIES | 85 |
| PROXY VOTING POLICY | 86 |
| PORTFOLIO TURNOVER | 87 |
| PORTFOLIO TRANSACTIONS | 88 |
| PURCHASE AND REDEMPTION OF SHARES | 91 |
| REDUCTION OF UP-FRONT SALES CHARGE ON CLASS A SHARES | 91 |
| WAIVERS OF UP-FRONT SALES CHARGE ON CLASS A SHARES | 92 |
| EXCHANGE PRIVILEGE | 93 |
| NET ASSET VALUE | 93 |
| TAX INFORMATION | 94 |
| INVESTMENTS IN FOREIGN SECURITIES | 94 |
| BACKUP WITHHOLDING | 95 |
| FOREIGN SHAREHOLDERS | 95 |
| FINANCIAL STATEMENTS | 96 |
| Appendix A—Description of Commercial Paper and Bond Ratings | 97 |
| Appendix B | 99 |
| Appendix C | 102 |
| Appendix D | 103 |
| Appendix E | 106 |
| Appendix F | 109 |
| Appendix G | 112 |
| Appendix H | 115 |
| Appendix I | 1 |

3

**MUTUAL FUND SERIES TRUST**

The Trust, an Ohio business trust, is registered with the Securities and Exchange Commission ("SEC") as an open-end management investment company (or mutual fund). The Trust was formed by an Agreement and Declaration of Trust on February 27, 2006. The Trust Agreement permits the Trustees to issue an unlimited number of shares of beneficial interest of separate series without par value. The Small-Cap Insider Buying  Fund, Insider Long/Short Fund, Activist Investor Fund ,Insider Income Fund, Absolute Total Return Fund, Event Arbitrage Fund, Hedged Futures Strategy Fund, High Income Fund, TRI Fund, Aggressive Growth Fund, Hedged Premium Return Fund, Tactical Allocation Fund, Dynamic Alpha Fund, Floating Rate Income Fund, Macro Strategy Fund and the Buyback Strategies Fund are each separate non-diversified series of the Trust and the Hedged Insider Fund, Insider Buying Fund, GOI Fund, Global TRI Fund and Global Appreciation Fund are each diversified series of the Trust. There are currently several other series (or funds) and additional series may be created by the Board of Trustees of the Trust ("Board" or "Trustees") from time to time.

Catalyst Capital Advisors LLC acts as advisor to the Funds.

ATR Advisors, LLC serves as the investment sub-advisor to the Absolute Total Return Fund.

SMH Capital Advisors, Inc. serves as the investment sub-advisor to the High Income and TRI Funds.

Groesbeck Investment Management Corp, serves as the investment sub-advisor to the GOI and Aggressive Growth Funds.

Managed Assets Portfolios, LLC serves as the investment sub-advisor to the Global TRI and Capital Appreciation Funds.

Lyons Wealth Management, LLC serves as the investment sub-advisor to the Hedged Premium Return and Tactical Allocation Funds.

Cookson Pierce & Co., Inc. serves as the investment sub-advisor to the Dynamic Alpha Fund.

Princeton Advisory Group, Inc. serves as the investment sub-advisor to the Floating Rate Income Fund.

Castle Financial & Retirement Planning Associates, Inc. serves as the investment sub-advisor to the Macro Strategy Fund.

Choice Financial Partners, Inc., d/b/a EquityCompass Strategies, serves as the portfolio consultant to the Buyback Strategy Fund.

The Trust does not issue share certificates.  All shares are held in non-certificate form registered on the books of the Trust and the Trust's transfer agent for the account of the shareholder.  Each share of a series represents an equal proportionate interest in the assets and liabilities belonging to that series with each other share of that series and is entitled to such dividends and distributions out of income belonging to the series as are declared by the Trustees.  The shares do not have cumulative voting rights or any preemptive or conversion rights, and the Trustees have the authority from time to time to divide or combine the shares of any series into a greater or lesser number of shares of that series so long as the proportionate beneficial interest in the assets belonging to that series and the rights of shares of any other series are in no way affected.  In case of any liquidation of a series, the holders of shares of the series being liquidated will be entitled to receive as a class a distribution out of the assets, net of the liabilities, belonging to that series.  Expenses attributable to any series are borne by that series. There can be no assurance that a series will grow to an economically viable size, in which case the Trustees may determine to liquidate the series at a time that may not be opportune for shareholders. Any general expenses of the Trust not readily identifiable as belonging to a particular series are allocated by or under the direction of the Trustees in such manner as the Trustees determine to be fair and equitable.  No shareholder is liable to further calls or to assessment by the Trust without his or her express consent.

Each Fund offers three classes of shares:  Class A, Class C and Class I Shares.  Each share class represents an interest in the same assets of a Fund, has the same rights and is identical in all material respects except that (i) each class

4

of shares may bear different distribution fees; (ii) each class of shares may be subject to different (or no) sales charges; (iii) certain other class specific expenses will be borne solely by the class to which such expenses are attributable; and (iv) each class has exclusive voting rights with respect to matters relating to its own distribution arrangements.  The Board of Trustees may classify and reclassify the shares of a Fund into additional classes of shares at a future date.

## INVESTMENT RESTRICTIONS

The following investment restrictions are fundamental policies of the Funds and cannot be changed unless the change is approved by the lesser of (a) 67% or more of the shares present at a meeting of shareholders if the holders of more than 50% of the outstanding voting shares of that Fund are present or represented by proxy or (b) more than 50% of the outstanding voting shares of that Fund.

As a matter of fundamental policy, each Fund, except as otherwise noted, may not:

(a)      borrow money, except as permitted under the 1940 Act, and as interpreted or modified by regulatory authority having jurisdiction, from time to time;

(b)      issue senior securities, except as permitted under the 1940 Act, and as interpreted or modified by regulatory authority having jurisdiction, from time to time;

(c)      engage in the business of underwriting securities issued by others, except to the extent that a Fund may be deemed to be an underwriter in connection with the disposition of portfolio securities;

(d)      purchase or sell real estate, which does not include securities of companies which deal in real estate or mortgages or investments secured by real estate or interests therein, except that each Fund reserves freedom of action to hold and to sell real estate acquired as a result of the Fund's ownership of securities;

(e)      purchase or sell physical commodities or forward contracts relating to physical commodities;

(f)      make loans to other persons, except (i) loans of portfolio securities, and (ii) to the extent that entry into repurchase agreements and the purchase of debt instruments or interests in indebtedness in accordance with a Fund's investment objective and policies may be deemed to be loans.

(g)      invest 25% or more of its total assets in a particular industry or group of industries. This limitation is not applicable to investments in obligations issued or guaranteed by the U.S. government, its agencies and instrumentalities or repurchase agreements with respect thereto.

(h)      (*Hedged Insider Fund, Insider Buying Fund, GOI Fund, Global TRI Fund and Global Appreciation Fund Only*) With respect to 75% of the Fund's total assets, purchase the securities of any issuer, except securities issued or guaranteed by the U.S. government or any of its agencies or instrumentalities or securities issued by other investment companies, if, as a result (i) more than 5% of the Fund's total assets would be invested in securities of that issuer, or (ii) the Fund would hold more than 10% of the outstanding voting securities of that issuer.

## OTHER INVESTMENT POLICIES

The following investment policies are not fundamental and may be changed by the Board without the approval of the shareholders of the Funds:

(a)      No Fund will invest more than 15% of its net assets in securities for which there are legal or contractual restrictions on resale and other illiquid securities.  Rule 144A securities with registration rights are not considered to be illiquid;

5

(b)     No Fund will purchase securities or evidences of interest thereon on "margin." This limitation is not applicable to short-term credit obtained by a Fund for the clearance of purchases and sales or redemption of securities, or to arrangements with respect to transactions involving futures contracts, and other permitted investments and techniques;

(c)     No Fund will mortgage, pledge, hypothecate or in any manner transfer, as security for indebtedness, any assets of the Fund except as may be necessary in connection with permitted borrowings. No Fund will mortgage, pledge or hypothecate more than 1/3 of its assets as collateral for such borrowing, and immediately after such borrowing the Fund shall maintain asset coverage of 300% of all borrowing. Margin deposits, security interests, liens and collateral arrangements with respect to transactions involving options, futures contracts, short sales, securities lending and other permitted investments and techniques are not deemed to be a mortgage, pledge or hypothecation of assets for purposes of this limitation;

(d)     No Fund will purchase any security while borrowings (including reverse repurchase transactions) representing more than one third of its total assets are outstanding.

**Temporary Defensive Positions**

From time to time, the Funds may take temporary defensive positions, which are inconsistent with a Fund's principal investment strategies, in attempting to respond to adverse market, economic, political, or other conditions. For example, a Fund may hold all or a portion of its assets in money market instruments, including cash, cash equivalents, U.S. government securities, other investment grade fixed income securities, certificates of deposit, bankers acceptances, commercial paper, money market funds and repurchase agreements. While the Fund is in a defensive position, the opportunity to achieve its investment objective will be limited. If a Fund invests in a money market fund, the shareholders of the Fund generally will be subject to duplicative management fees. Although a Fund would do this only in seeking to avoid losses, the Fund will be unable to pursue its investment objective during that time, and it could reduce the benefit from any upswing in the market.

**ADDITIONAL INFORMATION ABOUT INVESTMENTS AND RISKS**

Unless restricted by the fundamental policies of any Fund, the following policies supplement the investment objective and policies of the Funds as set forth in the Prospectus.

***Common Stocks.*** The Funds may invest in common stocks, which include the common stock of any class or series of domestic or foreign corporations or any similar equity interest, such as a trust or partnership interest. These investments may or may not pay dividends and may or may not carry voting rights. Common stock occupies the most junior position in a company's capital structure. The Funds may also invest in warrants and rights related to common stocks.

***Investments in Small and Unseasoned Companies***. Unseasoned and small companies may have limited or unprofitable operating histories, limited financial resources, and inexperienced management. In addition, they often face competition from larger or more established firms that have greater resources. Securities of small and unseasoned companies are frequently traded in the over-the-counter market or on regional exchanges where low trading volumes may result in erratic or abrupt price movements. To dispose of these securities, a Fund may need to sell them over an extended period or below the original purchase price. Investments by a Fund in these small or unseasoned companies may be regarded as speculative.

***Securities of Other Investment Companies.*** The Funds may invest in securities issued by other investment companies. Each Fund intends to limit its investments in accordance with applicable law or as permitted by an SEC rule or exemptive order. Among other things, such law would limit these investments so that, as determined immediately after a securities purchase is made by a Fund: (a) not more than 5% of the value of its total assets will be invested in the securities of any one investment company (the "5% Limitation"); (b) not more than 10% of the value of its total assets will be invested in the aggregate in securities of investment companies as a group (the "10%

6

Limitation"); (c) not more than 3% of the outstanding voting stock of any one investment company will be owned by the Fund; and (d) not more than 10% of the outstanding voting stock of any one closed-end investment company will be owned by the Fund together with all other investment companies that have the same advisor. Under certain sets of conditions, different sets of restrictions may be applicable. As a shareholder of another investment company, a Fund would bear, along with other shareholders, its pro rata portion of that investment company's expenses, including advisory fees. These expenses would be in addition to the advisory and other expenses that a Fund bears directly in connection with its own operations. Investment companies in which a Fund may invest may also impose a sales or distribution charge in connection with the purchase or redemption of their Shares and other types of commissions or charges. Such charges will be payable by the Fund and, therefore, will be borne directly by Shareholders.

The Funds intend to rely on Rule 12d1-3, which allows unaffiliated mutual funds to exceed the 5% Limitation and the 10% Limitation, provided the aggregate sales loads any investor pays (i.e., the combined distribution expenses of both the acquiring fund and the acquired funds) does not exceed the limits on sales loads established by Financial Industry Regulatory Authority ("FINRA") for funds of funds.

***Exchange Traded Funds.***  Each Fund may invest in a range of exchange-traded funds ("ETFs").  An ETF is an investment company that offers investors a proportionate share in a portfolio of stocks, bonds, commodities, currencies or other securities. Like individual equity securities, ETFs are traded on a stock exchange and can be bought and sold throughout the day.  Traditional ETFs attempt to achieve the same investment return as that of a particular market index, such as the Standard & Poor's 500 Index. To mirror the performance of a market index, an ETF invests either in all of the securities in the index or a representative sample of securities in the index. Some ETFs also invest in futures contracts or other derivative instruments to track their benchmark index. Unlike traditional indexes, which generally weight their holdings based on relative size (market capitalization), enhanced or fundamentally weighted indexes use weighting structures that include other criteria such as earnings, sales, growth, liquidity, book value or dividends. Some ETFs also use active investment strategies instead of tracking broad market indexes. Investments in ETFs are considered to be investment companies, see "Securities of Other Investment Companies" above.

When a Fund invests in ETFs, it is subject to the specific risks of the underlying investment of the ETF. These risks could include those associated with small companies, illiquidity risk, sector risk, foreign and emerging market risk, short selling, leverage as well as risks associated with fixed income securities, real estate investments, and commodities.  ETFs in which the Fund invests will not be able to replicate exactly the performance of the indices or sector they track because the total return generated by the securities will be reduced by transaction costs incurred in adjusting the actual balance of the securities. In addition, the ETFs in which the Fund invests will incur expenses not incurred by their applicable indices. Certain securities comprising the indices tracked by the ETFs may, from time to time, temporarily be unavailable, which may further impede the ETFs' ability to track their applicable indices.

When a Fund invests in sector ETFs, there is a risk that securities within the same group of industries will decline in price due to sector-specific market or economic developments.  If a Fund invests more heavily in a particular sector, the value of its shares may be especially sensitive to factors and economic risks that specifically affect that sector.  As a result, a Fund's share price may fluctuate more widely than the value of shares of a mutual fund that invests in a broader range of industries.  Additionally, some sectors could be subject to greater government regulation than other sectors.  Therefore, changes in regulatory policies for those sectors may have a material effect on the value of securities issued by companies in those sectors.  The sectors in which each Fund may be more heavily invested will vary.

To offset the risk of declining security prices, the Funds may invest in inverse ETFs.  Inverse ETFs are funds designed to rise in price when stock prices are falling.  Inverse ETF index funds seek to provide investment results that will match a certain percentage of the inverse of the performance of a specific benchmark on a daily basis.  For example, if an inverse ETFs current benchmark is the inverse of the Russell 2000 Index and the ETF meets its objective, the value of the ETF will tend to increase on a daily basis when the value of the underlying index decreases (e.g., if the Russell 2000 Index goes down 5% then the inverse ETF's value should go up 5%).  Under the 1940 Act, the Funds may not acquire shares of another investment company (ETFs or other investment companies) if, immediately after such acquisition, the Fund and its affiliated persons would hold more than 3% of

7

the ETF's or investment company's total outstanding stock ("3% Limitation"). Accordingly, the Fund is subject to the 3% Limitation unless: (i) the ETF or the Fund has received an order for exemptive relief from the 3% Limitation from the SEC that is applicable to the Fund; and (ii) the ETF and the Fund take appropriate steps to comply with any conditions in such order. The SEC has issued such an exemptive order to iShares Trust and iShares, Inc. which permits investment companies to invest in the various series of the iShares Trust and iShares, Inc. ("iShares Funds") beyond the 3% Limitation, subject to certain terms and conditions, including that such investment companies enter into an agreement with the iShares Funds. The Funds may seek to qualify to invest in iShares Funds in excess of the 3% Limitation.

To the extent the 3% Limitation applies to certain ETFs, that limitation may prevent the Funds from allocating its investments in the manner that the Fund's advisor, considers optimal, or cause the Fund to select a similar index or sector-based mutual fund or other investment company ("Other Investment Companies"), or a similar basket of stocks (a group of securities related by index or sector that are pre-selected by, and made available through, certain brokers at a discounted brokerage rate) ("Stock Baskets") as an alternative. The Funds may also invest in Other Investment Companies or Stock Baskets when the advisor believes they represent more attractive opportunities than similar ETFs. The Fund's investments in Other Investment Companies will be subject to the same 3% Limitation described above.

ETFs or Inverse ETFs may employ leverage, which magnifies the changes in the underlying stock index upon which they are based.  Any strategy that includes inverse or leveraged securities could cause a Fund to suffer significant losses.

***Closed-End Investment Companies.***  The Funds may invest in "closed-end" investment companies (or "closed-end funds"), subject to the investment restrictions set forth below.  The Funds, together with any company or companies controlled by the Funds, and any other investment companies having a sub-advisor as an investment advisor, may purchase only up to 10% of the total outstanding voting stock of any closed-end fund.  Typically, the common shares of closed-end funds are offered to the public in a one-time initial public offering by a group of underwriters who retain a spread or underwriting commission.  Such securities are then listed for trading on a national securities exchange or in the over-the-counter markets. Because the common shares of closed-end funds cannot be redeemed upon demand to the issuer like the shares of an open-end investment company (such as the Funds), investors seek to buy and sell common shares of closed-end funds in the secondary market.  The common shares of closed-end funds may trade at a price per share which is more or less than the NAV per share, the difference representing the "market premium" and the "market discount" of such common shares, respectively.

There can be no assurance that a market discount on common shares of any closed-end fund will ever decrease.  In fact, it is possible that this market discount may increase and the Funds may suffer realized or unrealized capital losses due to further decline in the market price of the securities of such closed-end funds, thereby adversely affecting the NAV of that fund's shares.  Similarly, there can be no assurance that the common shares of closed-end funds which trade at a premium will continue to trade at a premium or that the premium will not decrease subsequent to a purchase of such shares by the Funds. The Funds may also invest in preferred shares of closed-end funds.

An investor in the Funds should recognize that he may invest directly in closed-end funds and that by investing in closed-end funds indirectly through the Funds he will bear not only his proportionate share of the expenses of the Funds (including operating costs and investment advisory and administrative fees) but also, indirectly, similar fees of the underlying closed-end funds.  An investor may incur increased tax liabilities by investing in the Funds rather than directly in the underlying funds.

***Business Development Companies (BDCs) and Special Purpose Acquisition Companies (SPACs)***. The Funds may invest in BDCs and SPACs.  Federal securities laws impose certain restraints upon the organization and operations of BDCs and SPACs.  For example, BDCs are required to invest at least 70% of their total assets primarily in securities of private companies or in thinly traded U.S. public companies, cash, cash equivalents, U.S. government securities and high quality debt instruments that mature in one year or less.  SPACs typically hold 85% to 100% of the proceeds raised from their IPO in trust to be used at a later date for a merger or acquisition. The SPAC must sign a letter of intent for a merger or acquisition within 18 months of the IPO. Otherwise it will be

8

forced to dissolve and return the assets held in the trust to the public stockholders. However, if a letter of intent is signed within 18 months, the SPAC can close the transaction within 24 months. In addition, the target of the acquisition must have a fair market value that is equal to at least 80% of the SPAC's assets at the time of acquisition and a majority of shareholders voting must approve this combination with no more than 20% of the shareholders voting against the acquisition and requesting their money back. When a deal is proposed, a shareholder can stay with the transaction by voting for it or elect to sell his shares in the SPAC if voting against it. SPACs are more transparent than private equity as they may be subject to certain SEC regulations, including registration statement requirements under the Securities Act of 1933 and 10-K, 10-Q and 8-K financial reporting requirements. Since SPACs are publicly traded, they provide limited liquidity to an investor (i.e. investment comes in the form of common shares and warrants which can be traded). Other than the risks normally associated with IPOs, SPACs' public shareholders' risks include limited liquidity of their securities (as shares are generally thinly traded), loss of 0-15% of their investments (resulting from the SPACs operating costs) if no deals are made and lack of investment diversification as assets are invested in a single company.

**Options on Securities.** Each Fund may purchase put or call options on equity securities (including securities of ETFs). Each Fund may also write call options and put options on stocks only if they are covered, as described below, and such options must remain covered so long as the Fund is obligated as a writer. Option transactions can be executed either on a national exchange or through a private transaction with a broker-dealer (an "over-the-counter" transaction). Each Fund may write (sell) "covered" call options and purchase options in a spread to hedge (cover) written options, and to close out options previously written by it.

A call option gives the holder (buyer) the "right to purchase" a security at a specified price (the exercise price) at any time until a certain date (the expiration date). So long as the obligation of the writer (seller) of a call option continues, the writer may be assigned an exercise notice by the broker-dealer through whom such option was sold, requiring the writer to deliver the underlying security against payment of the exercise price. This obligation terminates upon the expiration of the call option, or such earlier time at which the writer effects a closing purchase transaction by purchasing an option identical to that previously sold. To secure the obligation to deliver the underlying security upon exercise of a call option subject to the Options Clearing Corporation ("OCC"), a writer is required to deposit in escrow the underlying security or other assets in accordance with OCC rules.

The purpose of writing covered call options is to generate additional premium income for a Fund. This premium income will serve to enhance a Fund's total return and will reduce the effect of any price decline of the security involved in the option. Covered call options will generally be written on securities which, in the opinion of the advisor, are not expected to make any major price moves in the near future but which, over the long term, are deemed to be attractive investments for the particular Fund.

A Fund may write only call options that are "covered" or for which the Fund has segregated liquid assets equal to the exercise liability of the option that are adjusted daily to the option's current market value. A call option is "covered" if the Fund either owns the underlying security or has an absolute and immediate right (such as a call with the same or a later expiration date) to acquire that security. In addition, a Fund will not permit the call to become uncovered without segregating liquid assets as described above prior to the expiration of the option or termination through a closing purchase transaction as described below. If a Fund writes a call option, the purchaser of the option has the right to buy (and the Fund has the obligation to sell) the underlying security at the exercise price throughout the term of the option. The initial amount paid to a Fund by the purchaser of the option is the "premium". A Fund's obligation as the writer of a call option to deliver the underlying security against payment of the exercise price will terminate either upon expiration of the option or earlier if the Fund is able to effect a "closing purchase transaction" through the purchase of an equivalent option. There can be no assurance that a closing purchase transaction can be effected at any particular time or at all. A Fund would not be able to effect a closing purchase transaction after it had received notice of exercise. Fund securities on which call options may be written will be purchased solely on the basis of investment considerations consistent with a Fund's investment objective. The writing of covered call options is a conservative investment technique believed to involve relatively little risk (in contrast to the writing of naked or uncovered options, which the Funds will not do unless the Fund arranges to have its Custodian segregate sufficient cash or liquid assets as described above), but capable of enhancing a Fund's total return. When writing a covered call option, a Fund, in return for the premium, gives up the opportunity for profit from a price increase in the underlying security above the exercise price, but retains the risk of loss should the price of the security decline. Unlike one who owns securities not subject to an option, a Fund has no control over

9

when the Fund may be required to sell the underlying securities, since it may be assigned an exercise notice at any time prior to the expiration of its obligation as a writer. If a call option which a Fund has written expires, the Fund will realize a gain in the amount of the premium; however, such gain may be offset by a decline in the market value of the underlying security during the option period. If the call option is exercised, the Fund will realize a gain or loss from the sale of the underlying security. The security, cash or other liquid assets covering the call will be maintained either in a segregated status by the Fund's Custodian or on deposit in escrow in accordance with OCC rules.

The premium received is the market value of an option. The premium a Fund will receive from writing a call option will reflect, among other things, the current market price of the underlying security, the relationship of the exercise price to such market price, the historical price volatility of the underlying security, and the length of the option period. Once the decision to write a call option has been made, the advisor, in determining whether a particular call option should be written on a particular security, will consider the reasonableness of the anticipated premium and the likelihood that a liquid secondary market will exist for such option. The premium received by a Fund for writing covered call options will be recorded as a liability in the Fund's statement of assets and liabilities. This liability will be adjusted daily to the option's current market value which is the mean of the closing bid and asked prices, after closing rotation is completed (*i.e.*, after such closing prices are computed, currently at 4:02 p.m. and 4:15 p.m., depending on the type of contract), the closing prices as of the time at which the net asset value per share of the Fund is computed (the close of the New York Stock Exchange). The liability will be extinguished upon expiration of the option, the purchase of an identical option in a closing transaction, or delivery of the underlying security upon the exercise of the option.

Closing transactions will be effected in order to realize a profit on an outstanding call option, to prevent an underlying security from being called, or to permit the sale of the underlying security. Furthermore, effecting a closing transaction will permit a Fund to write another call option on the underlying security with either a different exercise price or expiration date or both. If a Fund desires to sell a particular security from its portfolio on which it has written a call option, and it does not wish to segregate cash or other liquid assets equal in value to the exercise liability of the option adjusted daily to the option's current market value, the Fund will seek to effect a closing transaction prior to, or concurrently with, the sale of the security. There is, of course, no assurance that a Fund will be able to effect such closing transactions at a favorable price. If a Fund cannot effect such a closing transaction, and it does not wish to segregate cash or other liquid assets equal in value to the exercise liability of the option adjusted daily to the option's current market value, the Fund may be required to hold a security that it might otherwise have sold, in which case it would continue to be at market risk on the security. A Fund will pay transaction costs in connection with the writing of options to close out previously written options. Such transaction costs are normally higher than those applicable to purchases and sales of portfolio securities.

The exercise price of the options may be below, equal to, or above the current market values of the underlying securities at the time the options are written. From time to time, a Fund may purchase an underlying security for delivery in accordance with an exercise notice of a call option assigned to the Fund, rather than delivering such security from its portfolio. In such cases, additional costs will be incurred.

A Fund will realize a profit or loss from a closing purchase transaction if the cost of the transaction is less or more than the premium received from the writing of the option. It is possible that the cost of effecting a closing transaction may be greater than the premium received by a Fund for writing the option. Because increases in the market price of a call option will generally reflect increases in the market price of the underlying security, any loss resulting from the purchase of a call option is likely to be offset in whole or in part by appreciation of the underlying security owned by a Fund.

In order to write a call option, a Fund is required to comply with OCC rules and the rules of the various exchanges with respect to collateral requirements.

A Fund may also purchase put options so long as they are listed on an exchange. If a Fund purchases a put option, it has the option to sell the subject security at a specified price at any time during the term of the option.

Purchasing put options may be used as a portfolio investment strategy when the advisor perceives significant short-term risk but substantial long-term appreciation for the underlying security. The put option acts as an insurance policy, as it protects against significant downward price movement while it allows full participation in

10

---

any upward movement. If a Fund is holding a stock that the advisor feels has strong fundamentals, but for some reason may be weak in the near term, it may purchase a listed put on such security, thereby giving itself the right to sell such security at a certain strike price throughout the term of the option. Consequently, a Fund will exercise the put only if the price of such security falls below the strike price of the put. The difference between the put option's strike price and the market price of the underlying security on the date a Fund exercises the put, less transaction costs, will be the amount by which the Fund will be able to hedge against a decline in the underlying security. If, during the period of the option the market price for the underlying security remains at or above the put option's strike price, the put will expire worthless, representing a loss of the price a Fund paid for the put, plus transaction costs. If the price of the underlying security increases, the profit a Fund realizes on the sale of the security will be reduced by the premium paid for the put option less any amount for which the put may be sold.

A Fund may write put options on a fully covered basis on a stock the Fund intends to purchase or where the Fund arranges with its Custodian to segregate cash or other liquid asset equal in value to the exercise liability of the put option adjusted daily to the option's current market value. If a Fund writes a put option, the purchaser of the option has the right to sell (and the Fund has the obligation to buy) the underlying security at the exercise price throughout the term of the option. The initial amount paid to a Fund by the purchaser of the option is the "premium". A Fund's obligation to purchase the underlying security against payment of the exercise price will terminate either upon expiration of the option or earlier if the Fund is able to effect a "closing purchase transaction" through the purchase of an equivalent option. There can be no assurance that a closing purchase transaction can be effected at any particular time or at all. In all cases where a put option is written, that is not covered by the Fund's having an immediate and absolute right to sell such securities, a Fund will segregate with its Custodian, or pledge to a broker as collateral any combination of "qualified securities" (which consists of cash, U.S. Government securities or other liquid securities) with a market value at the time the option is written of not less than 100% of the exercise price of the put option multiplied by the number of options contracts written times the option multiplier, which will be adjusted daily to the option's current market value.

A Fund may purchase a call option or sell a put option on a stock (including securities of ETFs) it may purchase at some point in the future. The purchase of a call option or sale of a put option is viewed as an alternative to the purchase of the actual stock. The number of option contracts purchased multiplied by the exercise price times the option multiplier will normally not be any greater than the number of shares that would have been purchased had the underlying security been purchased. If a Fund purchases a call option, it has the right but not the obligation to purchase (and the seller has the obligation to sell) the underlying security at the exercise price throughout the term of the option. The initial amount paid by a Fund to the seller of the call option is known as the "premium". If during the period of the option the market price of the underlying security remains at or below the exercise price, a Fund will be able to purchase the security at the lower market price. The profit or loss a Fund may realize on the eventual sale of a security purchased by means of the exercise of a call option will be reduced by the premium paid for the call option.  If, during the period of the call option, the market price for the underlying security is at or below the call option's strike price, the call option will expire worthless, representing a loss of the price a Fund paid for the call option, plus transaction costs.

***Stock Index Options.*** Except as described below, a Fund will write call options on stock indexes only if on such date it holds a portfolio of stocks at least equal to the value of the index times the multiplier times the number of contracts or the Fund arranges with its Custodian to segregate cash or other liquid assets equal in value to the exercise liability of the call option adjusted daily to the option's current market value. When a Fund writes a call option on a broadly-based stock market index, it will segregate with its custodian, and/or segregate to a broker as collateral for the option, any combination of "qualified securities" (which consists of cash, U.S. Government securities or other liquid securities) with a market value at the time the option is written of not less than 100% of the current index value times the multiplier times the number of contracts.

If at the close of business on any business day the market value of such qualified securities so segregated or pledged falls below 100% of the current stock index value times the multiplier times the number of contracts, a Fund will so segregate and/or pledge an amount in cash or other liquid assets or securities equal in value to the difference. However, if a Fund holds a call on the same index as the call written where the exercise price of the call held is equal to or less than the exercise price of the call written or greater than the exercise price of the call written if the difference is maintained in cash, short-term U.S. Government securities, or other liquid securities (including

11

common stocks) in a segregated account with the Custodian, it will not be subject to the requirements described in this section.

***Risks of Transactions in Stock Options.*** Purchase and sales of options involves the risk that there will be no market in which to effect a closing transaction. An option position may be closed out only on an exchange that provides a secondary market for an option of the same series or if the transaction was an over-the-counter transaction, through the original broker-dealer. Although a Fund will generally buy and sell options for which there appears to be an active secondary market, there is no assurance that a liquid secondary market on an exchange will exist for any particular option, or at any particular time, and for some options no secondary market on an exchange may exist. If the Fund, as a covered call or put option writer, is unable to effect an offsetting closing transaction in a secondary market, and does not arrange with its Custodian to segregate cash or other liquid assets equal in value to the Fund's exercise liability of the option adjusted daily to the option's current market value, it will, for a call option it has written, not be able to sell the underlying security until the call option expires and, for a put option it has written, not be able to avoid purchasing the underlying security until the put option expires.

***Risks of Options on Stock Indexes.*** Each Fund's purchase and sale of options on stock indexes will be subject to risks described above under "Risks of Transactions in Stock Options". In addition, the distinctive characteristics of options on stock indexes create certain risks that are not present with stock options.

Since the value of a stock index option depends upon the movements in the level of the stock index, rather than the price of a particular stock, whether a Fund will realize a gain or loss on the purchase or sale of an option on a stock index depends upon movements in the level of stock prices in the stock market generally or in an industry or market segment rather than movements in the price of a particular stock. Accordingly, successful use by a Fund of options on stock indexes is subject to the advisor's ability to correctly predict movements in the direction of the stock market generally or of a particular industry or market segment. This requires skills and techniques different from predicting changes in the price of individual stocks.

Stock index prices may be distorted if trading of certain stocks included in the stock index is interrupted. Trading in the stock index options also may be interrupted in certain circumstances, such as if trading were halted in a substantial number of stocks included in the stock index. If this occurred, a Fund would not be able to close out options that it had purchased or written and, if restrictions on exercise were imposed, might not be able to exercise an option that it was holding, which could result in substantial losses to the Fund. It is the policy of each Fund to purchase or write options only on stock indexes that include a number of stocks sufficient to minimize the likelihood of a trading halt in the stock index, for example, the S&P 100 or S&P 500 index option.

Trading in stock index options commenced in April 1983 with the S&P 100 option (formerly called the CBOE 100). Since that time, a number of additional stock index option contracts have been introduced, including options on industry stock indexes. Although the markets for certain stock index option contracts have developed rapidly, the markets for other stock index options are still relatively illiquid. The ability to establish and close out positions on such options will be subject to the development and maintenance of a liquid secondary market. It is not certain that this market will develop in all stock index option contracts. Fund will not purchase or sell stock index option contracts unless and until, in the advisor's opinion, the market for such options has developed sufficiently that the risk in connection with these transactions is no greater than the risk in connection with options on stock.

***Hedging.*** Hedging is a means of transferring risk that an investor does not wish to assume during an uncertain market environment. The Funds are permitted to enter into these transactions solely: (a) to hedge against changes in the market value of portfolio securities and against changes in the market value of securities intended to be purchased, (b) to close out or offset existing positions, or (c) to manage the duration of a portfolio's fixed income investments.

Hedging activity in a Fund may include buying or selling (writing) put or call options on stocks, shares of exchange traded funds or stock indexes, entering into stock index futures contracts or buying or selling options on stock index futures contracts or financial futures contracts, such as futures contracts on U.S. Treasury securities and interest related indices, and options on financial futures. The Fund will buy or sell options on stock index futures traded on a national exchange or board of trade and options on securities and on stock indexes traded on national securities exchanges or through private transactions directly with a broker-dealer. The Fund may hedge a portion of

12

its portfolio by selling stock index futures contracts or purchasing puts on these contracts to limit exposure to an actual or anticipated market decline. A Fund may hedge against fluctuations in currency exchange rates, in connection with its investments in foreign securities, by purchasing foreign forward currency exchange contracts. All hedging transactions must be appropriate for reduction of risk and they cannot be for speculation.

The Funds may engage in transactions in futures contracts and options on futures contracts.

**Regulation as a Commodity Pool Operator** The Trust, on behalf of each Fund, has filed with the National Futures Association, a notice claiming an exclusion from the definition of the term "commodity pool operator" under the Commodity Exchange Act, as amended ("CEA"), and the rules of the Commodity Futures Trading Commission ("CFTC") promulgated thereunder, with respect to each Fund's operations.  Accordingly, the Funds are not currently subject to registration or regulation as a commodity pool operator.

**Convertible Securities.** The Funds may invest in convertible securities, including debt securities or preferred stock that may be converted into common stock or that carry the right to purchase common stock. Convertible securities entitle the holder to exchange the securities for a specified number of shares of common stock, usually of the same company, at specified prices within a certain period of time. They also entitle the holder to receive interest or dividends until the holder elects to exercise the conversion privilege.

The terms of any convertible security determine its ranking in a company's capital structure. In the case of subordinated convertible debentures, the holder's claims on assets and earnings are generally subordinate to the claims of other creditors, and senior to the claims of preferred and common stockholders. In the case of convertible preferred stock, the holder's claims on assets and earnings are subordinate to the claims of all creditors and are senior to the claims of common stockholders. As a result of their ranking in a company's capitalization, convertible securities that are rated by nationally recognized statistical rating organizations are generally rated below other obligations of the company and many convertible securities are not rated.

**Preferred Stock.** The Funds may invest in preferred stock. Preferred stock, unlike common stock, offers a stated dividend rate payable from the issuer's earnings. Preferred stock dividends may be cumulative or non-cumulative, participating, or auction rate. If interest rates rise, the fixed dividend on preferred stocks may be less attractive, causing the price of the preferred stocks to decline. Preferred stock may have mandatory sinking fund provisions, as well as call/redemption provisions prior to maturity, a negative feature when interest rates decline.

**Warrants.** The Funds may invest in warrants. A Fund may purchase warrants issued by domestic and foreign companies to purchase newly created equity securities consisting of common and preferred stock. Warrants are securities that give the holder the right, but not the obligation to purchase equity issues of the company issuing the warrants, or a related company, at a fixed price either on a date certain or during a set period. The equity security underlying a warrant is authorized at the time the warrant is issued or is issued together with the warrant.

Investing in warrants can provide a greater potential for profit or loss than an equivalent investment in the underlying security, and, thus, can be a speculative investment. At the time of issue, the cost of a warrant is substantially less than the cost of the underlying security itself, and price movements in the underlying security are generally magnified in the price movements of the warrant. This leveraging effect enables the investor to gain exposure to the underlying security with a relatively low capital investment. This leveraging increases an investor's risk, however, in the event of a decline in the value of the underlying security and can result in a complete loss of the amount invested in the warrant. In addition, the price of a warrant tends to be more volatile than, and may not correlate exactly to, the price of the underlying security. If the market price of the underlying security is below the exercise price of the warrant on its expiration date, the warrant will generally expire without value. The value of a warrant may decline because of a decline in the value of the underlying security, the passage of time, changes in interest rates or in the dividend or other policies of the company whose equity underlies the warrant or a change in the perception as to the future price of the underlying security, or any combination thereof. Warrants generally pay no dividends and confer no voting or other rights other than to purchase the underlying security.

**United States Government Obligations.** The Funds may invest in obligations issued or guaranteed by the United States Government, or by its agencies or instrumentalities. Obligations issued or guaranteed by federal agencies or instrumentalities may or may not be backed by the "full faith and credit" of the United States. Securities

13

that are backed by the full faith and credit of the United States include Treasury bills, Treasury notes, Treasury bonds, and obligations of the Government National Mortgage Association, the Farmers Home Administration, and the Export-Import Bank. In the case of securities not backed by the full faith and credit of the United States, the Funds must look principally to the agency issuing or guaranteeing the obligation for ultimate repayment and may not be able to assert a claim against the United States itself in the event the agency or instrumentality does not meet its commitments. Securities that are not backed by the full faith and credit of the United States include, but are not limited to, obligations of the Tennessee Valley Authority, the Federal National Mortgage Association and the United States Postal Service, each of which has the right to borrow from the United States Treasury to meet its obligations, and obligations of the Federal Farm Credit System and the Federal Home Loan Banks, both of whose obligations may be satisfied only by the individual credits of each issuing agency.

**Foreign Government Obligations.** The Funds may invest in short-term obligations of foreign sovereign governments or of their agencies, instrumentalities, authorities or political subdivisions. These securities may be denominated in United States dollars or in another currency. See "Foreign Investment Risk."

**Bank Obligations.** Each Fund may invest in bank obligations such as bankers' acceptances, certificates of deposit, and time deposits.

Bankers' acceptances are negotiable drafts or bills of exchange typically drawn by an importer or exporter to pay for specific merchandise, which are "accepted" by a bank, meaning, in effect, that the bank unconditionally agrees to pay the face value of the instrument on maturity. Investments will be in bankers' acceptances guaranteed by domestic and foreign banks having, at the time of investment, capital, surplus, and undivided profits in excess of $100,000,000 (as of the date of their most recently published financial statements).

Certificates of deposit are negotiable certificates issued against funds deposited in a commercial bank or a savings and loan association for a definite period of time and earning a specified return.

**Commercial Paper.** Commercial paper consists of unsecured promissory notes, including Master Notes, issued by corporations. Issues of commercial paper normally have maturities of less than nine months and fixed rates of return. Master Notes, however, are obligations that provide for a periodic adjustment in the interest rate paid and permit daily changes in the amount borrowed.

Master Notes are governed by agreements between the issuer and the advisor acting as agent, for no additional fee, in its capacity as advisor to a Fund and as fiduciary for other clients for whom it exercises investment discretion. The monies loaned to the borrower come from accounts maintained with or managed by the advisor or its affiliates pursuant to arrangements with such accounts. Interest and principal payments are credited to such accounts. The advisor, acting as a fiduciary on behalf of its clients, has the right to increase or decrease the amount provided to the borrower under an obligation. The borrower has the right to pay without penalty all or any part of the principal amount then outstanding on an obligation together with interest to the date of payment. Since these obligations typically provide that the interest rate is tied to the Treasury bill auction rate, the rate on Master Notes is subject to change. Repayment of Master Notes to participating accounts depends on the ability of the borrower to pay the accrued interest and principal of the obligation on demand which is continuously monitored by the advisor. Master Notes typically are not rated by credit rating agencies.

The Funds may purchase commercial paper consisting of issues rated at the time of purchase within the three highest rating categories by a nationally recognized statistical rating organization (an "NRSRO"). The Funds may also invest in commercial paper that is not rated but is determined by the advisor, under guidelines established by the Trust's Board of Trustees, to be of comparable quality.

**Other Fixed Income Securities.** Other fixed income securities in which the Funds may invest include nonconvertible preferred stocks and nonconvertible corporate debt securities.

The Funds may invest in short-term investments (including repurchase agreements "collateralized fully," as provided in Rule 2a-7 under the 1940 Act; interest-bearing or discounted commercial paper, including dollar denominated commercial paper of foreign issuers; and any other taxable and tax-exempt money market instruments, including variable rate demand notes, that are "Eligible Securities" as defined in Rule 2a-7 under the 1940 Act).

14

*Variable Amount Master Demand Notes.* Variable amount master demand notes are unsecured demand notes that permit the indebtedness thereunder to vary and provide for periodic readjustments in the interest rate according to the terms of the instrument. They are also referred to as variable rate demand notes. Because master demand notes are direct lending arrangements between a Fund and the issuer, they are not normally traded. Although there is no secondary market in the notes, a Fund may demand payment of principal and accrued interest at any time or during specified periods not exceeding one year, depending upon the instrument involved, and may resell the note at any time to a third party. The advisor will consider the earning power, cash flow, and other liquidity ratios of the issuers of such notes and will continuously monitor their financial status and ability to meet payment on demand.

*Variable and Floating Rate Notes.* A variable rate note is one whose terms provide for the readjustment of its interest rate on set dates and which, upon such readjustment, can reasonably be expected to have a market value that approximates its par value. A floating rate note is one whose terms provide for the readjustment of its interest rate whenever a specified interest rate changes and which, at any time, can reasonably be expected to have a market value that approximates its par value. Such notes are frequently not rated by credit rating agencies. These notes must satisfy the same quality standards as commercial paper investments. Unrated variable and floating rate notes purchased by a Fund must be determined by the advisor under guidelines approved by the Trust's Board of Trustees to be of comparable quality at the time of purchase to rated instruments eligible for purchase under the Fund's investment policies. In making such determinations, the advisor will consider the earning power, cash flow and other liquidity ratios of the issuers of such notes (such issuers include financial, merchandising, bank holding and other companies) and will continuously monitor their financial condition. Although there may be no active secondary market with respect to a particular variable or floating rate note purchased by a Fund, a Fund may resell the note at any time to a third party. The absence of an active secondary market, however, could make it difficult for a Fund to dispose of a variable or floating rate note in the event the issuer of the note defaulted on its payment obligations and a Fund could, as a result or for other reasons, suffer a loss to the extent of the default. Variable or floating rate notes may be secured by bank letters of credit.

*Foreign Investments.* The Funds may invest in certain obligations or securities of foreign issuers. Certain of these investments may be in the form of American Depositary Receipts ("ADRs"), European Depositary Receipts ("EDRs"), Global Depositary Receipts ("GDRs"), other similar depositary receipts, and exchange traded funds ("ETFs") or other investment companies that invest in foreign securities, Yankee Obligations, and U.S. dollar-denominated securities issued by foreign branches of U.S. and foreign banks. Foreign investments may subject a Fund to investment risks that differ in some respects from those related to investment in obligations of U.S. domestic issuers. Such risks include future adverse political and economic developments, possible seizure, nationalization, or expropriation of foreign investments, less stringent disclosure requirements, the possible establishment of exchange controls or taxation at the source or other taxes, and the adoption of other foreign governmental restrictions.

Additional risks include less publicly available information, less government supervision and regulation of foreign securities exchanges, brokers and issuers, the risk that companies may not be subject to the accounting, auditing and financial reporting standards and requirements of U.S. companies, the risk that foreign securities markets may have less volume and that therefore many securities traded in these markets may be less liquid and their prices more volatile than U.S. securities, and the risk that custodian and brokerage costs may be higher. Foreign issuers of securities or obligations are often subject to accounting treatment and engage in business practices different from those respecting domestic issuers of similar securities or obligations. Foreign branches of U.S. banks and foreign banks may be subject to less stringent reserve requirements than those applicable to domestic branches of U.S. banks. Certain of these investments may subject the Funds to currency fluctuation risks.

Other investment risks include the possible imposition of foreign withholding taxes on certain amounts of the Fund's income which may reduce the net return on non-U.S. investments as compared to income received from a U.S. issuer, the possible seizure or nationalization of foreign assets and the possible establishment of exchange controls, expropriation, confiscatory taxation, other foreign governmental laws or restrictions which might affect adversely payments due on securities held by the Fund, the lack of extensive operating experience of eligible foreign subcustodians and legal limitations on the ability of the Fund to recover assets held in custody by a foreign subcustodian in the event of the subcustodian's bankruptcy.

15

In addition, there may be less publicly-available information about a non-U.S. issuer than about a U.S. issuer, and non-U.S. issuers may not be subject to the same accounting, auditing and financial record-keeping standards and requirements as U.S. issuers. In particular, the assets and profits appearing on the financial statements of an emerging market country issuer may not reflect its financial position or results of operations in the way they would be reflected had the financial statements been prepared in accordance with U.S. generally accepted accounting principles. In addition, for an issuer that keeps accounting records in local currency, inflation accounting rules may require, for both tax and accounting purposes, that certain assets and liabilities be restated on the issuer's balance sheet in order to express items in terms of currency of constant purchasing power. Inflation accounting may indirectly generate losses or profits. Consequently, financial data may be materially affected by restatements for inflation and may not accurately reflect the real condition of those issuers and securities markets.

Finally, in the event of a default of any such foreign obligations, it may be more difficult for the Fund to obtain or enforce a judgment against the issuers of such obligations. The manner in which foreign investors may invest in companies in certain emerging market countries, as well as limitations on such investments, also may have an adverse impact on the operations of the Fund. For example, the Fund may be required in certain of such countries to invest initially through a local broker or other entity and then have the shares purchased re-registered in the name of the Fund. Re-registration may in some instances not be able to occur on a timely basis, resulting in a delay during which the Fund may be denied certain of its rights as an investor.

**Depositary Receipts.** Each Fund's investments may include securities of foreign issuers in the form of sponsored or unsponsored ADRs, GDRs and EDRs. ADRs are depositary receipts typically issued by a United State bank or trust company which evidence ownership of underlying securities issued by a foreign corporation. EDRs and GDRs are typically issued by foreign banks or trust companies, although they also may be issued by United States banks or trust companies, and evidence ownership of underlying securities issued by either a foreign or a United States corporation. Generally, depositary receipts in registered form are designed for use in the United States securities market and depositary receipts in bearer form are designed for use in securities markets outside the United States Depositary receipts may not necessarily be denominated in the same currency as the underlying securities into which they may be converted. Ownership of unsponsored depositary receipts may not entitle the Fund to financial or other reports from the issuer of the underlying security, to which it would be entitled as the owner of sponsored depositary receipts.

**Emerging Markets.** Each Fund may invest in securities of issuers located in "emerging markets" (lesser developed countries located outside of the U.S.) or ETFs or other investment companies that invest in emerging market securities. Investing in emerging markets involves not only the risks described above with respect to investing in foreign securities, but also other risks, including exposure to economic structures that are generally less diverse and mature than, and to political systems that can be expected to have less stability than, those of developed countries. For example, many investments in emerging markets experienced significant declines in value due to political and currency volatility in emerging markets countries during the latter part of 1997 and the first half of 1998. Other characteristics of emerging markets that may affect investment include certain national policies that may restrict investment by foreigners in issuers or industries deemed sensitive to relevant national interests and the absence of developed structures governing private and foreign investments and private property. The typically small size of the markets of securities of issuers located in emerging markets and the possibility of a low or nonexistent volume of trading in those securities may also result in a lack of liquidity and in price volatility of those securities.

**When-Issued and Delayed Delivery Securities.** The Funds may purchase securities on a when-issued or delayed delivery basis. Delivery of and payment for these securities may take as long as a month or more after the date of the purchase commitment. The value of these securities is subject to market fluctuation during this period and no interest or income accrues to a Fund until settlement. The Funds will maintain with the custodian a separate account with a segregated portfolio of liquid assets consisting of cash, U.S. Government securities or other liquid high-grade debt securities in an amount at least equal to these commitments. When entering into a when-issued or delayed delivery transaction, a Fund will rely on the other party to consummate the transaction; if the other party fails to do so, the Fund may be disadvantaged. It is the current policy of the Funds not to enter into when-issued commitments exceeding in the aggregate 25% of the market value of a Fund's total assets, less liabilities other than the obligations created by these commitments.

16

***Lower Rated or Unrated Securities.*** Securities rated Baa by Moody's or BBB by S&P or lower, or deemed of comparable quality by the advisor, may have speculative characteristics. Securities rated below investment grade, *i.e.*, below Baa or BBB, or deemed of comparable quality by the Advisor, have higher yields but also involve greater risks than higher rated securities. Under guidelines used by rating agencies, securities rated below investment grade, or deemed of comparable quality, have large uncertainties or major risk exposures in the event of adverse conditions, which features outweigh any quality and protective characteristics. Securities with the lowest ratings are considered to have extremely poor prospects of ever attaining any real investment standing, to have a current identifiable vulnerability to default, to be unlikely to have the capacity to pay interest and repay principal when due in the event of adverse business, financial or economic conditions, and/or to be in default or not current in the payment of interest or principal. Such securities are considered speculative with respect to the issuer's capacity to pay interest and repay principal in accordance with the terms of the obligations. Accordingly, it is possible that these types of factors could, in certain instances, reduce the value of such securities held by a Fund with a commensurate effect on the value of its shares.

The secondary market for lower rated securities is not as liquid as that for higher rated securities. This market is concentrated in relatively few market makers and participants in the market are mostly institutional investors, including insurance companies, banks, other financial institutions and investment companies. In addition, the trading market for lower rated securities is generally lower than that for higher-rated securities, and the secondary markets could contract under adverse market or economic conditions independent of any specific adverse changes in the condition of a particular issuer. These factors may have an adverse effect on a Fund's ability to dispose of these securities and may limit its ability to obtain accurate market quotations for purposes of determining the value of its assets. If the Fund is not able to obtain precise or accurate market quotations for a particular security, it will become more difficult to value its portfolio, requiring them to rely more on judgment. Less liquid secondary markets may also affect a Fund's ability to sell securities at their fair value. Each Fund may invest up to 15% of its net assets, measured at the time of investment, in illiquid securities, which may be more difficult to value and to sell at fair value. If the secondary markets for high yield debt securities are affected by adverse economic conditions, the proportion of a Fund's assets invested in illiquid securities may increase.

In the case of corporate debt securities, while the market values of securities rated below investment grade and comparable unrated securities tend to react less to fluctuations in interest rate levels than do those of higher-rated securities, the market values of certain of these securities also tend to be more sensitive to individual corporate developments and changes in economic conditions than higher-rated securities. Price volatility in these securities will be reflected in a Fund's share value. In addition, such securities generally present a higher degree of credit risk. Issuers of these securities often are highly leveraged and may not have more traditional methods of financing available to them, so that their ability to service their debt obligations during an economic downturn or during sustained periods of rising interest rates may be impaired. The risk of loss due to default by such issuers is significantly greater than with investment grade securities because such securities generally are unsecured and frequently are subordinated to the prior payment of senior indebtedness.

A description of the quality ratings of certain NRSROs is contained in Appendix A.

***Zero Coupon Securities.*** The Funds may invest in "zero coupon" U.S. Treasury, foreign government and U.S. and foreign corporate convertible and nonconvertible debt securities, which are bills, notes and bonds that have been stripped of their unmatured interest coupons and custodial receipts or certificates of participation representing interests in such stripped debt obligations and coupons. A zero coupon security pays no interest to its holder prior to maturity. Accordingly, such securities usually trade at a deep discount from their face or par value and will be subject to greater fluctuations of market value in response to changing interest rates than debt obligations of comparable maturities that make current distributions of interest. Each Fund anticipates that it will not normally hold zero coupon securities to maturity. Redemption of shares of the Fund that require it to sell zero coupon securities prior to maturity may result in capital gains or losses that may be substantial. Federal tax law requires that a holder of a zero coupon security accrue a portion of the discount at which the security was purchased as income each year, even though the holder receives no interest payment on the security during the year. Such accrued discount will be includible in determining the amount of dividends the Fund must pay each year and, in order to generate cash necessary to pay such dividends, the Fund may liquidate portfolio securities at a time when it would not otherwise have done so.

17

***Forward Foreign Currency Exchange Contracts.*** A Fund may enter into forward foreign currency exchange contracts in connection with its investments in foreign securities. A forward contract may be used by a Fund only to hedge against possible variations in exchange rates of currencies in countries in which it may invest. A forward foreign currency exchange contract ("forward contract") involves an obligation to purchase or sell a specific currency at a future date, which may be any fixed number of days from the date of the contract agreed upon by the parties, at a price set at the time of the contract. Forward contracts are traded in the interbank market directly between currency traders (usually large commercial banks) and their customers. A forward contract generally has no deposit requirement, and no commissions are charged at any stage for trades.

***Futures Contracts.*** Each Fund may invest in futures contracts and options thereon (stock index futures contracts, interest rate futures contracts or currency futures contracts or options thereon) to hedge or manage risks associated with the Fund's securities investments. When a futures contract is executed, each party deposits with a futures commission merchant ("FCM") or broker ("Custodian"), or in a segregated custodial account, a specified percentage of the contract amount, called the initial margin, and during the term of the contract, the amount of the deposit is adjusted based on the current value of the futures contract by payments of variation margin to or from the FCM or broker or segregated custodial account. In the case of options on futures, the holder of the option pays a premium and receives the right, upon exercise of the option at a specified price during the option period, to assume the option writer's position in the futures contract and related margin account. If the option is exercised on the last trading day, cash in an amount equal to the difference between the option exercise price and the closing level of the relevant index, interest rate or currency price, as applicable, on the expiration date is delivered.

As required by the 1940 Act, a Fund may purchase or sell futures contracts or options thereon only if the Fund's liability for the futures position is "covered" by an offsetting position in a futures contract or option thereon, or by the Fund's segregating liquid assets equal to the Fund's liability on the futures contract or option thereon, which are adjusted daily to equal the current market value of Fund's liability on the futures contract or option thereon. To enter into a futures contract, an amount of cash, U.S. Government securities, or other liquid securities or assets, equal to the market value of the futures contract, is segregated with the Custodian and/or in a margin account with a FCM or broker, and this amount of cash or cash equivalents is adjusted daily to the current market value of the futures contract to collateralize the position and thereby ensure that the use of such futures is unleveraged. Alternatively, a Fund may cover such positions by purchasing offsetting positions, or by using a combination of offsetting positions and cash or other liquid securities or assets.

Positions in futures contracts may be closed out only on an exchange that provides a secondary market for such futures. However, there can be no assurance that a liquid secondary market will exist for any particular futures contract at any specific time. Thus, it may not be possible to close a futures position. In the event of adverse price movements, a Fund would continue to be required to make daily cash payments to maintain its required margin. In such situations, if a Fund had insufficient cash, it might have to sell portfolio securities to meet daily margin requirements at a time when it would be disadvantageous to do so. In addition, a Fund might be required to make delivery of the instruments underlying futures contracts it holds. The inability to close positions in futures or options thereon also could have an adverse impact on a Fund's ability to hedge or manage risks effectively.

Successful use of futures by a Fund is also subject to the advisor's ability to predict movements correctly in the direction of the market. There is typically an imperfect correlation between movements in the price of the future and movements in the price of the securities that are the subject of the hedge. In addition, the price of futures may not correlate perfectly with movement in the cash market due to certain market distortions. Due to the possibility of price distortion in the futures market and because of the imperfect correlation between the movements in the cash market and movements in the price of futures, a correct forecast of general market trends or interest rate movements by the advisor may still not result in a successful hedging transaction over a short time frame.

The trading of futures contracts is also subject to the risk of trading halts, suspension, exchange or clearing house equipment failures, government intervention, insolvency of a commodities or brokerage firm or clearing house or other disruption of normal trading activity, which could at times make it difficult or impossible to liquidate existing positions or to recover excess variation margin payments.

18

The purchase and sale of futures contracts or related options will not be a primary investment technique of the Funds. A Fund will purchase or sell futures contracts (or related options thereon) in accordance with the CFTC regulations described above.

***Interest Rate Futures.*** A Fund may purchase an interest rate futures contract as a hedge against changes in interest rates. An interest rate futures contract provides for the future sale by one party and the purchase by the other party of a certain amount of a specific interest rate sensitive financial instrument (debt security) at a specified price, date, time and place. Generally, if market interest rates increase, the value of outstanding debt securities declines (and vice versa). Thus, if a Fund holds long-term debt obligations and the advisor anticipates a rise in long-term interest rates, the Fund could, instead of selling its debt obligations, enter into an interest rate futures contract for the sale of similar long-term securities. If interest rates rise, the value of the futures contract would also rise, helping to offset the price decline of the obligations held by the Fund. A Fund might also purchase futures contracts as a proxy for underlying securities that it cannot currently buy.

***Stock Index Futures.*** A Fund may purchase and sell stock index futures contracts as a hedge against changes resulting from market conditions in the values of securities that are held in its portfolio or that it intends to purchase or when such purchase or sale is economically appropriate for the reduction of risks inherent in the ongoing management of the Fund. A stock index futures contract is an agreement in which one party agrees to deliver to the other an amount of cash equal to a specific dollar amount times the difference between the value of a specific stock index at the close of the last trading day of the contract and the price at which the agreement is made.

A Fund may hedge a portion of its portfolio by selling stock index futures contracts or purchasing puts on these contracts to limit exposure to an actual or anticipated market decline. This provides an alternative to liquidation of securities positions. Conversely, during a market advance or when the advisor anticipates an advance, a Fund may hedge a portion of its portfolio by purchasing stock index futures, or options on these futures. This affords a hedge against a Fund not participating in a market advance when it is not fully invested and serves as a temporary substitute for the purchase of individual securities, which may later be purchased in a more advantageous manner.

A Fund's successful use of stock index futures contracts depends upon the advisor's ability to predict the direction of the market and is subject to various additional risks. The correlation between movement in the price of the stock index future and the price of the securities being hedged is imperfect and the risk from imperfect correlation increases as the composition of a Fund's portfolio diverges from the composition of the relevant index. In addition, if a Fund purchases futures to hedge against market advances before it can invest in common stock in an advantageous manner and the market declines, there may be a loss on the futures contracts. In addition, the ability of a Fund to close out a futures position or an option on futures depends on a liquid secondary market. There is no assurance that liquid secondary markets will exist for any particular futures contract or option on a futures contract at any particular time. The risk of loss to a Fund is theoretically unlimited when the Fund sells an uncovered futures contract because there is an obligation to make delivery unless the contract is closed out, regardless of fluctuations in the price of the underlying security.

***Foreign Currency Futures Transactions.*** Unlike forward foreign currency exchange contracts, foreign currency futures contracts and options on foreign currency futures contract are standardized as to amount and delivery period and may be traded on boards of trade and commodities exchanges or directly with a dealer which makes a market in such contracts and options. It is anticipated that such contracts may provide greater liquidity and lower cost than forward foreign currency exchange contracts. As part of their financial futures transactions, the Funds may use foreign currency futures contracts and options on such futures contracts. Through the purchase or sale of such contracts, the Funds may be able to achieve many of the same objectives as through investing in forward foreign currency exchange.

***Foreign Currency Options.*** A foreign currency option provides the option buyer with the right to buy or sell a stated amount of foreign currency at the exercise price at a specified date or during the option period. A call option gives its owner the right, but not the obligation, to buy the currency, while a put option gives its owner the right, but not the obligation, to sell the currency. The option seller (writer) is obligated to fulfill the terms of the option sold if it is exercised. However, either seller or buyer may close its position during the option period in the secondary market for such options at any time prior to expiration.

19

A Fund may write only foreign currency options that are "covered" or for which the Fund has segregated liquid assets equal to the exercise liability of the option that are adjusted daily to the option's current market value. A call option is "covered" if the Fund either owns the underlying currency or has an absolute and immediate right (such as a call with the same or a later expiration date) to acquire that currency. A Fund may write put options on a fully covered basis on a currency the Fund intends to purchase or where the Fund arranges with its Custodian to segregate cash or other liquid asset equal in value to the exercise liability of the put option adjusted daily to the option's current market value. In addition, a Fund will not permit the option to become uncovered without segregating liquid assets as described above prior to the expiration of the option or termination through a closing purchase transaction as described in *"Options on Securities"* above.

A foreign currency call option rises in value if the underlying currency appreciates. Conversely, a foreign currency put option rises in value if the underlying currency depreciates. While purchasing a foreign currency option may protect a Fund against an adverse movement in the value of a foreign currency, it would not limit the gain which might result from a favorable movement in the value of the currency. For example, if a Fund were holding securities denominated in an appreciating foreign currency and had purchased a foreign currency put to hedge against a decline in the value of the currency, it would not have to exercise its put. In such an event, however, the amount of the Fund's gain would be offset in part by the premium paid for the option. Similarly, if a Fund entered into a contract to purchase a security denominated in a foreign currency and purchased a foreign currency call to hedge against a rise in the value of the currency between the date of purchase and the settlement date, the Fund would not need to exercise its call if the currency instead depreciated in value. In such a case, the Fund would acquire the amount of foreign currency needed for settlement in the spot market at a lower price than the exercise price of the option.

***REITs.*** The Funds may invest in securities of real estate investment trusts ("REITs"). REITs are publicly traded corporations or trusts that specialize in acquiring, holding and managing residential, commercial or industrial real estate. A REIT is not taxed at the entity level on income distributed to its shareholders or unitholders if it distributes to shareholders or unitholders at least 95% of its taxable income for each taxable year and complies with regulatory requirements relating to its organization, ownership, assets and income.

REITs generally can be classified as "Equity REITs", "Mortgage REITs" and "Hybrid REITs." An Equity REIT invests the majority of its assets directly in real property and derives its income primarily from rents and from capital gains on real estate appreciation which are realized through property sales. A Mortgage REIT invests the majority of its assets in real estate mortgage loans and services its income primarily from interest payments. A Hybrid REIT combines the characteristics of an Equity REIT and a Mortgage REIT. Although the Fund can invest in all three kinds of REITs, its emphasis is expected to be on investments in Equity REITs.

Investments in the real estate industry involve particular risks. The real estate industry has been subject to substantial fluctuations and declines on a local, regional and national basis in the past and may continue to be in the future. Real property values, and income from real property continue to be in the future. Real property values and income from real property may decline due to general and local economic conditions, overbuilding and increased competition, increases in property taxes and operating expenses, changes in zoning laws, casualty or condemnation losses, regulatory limitations on rents, changes in neighborhoods and in demographics, increases in market interest rates, or other factors. Factors such as these may adversely affect companies that own and operate real estate directly, companies that lend to such companies, and companies that service the real estate industry.

Direct investments in REITs also involve risks. Equity REITs will be affected by changes in the values of and income from the properties they own, while Mortgage REITs may be affected by the credit quality of the mortgage loans they hold. In addition, REITs are dependent on specialized management skills and on their ability to generate cash flow for operating purposes and to make distributions to shareholders or unitholders REITs may have limited diversification and are subject to risks associated with obtaining financing for real property, as well as to the risk of self-liquidation. REITs also can be adversely affected by their failure to qualify for tax-free pass-through treatment of their income under the Internal Revenue Code of 1986, as amended, or their failure to maintain an exemption from registration under the 1940 Act. By investing in REITs indirectly through a Fund, a shareholder bears not only a proportionate share of the expenses of the Fund, but also may indirectly bear similar expenses of some of the REITs in which it invests.

20

***Structured Securities.*** The Funds may purchase any type of publicly traded or privately negotiated fixed income security, including mortgage-backed securities; structured notes, bonds or debentures; and assignments of and participations in loans.

***Mortgage-Backed Securities.*** The Funds may invest in mortgage-backed securities, such as those issued by the Government National Mortgage Association ("GNMA"), Federal National Mortgage Association ("FNMA"), Federal Home Loan Mortgage Corporation ("FHLMC") or certain foreign issuers. Mortgage-backed securities represent direct or indirect participations in, or are secured by and payable from, mortgage loans secured by real property. The mortgages backing these securities include, among other mortgage instruments, conventional 30-year fixed-rate mortgages, 15-year fixed-rate mortgages, graduated payment mortgages and adjustable rate mortgages. The government or the issuing agency typically guarantees the payment of interest and principal of these securities. However, the guarantees do not extend to the securities' yield or value, which are likely to vary inversely with fluctuations in interest rates, nor do the guarantees extend to the yield or value of a Fund's shares. These securities generally are "pass-through" instruments, through which the holders receive a share of all interest and principal payments from the mortgages underlying the securities, net of certain fees.

Yields on pass-through securities are typically quoted by investment dealers and vendors based on the maturity of the underlying instruments and the associated average life assumption. The average life of pass-through pools varies with the maturities of the underlying mortgage loans. A pool's term may be shortened by unscheduled or early payments of principal on the underlying mortgages. The occurrence of mortgage prepayments is affected by various factors, including the level of interest rates, general economic conditions, the location, scheduled maturity and age of the mortgage and other social and demographic conditions. Because prepayment rates of individual pools vary widely, it is not possible to predict accurately the average life of a particular pool. For pools of fixed-rate 30-year mortgages in a stable interest rate environment, a common industry practice in the U.S. has been to assume that prepayments will result in a 12-year average life, although it may vary depending on numerous factors. At present, pools, particularly those with loans with other maturities or different characteristics, are priced on an assumption of average life determined for each pool. In periods of falling interest rates, the rate of prepayment tends to increase, thereby shortening the actual average life of a pool of mortgage-related securities. Conversely, in periods of rising rates the rate of prepayment tends to decrease, thereby lengthening the actual average life of the pool. However, these effects may not be present, or may differ in degree, if the mortgage loans in the pools have adjustable interest rates or other special payment terms, such as a prepayment charge. Actual prepayment experience may cause the yield of mortgage-backed securities to differ from the assumed average life yield. Reinvestment of prepayments may occur at higher or lower interest rates than the original investment, thus affecting a Fund's yield.

The rate of interest on mortgage-backed securities is lower than the interest rates paid on the mortgages included in the underlying pool due to the annual fees paid to the servicer of the mortgage pool for passing through monthly payments to certificate holders and to any guarantor, such as GNMA, and due to any yield retained by the issuer. Actual yield to the holder may vary from the coupon rate, even if adjustable, if the mortgage-backed securities are purchased or traded in the secondary market at a premium or discount. In addition, there is normally some delay between the time the issuer receives mortgage payments from the servicer and the time the issuer makes the payments on the mortgage-backed securities, and this delay reduces the effective yield to the holder of such securities.

***Asset-Backed Securities.*** The Funds may invest in asset-backed securities, which represent participations in, or are secured by and payable from, assets such as motor vehicle installment sales, installment loan contracts, leases of various types of real and personal property and receivables from revolving credit (credit card) agreements. Such assets are securitized through the use of trusts and special purpose corporations. Payments or distributions of principal and interest may be guaranteed up to certain amounts and for a certain time period by a letter of credit or a pool insurance policy issued by a financial institution unaffiliated with the trust or corporation.

Asset-backed securities present certain risks that are not presented by other securities in which the Fund may invest. Automobile receivables generally are secured by automobiles. Most issuers of automobile receivables permit the loan servicers to retain possession of the underlying obligations. If the servicer were to sell these obligations to another party, there is a risk that the purchaser would acquire an interest superior to that of the holders of the asset-backed securities. In addition, because of the large number of vehicles involved in a typical issuance and

21

technical requirements under state laws, the trustee for the holders of the automobile receivables may not have a proper security interest in the underlying automobiles. Therefore, there is the possibility that recoveries on repossessed collateral may not, in some cases, be available to support payments on these securities. Credit card receivables are generally unsecured, and the debtors are entitled to the protection of a number of state and federal consumer credit laws, many of which give such debtors the right to set off certain amounts owed on the credit cards, thereby reducing the balance due. In addition, there is no assurance that the security interest in the collateral can be realized.

**Structured Notes, Bonds and Debentures.** The Funds may invest in structured notes, bonds and debentures. Typically, the value of the principal and/or interest on these instruments is determined by reference to changes in the value of specific currencies, interest rates, commodities, indexes or other financial indicators (the "Reference") or the relevant change in two or more References. The interest rate or the principal amount payable upon maturity or redemption may be increased or decreased depending upon changes in the applicable Reference. The terms of the structured securities may provide that in certain circumstances no principal is due at maturity and, therefore, may result in the loss of the Fund's entire investment. The value of structured securities may move in the same or the opposite direction as the value of the Reference, so that appreciation of the Reference may produce an increase or decrease in the interest rate or value of the security at maturity. In addition, the change in interest rate or the value of the security at maturity may be a multiple of the change in the value of the Reference so that the security may be more or less volatile than the Reference, depending on the multiple. Consequently, structured securities may entail a greater degree of market risk and volatility than other types of debt obligations.

**Assignments and Participations.** The Funds may invest in assignments of and participations in loans issued by banks and other financial institutions.

When the Fund purchases assignments from lending financial institutions, the Fund will acquire direct rights against the borrower on the loan. However, since assignments are generally arranged through private negotiations between potential assignees and potential assignors, the rights and obligations acquired by the Fund as the purchaser of an assignment may differ from, and be more limited than, those held by the assigning lender.

Participations in loans will typically result in a Fund having a contractual relationship with the lending financial institution, not the borrower. The Fund would have the right to receive payments of principal, interest and any fees to which it is entitled only from the lender of the payments from the borrower. In connection with purchasing a participation, a Fund generally will have no right to enforce compliance by the borrower with the terms of the loan agreement relating to the loan, nor any rights of set-off against the borrower, and a Fund may not benefit directly from any collateral supporting the loan in which it has purchased a participation. As a result, a Fund purchasing a participation will assume the credit risk of both the borrower and the lender selling the participation. In the event of the insolvency of the lender selling the participation, the Fund may be treated as a general creditor of the lender and may not benefit from any set-off between the lender and the borrower.

A Fund may have difficulty disposing of assignments and participations because there is no liquid market for such securities. The lack of a liquid secondary market will have an adverse impact on the value of such securities and on a Fund's ability to dispose of particular assignments or participations when necessary to meet the Fund's liquidity needs or in response to a specific economic event, such as a deterioration in the creditworthiness of the borrower. The lack of a liquid market for assignments and participations also may make it more difficult for a Fund to assign a value to these securities for purposes of valuing the Fund's portfolio and calculating its net asset value.

A Fund may invest in fixed and floating rate loans ("Loans") arranged through private negotiations between a foreign government (a "Borrower") and one or more financial institutions ("Lenders"). The majority of a Fund's investments in Loans are expected to be in the form of participations in Loans ("Participations") and assignments of portions of Loans from third parties ("Assignments"). Participations typically will result in a Fund having a contractual relationship only with the Lender, not with the Borrower. The Fund will have the right to receive payments of principal, interest and any fees to which it is entitled only from the Lender selling the Participation and only upon receipt by the Lender of the payments from the Borrower. In connection with purchasing Participations, a Fund generally will have no right to enforce compliance by the Borrower with the terms of the loan agreement relating to the Loan, nor any rights of set-off against the Borrower, and the Fund may not directly benefit from any collateral supporting the Loan in which it has purchased the Participation. As a result, a

22

---

Fund will assume the credit risk of both the Borrower and the Lender that is selling the Participation. In the event of the insolvency of the Lender selling a Participation, a Fund may be treated as a general creditor of the Lender and may not benefit from any set-off between the Lender and the Borrower. A Fund will acquire Participations only if the Lender interpositioned between the Fund and the Borrower is determined by the Advisor to be creditworthy.

When a Fund purchases Assignments from Lenders, the Fund will acquire direct rights against the Borrower on the Loan. However, since Assignments are generally arranged through private negotiations between potential assignees and potential assignors, the rights and obligations acquired by the Fund as the purchaser of an Assignment may differ from, and be more limited than, those held by the assigning Lender.

There are risks involved in investing in Participations and Assignments. The Fund may have difficulty disposing of them because there is no liquid market for such securities. The lack of a liquid secondary market will have an adverse impact on the value of such securities and on the Fund's ability to dispose of particular Participations or Assignments when necessary to meet the Fund's liquidity needs or in response to a specific economic event, such as a deterioration in the creditworthiness of the Borrower. The lack of a liquid market for Participations and Assignments also may make it more difficult for the Fund to assign a value to these securities for purposes of valuing the Fund's portfolio and calculating its net asset value.

***Restricted and Illiquid Securities.*** A Fund may acquire, in privately negotiated transactions, securities that cannot be offered for public sale in the United States without first being registered under the Securities Act of 1933 ("Securities Act"). Restricted securities are subject to restrictions on resale under federal securities law. Because of these restrictions, a Fund may not be able to readily resell these securities at a price equal to what it might obtain for similar securities with a more liquid market. A Fund's valuation of these securities will reflect relevant liquidity considerations.  Under criteria established by the Funds' Trustees, certain restricted securities sold pursuant to Rule 144A under the Securities Act may be determined to be liquid. To the extent that restricted securities are not determined to be liquid, each Fund will limit its purchase, together with other illiquid securities including non-negotiable time deposits and repurchase agreements providing for settlement in more than seven days after notice, to no more than 15% of its net assets.

Restricted securities in which a Fund may invest may include commercial paper issued in reliance on the exemption from registration afforded by Section 4(a)(2) of the Securities Act. Section 4(a)(2) commercial paper is restricted as to disposition under federal securities law, and is generally sold to institutional investors, such as the Funds, who agree that they are purchasing the paper for investment purposes and not with a view to public distribution. Any resale by the purchaser must be in an exempt transaction. Section 4(a)(2) commercial paper is normally resold to other institutional investors like the Funds through or with the assistance of the issuer or investment dealers who make a market in Section 4(a)(2) commercial paper, thus providing liquidity. Each advisor believes that Section 4(a)(2) commercial paper and possibly certain other restricted securities which meet the criteria for liquidity established by the Trustees of the Funds are quite liquid. The Funds intend, therefore, to treat the restricted securities which meet the criteria for liquidity established by the Trustees, including Section 4(a)(2) commercial paper, as determined by the advisor, as liquid and not subject to the investment limitations applicable to illiquid securities.

***Repurchase Agreements.*** Securities held by a Fund may be subject to repurchase agreements. These transactions permit a Fund to earn income for periods as short as overnight. The Fund could receive less than the repurchase price on any sale of such securities.  Under the terms of a repurchase agreement, a Fund would acquire securities from member banks of the Federal Deposit Insurance Corporation and registered broker-dealers and other financial institutions that the Advisor deems creditworthy under guidelines approved by the Trust's Board of Trustees, subject to the seller's agreement to repurchase such securities at a mutually agreed-upon date and price. The repurchase price would generally equal the price paid by a Fund plus interest negotiated on the basis of current short-term rates, which may be more or less than the rate on the underlying portfolio securities. The seller under a repurchase agreement will be required to maintain continually the value of collateral held pursuant to the agreement at not less than the repurchase price (including accrued interest). If the seller were to default on its repurchase obligation or become insolvent, the Fund holding such obligation would suffer a loss to the extent that the proceeds from a sale of the underlying portfolio securities were less than the repurchase price under the agreement, or to the extent that the disposition of such securities by the Fund were delayed pending court action. Additionally, there is no controlling legal precedent confirming that a Fund would be entitled, as against a claim by such seller or its receiver

23

or trustee in bankruptcy, to retain the underlying securities, although the Trust believes that, under the regular procedures normally in effect for custody of the Funds' securities subject to repurchase agreements and under federal laws, a court of competent jurisdiction would rule in favor of the Trust if presented with the question. Securities subject to repurchase agreements will be held by the Funds' custodian or another qualified custodian or in the Federal Reserve/Treasury book-entry system. Repurchase agreements are considered to be loans by a Fund under the 1940 Act.

**Reverse Repurchase Agreements.** The Funds may enter into reverse repurchase agreements. In a reverse repurchase agreement, a Fund sells a security and agrees to repurchase it at a mutually agreed upon date and at a price reflecting the interest rate effective for the term of the agreement. This may also be viewed as the borrowing of money by the Fund. The Funds will not invest the proceeds of a reverse repurchase agreement for a period which exceeds the duration of the reverse repurchase agreement. No Fund may enter into reverse repurchase agreements exceeding in the aggregate one-third of the market value of its total assets, less liabilities other than the obligations created by reverse repurchase agreements. Each Fund will segregate assets consisting of cash or liquid securities in an amount at least equal to its repurchase obligations under its reverse repurchase agreements.

Reverse repurchase agreements involve the risk that the market value of the securities retained by a Fund may decline below the price of the securities it has sold but is obligated to repurchase under the agreement. In the event the buyer of securities under a reverse repurchase agreement files for bankruptcy or becomes insolvent, a Fund's use of proceeds from the agreement may be restricted pending a determination by the other party or its trustee or receiver whether to enforce the Fund's obligation to repurchase the securities.

**Loans of Portfolio Securities.** Each Fund may lend securities if such loans are secured continuously by liquid assets consisting of cash, U.S. Government securities or other liquid debt securities or by a letter of credit in favor of the Fund at least equal at all times to 100% of the market value of the securities loaned, plus accrued interest. While such securities are on loan, the borrower will pay the Fund any income accruing thereon. Loans will be subject to termination by the Fund in the normal settlement time, currently three Business Days after notice, or by the borrower on one day's notice (as used herein, "Business Day" shall denote any day on which the New York Stock Exchange and the custodian are both open for business). Any gain or loss in the market price of the borrowed securities that occurs during the term of the loan inures to the lending Fund and its shareholders. The Funds may pay reasonable finders' and custodial fees, including fees to an advisor or its affiliate, in connection with loans. In addition, the Funds will consider all facts and circumstances including the creditworthiness of the borrowing financial institution, and the Funds will not lend their securities to any director, officer, employee, or affiliate of an advisor, the Administrator or Distributor, unless permitted by applicable law. Loans of portfolio securities involve risks, such as delays or an inability to regain the securities or collateral adjustments in the event the borrower defaults or enters into bankruptcy.

**Short Sales Against The Box.** The Funds may engage in short sales against the box. In a short sale, a Fund sells a borrowed security and has a corresponding obligation to the lender to return the identical security. The seller does not immediately deliver the securities sold and is said to have a short position in those securities until delivery occurs. The Funds may engage in a short sale if at the time of the short sale the Fund owns or has the right to obtain without additional cost an equal amount of the security being sold short. This investment technique is known as a short sale "against the box." It may be entered into by the Fund to, for example, lock in a sale price for a security the Fund does not wish to sell immediately. If the Fund engages in a short sale, the collateral for the short position will be segregated in an account with the Fund's custodian or qualified sub-custodian. No more than 10% of the Fund's net assets (taken at current value) may be held as collateral for short sales against the box at any one time.

The Fund may make a short sale as a hedge, when it believes that the price of a security may decline, causing a decline in the value of a security owned by the Fund (or a security convertible or exchangeable for such security). In such case, any future losses in the Fund's long position should be offset by a gain in the short position and, conversely, any gain in the long position should be reduced by a loss in the short position. The extent to which such gains or losses are reduced will depend upon the amount of the security sold short relative to the amount the Fund owns. There will be certain additional transaction costs associated with short sales against the box, but the Fund will endeavor to offset these costs with the income from the investment of the cash proceeds of short sales.

24

If the Fund effects a short sale of securities at a time when it has an unrealized gain on the securities, it may be required to recognize that gain as if it had actually sold the securities (as a "constructive sale") on the date it effects the short sale. However, such constructive sale treatment may not apply if the Fund closes out the short sale with securities other than the appreciated securities held at the time of the short sale and if certain other conditions are satisfied. Uncertainty regarding the tax consequences of effecting short sales may limit the extent to which the Fund may effect short sales.

**Short Sales (excluding Short Sales "Against the Box").** The Funds may sell securities short or purchase ETFs that sell securities short. A short sale is a transaction in which the Fund sells securities it does not own in anticipation of a decline in the market price of the securities.

To deliver the securities to the buyer, the Fund must arrange through a broker to borrow the securities and, in so doing, the Fund becomes obligated to replace the securities borrowed at their market price at the time of replacement, whatever that price may be. The Fund will make a profit or incur a loss as a result of a short sale depending on whether the price of the securities decreases or increases between the date of the short sale and the date on which the Fund purchases the security to replace the borrowed securities that have been sold. The amount of any loss would be increased (and any gain decreased) by any premium or interest the Fund is required to pay in connection with a short sale.

A Fund's obligation to replace the securities borrowed in connection with a short sale will be secured by cash or liquid securities deposited as collateral with the broker. In addition, the Fund will place in a segregated account with its custodian or a qualified sub-custodian an amount of cash or liquid securities equal to the difference, if any, between (i) the market value of the securities sold at the time they were sold short and (ii) any cash or liquid securities deposited as collateral with the broker in connection with the short sale (not including the proceeds of the short sale). Until it replaces the borrowed securities, the Fund will maintain the segregated account daily at a level so that (a) the amount deposited in the account plus the amount deposited with the broker (not including the proceeds from the short sale) will equal the current market value of the securities sold short and (b) the amount deposited in the account plus the amount deposited with the broker (not including the proceeds from the short sale) will not be less than the market value of the securities at the time they were sold short.

**Municipal Securities.** Municipal securities are debt obligations issued to obtain funds for various public purposes, including the construction of a wide range of public facilities such as airports, bridges, highways, housing, hospitals, mass transportation, schools, streets and water and sewer works. Other public purposes for which municipal securities may be issued include refunding of outstanding obligations, obtaining funds for general operating expenses and obtaining funds to loan to other public institutions and facilities. In addition, certain types of industrial development bonds are issued by or on behalf of public authorities to obtain funds to provide privately-operated housing facilities, sports facilities, convention or trade show facilities, airport, mass transit, port or parking facilities, air or water pollution control facilities and certain local facilities for water supply, gas, electricity, or sewage or solid waste disposal. Such obligations, which may include lease arrangements, are included within the term "municipal securities" if the interest paid thereon qualifies as exempt from federal income tax. Other types of industrial development bonds, the proceeds of which are used for the construction, equipment, repair or improvement of privately operated industrial or commercial facilities, may constitute municipal securities, although the current federal tax laws place substantial limitations on the size of such issues.

The two principal classifications of municipal securities are "general obligation" and "revenue" bonds. General obligation bonds are secured by the issuer's pledge of its full faith, credit and taxing power for the payment of principal and interest. Revenue bonds are payable only from the revenues derived from a particular facility or class of facilities or, in some cases, from the proceeds of a special excise or other specific revenue source. Industrial development bonds that are municipal securities are in most cases revenue bonds and do not generally involve the pledge of the credit of the issuer of such bonds. There are, of course, variations in the degree of risk of municipal securities, both within a particular classification and between classifications, depending upon numerous factors.

The yields on municipal securities are dependent upon a variety of factors, including general money market conditions, general conditions of the municipal securities market, size of particular offering, maturity of the obligation and rating of the issue. The ratings of Moody's and S&P represent their opinions as to the quality of the municipal securities which they undertake to rate. It should be emphasized, however, that ratings are general and

25

are not absolute standards of quality.  Consequently, municipal securities with the same maturity, coupon and rating may have different yields, while municipal securities of the same maturity and coupon with different ratings may have the same yield.

Each Fund may invest in "private activity" bonds.  Each Fund may also purchase participation interests in municipal securities (such as industrial development bonds) from financial institutions, including banks, insurance companies and broker-dealers.  A participation interest gives a Fund an undivided interest in the municipal securities in the proportion that the Fund's participation interest bears to the total principal amount of the municipal securities.  These instruments may be variable or fixed rate.

Provisions of the federal bankruptcy statutes relating to the adjustment of debts of political subdivisions and authorities of states of the United States provide that, in certain circumstances, such subdivisions or authorities may be authorized to initiate bankruptcy proceedings without prior notice to or consent of creditors, which proceedings could result in material and adverse modification or alteration of the rights of holders of obligations issued by such subdivisions or authorities.

Litigation challenging the validity under state constitutions of present systems of financing public education has been initiated or adjudicated in a number of states, and legislation has been introduced to effect changes in public school finances in some states.  In other instances there has been litigation challenging the issuance of pollution control revenue bonds or the validity of their issuance under state or federal law which litigation could ultimately affect the validity of those Municipal Securities or the tax-free nature of the interest thereon.

## DISCLOSURE OF PORTFOLIO HOLDINGS

The Funds' Board of Trustees has adopted policies and procedures for the public and nonpublic disclosure of the Funds' portfolio securities.  A complete list of the Funds' portfolio holdings are publicly available on a quarterly basis through filings made with the SEC on Forms N-CSR and N-Q.

As a general matter, no information concerning the portfolio holdings of the Funds may be disclosed to any unaffiliated third party except (1) to service providers that require such information in the course of performing their duties (for example, the Funds' custodian, administrator, investment advisor, sub-investment advisor, independent public accountants, attorneys, officers and trustees) and are subject to a duty of confidentiality,  and (2) pursuant to certain exceptions that serve a legitimate business purpose.  These exceptions may include:  (1) disclosure of portfolio holdings only after such information has been publicly disclosed and (2) to third-party vendors, currently consisting of Morningstar Investment Services and Lipper Analytical Services that (a) agree to not distribute the portfolio holdings or results of the analysis to third parties, other departments or persons who are likely to use the information for purposes of purchasing or selling the Fund before the portfolio holdings or results of the analysis become publicly available; and (b) sign a written confidentiality agreement.  The confidentiality agreement must provide, but is not limited to, that the recipient of the portfolio holdings information agrees to limit access to the portfolio holdings information to its employees who, on a need to know basis are (1) authorized to have access to the portfolio holdings information and (2) subject to confidentiality obligations, including duties not to trade on non-public information, no less restrictive that the confidentiality obligations contained in the confidentiality agreement.

Neither the Funds or the Advisor may enter into any arrangement providing for the disclosure of non-public portfolio holding information for the receipt of compensation or benefit of any kind.  Any exceptions to the policies and procedures may only be made by the consent of the Trust's chief compliance officer upon a determination that such disclosure serves a legitimate business purpose and is in the best interests of the Funds and will be reported to the Board at the Board's next regularly scheduled meeting.

## TRUSTEES AND OFFICERS

The Board of Trustees manages the business and affairs of the Trust and appoints or elects officers responsible for the day-to-day operations of the Trust and the execution of policies established by Board resolution or directive. In the absence of such provisions, the respective officers have the powers and discharge the duties customarily held and performed by like officers of corporations similar in organization and business purposes.

The Trustees who are not "interested persons" (for regulatory purposes) of the Trust or an advisor or the Distributor (the "Independent Trustees") are charged with, among other functions, recommending to the full Board approval of the distribution, transfer agency and accounting services agreements and the investment advisory agreements. When considering approval of the existing advisory agreements, the Independent Trustees evaluate the nature and quality of the services provided by the advisor, the performance of the Funds, the advisor's costs and the profitability of the agreements to the advisor, ancillary benefits to the advisor or their affiliates in connection with its relationship to the Funds and the amount of fees charged in comparison to those of other investment companies.

The Board of Trustees currently has two standing committees: the Audit Committee and the Valuation Committee. Each committee is described below.

The term of office for each Trustee is for the duration of the Trust or until death, removal, resignation or retirement.  The term of office of each officer is until the successor is elected.

Information pertaining to the Trustees and officers of the Trust, including their principal occupations for the last five years, is set forth below.

**Disinterested Trustees**

| Name, Address Year of Birth | Position(s) Held with Registrant | Term and Length Served* | Principal Occupation (s) During Past 5 Years | Number of Portfolios Overseen In The Fund Complex** | Other Directorships Held During Past 5 Years |
|---|---|---|---|---|---|
| Tobias Caldwell c/o Mutual Fund Series Trust 17605 Wright Street, Omaha NE 68130 Year of Birth:  1967 | Trustee | Since 6/2006 | Manager of Genovese Family Enterprises, a real estate firm, since 1999. Managing Member of PTL Real Estate LLC, a real estate/investment firm, since 2000. Managing Member of Bear Property, LLC, a real estate firm, since 2006.  President of Genovese Imports, an importer/ distributor of wine, from 2005 to 2011. | 39 | Variable Insurance Trust since 2010 |

27

| Tiberiu Weisz c/o Mutual Fund Series Trust 17605 Wright Street, Omaha NE 68130 Year of Birth: 1949 | Trustee | Since 6/2006 | Attorney with and shareholder of Gottlieb, Rackman & Reisman, P.C., since 1994. | 39 | Variable Insurance Trust since 2010 |
| Dr. Bert Pariser c/o The MITCU Corporation 860 East Broadway, Suite 2D, Long Beach, NY 11561 Year of Birth: 1940 | Trustee | Since 5/2007 | Managing Partner of The MITCU Corporation, a technology consulting firm since 2004. Faculty Member Technical Career Institutes, since 1991. | 39 | Variable Insurance Trust since 2010 |

**Interested Trustee*** and Officers**

| Name, Address, Year of Birth | Position(s) Held with Registrant | Term and Length Served* | Principal Occupation(s) During Past 5 Years | Number of Portfolios Overseen In The Fund Complex** | Other Directorships Held During Past 5 Years |
|---|---|---|---|---|---|
| Jerry Szilagyi 22 High Street Huntington, NY 11743 Year of Birth: 1962 | Trustee, President | Trustee since 7/2006; President since 2/2012 | Managing Member and Chief Compliance Officer, Catalyst Capital Advisors LLC, 1/2006-present; Member and Chief Compliance Officer, AlphaCentric Advisors LLC, 2/2014 to Present; President, MFund Distributors LLC, 10/2012-present; President, MFund Services LLC, 1/2012 - Present; President, Abbington Capital Group LLC, 1998-present; President, Cross Sound Capital LLC, 6/2011 to 10/2013; President, USA Mutuals, Inc., 3/2011 to present; CEO, ThomasLloyd Global Asset Management (*Americas*) LLC, 9/2006 to 2010. | 39 | Variable Insurance Trust since 2010 |

28

| | | | | | |
|---|---|---|---|---|---|
| Erik Naviloff<br>80 Arkay Drive<br>Hauppauge, New York 11788<br>Year of Birth: 1968 | Treasurer | Since 4/2012 | Vice President – Fund Administration, Gemini Fund Services, LLC, since 2011; Assistant Vice President, Gemini Fund Services, 2007 - 2012. | N/A | N/A |
| Aaron Smith<br>80 Arkay Drive.<br>Hauppauge, New York 11788<br>Year of Birth: 1974 | Assistant Treasurer | Since 11/2013 | Manager - Fund Administration, Gemini Fund Services, LLC, since 2012; Authorized Officer, UBS Global Asset Management, a business division of UBS AG, 2010-2012. | N/A | N/A |
| Brian Curley<br>80 Arkay Drive.<br>Hauppauge, New York 11788<br>Year of Birth: 1970 | Assistant Treasurer | Since 11/2013 | Assistant Vice President, Gemini Fund Services, LLC, since 2012; Senior Controller of Fund Treasury, The Goldman Sachs Group, Inc., 2008 – 2012. | N/A | N/A |
| Carol Spawn Desmond<br>CCO Compliance Services, LLC<br>1140 Avenue of the Americas, 9th Floor<br>New York, NY 10036<br>Year of Birth: 1957 | Chief Compliance Officer | Since 9/2014 | Managing Director, CCO Compliance Services, LLC, since 7/2014; Managing Director, SEC Compliance Consultants, Inc.,  since 7/2014 ; Counsel, Satterlee, Stephens, Burke & Burke LLP, 2006 -7/2014 | N/A | N/A |
| Jennifer A. Bailey<br>22 High Street<br>Huntington, NY 11743<br>Year of Birth: 1968 | Secretary | Since 4/2014 | Director of Legal Services, MFund Services LLC, 2/2012 to present; Attorney, Weiss & Associates, 12/2008 to 6/2010. | N/A | N/A |
| Steve Troche<br>80 Arkay Drive.<br>Hauppauge, New York 11788<br>Year of Birth: 1984 | Assistant Secretary | Since 2/2013 | Junior Paralegal, Gemini Fund Services, LLC, since 2012; Legal Assistant, Gemini Fund Services, LLC, 2011 to 2012; MetLife, Financial Services Representative, 2008 to 2010. | N/A | N/A |

\* The term of office of each Trustee is indefinite.
\*\* The 'Fund Complex' includes the Trust and Variable Insurance Trust, a registered open-end investment company.

29

***The Trustee who is an "interested persons" of the Trust as defined in the 1940 Act is an interested person by virtue of being an officer of the Fund advisor.

*Leadership Structure.*  The Trust is led by Mr. Jerry Szilagyi, who has served as the Chairman of the Board since 2010.  Mr. Szilagyi is an interested person by virtue of his controlling interest in the Advisor, which also serves as investment advisor to other certain series of the Trust.  The Board of Trustees is comprised of Mr. Szilagyi, an Interested Trustee, and Mr. Tobias Caldwell, Mr. Tiberiu Weisz and Dr. Bert Pariser, each an Independent Trustee.  The Trust does not have a Lead Independent Trustee, but governance guidelines provide that Independent Trustees will meet in executive session at each Board meeting.  Under the Trust's bylaws and governance guidelines, the Chairman of the Board is responsible for (a) chairing Board meetings, (b) setting the agendas for these meetings and (c) providing information to Board members in advance of each Board meeting and between Board meetings.  The Trustees believe this is the most appropriate leadership structure for the Trust given Mr. Szilagyi's background in the investment management industry and his experience in providing both advisory and administrative services to other mutual funds.  Additionally, as the President of MFund Services LLC, which provides management and administrative services to the Fund, Mr. Szilagyi is well positioned and informed regarding issues requiring the attention of the Board, and as the leader of the Board, can ensure such issues are included in the Board's agenda for meetings and that appropriate time is allocated to discuss such issues and take any necessary actions.

*Risk Oversight*.  In its risk oversight role, the Board oversees risk management, and the full Board engages in discussions of risk management and receives reports on investment and compliance risk  at quarterly meetings and on an ad hoc basis, when and if necessary. The Board, directly or through its Audit Committee, reviews reports from among others, the advisors, sub-advisors, the Trust's Chief Compliance Officer, the Trust's independent registered public accounting firm, and the Independent Trustees' counsel, as appropriate, regarding risks faced by the Trust and the Fund and the risk management programs of the Trust, the advisors and certain service providers. The full Board regularly engages in discussions of risk management and receives compliance reports that inform its oversight of risk management from the Trust's Chief Compliance Officer at quarterly meetings and on an ad hoc basis, when and if necessary. The Trust's Chief Compliance Officer also meets at least quarterly in executive session with the Independent Trustees. The actual day-to-day risk management with respect to the Fund resides with the Fund's advisor and other service providers to the Fund. Although the risk management policies of the advisor and the service providers are designed to be effective, those policies and their implementation vary among service providers and over time, and there is no guarantee that they will be effective. Generally, the Board believes that its oversight of material risks is adequately maintained through the risk-reporting chain where the Chief Compliance Officer is the primary recipient and communicator of such risk-related information.

*Audit Committee*.  Mr. Caldwell, Mr. Weisz and Dr. Pariser serve on the Board's Audit Committee.  The Board's Audit Committee is a standing independent committee with a separate chair.  The primary function of the Audit Committee is to assist the full Board in fulfilling its oversight responsibilities to the shareholders and the investment community relating to fund accounting, reporting practices and the quality and integrity of the financial reports. To satisfy these responsibilities, the Audit Committee reviews with the independent auditors, the audit plan and results and recommendations following independent audits, reviews the performance of the independent auditors and recommends engagement or discharge of the auditors to the full Board, reviews the independence of the independent auditors, reviews the adequacy of the Funds' internal controls and prepares and submits Committee meeting minutes and supporting documentation to the full Board. During the fiscal year ended June 30, 2014, the Audit Committee met four times.

 *Valuation Committee*.  The Valuation Committee is composed of (1) either the Trust's Treasurer or Assistant Treasurer and (2) either the Trust's Chief Compliance Officer or a Trustee that is independent of the adviser/sub-adviser and the fund involved in the subject valuation.  Prior to November 26, 2013, the Valuation Committee is composed of at least one Independent Trustee and one individual from the Fund's administrator. The Pricing Committee is responsible for the valuation and revaluation of any portfolio investment for which market quotations or sale prices are not readily available. The Valuation Committee meets as is required. During the fiscal year ended June 30, 2014, the Valuation Committee held four meetings.

30

*Background and Qualifications of the Trustees.*  Mr. Szilagyi is the managing member of the Advisor, an original sponsor of the Trust.  He is also President of MFund Services LLC which provides management and administrative services to the Trust. Mr. Szilagyi has many years of experience managing mutual funds and providing administrative services to other mutual funds.  His experience in the investment management industry makes him uniquely qualified to serve as the Trust's Chairman.

Mr. Caldwell is the manager of a real estate investment firm.  Mr. Caldwell's experience in the real estate and investment industries provides the Board with an additional perspective and understanding of investment strategies used by advisors to the funds.

Mr. Weisz is an attorney and provides the Board with insight and experience regarding their duties and standards of care as well as legal procedures related to the Board's responsibilities.

Dr. Pariser is the managing partner of a technology consulting firm and has served on the Boards of many other companies.  His experience with other Boards provides the Trustees with insight as to the manner in which matters are handled in other corporate settings, including the hiring and use of professionals such as counsel and audit firms.

**Share Ownership in the Funds**
**Fund Shares Owned by Trustees as of December 31, 2013**

| Name of Trustee | Mr. Caldwell | Mr. Weisz | Dr. Pariser | Mr. Szilagyi |
|---|---|---|---|---|
| Dollar Range of Equity Securities in Small-Cap Insider Buying Fund | None | Over $100,000 | Over $100,000 | Over $100,000 |
| Dollar Range of Equity Securities in Hedged Insider Buying Fund | $10,001-$50,000 | $10,001-$50,000 | $10,001-$50,000 | Over $100,000 |
| Dollar Range of Equity Securities in Insider Buying Fund | $1-$10,000 | None | $1-$10,000 | Over $100,000 |
| Dollar Range of Equity Securities in Insider Long/Short Fund | $10,001-$50,000 | $1-$10,000 | $1-$10,000 | Over $100,000 |
| Dollar Range of Equity Securities in Activist Investor Fund | N/A | N/A | N/A | N/A |
| Dollar Range of Equity Securities in Insider Income Fund | N/A | N/A | N/A | N/A |
| Dollar Range of Equity Securities in Absolute Total Return Fund | N/A | N/A | N/A | N/A |
| Dollar Range of Equity Securities in Event Arbitrage Fund | None | None | None | Over $100,000 |
| Dollar Range of Equity Securities in Hedged Futures Strategy Fund | None | None | None | Over $100,000 |
| Dollar Range of Equity Securities in the High Income Fund | None | $10,001-$50,000 | $50,001-$100,000 | Over $100,000 |
| Dollar Range of Equity Securities in the TRI Fund | None | $1-$10,000 | $10,001-$50,000 | Over $100,000 |
| Dollar Range of Equity Securities in GOI Fund | $1-$10,000 | $10,001-$50,000 | $10,001-$50,000 | Over $100,000 |
| Dollar Range of Equity Securities in GAG Fund | N/A | N/A | N/A | N/A |
| Dollar Range of Equity Securities in Global TRI Fund | None | None | None | Over $100,000 |
| Dollar Range of Equity Securities in Global Capital Appreciation Fund | None | None | None | Over $100,000 |

31

| | | | |
|---|---|---|---|
| Dollar Range of Equity Securities in Hedged Premium Return Fund | N/A | N/A | N/A | $50,001-$100,000 |
| Dollar Range of Equity Securities in Tactical Allocation Fund | $1-$10,000 | None | None | Over $100,000 |
| Dollar Range of Equity Securities in Dynamic Alpha Fund | None | None | None | Over $100,000 |
| Dollar Range of Equity Securities in Floating Rate Income Fund | None | None | None | Over $100,000 |
| Dollar Range of Equity Securities in Macro Strategy Fund | N/A | N/A | N/A | N/A |
| Dollar Range of Equity Securities in EquityCompass Buyback Strategy Fund | None | None | None | Over $100,000 |
| Aggregated Dollar Range of Equity Securities in all Registered Investment Companies overseen by Trustee in the Trust | $50,001-$100,000 | Over $100,000 | Over $100,000 | Over $100,000 |

*The Activist Insider, Insider Income, Absolute Total Return, Aggressive Growth, Hedged Premium Return Fund and Macro Strategy Fund were not in operation as of December 31, 2013.

**Compensation of the Board of Trustees**

As of April 1, 2014, the Trustees who are not "interested persons" as that term is defined in the 1940 Act of the Funds, are paid a quarterly retainer of $350 per fund of the Trust and receive, at the discretion of the Chairman, $500 per Valuation Committee meeting attended, $500 per special telephonic board meeting attended and $2,000 per special in-person meeting attended.  The fees paid to the Independent Trustees for their attendance at a meeting are shared equally by the Funds of the Trust and Variable Insurance Trust to which the meeting relates. The Chairman of the Trust's Audit Committee receives an additional fee of $400 per Fund in the Trust per year. The fees paid to the Trustees are paid in Fund shares. Prior to April 1, 2014, the Trustees who are not "interested persons" were paid a quarterly retainer of $250, $500 per Valuation Committee meeting and per special board meeting attended at the discretion of the Chairman, and the Chairman of the Trust's Audit Committee received an additional fee of $400 per Fund in the Trust per year.

The following table describes the compensation paid to the Trustees of the Trust during the most recent fiscal year ended June 30, 2014.  The Trust has no retirement or pension plans.

32

| Compensation Table | | | | |
|---|---|---|---|---|
| Name of Person, Position(s) | Mr. Caldwell | Mr. Weisz | Dr. Pariser | Mr. Szilagyi** |
| Aggregate Compensation from the Small-Cap Insider Buying Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Hedged Insider Buying Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Insider Buying Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Insider Long/Short Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Event Arbitrage Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Hedged Futures Strategy Fund | $1,240 | $940 | $940 | $0 |
| Aggregate Compensation from the High Income Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the TRI Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the GOI Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Global TRI Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Global Capital Appreciation Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Hedged Premium Return Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Tactical Allocation Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Dynamic Alpha Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Floating Rate Income Fund | $1,590 | $1,190 | $1,190 | $0 |
| Aggregate Compensation from the Macro Strategy Fund | $521 | $421 | $421 | $0 |
| Aggregate Compensation from the EquityCompass Buyback Strategy Fund | $890 | $690 | $690 | $0 |
| Total Compensation from Fund Complex* | $45,650 | $32,650 | $32,650 | $0 |

* The 'Fund Complex' includes the Trust and Variable Insurance Trust, a registered open-end investment company.
** Mr. Szilagyi is compensated by MFund Services LLC for administrative support services to the Trust.  Please see the "Transfer Agent, Fund Accounting and Administrator" section for more details.

## PRINCIPAL SHAREHOLDERS

Persons controlling a Fund can determine the outcome of any proposal submitted to the shareholders for approval, including changes to a Fund's fundamental policies or the terms of the advisory agreement with the advisor.  Persons owning 25% or more of the outstanding shares of a Fund (or a class of shares of a Fund) may be

deemed to control the Fund (or class of the Fund). Below are the beneficial and/or record holders of 5% or more of each fund.

**Catalyst Small-Cap Insider Buying Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Small-Cap Insider Buying Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial Attn: Mutual Fund Ops P.O. Box 509046 San Diego, CA 92150 | 320,667.6510 | 6.75% |

As of October 1, 2014, securities of the Catalyst Small-Cap Insider Buying Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst Small-Cap Insider Buying Fund Class C Shares**

No Shareholder is known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Small-Cap Insider Buying Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the Catalyst Small-Cap Insider Buying Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**Catalyst Small-Cap Insider Buying Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Small-Cap Insider Buying Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Oppenheimer & Co. Inc. FBO Quinton PAS Managed Account 1003 221st Ave Sammamish, WA 98075 | 34,282.8060 | 5.32% |
| LPL Financial Attn: Mutual Fund Ops P.O. Box 509046 San Diego, CA 92150-9046 | 289,158.3170 | 44.90%* |

34

Charles Schwab & Co
101 Montgomery St.
Attn Mutual Funds
San Francisco, CA 94104                          68,006.7150                          10.56%

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst Small-Cap Insider Buying Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class I shares of the Fund.

## Catalyst Hedged Insider Buying Fund Class A Shares

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Strategic Insider Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial Attn: Mutual Fund Ops P.O. Box 509046 San Diego, CA 92150 | 554,045.7820 | 29.90%* |

*May be deemed to control Class A shares of the Fund because holds more than 25% of the outstanding Class A shares.
As of October 1, 2014, securities of the Catalyst Hedged Insider Buying Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

## Catalyst Hedged Insider Buying Fund Class C Shares

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Hedged Insider Buying Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| John C Fiddes 28110 Story Hill Lane Los Altos Hills CA 94022 | 19,936.2040 | 5.23% |

As of October 1, 2014, securities of the Catalyst Hedged Insider Buying Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

35

**Catalyst Hedged Insider Buying Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Hedged Insider Buying Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Fund Ops<br>P.O. Box 509046<br>San Diego, CA 92150 | 4,293.1150 | 15.12% |
| Paul R Tobin IRR TR<br>PB box 2052<br>Jersey City, NJ 07303 | 2,192.9820 | 7.72% |
| IRA FBO Gary Paris<br>PO Box 2052<br>Jersey City, NJ 07303 | 1,675.1640 | 5.90% |
| 866 SEI JDR IP<br>One Freedom Valley Drive<br>Oaks, PA 19456 | 2,465.4590 | 8.68% |
| Scott Pease<br>5057 Topeka Drive<br>Tarzana CA 91356 | 3,681.8850 | 12.96% |
| Szilagyi, Jerry J<br>5 Abbington Drive<br>Lloyd Harbor, NY 11743 | 10,595.0710 | 37.31%* |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst Hedged Insider Buying Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 37.31% of the outstanding Class I shares of the Fund.

**Catalyst Insider Buying Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Insider Buying Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Fund Ops<br>P.O. Box 509046<br>San Diego, CA 92150 | 3,046,758.7060 | 14.84% |

36

As of October 1, 2014, securities of the Catalyst Insider Buying Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst Insider Buying Class C Shares**

No Shareholders are known by the Trust to own of record more than 5% of the outstanding shares of the Insider Buying Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the Catalyst Insider Buying Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**Catalyst Insider Buying Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Insider Buying Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial Attn: Mutual Fund Ops P.O. Box 509046 San Diego, CA 92150 | 391,094.4170 | 34.94%* |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst Insider Buying Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class I shares of the Fund.

**Catalyst Insider Long/Short Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Insider Long/Short Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial Attn: Mutual Fund Ops PO Box 509046 San Diego, CA 92150 | 219,832.5130 | 26.18%* |

37

*May be deemed to control Class A shares of the Fund because holds more than 25% of the outstanding Class A shares.

As of October 1, 2014, securities of the Catalyst Insider Long/Short Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst Insider Long/Short Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Insider Long/Short Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| MG Trust Company Cust. FBO LAREDO COMMUNITY COLLEGE ORP PLAN 717 17th Street Suite 1300 Denver CO 80202 | 43,142.9560 | 17.95% |

As of October 1, 2014, securities of the Catalyst Insider Long/Short Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group less than 1% of the outstanding Class C shares of the Fund.

**Catalyst Insider Long/Short Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Insider Long/Short Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial Attn: Mutual Fund Ops PO Box 509046 San Diego, CA 92150 | 43,531.4080 | 38.71%* |
| Michael Stone PO Box 2052 Jersey City, NJ 07303 | 6,500.3060 | 5.78% |
| Szilagyi, Jerry J 5 Abbington Drive Lloyd Harbor, NY 11743 | 17,178.8620 | 15.27% |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

38

As of October 1, 2014, securities of the Catalyst Insider Long/Short Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 15.27% of the outstanding Class I shares of the Fund.

**Catalyst Activist Investor Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Activist Investor Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Ameritrade Inc FBO 8824160961<br>Jerry Szilagyi<br>5 Abbington Dr<br>Lloyd Harbor NY 11743 | 5,025.1260 | 14.19% |
| Miller, David S<br>1521 Alton Rd<br>Box 527<br>Miami Beach, FL 33139 | 27,337.9470 | 77.20%* |

*May be deemed to control Class A shares of the Fund because holds more than 25% of the outstanding Class A shares.

As of October 1, 2014, securities of the Catalyst Activist Investor Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented 14.19% of the outstanding Class A shares of the Fund.

**Catalyst Activist Investor Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Activist Investor Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Jerry Szilagyi & Isobel Szilagyi<br>5 Abbington Drive<br>Lloyd Harbor, NY 11743 | 100.0000 | 12.27% |
| Mary Beth Linnenkamp<br>11116 Chimineas Ave<br>Northridge CA 913262507 | 715.0150 | 87.73%* |

*May be deemed to control Class C shares of the Fund because holds more than 25% of the outstanding Class C shares.

39

As of October 1, 2014, securities of the Catalyst Activist Investor Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group owned 12.27% of the outstanding Class C shares of the Fund.

**Catalyst Activist Investor Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Insider Long/Short Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial Attn: Mutual Fund Ops PO box 509046 San Diego, CA 92150 | 2,465.4830 | 20.10% |
| Jerry  Szilagyi & Isobel Szilagyi 5 Abbington Drive Lloyd Harbor, NY 11743 | 9,800.0000 | 79.90%* |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst Activist Investor Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group 79.90% of the outstanding Class I shares of the Fund.

**Catalyst Insider Income Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Insider Income Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Ameritrade Inc FBO 8824160961 Jerry Szilagyi 5 Abbington Dr Lloyd Harbor NY 11743 | 10,297.0860 | 24.94% |
| Miller, David S 1521 Alton Rd Box 527 Miami Beach, FL 33139 | 30,891.2600 | 74.82%* |

*May be deemed to control Class A shares of the Fund because holds more than 25% of the outstanding Class A shares.

As of October 1, 2014, securities of the Catalyst Insider Income Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented 24.94% of the outstanding Class A shares of the Fund.

**Catalyst Insider Income Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Insider Income Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Jerry Szilagyi & Isobel Szilagyi<br>5 Abbington Drive<br>Lloyd Harbor, NY 11743 | 100.0000 | 100.00%* |

*May be deemed to control Class C shares of the Fund because holds more than 25% of the outstanding Class C shares.

As of October 1, 2014, securities of the Catalyst Insider Income Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented 100% of the outstanding Class C shares of the Fund.

**Catalyst Insider Income Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Insider Income Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Fund Ops<br>PO box 509046<br>San Diego, CA 92150 | 2,075.1460 | 12.28% |
| Jerry Szilagyi & Isobel Szilagyi<br>5 Abbington Drive<br>Lloyd Harbor, NY 11743 | 9,800.0000 | 58.02%* |
| Szilagyi, Jerry J<br>5 Abbington Drive<br>Lloyd Harbor, NY 11743 | 5,016.6670 | 29.70%* |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst Insider Income Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group less represented 87.72% of the outstanding Class I shares of the Fund.

41

**Catalyst Absolute Total Return Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Absolute Total Return Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| G876108965 1005 Valley Creek Dr Plano TX 75075 | 735.0000 | 15.08% |
| G420092343 206 Fairfield Drive E Holbrook NY 11741 | 2,355.0000 | 48.30%* |
| Susan B Luthi PO Box 2052 Jersey City, NJ 07303 | 1,685.3930 | 34.57%* |

*May be deemed to control Class A shares of the Fund because holds more than 25% of the outstanding Class A shares.

As of October 1, 2014, securities of the Catalyst Absolute Total Return Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 2.05% of the outstanding Class A shares of the Fund.

**Catalyst Absolute Total Return Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Absolute Total Return Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Jerry Szilagyi & Isobel Szilagyi 5 Abbington Drive Lloyd Harbor, NY 11743 | 100.0000 | 100.00%* |

*May be deemed to control Class C shares of the Fund because holds more than 25% of the outstanding Class C shares.

As of October 1, 2014, securities of the Catalyst Absolute Total Return Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented 100% of the outstanding Class C shares of the Fund.

**Catalyst Absolute Total Return Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Absolute Total Return Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| B Blau 10 DE GST EXM<br>PO Box 2052<br>Jersey City, NJ 07303 | 4,911.5910 | 50.57%* |
| Jerry  Szilagyi & Isobel Szilagyi<br>5 Abbington Drive<br>Lloyd Harbor, NY 11743 | 4,800.0000 | 24.40%* |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst Absolute Total Return Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 24.40% of the outstanding Class I shares of the Fund.

**Catalyst Event Arbitrage Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Event Arbitrage Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Fund Ops<br>P.O. Box 509046<br>San Diego, CA 92150-9046 | 130,709.5320 | 7.97% |
| Rosenberg Trust<br>133 Windwatch Drive<br>Hauppauge, NY 11788 | 175,078.4370 | 10.68% |
| ABS Associates LTD<br>450 Seventh Ave, 45th Floor<br>New York, NY 10123 | 386,984.3100 | 23.60% |
| DIDCO Urban Renewal Co LTD<br>450 Seventh Ave, 45th Floor<br>New York, NY 10123 | 440,165.4520 | 26.85%* |

*May be deemed to control Class A shares of the Fund because holds more than 25% of the outstanding Class A shares.

43

As of October 1, 2014, securities of the Catalyst Event Arbitrage Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst Event Arbitrage Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Event Arbitrage Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Yamane Leanne 707 2nd Avenue South Minneapolis, MN 55402 | 3,559,1500 | 5.46% |
| Cope Howard 9785 Towne Centre Drive San Diego CA 92121 | 4,424.7790 | 6.79% |
| Wenatchee Emergency 501 North Broadway St. Louis, MO 63102 | 5,263.0670 | 8.08% |
| Hwang Kevin 707 2nd Avenue South Minneapolis, MN 55402 | 3,651.9870 | 5.60% |
| Allen Rebecca 501 North Broadway St Louis MO 63102 | 10,964.9120 | 16.82% |
| Darwood Darralyn 501 North Broadway St Louis MO 63102 | 5,567.9290 | 8.54% |

As of October 1, 2014, securities of the Catalyst Event Arbitrage Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**Catalyst Event Arbitrage Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Event Arbitrage Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

44

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Fund Ops<br>P.O. Box 509046<br>San Diego, CA 92150 | 36,500.6690 | 68.64%* |
| MG Trust Company Cust. FBO BARDAHL MGF CORP PENSION TRUST<br>717 17th Street<br>Suite 1300<br>Denver CO 80202 | 4,620.9830 | 8.69% |
| Jerry Szilagyi & Isobel Szilagyi<br>5 Abbington Drive<br>Llyod Harbor, NY 11743 | 9,857.1320 | 18.54% |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst Event Arbitrage Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 18.54% of the outstanding Class I shares of the Fund.

**Catalyst Hedged Futures Strategy Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Hedged Futures Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Charles Schwab & Co., Inc.<br>Attn: Mutual Funds<br>101 Montgomery Street<br>San Francisco, CA 94104-4122 | 5,384,705.7780 | 28.37%* |

*May be deemed to control Class A shares of the Fund because holds more than 25% of the outstanding Class A shares.

As of October 1, 2013, securities of the Catalyst Hedged Futures Strategy Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst Hedged Futures Strategy Fund Class C Shares**

No Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Hedged Futures Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

45

As of October 1, 2014, securities of the Catalyst Hedged Futures Strategy Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**Catalyst Hedged Futures Strategy Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Hedged Futures Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Fund Ops<br>P.O. Box 509046<br>San Diego, CA 92150-0946 | 5,201,145 | 30.33%* |
| Charles Schwab & Co., Inc<br>Attn: Mutual Funds<br>101 Montgomery Street<br>San Francisco, CA 94104-4122 | 1,703,220 | 9.93% |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst Hedged Futures Strategy Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class I shares of the Fund.

**High Income Fund Class A Shares**

No Shareholders are known by the Trust to own of record more than 5% of the outstanding shares of the High Income Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the High Income Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**High Income Fund Class C Shares**

No Shareholders are known by the Trust to own of record more than 5% of the outstanding shares of the High Income Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

46

As of October 1, 2014, securities of the High Income Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**High Income Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst High Income Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Jerry Szilagyi 5 Abbington Drive Lloyd Harbor, NY 11743 | 17,868.1510 | 5.83% |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the High Income Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 5.83% of the outstanding Class I shares of the Fund.

**TRI Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the TRI Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Hustler Conveyor Com Pershing LLC P.O. Box 2052 Jersey City, NJ 07303 | 273,224.0440 | 7.97% |

As of October 1, 2014, securities of the TRI Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**TRI Fund Class C Shares**

No Shareholder are known by the Trust to own of record more than 5% of the outstanding shares of the TRI Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the Total Return Income Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

47

**TRI Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the TRI Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| BETTITRFPB PO Box 800475 Balch Springs TX 75180-0475751 | 146,290.9880 | 11.99% |

As of October 1, 2014, securities of the TRI Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 3.13% of the outstanding Class I shares of the Fund.

**GOI Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the GOI Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Mid Atlantic Trust Company FBO 1251 Waterfront Place Suite 525 Pittsburgh, PA 15222 | 53,256.4140 | 5.02% |
| Robert P. Groesbeck 150 Jordon Rd. Emerson, NJ 07630 | 61,298.6090 | 5.78% |

As of October 1, 2014, securities of the GOI Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**GOI Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the GOI Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Pershing, LLC P.O. Box 2052 Jersey City, NJ 07303 | 5,687.5180 | 16.36% |
| LPL Financial A/C 3976-1387 9785 Towne Centre Drive San Diego, CA 92121 | 1,952.2700 | 5.61% |

48

| | | |
|---|---|---|
| D180024079 U/A/DTD 6/29/2009 4431 Chula Vista | 2,474.7080 | 7.12% |
| Luski J 6292 3rd Avenue North St Petersburg FL 33710 | 2,120.7930 | 6.10% |
| First Clearing, LLC 2801 Market Street Saint Louis, MO 63103 | 1,931.2700 | 5.55% |
| American Enterprise Inv Svcs 707 2nd Avenue South Minneapolis, MN 55402 | 2,261.9400 | 6.51% |
| American Enterprise Inv Svcs 707 2nd Avenue South Minneapolis, MN 55402 | 2,024.2910 | 5.82% |
| American Enterprise Inv Svcs 707 2nd Avenue South Minneapolis, MN 55402 | 2,024.2910 | 5.82% |
| John E. Sleighter 501 North Broadway St. Louis, MO 63102 | 4,407.3040 | 12.68% |
| Zimmerman Edward 9785 Towne Centre Drive San Diego CA 92121-1968 | 1,969.9700 | 5.67% |
| Horowitz Estate Saul 501 North Broadway St Louis, MO 63102 | 2,593.7870 | 7.46% |

As of October 1, 2014, securities of the GOI Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

## GOI Fund Class I Shares

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the GOI Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| RBC Capital Markets LLC Pamela A B 14 Riverside Drive Florham Park NJ 07932-2417 | 10,348.1670 | 5.23% |

49

| | | |
|---|---|---|
| RBC Capital Markets Corp. FBO PREFE | | |
| 370 Lexington Ave 27th Fl. | | |
| New York NY 10017-6573 | 17,916.8700 | 9.06% |
| RBC Capital Markets LLC LITT | | |
| 18 Arrowhead Way | | |
| Darien, CT 06820 | 13,949.6380 | 7.06% |
| Barnet DTD 6/16/05 | | |
| 3500 W Olive Ave | | |
| Burbank, CA 91505 | 16,269.2000 | 8.23% |
| RBC Capital Markets | | |
| Donald S M | | |
| 9788 Carriage Run CT | | |
| Loveland OH 45140 | 19,129.0880 | 9.68% |
| Church | | |
| 2700 Martin Highway | | |
| Palm City FL 34990-3146 | 9,924.0590 | 5.02% |
| Furlo | | |
| 2443 Sandston CT | | |
| Davidson MI 48423-8629 | 15,817.8040 | 8.00% |

As of October 1, 2014, securities of the GOI Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class I shares of the Fund.

**Aggressive Growth Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the GOI Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Robert Groesbeck | | |
| 150 Jordan Road | | |
| Emerson, NJ 07630 | 99,800.0000 | 99.03%* |

*May be deemed to control Class A shares of the Fund because holds more than 25% of the outstanding Class A shares.

As of October 1, 2014, securities of the Aggressive Growth Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

50

**Aggressive Growth Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Aggressive Growth Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Myers Anita 4707 Executive Drive San Diego, CA 92121 | 1,200.0000 | 92.31%* |
| Robert Groesbeck 150 Jordan Road Emerson, NJ 07630 | 100.0000 | 7.69% |

*May be deemed to control Class C shares of the Fund because holds more than 25% of the outstanding Class C shares.

As of October 1, 2014, securities of the Aggressive Growth Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**Aggressive Growth Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Aggressive Growth Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Robert Groesbeck 150 Jordan Road Emerson, NJ 07630 | 100.0000 | 100.00%* |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Aggressive Growth Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class I shares of the Fund.

**Catalyst/MAP Global Total Return Income Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/MAP Global Total Return Income Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

51

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Charles Schwab & Co. Inc.<br>101 Montgomery St<br>San Francisco, CA | 187,704.6960 | 14.69% |

As of October 1, 2014, securities of the Catalyst/MAP Global Total Return Income Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

## Catalyst/MAP Global Total Return Income Fund Class C Shares

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/MAP Global Total Return Income Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Quint Plumbing<br>707 2nd Ave. South<br>Minneapolis, MN 55402 | 22,434.4310 | 5.14% |
| Brenman S&M<br>10475 Gandy Blvd N Unit 3117<br>Saint Petersburg FL 33702 | 26,059.4570 | 5.97% |

As of October 1, 2014, securities of the Catalyst/MAP Global Total Return Income Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

## Catalyst/MAP Global Total Return Income Fund Class I Shares

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/MAP Global Total Return Income Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Fund Ops<br>PO box 509046<br>San Diego, CA 92150 | 4,410.5370 | 30.61%* |
| Jerry  Szilagyi & Isobel Szilagyi<br>5 Abbington Drive<br>Lloyd Harbor, NY 11743 | 10,000.0000 | 69.39%* |

52

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst/MAP Global Total Return Income Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 71.50% of the outstanding Class I shares of the Fund.

**Catalyst/MAP Global Capital Appreciation Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/MAP Global Capital Appreciation Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Charles Schwab & Co. Inc. Attn: Mutual Funds 101 Montgomery St San Francisco, CA 94104 | 290,408.0970 | 12.95% |
| NFS Susan Rosenblatt 201 S Biscayne Blvd Ste 818 Miami FL 33131 | 310,418.5350 | 13.84% |

As of October 1, 2014, securities of the Catalyst/MAP Global Capital Appreciation Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst/MAP Global Capital Appreciation Fund Class C Shares**

No Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/MAP Global Capital Appreciation Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the Catalyst/MAP Global Capital Appreciation Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

53

**Catalyst/MAP Global Capital Appreciation Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/MAP Global Capital Appreciation Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial Attn: Mutual Fund Ops PO box 509046 San Diego, CA 92150 | 2,998.5010 | 15.43% |
| TTEE 14308 Kingswood St Riverview MI 48193 | 5,530.9730 | 28.47% |
| Jerry Szilagyi & Isobel Szilagyi 5 Abbington Drive Lloyd Harbor, NY 11743 | 10,000.0000 | 51.47%* |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst/MAP Global Capital Appreciation Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 51.47% of the outstanding Class I shares of the Fund.

**Catalyst/Lyons Hedged Premium Return Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Lyons Hedged Premium Return Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Ameritrade Inc PO Box 262 Cleveland SC 29635 | 47,846.8900 | 8.39% |
| Ameritrade Inc 8194 County Rd 31 Killen AL 35645 | 47,846.8900 | 8.39% |
| Ameritrade Inc 11 Brantwood Road Winchester MA 01890 | 28,763.1830 | 5.04% |
| Ameritrade Inc 700 Church St San Francisco CA 94114-3003 | 28,708.1340 | 5.03% |

54

As of October 1, 2014, securities of the Catalyst/Lyons Hedged Premium Return Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst/Lyons Hedged Premium Return Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Lyons Hedged Premium Return Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Jerry Szilagyi & Isobel Szilagyi 5 Abbington Drive Lloyd Harbor, NY 11743 | 100.0000 | 11.63% |
| Tomko, Sharon 411 Essex Wood CT Baltimore, MD 21221 | 759.8780 | 88.37%* |

*May be deemed to control Class C shares of the Fund because holds more than 25% of the outstanding Class C shares.

As of October 1, 2014, securities of the Catalyst/Lyons Hedged Premium Return Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented 11.63% of the outstanding Class C shares of the Fund.

**Catalyst/Lyons Hedged Premium Return Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Lyons Hedged Premium Return Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Jerry  Szilagyi & Isobel Szilagyi 5 Abbington Drive Lloyd Harbor, NY 11743 | 5,000.0000 | 100.00%* |

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst/Lyons Hedged Premium Return Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 100% of the outstanding Class I shares of the Fund.

55

**Catalyst /Lyons Tactical Allocation Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Lyons Tactical Allocation Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Fund Ops<br>P.O. Box 509046<br>San Diego, CA 92150-9046 | 785,716.8100 | 13.82% |

As of October 1, 2014, securities of the Catalyst/Lyons Tactical Allocation Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst /Lyons Tactical Allocation Fund Class C Shares**

No Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Lyons Tactical Allocation Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the Catalyst/Lyons Tactical Allocation Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**Catalyst/Lyons Tactical Allocation Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Lyons Tactical Allocation Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial Attn: MF OPS<br>PO Box 509046<br>San Diego, CA 92150 | 7,941.9020 | 30.75%* |
| Northern Trust AS TT<br>PO Box 2052<br>Jersey City, NJ 07303 | 2,320.7790 | 8.98% |
| Schulze<br>W280 N 1792 Golf View Dr<br>Pewaukee WI 53072 | 3,479.4710 | 13.47% |
| Schulze<br>8345 Raphael Lane<br>Littleton CO 80125 | 1,739.7360 | 6.74% |

56

Jerry Szilagyi & Isobel Szilagyi
5 Abbington Drive
Lloyd Harbor, NY 11743                    9,337.0680                    36.15%*

*May be deemed to control Class I shares of the Fund because holds more than 25% of the outstanding Class I shares.

As of October 1, 2014, securities of the Catalyst/Lyons Tactical Allocation Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 36.15% of the outstanding Class I shares of the Fund.

## Catalyst Dynamic Alpha Fund Class A Shares

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Dynamic Alpha Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Charles Schwab & Co., Inc. Attn: Mutual Funds 101 Montgomery St. San Francisco, CA 94104 | 2,113,568.9580 | 94.97%* |

*May be deemed to control Class A shares of the Fund because holds more than 25% of the outstanding Class A shares.

As of October 1, 2014, securities of the Catalyst Dynamic Alpha Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

## Catalyst Dynamic Alpha Fund Class C Shares

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst  Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

57

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Vincent Callahan PO Box 2052 Jersey City, NJ 07303 | 13,619.1690 | 28.88%* |
| Brian Comer PO Box 2052 Jersey City, NJ 07303 | 3,031.7670 | 6.43% |
| Cookson Peirce & Co., Inc. 555 Grant St. Suite 380 Pittsburgh, PA 15219 | 2,727.4100 | 5.78% |
| IRA FBO James E. Dill PO Box 2052 Jersey City, NJ 07303 | 2,911.8680 | 6.17% |
| Natkiel Lucianna 707 2nd Avenue South Minneapolis, MN 55402 | 2,985.4230 | 6.33% |
| IRA FBO Joan M Glove | 3,405.2150 | 7.22% |
| Shaw Kenneth 9785 Towne Centre Drive San Diego, CA 92121-1968 | 3,598.3050 | 7.63% |

*May be deemed to control Class C shares of the Fund because holds more than 25% of the outstanding Class C shares.

As of October 1, 2014, securities of the Catalyst Dynamic Alpha Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**Catalyst Dynamic Alpha Fund Class I Shares**

No Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the Catalyst Dynamic Alpha Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 3.41% of the outstanding Class I shares of the Fund.

**Catalyst/Princeton Floating Rate Income Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Princeton Floating Rate Income Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Funds Ops<br>P.O. Box 509046<br>San Diego, CA 92150-9046 | 544,166.1480 | 14.96% |
| NFS<br>Susan Rosenblatt<br>201 S Biscayne Blvd Ste 818<br>Miami FL 33131 | 380,053.1580 | 10.45% |
| Stanard<br>15 Linden Lane<br>Chatham NJ 07928-1623 | 187,969.9250 | 5.17% |

As of October 1, 2014, securities of the Catalyst/Princeton Floating Rate Income Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst/Princeton Floating Rate Income Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Princeton Floating Rate Income Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Lee Herman<br>4255 30th Avenue South<br>Apartment 106<br>Fargo ND 58104-8427 | 49,344.3010 | 5.33% |
| Safar P<br>980 Ferndale Road West<br>Wayzata MN 55391-9631 | 70,214.3890 | 7.58% |

As of October 1, 2014, securities of the Catalyst/Princeton Floating Rate Income Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**Catalyst/Princeton Floating Rate Income Fund Class I Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Princeton Floating Rate Income Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

59

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| LPL Financial<br>Attn: Mutual Funds Ops<br>P.O. Box 509046<br>San Diego, CA 92150-9046 | 212,672.2300 | 7.55% |
| Charles Schwab & Co., Inc<br>Attn: Mutual Funds<br>101 Montgomery Street<br>San Francisco, CA 94104-4122 | 622,971.3750 | 22.13% |
| Ted Glasrud Assoc<br>501 North Broadway<br>St Louis MO 63102 | 333,757.0310 | 11.85% |

As of October 1, 2014, securities of the Catalyst/Princeton Floating Rate Income Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst Macro Strategy Fund Class A Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Princeton Macro Strategy Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Ameritrade Inc<br>47 Club Way<br>Red Bank NJ 07701 | 17,705.7650 | 5.77% |
| Ameritrade Inc<br>44 Wardell Ave<br>Rumson NJ 07760 | 41,211.0390 | 13.44% |
| Ameritrade Inc<br>233 Bolton Rd<br>Burlington Flats NY 13315 | 18,816.6330 | 6.14% |
| Ameritrade Inc<br>2231 Wentz Lane<br>Schwenksville PA 19473 | 30,852.2640 | 10.06% |
| Ameritrade Inc<br>55 York St<br>Old Bridge NJ 08857 | 32,868.2810 | 10.72% |
| Ameritrade Inc<br>313 Hennepin Dr<br>Maineville OH 45039 | 18,791.1710 | 6.13% |

60

| | | |
|---|---|---|
| Ameritrade Inc<br>33 Maidenstone Dr<br>Wayside NJ 07712 | 16,106.4880 | 5.25% |
| Ameritrade Inc<br>1219 Radiant St<br>Reunion FL 34747 | 25,146.5190 | 8.20% |
| Benjamin Zucker Roll<br>220 Appletree LN<br>Mountainside NJ 07092-1702 | 22,101.9540 | 7.21% |
| Seth D Sloan Rollover<br>13 Green Hill Rd<br>East Brunswick NJ 08816-2877 | 23,350.2780 | 7.61% |

As of October 1, 2014, securities of the Catalyst Macro Strategy Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

## Catalyst Macro Strategy Fund Class C Shares

No Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst Macro Strategy Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the Catalyst Macro Strategy Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

## Catalyst Macro Strategy Fund Class I Shares

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/Princeton Macro Strategy Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address<br>of Beneficial or Record Owner | Number of Record<br>and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Al Procaccino TTEE F<br>P.O Box 2052<br>Jersey City, NJ 07303 | 23,180.4430 | 6.37% |
| Ameritrade Inc<br>4548 E Indigo Street<br>Gilbert AZ 85298 | 23,000.0000 | 6.32% |
| JP Morgan Chase NA T<br>PO Box 2052<br>Jersey City, NJ 07303 | 31,194.1460 | 8.57% |

61

As of October 1, 2014, securities of the Catalyst Macro Strategy Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented 1.32% of the outstanding Class A shares of the Fund.

**Catalyst/EquityCompass Buyback Strategy Fund Class A Shares**

No Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/EquityCompass Buyback Strategy Fund Class A shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the Catalyst/EquityCompass Buyback Strategy Fund Class A shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class A shares of the Fund.

**Catalyst/EquityCompass Buyback Strategy Fund Class C Shares**

Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/EquityCompass Buyback Strategy Fund Class C shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

| Name and Address of Beneficial or Record Owner | Number of Record and Beneficial (Shares) | Percent (%) of Class |
|---|---|---|
| Ridgway Sr Frederic 501 North Broadway St Louis MO 63102 | 31,232.3440 | 5.42% |

As of October 1, 2014, securities of the Catalyst/EquityCompass Buyback Strategy Fund Class C shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class C shares of the Fund.

**Catalyst/EquityCompass Buyback Strategy Fund Class I Shares**

No Shareholders known by the Trust to own of record more than 5% of the outstanding shares of the Catalyst/EquityCompass Buyback Strategy Fund Class I shares on October 1, 2014 and the percentage of the outstanding shares owned on that date are listed below.

As of October 1, 2014, securities of the Catalyst/EquityCompass Buyback Strategy Fund Class I shares owned by all officers and trustees, including beneficial ownership, as a group represented less than 1% of the outstanding Class I shares of the Fund.

## ADVISOR AND SUB-ADVISORS

Catalyst Capital Advisors LLC (the "Advisor") has been retained by the Funds under a Management Agreements to act as each Fund's advisor, subject to the authority of the Board of Trustees. Catalyst Capital Advisors was organized under the laws of New York on January 24, 2006. The Advisor oversees the day-to-day investment decisions for the Fund and continuously reviews, supervises and administers each Fund's investment program. The address of the Advisor is 22 High Street, Huntington, NY 11743. Jerry Szilagyi is the controlling member of the Advisor.

62

The Management Agreement provides that the Advisor will provide the applicable Fund with investment advice and supervision and will continuously furnish an investment program for each Fund consistent with the investment objectives and policies of the Fund. The Advisor is responsible for the payment of the salaries and expenses of all of its personnel, office rent and the expenses of providing investment advisory and related clerical expenses.

Under the terms of the Management Agreement, the Advisor manages the investment of the assets of the applicable Fund in conformity with the investment objectives and policies of that Fund. It is the responsibility of the Advisor to make investment decisions for the applicable Fund and to provide continuous supervision of the investment portfolios of the Fund.

For its services under the Management Agreement, each Fund pays the Advisor a monthly management fee based on its average daily net assets at the annual rates set forth below:

|  | Contractual Advisory Fee |
|---|---|
| Small-Cap Insider | 1.25% |
| Hedged Insider Buying | 1.25% |
| Insider Buying | 1.00% |
| Insider Long/Short | 1.25% |
| Activist Investor Fund | 1.25% |
| Insider Income Fund | 1.00% |
| Absolute Total Return Fund | 1.50% |
| Event Arbitrage | 1.25% |
| Hedged Futures Strategy | 1.75% |
| High Income | 1.00% |
| Total Return Income | 1.00% |
| Growth of Income | 1.00% |
| Aggressive Growth Fund | 1.00% |
| Global Total Return Income | 1.00% |
| Global Capital Appreciation | 1.00% |
| Hedged Premium Return | 1.25% |
| Tactical Allocation | 1.25% |
| Dynamic Alpha | 1.00% |
| Floating Rate Income | 1.00% |
| Macro Strategy | 1.50% |
| EquityCompass Buyback Strategies | 1.00% |

The Advisor pays expenses incurred by it in connection with acting as advisor, other than costs (including taxes and brokerage commissions, borrowing costs, costs of investing in underlying funds and extraordinary expenses, if any) of securities purchased for the Funds and other expenses paid by the Funds as detailed in each Fund's Management Agreement. The Advisor pays for all employees, office space and facilities required by it to provide services under the Management Agreement, except for specific items of expense referred to below.

Except for the expenses described above that have been assumed by the Advisor, all expenses incurred in administration of the Funds will be charged to a particular Fund, including investment management fees; fees and expenses of the Board of Trustees; interest charges; taxes; brokerage commissions; expenses of valuing assets; expenses of continuing registration and qualification of the Funds and the shares under federal and state law; share issuance expenses; fees and disbursements of independent accountants and legal counsel; fees and expenses of

63

custodians, including sub-custodians and securities depositories, transfer agents and shareholder account servicing organizations; expenses of preparing, printing and mailing prospectuses, reports, proxies, notices and statements sent to shareholders; expenses of shareholder meetings; costs of investing in underlying funds; and insurance premiums. The Funds are also liable for nonrecurring expenses, including litigation to which it may from time to time be a party. Expenses incurred for the operation of a particular Fund, including the expenses of communications with its shareholders, are paid by that Fund.

The Advisor has contractually agreed to waive fees and/or reimburse expenses but only to the extent necessary to maintain the Funds' total annual operating expenses (excluding brokerage costs; 12b-1 fees, borrowing costs, such as (a) interest and (b) dividends on securities sold short; taxes; costs of investing in acquired funds, and extraordinary expenses) at the levels set forth in the table below through October 31, 2015.

| | Expense Limitation* |
|---|---|
| Small-Cap Insider | 1.50% |
| Hedged Insider Buying | Class A and C Shares – 1.50 Class I Shares – 1.30 |
| Insider Buying | 1.25% |
| Insider Long/Short | Class A and C Shares – 1.50 Class I Shares – 1.25 |
| Activist Investor Fund | 1.25% |
| Insider Income Fund | 1.20% |
| Absolute Total Return Fund | 1.74% |
| Event Arbitrage | 1.50% |
| Hedged Futures Strategy | 2.74% |
| High Income | 1.20% |
| Total Return Income | 1.30% |
| Growth of Income | 1.30% |
| Aggressive Growth Fund | 1.30% |
| Global Total Return Income | Class A and C shares - 1.30 Class I shares 1.25% |
| Global Capital Appreciation | Class A and C shares 1.30/ Class I shares 1.25% |
| Hedged Premium Return | 1.25% |
| Tactical Allocation | 1.25% |
| Dynamic Alpha | 1.10% |
| Floating Rate Income | 1.20% |
| Macro Strategy | 1.70% |
| EquityCompass Buyback Strategies | 1.25% |

* Applicable to all classes of shares unless otherwise noted.

Each waiver or reimbursement by the Advisor is subject to repayment by the Fund within the three fiscal years following the fiscal year in which that particular expense is incurred, if the Fund is able to make the repayment without exceeding the expense limitation in effect at the time of the waiver and the repayment is approved by the Board of Trustees.

The Management Agreement with each Fund continues in effect for an initial two year term and then from year to year as long as its continuation is approved at least annually by the Board of Trustees, including a majority of the Trustees who are not "interested persons," or by the shareholders of the applicable Fund.  Each Management

64

Agreement may be terminated at any time upon 60 days' written notice by the relevant Fund or by a majority vote of the outstanding shares or 90 days' written notice by the advisor and will terminate automatically upon assignment. The Management Agreement was most recently renewed for the Small-Cap Insider, Hedged Insider Buying, High Income, Total Return Income, GOI, Global Total Return Income and Global Capital Appreciation Funds on May 15, 2014, for the Event Arbitrage, Insider Long/Short and Tactical Allocation Funds on February 11, 2014 and for the Dynamic Alpha Fund on November 25, 2013. The Management Agreement was initially approved on April 1, 2014 for the Activist Insider, Insider Income, Absolute Total Return and Aggressive Growth Fund on April 1, 2014, on February 11, 2014 for the Macro Strategy Fund, November 25, 2013 for the Buyback Strategy Fund, May 13, 2013 for the Hedged Futures Strategy Fund, November 26, 2012 for the Floating Rate Income Fund and February 26, 2012 for the Hedged Premium Return Fund.  A discussion of the matters considered by the Board in connection with the renewal of the Management Agreement for each Fund, except the Activist Insider, Insider Income, Absolute Total Return and Aggressive Growth Fund, can be found in the Fund's Annual Report to Shareholders dated June 30, 2014. A discussion of the matters considered by the Board in connection with the renewal of the Management Agreement for the Activist Insider, Insider Income, Absolute Total Return and Aggressive Growth Fund Trust's will be contained in the semi-annual report to shareholders for the period ending December 31, 2014.

Each Management Agreement provides that the advisor shall not be liable for any error of judgment or mistake of law or for any loss suffered by the Trust in connection with the performance of its duties, except a loss resulting from a breach of fiduciary duty with respect to the receipt of compensation for services or a loss resulting from willful misfeasance, bad faith, or gross negligence on the part of the Advisor in the performance of its duties, or from reckless disregard of its duties and obligations thereunder.

The table below provides information about the advisory fees paid to the Advisor of each Fund for each of the fiscal periods ended June 30:

| Fund | | 2012 | 2013 | 2014 |
|---|---|---|---|---|
| **Small-Cap Insider Buying Fund** | *Total Advisory Fee* | $968,963 | $557,119 | $803,666 |
| | *Waiver/Reimbursement* | $196,735 | $136,728 | $187,134 |
| | *Net Advisory Fee* | $772,228 | $420,391 | $616,532 |
| **Hedged Insider Buying Fund** | *Total Advisory Fee* | $54,841 | $74,042 | $281,326 |
| | *Waiver/Reimbursement* | $77,649 | $65,295 | $96,238 |
| | *Net Advisory Fee* | $0 | $8,747 | $185,088 |
| **Insider Buying** | *Total Advisory Fee* | $3,660 | $8,446 | $922,152 |
| | *Waiver/Reimbursement* | $54,654 | $39,984 | $13,983 |
| | *Net Advisory Fee* | $0 | $0 | $908,169 |
| **Insider Long/Short Fund** | *Total Advisory Fee* | $994 | $31,538 | $39,703 |
| | *Waiver/Reimbursement* | $15,045 | $55,439 | $65,251 |
| | *Net Advisory Fee* | $0 | $0 | $(25,548) |
| **Activist Insider Fund** | *Total Advisory Fee* | N/A | N/A | N/A |
| | *Waiver/Reimbursement* | N/A | N/A | N/A |
| | *Net Advisory Fee* | N/A | N/A | N/A |
| **Insider Income Fund** | *Total Advisory Fee* | N/A | N/A | N/A |
| | *Waiver/Reimbursement* | N/A | N/A | N/A |
| | *Net Advisory Fee* | N/A | N/A | N/A |
| **ATR Fund** | *Total Advisory Fee* | N/A | N/A | N/A |
| | *Waiver/Reimbursement* | N/A | N/A | N/A |
| | *Net Advisory Fee* | N/A | N/A | N/A |
| **Event Arbitrage Fund** | *Total Advisory Fee* | N/A | $202,631 | $213,549 |
| | *Waiver/Reimbursement* | N/A | $33,837 | $45,965 |
| | *Net Advisory Fee* | N/A | $168,794 | $167,584 |
| **Hedged Futures** | | | | |

| | | | | |
|---|---|---|---|---|
| **Strategy Fund** | *Total Advisory Fee* | N/A | N/A | $674,048 |
| | *Waiver/Reimbursement* | N/A | N/A | - |
| | *Net Advisory Fee* | N/A | N/A | $674,048 |
| **High Income Fund** | *Total Advisory Fee* | $1,241,708 | $1,207,317 | $797,061 |
| | *Waiver/Reimbursement* | $11,422 | $28,192 | $62,056 |
| | *Net Advisory Fee* | $1,230,286 | $1,179,125 | $735,005 |
| **TRI Fund** | *Total Advisory Fee* | $667,748 | $517,237 | $469,054 |
| | *Waiver/Reimbursement* | $0 | $1,211 | $18,847 |
| | *Net Advisory Fee* | $669,401* | $516,026 | $450,207 |
| **GOI Fund** | *Total Advisory Fee* | $102,943 | $149,789 | $181,780 |
| | *Waiver/Reimbursement* | $42,853 | $35,609 | $25,265 |
| | *Net Advisory Fee* | $60,090 | $114,180 | $156,515 |
| **Aggressive Growth Fund** | *Total Advisory Fee* | N/A | N/A | N/A |
| | *Waiver/Reimbursement* | N/A | N/A | N/A |
| | *Net Advisory Fee* | N/A | N/A | N/A |
| **Global TRI** | *Total Advisory Fee* | $35,006 | $99,629 | $159,460 |
| | *Waiver/Reimbursement* | $55,559 | $43,156 | $45,170 |
| | *Net Advisory Fee* | $0 | $56,473 | $114,290 |
| **Global Appreciation Fund** | *Total Advisory Fee* | $27,089 | $93,183 | $187,083 |
| | *Waiver/Reimbursement* | $56,015 | $46,010 | $41,616 |
| | *Net Advisory Fee* | $0 | $47,173 | $145,467 |
| **Hedged Premium Return Fund** | *Total Advisory Fee* | N/A | N/A | $15,460 |
| | *Waiver/Reimbursement* | N/A | N/A | $38,845 |
| | *Net Advisory Fee* | N/A | N/A | $(23,385) |
| **Tactical Allocation Fund** | *Total Advisory Fee* | N/A | $108,112 | $731,945 |
| | *Waiver/Reimbursement* | N/A | $62,570 | $154,771 |
| | *Net Advisory Fee* | N/A | $45,542 | $577,174 |
| **Dynamic Alpha Fund** | *Total Advisory Fee* | $100,132 | $220,877 | $276,031 |
| | *Waiver/Reimbursement* | $46,613 | $48,043 | $56,685 |
| | *Net Advisory Fee* | $53,519 | $172,834 | $219,346 |
| **Floating Rate Income Fund** | *Total Advisory Fee* | N/A | $19,825 | $359,790 |
| | *Waiver/Reimbursement* | N/A | $52,139 | $102,668 |
| | *Net Advisory Fee* | N/A | $0 | $257,122 |
| **Macro Strategy Fund** | *Total Advisory Fee* | N/A | N/A | $154,490 |
| | *Waiver/Reimbursement* | N/A | N/A | $28,118 |
| | *Net Advisory Fee* | N/A | N/A | $126,372 |
| **EquityCompass Buyback Strategies Fund** | *Total Advisory Fee* | N/A | $0 | $79,979 |
| | *Waiver/Reimbursement* | N/A | $0 | $38,309 |
| | *Net Advisory Fee* | N/A | $0 | $41,670 |

**Sub-Investment Advisor – Absolute Total Return Fund**

ATR Advisors, LLC, originally founded in 2003, is an investment advisory firm that has been retained to act as the Sub-Advisor to the Fund under a Sub-Advisory Agreement ("Sub-Advisory Agreement") with the Advisor. ATR is a Connecticut limited liability company, located at 2452 Black Rock Turnpike, Fairfield, CT 06825-2407. In addition to serving as investment sub-advisor to the Fund, it provides investment advice and investment management to individuals and trusts.

As compensation for the sub-advisory services it provides to the Funds, the Advisor will pay ATR 50% of the net advisory fees earned by the Advisor from each Fund. For this purpose, "net advisory fees" mean advisory

66

fees collected from the Fund (net of fee waivers due to expense caps) less any revenue sharing and asset-based fees paid to broker-dealers or custodians with assets in the Fund. The fee paid to the Sub-Advisor by the Advisor will be paid from the Advisor's management fee and is not an additional cost to the Funds. The Sub-Advisory Agreement is effective for an initial two year period and continues in effect for successive twelve-month periods, provided that the Board of Trustees annually approves it for continuance. The Sub-Advisory Agreement for the Absolute Total Return Fund was approved by the Board on May 15, 2014. A discussion of the matters considered by the Board in connection with the approval of the Sub-Advisory Agreement will be contained in the semi-annual report to shareholders for the period ending December 31, 2014.

**Sub-Investment Advisor – High Income Fund and TRI Fund**

SMH Capital Advisors, Inc., an investment advisory firm founded in 1997 ("SMHCA"), has been retained to act as the Sub-Advisor to the Funds under an Investment Sub-Advisory Agreement ("Sub-Advisory Agreement") with the Advisor.  SMHCA also provides investment advisory services to high net worth individuals, pension and profit sharing plans and charitable organizations. SMHCA is a subsidiary of The Edelman Financial Group Inc. ("TEFG"), a financial service holding company with principal office in Houston, Texas and Fairfax, Virginia, and an indirect wholly-owned subsidiary of Lee Summer LP., a holding company formed by equity investors led by Lee Equity Partners, LLC ("LEP") and Ric Edelman. The Investment Advisor and the Trustees have chosen to engage SMHCA's services as Sub-Advisor to the Fund in part because of SMHCA's prior expertise and performance in advising other accounts similar in objective to that of the Funds.

As compensation for the sub-advisory services it provides to the Funds, the Advisor will pay SMHCA 50% of the net advisory fees earned by the Advisor from each Fund. For this purpose, "net advisory fees" mean advisory fees collected from the Fund (net of fee waivers due to expense caps) less any revenue sharing and asset-based fees paid to broker-dealers or custodians with assets in the Fund. The fee paid to the Sub-Advisor by the Advisor will be paid from the Advisor's management fee and is not an additional cost to the Funds. The Sub-Advisory Agreement is effective for an initial two year period and continues in effect for successive twelve-month periods, provided that the Board of Trustees annually approves it for continuance. The Sub-Advisory Agreement for the High Income Fund and the Total Return Income Fund was most recently renewed by the Board on August 26, 2014.  A discussion of the matters considered by the Board in connection with the approval of the Sub-Advisory Agreement will be contained in the semi-annual report to shareholders for the period ending December 31, 2014. For the previous three fiscal years, SMHCA earned the following amounts in sub-advisory fees for its services to the High Income and TRI Funds:

| | Fiscal Period Ended June 30, 2014 | Fiscal Period Ended June 30, 2013 | Fiscal Year Ended June 20, 2012 |
|---|---|---|---|
| High Income Fund | $364,587 | $589,563 | $615,484 |
| TRI Fund | $221,838 | $258,013 | $334,699 |

**Sub-Investment Advisor – GOI Fund and Aggressive Growth Fund**

Groesbeck Investment Management Corp. ("GIM"), an investment advisory firm founded in 1993, has been retained to act as the Sub-Advisor to the Fund under an Investment Sub-Advisory Agreement ("Sub-Advisory Agreement") with the Advisor.  GIM is controlled by Robert Groesbeck, GIM's President and Chief Compliance Officer.  GIM also provides investment advisory services to high net worth individuals, pension and profit sharing plans and charitable organizations. The Investment Advisor and the Trustees have chosen to engage GIM as Sub-Advisor to the Fund in part because of GIM's prior expertise and performance in advising other accounts similar in objective to that of the Fund.

As compensation for the sub-advisory services it provides to the Fund, the Investment Advisor will pay GIM 50% of the net advisory fees earned by the Investment Advisor from the Fund. For this purpose, "net advisory fees" mean advisory fees collected from the Fund (net of fee waivers due to expense caps) less any revenue sharing and asset-based fees paid to broker-dealers or custodians with assets in the Fund. The fee paid to the Sub-Advisor by the Investment Advisor will be paid from the Investment Advisor's management fee and is not an additional cost to

67

the Fund. The Sub-Advisory Agreement is effective for an initial two year period and continues in effect for successive twelve-month periods, provided that the Board of Trustees annually approves it for continuance. The Sub-Advisory Agreement for the Growth of Income Fund was most recently renewed by the Board on May 15, 2014. A discussion of the matters considered by the Board in connection with the approval of the Sub-Advisory Agreement can be found in the Fund's Annual Report to Shareholders dated June 30, 2014. The Sub-Advisor has agreed to pay 100% of the start-up costs of the Fund, which it expects to recoup through sub-advisory fees received. For the fiscal periods ended June 30, 2012, June 30, 2013 and June 30, 2014, GIM earned $30,045, $57,090 and $77,972, respectively, in sub-advisory fees for its services to the GOI Fund.

The Sub-Advisory Agreement for the Aggressive Growth Fund was initially approved by the Board on April 1, 2014. A discussion of the matters considered by the Board in connection with the approval of the Sub-Advisory Agreement will be contained in the semi-annual report to shareholders for the period ending December 31, 2014.

**Sub-Investment Advisor – Global TRI Fund and Global Appreciation Fund**

Managed Asset Portfolios, LLC ("MAP")., an investment advisory firm founded in 2000, has been retained to act as the Sub-Advisor to the Funds under an Investment Sub-Advisory Agreement ("Sub-Advisory Agreement") with the Advisor.  MAP is controlled by Michael Dzialo, MAP's President and Managing Member.  MAP also provides investment advisory services to high net worth individuals, pension and profit sharing plans and charitable organizations. The Investment Advisor and the Trustees have chosen to engage MAP's services as Sub-Advisor to the Funds in part because of MAP's prior expertise and performance in advising other accounts similar in objective to that of the Funds.

As compensation for the sub-advisory services it provides to the Funds, the Advisor will pay MAP 50% of the net advisory fees earned by the Advisor from each Fund. For this purpose, "net advisory fees" mean advisory fees collected from the Fund (net of fee waivers due to expense caps) less any revenue sharing and asset-based fees paid to broker-dealers or custodians with assets in the Fund. The fee paid to the Sub-Advisor by the Advisor will be paid from the Advisor's management fee and is not an additional cost to the Funds. The Sub-Advisory Agreement is effective for an initial two year period and continues in effect for successive twelve-month periods, provided that the Board of Trustees annually approves it for continuance. The Sub-Advisory Agreement for the Global Total Return Income Fund and Global Capital Appreciation Fund was most recently renewed by the Board on May 15, 2014. A discussion of the matters considered by the Board in connection with the approval of the Sub-Advisory Agreement can be found in the Fund's Annual Report to Shareholders dated June 30, 2014. For the fiscal periods ended June 30, 2012, 2013 and 2014, MAP earned the following amounts in sub-advisory fees for its services to the Global TRI and Global Appreciation Funds:

| | Fiscal Period Ended June 30, 2014 | Fiscal Year Ended June 30, 2013 | Fiscal Period Ended June 30, 2012 |
|---|---|---|---|
| Global TRI Fund | $57,145 | $25,237 | $1,205 |
| Global Appreciation Fund | $72,733 | $21,214 | $121 |

**Sub-Investment Advisor – Hedged Premium Return and Tactical Allocation Fund**

Lyons Wealth Management LLC ("Lyons"), an investment advisory firm founded in 2009, has been retained to act as the Sub-Advisor to the Hedged Premium Return Fund and Tactical Allocation Fund under an Investment Sub-Advisory Agreement ("Sub-Advisory Agreement") with the Advisor.  Lyons is controlled by Alexander Read.  Lyons also provides investment advisory services to high net worth individuals and associated trusts, estates, pension and profit sharing plans. The Advisor and the Trustees have chosen to engage Lyons' services as Sub-Advisor to the Tactical Allocation Fund in part because of Lyons' prior expertise and performance in advising other accounts similar in objective to that of the Fund.

As compensation for the sub-advisory services it provides to the Tactical Allocation Fund, the Advisor will pay Lyons 50% of the net advisory fees earned by the Advisor from the Fund. For this purpose, "net advisory fees"

68

mean advisory fees collected from the Fund (net of fee waivers due to expense caps) less any revenue sharing and asset-based fees paid to broker-dealers or custodians with assets in the Fund. The fee paid to the Sub-Advisor by the Advisor will be paid from the Advisor's management fee and is not an additional cost to the Fund. The Sub-Advisory Agreement is effective for an initial two year period and continues in effect for successive twelve-month periods, provided that the Board of Trustees annually approves it for continuance. The Sub-Advisory Agreement for the Tactical Allocation Fund was approved by the Board on February 11, 2014 and for the Hedged Premium Return Fund on February 26, 2012. A discussion of the matters considered by the Board in connection with the approval of the Sub-Advisory Agreement can be found in the Fund's Annual Report to Shareholders dated June 30, 2014. For the fiscal periods ended June 30, 2013 and June 30, 2014 Lyons earned $13,658 and $190,540, respectively, in sub-advisory fees for its services to the Tactical Allocation Fund.

**Sub-Investment Advisor – Dynamic Alpha Fund**

Cookson, Peirce & Co., Inc., an investment advisory firm founded in 1984 ("CP" or the "Sub-Advisor"), has been retained to act as the Sub-Advisor to the Dynamic Alpha Fund under an Investment Sub-Advisory Agreement ("Sub-Advisory Agreement") with the Advisor. Over the last 20 years, the Sub-Advisor has managed the assets of some of the country's most prominent families and institutions. As of August 30, 2014, the Sub-Advisor had approximately $649 million in assets under management. The Investment Advisor and the Trustees have chosen to engage CP's services as Sub-Advisor to the Dynamic Alpha Fund in part because of CP's prior expertise and performance in advising other accounts similar in objective to that of the Fund.

As compensation for the sub-advisory services it provides to the Dynamic Alpha Fund, the Advisor will pay the Sub-Advisor a minimum of 50% of the net advisory fees earned by the Advisor from the Fund. For this purpose, "net advisory fees" mean advisory fees collected from the Dynamic Alpha Fund (net of fee waivers due to expense caps) less any revenue sharing and asset-based fees paid to broker-dealers or custodians with assets in the Fund. The fee paid to the Sub-Advisor by the Advisor will be paid from the Advisor's management fee and is not an additional cost to the Dynamic Alpha Fund. The Sub-Advisory Agreement is effective for an initial two year period and continues in effect for successive twelve-month periods, provided that the Board of Trustees annually approves it for continuance. The Sub-Advisory Agreement for the Dynamic Alpha Fund was renewed by the Board on November 25, 2013. A discussion of the matters considered by the Board in connection with the approval of the Sub-Advisory Agreement can be found in the Fund's Annual Report to Shareholders dated June 30, 2014. For the fiscal period ended June 30, 2012, June 30, 2013 and June 30, 2014, CP earned $52,857, $169,898 and $210,968, respectively, in sub-advisory fees for its services to the Dynamic Alpha Fund.

**Sub-Investment Advisor  - Floating Rate Income Fund**

Princeton Advisory Group, Inc. ("Princeton" or "Sub-Advisor"), an investment advisory firm founded in 2002, has been retained to act as the Sub-Advisor to the Fund under an Investment Sub-Advisory Agreement ("Sub-Advisory Agreement") with the Advisor. Princeton also provides investment advice to high net worth individuals, corporations, endowments and other pooled and special purpose investment vehicles. The Advisor and the Trustees have chosen to engage Princeton's services as Sub-Advisor to the Fund in part because of Princeton's prior expertise and performance in advising other accounts similar in objective to that of the Funds.

As compensation for the sub-advisory services it provides to the Fund, the Advisor will pay Princeton 50% of the net advisory fees earned by the Advisor from the Fund. For this purpose, "net advisory fees" mean advisory fees collected from the Fund (net of fee waivers due to expense caps) less any revenue sharing and asset-based fees paid to broker-dealers or custodians with assets in the Fund. The fee paid to the Sub-Advisor by the Advisor will be paid from the Advisor's management fee and is not an additional cost to the Fund. The Sub-Advisory Agreement is effective for an initial two year period and continues in effect for successive twelve-month periods, provided that the Board of Trustees annually approves it for continuance. The Sub-Advisory Agreement for the Floating Rate Income Fund was initially approved by the Board on November 26, 2012. A discussion of the matters considered by the Board in connection with the approval of the Sub-Advisory Agreement can be found in the Fund's Annual Report to Shareholders dated June 30, 2014. For the fiscal period ended June 30, 2013, Princeton earned $0 in sub-advisory fees for its services to the Floating Rate Income Fund.  For the fiscal period ended June 30, 2014, Princeton earned $129,748 in sub-advisory fees for its services to the Floating Rate Income Fund.

**Sub-Investment Advisor – Macro Strategy Fund**

Castle Financial & Retirement Planning Associates Inc. ("Castle Financial" or the "Sub-Advisor"), an investment advisory firm founded in 1992, has been retained to act as the Sub-Advisor to the Fund under an Investment Sub-Advisory Agreement ("Sub-Advisory Agreement") with the Advisor. The Sub-Advisor is controlled by Al Procaccino, II, the Sub-Advisor's President, Chief Executive Officer and Chief Compliance Officer. Sub-Advisor also provides investment advisory services to individuals, high net worth individuals, and pension and profit sharing plans. The Investment Advisor and the Trustees have chosen to engage Sub-Advisor as the sub-advisor to the Fund in part because of Sub-Advisor's prior expertise and performance in advising other accounts.

As compensation for the sub-advisory services it provides to the Fund, the Advisor will pay the Sub-Advisor 50% of the net advisory fees earned by the Advisor from the Fund. For this purpose, "net advisory fees" mean advisory fees collected from the Fund (net of fee waivers due to expense caps) less any revenue sharing and asset-based fees paid to broker-dealers or custodians with assets in the Fund. The fee paid to the Sub-Advisor by the Advisor will be paid from the Advisor's management fee and is not an additional cost to the Fund. The Sub-Advisory Agreement is effective for an initial two year period and continues in effect for successive twelve-month periods, provided that the Board of Trustees annually approves it for continuance. The Sub-Advisory Agreement was initially approved at a meeting of the Board of Trustees of the Trust held on February 11, 2014. A discussion of the matters considered by the Board in connection with the renewal of the Sub-Advisory Agreement is available in Fund's Annual Report to Shareholders dated June 30, 2014. For the fiscal period ended June 30, 2014, Castle Financial earned $63,186 in sub-advisory fees for its services to the Macro Strategy Fund.

**Portfolio Consultant – EquityCompass Buyback Strategies Fund**

Choice Financial Partners, Inc. d/b/a EquityCompass Strategies ("EquityCompass" or the "Portfolio Consultant") is a registered investment advisor located at 501 North Broadway, St. Louis, Missouri 63102. Choice Financial Partners, Inc. is a Missouri corporation and a wholly-owned subsidiary of Stifel Financial Corp. (NYSE: SF). The Portfolio Consultant was formed in 2007 and registered with the SEC as an investment advisor in May 2008. In addition to serving as portfolio consultant to the Fund, EquityCompass offers a broad range of portfolio strategies based on its research driven, rules-based investment process which merges traditional investment theory with quantitative techniques. EquityCompass portfolio strategies are provided to its clients as model portfolios or through investment vehicles such as structured notes or similar equity-linked instruments.

As compensation for the portfolio consultancy services it provides to the Fund, the Advisor will pay the Portfolio Consultant 40% of the net advisory fees earned by the Advisor from the Fund. For this purpose, "net" advisory fees are defined as the Advisor's management fees from the Fund, less applicable fee waivers due to the expense limitation agreement and any documented revenue sharing, administration, account-based and asset-based fees or sub-transfer agency fees not paid by the Fund. The fee paid to the Portfolio Consultant by the Advisor will be paid from the Advisor's management fee and is not an additional cost to the Fund. The Portfolio Consultancy Agreement is effective for an initial two year period and continues in effect for successive twelve-month periods, provided that the Board of Trustees annually approves it for continuance. For the fiscal period ended June 30, 2014, EquityCompass earned $16,688 in sub-advisory fees for its services to the EquityCompass Buyback Strategies Fund.

**Portfolio Managers –Small-Cap Insider Buying Fund, Hedged Insider Buying Fund, Insider Buying and Insider Long/Short Fund, Activist Investor Fund and Insider Income Fund**

David Miller is the senior portfolio manager responsible for the day-to-day management of the Catalyst Small-Cap Insider Buying Fund, Hedged Insider Buying Fund, Insider Buying, Insider Long/Short Fund, Activist Fund and Insider Income Fund. Jerry Szilagyi is co-portfolio manager for the Hedged Insider Buying Fund. Mr. Schoonover is co-portfolio manager for the Insider Income Fund. Messrs. Miller and Szilagyi's compensation from the Fund's advisor is based on a percentage of the overall profits of the advisor. They are also entitled to a portion of the proceeds if the advisor sells all or a portion of the advisor's business. They also participate in a pension plan. Mr. Schoonover's compensation from the Advisor is a fixed base salary and a discretionary bonus based on performance and the profitability of the Funds that he serves as a portfolio manager.

70

**Portfolio Managers – Absolute Total Return Fund**

Subject to the oversight and approval of the Advisor, Mr. Shawn Blau and Mr. William Kennedy, as portfolio managers, are jointly and primary responsible for the day-to-day management of the portfolio of the Fund. Mr. Blau and Mr. Kennedy's compensations are based on a salary plus a bonus based on the overall profits of ATR.

**Portfolio Manager – Event Arbitrage Fund**

Paul Rosenberg is the portfolio manager responsible for the day-to-day management of the Event Arbitrage Fund. Mr. Rosenberg's compensation is based on a percentage of the net profits received by the Advisor for its services under the Event Arbitrage Fund's Management Agreement. He does not receive bonuses or participate in a pension plan.

**Portfolio Manager – Hedged Futures Strategy Fund**

Edward Walczar is the portfolio manager responsible for the day-to-day management of the Hedged Futures Fund. Mr. Walczar's compensation is based on a percentage of the net profits received by the Advisor for its services under the Hedged Futures Fund's Management Agreement. He does not receive bonuses or participate in a pension plan.

**Portfolio Managers - High Income Fund and TRI Fund**

Subject to the oversight and approval of the Advisor, Mr. Dwayne Moyers, Mr. Morgan Neff and Mr. Daniel Rudnitsky, as portfolio managers, have sole responsibility for the day-to-day management of the portfolio of the Funds. Messrs. Moyers, Neff and Rudnitsky's compensation is based on a salary plus a bonus based on the overall profits of SMHCA. They are also contractually entitled to a portion of the proceeds if the advisor sells all or a portion of the advisor's business.

**Portfolio Managers – GOI Fund and Aggressive Growth Fund**

Subject to the oversight and approval of the Advisor, Mr. Robert Groesbeck and Mr. Robert Dainesi, as portfolio managers, have primary responsibility for the day-to-day management of the portfolio of the GOI Fund.  Messrs. Groesbeck and Dainesi's compensation is based on a salary plus a bonus based on the overall profits of GIM. Messrs. Groesbeck and Dainesi are also owners of GIM and therefore benefit for any increase in value of the firm. Mr. Groesbeck has primary responsibility for the day-to-day management of the portfolio of the Aggressive Growth Fund.

**Portfolio Managers – Global TRI Fund and Global Capital Appreciation Fund**

Subject to the oversight and approval of the Advisor, Mr. Michael Dzialo, Mr. Peter Swan and Karen Culver, as portfolio managers, have primary responsibility for the day-to-day management of the portfolio of the Funds. Mr. Dzialo's compensation is based on a salary plus the overall profits of MAP. He is also the majority owner of MAP and therefore benefits from any increase in value of the firm. Mr. Swan's compensation is based on a salary plus a percentage of the profits from MAP's mutual fund business. He also holds an ownership stake in the firm and therefore benefits proportionately from any increase in the value of the firm. Ms. Culver's compensation is based on a salary plus a percentage of the profits from MPA's mutual fund business. She also holds an ownership stake in the firm and therefore benefits proportionately from any increase in the value of the firm.

**Portfolio Manager – Hedged Premium Return Fund and Tactical Allocation Fund**

71

Subject to the oversight and approval of the Advisor, Alexander Read and Louis A. Stevens are jointly and primarily responsible for the day-to-day management of the portfolio of the Hedged Premium Return Fund and Mr. Louis A. Stevens is primarily responsibility for the day-to-day management of the portfolio of the Tactical Allocation Fund.  Messrs. Read and Stevens' compensation from Lyons is based on a salary plus a bonus based on the overall profits of Lyons.

**Portfolio Managers – Dynamic Alpha Fund**

Bruce W. Miller and Cory S. Krebs are the portfolio managers responsible for the day-to-day management of the Dynamic Alpha Fund. Messrs. Miller and Krebs' compensation from the Funds' sub-advisor is based on a fixed salary plus bonus based on the overall profits of the Sub-Advisor.  They are also entitled to a portion of the proceeds if the sub-advisor sells all or a portion of the advisor's business.  They also participate in a 401(k) retirement plan.

**Portfolio Managers –Floating Rate Income Fund**

Munish Sood and Paul Malecki serve as the Fund's portfolio managers responsible for the day-to-day management of the Fund. The portfolio manager's compensation from the Fund's Sub-Advisor is based on a fixed salary plus a bonus based on the profitability of the Sub-Advisor.

**Portfolio Manager – Macro Strategy Fund**

Al Procaccino, II and Korey Bauer serves as the Fund's portfolio managers responsible for the day-to-day management of the Fund. Each Messrs. Procaccino and Bauer receive a salary from the Sub-Advisor. Mr. Bauer also receives a bonus as the discretion of the Sub-Advisor. In addition, Messrs. Procaccino and Bauer receive a portion of the fee received pursuant to the Sub-Advisory Agreement.

**Portfolio Manager and Portfolio Management Consultant - EquityCompass Buyback Strategies Fund**

Michael Schoonover serves as the Fund's portfolio manager and, in that capacity, is primarily responsible for the day-to-day management of the Fund including execution of portfolio transactions. The Advisor compensates the portfolio manager with a fixed base salary and a discretionary bonus based on performance and the profitability of the Fund.

Timothy M. McCann serves as the Fund's portfolio management consultant and, in such capacity, provides the Advisor with investment recommendations in the form of model portfolios based on the Portfolio Consultant's share buyback strategy. The Portfolio Consultant compensates the portfolio management consultant with a fixed base salary and a discretionary bonus that is based on the portfolio management consultant's individual performance, his contribution to overall EquityCompass performance as well as EquityCompass's net revenues for the year.  In assessing the portfolio management consultant's performance, the Portfolio Consultant considers the investment performance of the portfolio strategies for which such portfolio manager is responsible, measured on a pre-tax basis, over the 1-, 3- and 5-year time horizons (as applicable).

As of June 30, 2014, the number of, and total assets in all registered investment companies, other pooled investment vehicles, and other accounts overseen by David Miller, Jerry Szilagyi, Paul Rosenberg, Michael Schoonover, Shawn Blau, William Kennedy, Edward Walczak, Dwayne Moyers, Morgan Neff, Daniel Rudnitsky, Robert Groesbeck, Robert Dainesi, Michael Dzialo, Peter Swan, Karen Culver, Alexander Read, Louis A. Stevens, Bruce W. Miller, Cory S. Krebs, Munish Sood, Paul Malecki, Al Procaccino and Korey Bauer are as follows:

72

| Name of Portfolio Manager | Registered Investment Companies | | Other Pooled Investment Vehicles Managed | | Other Accounts Managed | |
|---|---|---|---|---|---|---|
| | Number | Total Assets (millions) | Number | Total Assets (millions) | Number | Total Assets (millions) |
| David Miller | 4 | $393 | N/A | N/A | N/A | N/A |
| Jerry Szilagyi | 1 | $35 | N/A | N/A | N/A | N/A |
| Paul Rosenberg | 1 | $17 | N/A | N/A | N/A | N/A |
| Michael Schoonover | 1 | $23 | N/A | N/A | N/A | N/A |
| Shawn Blau | N/A | N/A | N/A | N/A | 75 | $32 |
| William Kennedy | N/A | N/A | N/A | N/A | 75 | $32 |
| Edward Walczak | 1 | 155 | 0 | 0 | 83 | $11 |
| Dwayne Moyers | 3 | $125 | 2 | $9 | 1,674 | $1,073 |
| Morgan Neff | 3 | $125 | 2 | $9 | 1,674 | $1,073 |
| Daniel Rudnitsky | 3 | $125 | 2 | $9 | 1,674 | $1,073 |
| Robert Groesbeck | 1 | $21 | N/A | N/A | 185 | $232 |
| Robert Dainesi | 1 | $21 | N/A | N/A | 185 | $232 |
| Michael Dzialo | 2 | $44 | 1 | $16 | 984 | $348 |
| Peter Swan | 2 | $44 | N/A | N/A | 984 | $348 |
| Karen Culver | 2 | $44 | 1 | $16 | 984 | $348 |
| Alexander Read | 1 | $6 | 1 | $2 | 312 | $99 |
| Louis A. Stevens | 2 | $106 | 1 | $2 | 41 | $21 |
| Bruce W. Miller | 1 | $32 | 0 | $0 | 519 | $605 |
| Cory S. Krebs | 1 | $32 | 0 | $0 | 519 | $605 |
| Munish Sood | 1 | $78 | 4 | $255 | 5 | $297 |
| Paul Malecki | 1 | $78 | 4 | $255 | 5 | $297 |
| Al Procaccino | 1 | $43 | 0 | 0 | 328 | $78 |
| Korey Bauer | 1 | $43 | 0 | 0 | 328 | $78 |

73

The advisory fee for the registered investment companies, other pooled investment vehicles or other accounts managed by each of the portfolio managers listed above, except those managed by Edward Walczak, Munish Sood and Paul Malecki, are not based on the performance of the respective account. Edward Walczak manages each of the other accounts listed above pursuant to limited power of attorney agreement between the accounts and Harbor Financial, LLC ("Harbor"). Mr. Walczak is a principal of Harbor. A portion of the advisory fee received by Harbor from each of these accounts (collective assets totaling $10.9 million) is based on the performance of the respective account.  A portion of the advisory fee received by Princeton from each of the two pooled other investment vehicles managed by Munish Sood and Paul Malecki listed above (collective assets totaling $35 million) is based on the performance of the respective pooled investment vehicles.

The following table shows the dollar range of equity securities of the Funds beneficially owned by each portfolio manager as of June 30, 2014.

| Name of Portfolio Manager | Fund Name | Dollar Range of Equity Securities in the Funds |
|---|---|---|
| David Miller | Small-Cap Insider Buying Fund | $10,001-$50,000 |
| | Hedged Insider Buying Fund | $0 |
| | Insider Buying Fund | $0 |
| | Insider Long/Short Fund | $0 |
| | Activist Investor Fund | $0 |
| | Insider Income Fund | $0 |
| | Absolute Total Return Fund | $0 |
| Jerry Szilagyi | Hedged Insider Buying Fund | $100,001-$500,000 |
| Michael Schoonover | Insider Income Fund* | $0 |
| | EquityCompass Buyback Strategy Fund | $0 |
| Shawn Blau | Absolute Total Return Fund* | $0 |
| William Kennedy | Absolute Total Return Fund* | $0 |
| Paul Rosenberg | Event Arbitrage Fund | $100,001-$500,000 |
| Edward Walczak | Hedged Futures Fund | $500,001-$1,000,000 |
| Dwayne Moyers | High Income Fund | $0 |
| | TRI Fund | $0 |
| Morgan Neff | High Income Fund | $0 |
| | TRI Fund | $0 |

74

| Daniel Rudnitsky | High Income Fund | $0 |
|---|---|---|
|  | TRI Fund | $0 |
| Robert Groesbeck | GOI Fund | Over $1,000,000 |
|  | Aggressive Growth Fund* | $0 |
| Robert Dainesi | GOI Fund | $100,001-$500,000 |
|  | Global TRI Fund | $50,001 - $100,000 |
| Michael Dzialo | Global Capital Appreciation Fund | $0 - $10,000 |
|  | Global TRI Fund | $0 |
| Peter Swan | Global Capital Appreciation Fund | $50,001 - $100,000 |
|  | Global TRI Fund | $0 |
| Karen Culver | Global Capital Appreciation Fund | $0 |
| Alexander Read | Hedged Premium Return Fund | $50,001-$100,000 |
|  | Tactical Allocation Fund | $0 |
| Louis Stevens | Hedged Premium Return Fund | $0 |
| Bruce W. Miller | Core Equity Fund | $50,001-$100,000 |
| Cory S. Krebs | Core Equity Fund | $10,001-$50,000 |
| Munish Sood | Floating Rate Income Fund | $50,001-$100,000 |
| Paul Malecki | Floating Rate Income Fund | $0 |
| Al Procaccino | Macro Strategy Fund | $500,001-$1,000,000 |
| Korey Bauer | Macro Strategy Fund | $0 - $10,000 |

*The Activist Investor Fund, Insider Income Fund, Absolute Total Return Fund and Aggressive Growth Fund had not commenced operations as of June 30, 2014.

**Potential Conflicts of Interest – Advisor and Sub-Advisors**

Actual or apparent conflicts of interest may arise when a portfolio manager has day-to-day management responsibilities with respect to more than one fund or other accounts.  More specifically, portfolio managers who manage multiple funds are presented with the following potential conflicts:

The management of multiple accounts may result in a portfolio manager devoting unequal time and attention to the management of each account.  The management of multiple funds and accounts also may give rise to potential conflicts of interest if the funds and accounts have different objectives, benchmarks, time horizons, and fees as the portfolio manager must allocate his time and investment ideas across multiple funds and accounts.

75

- With respect to securities transactions for the Funds, the advisor or sub-advisors determines which broker to use to execute each order, consistent with the duty to seek best execution of the transaction. The portfolio manager may execute transactions for another fund or account that may adversely impact the value of securities held by the Funds. Securities selected for funds or accounts other than the Funds may outperform the securities selected for the Funds.

- The appearance of a conflict of interest may arise where an advisor or sub-advisor has an incentive, such as a performance-based management fee. The management of personal accounts may give rise to potential conflicts of interest; there is no assurance that the Funds' code of ethics will adequately address such conflicts. One of the portfolio manager's numerous responsibilities is to assist in the sale of Fund shares. Because the portfolio manager's compensation is indirectly linked to the sale of Fund shares, they may have an incentive to devote time to marketing efforts designed to increase sales of Fund shares.

- Although the Portfolio Managers generally do not trade securities in their own personal account, each of the Funds has adopted a code of ethics that, among other things, permits personal trading by employees under conditions where it has been determined that such trades would not adversely impact client accounts. Nevertheless, the management of personal accounts may give rise to potential conflicts of interest, and there is no assurance that these codes of ethics will adequately address such conflicts.

Each advisor, sub-advisor and the Funds have adopted certain compliance procedures which are designed to address these types of conflicts. However, there is no guarantee that such procedures will detect each and every situation in which a conflict arises.


## CODE OF ETHICS

Catalyst, SMHCA, GIM, MAP, Lyons, CP, Princeton, Castle Financial, Northern Lights Distributors, LLC and the Funds have adopted codes of ethics under Rule 17j-1(c) of the 1940 Act. The purpose of each code is to avoid potential conflicts of interest and to prevent fraud, deception or misconduct with respect to the Funds. Such codes of ethics permit personnel covered by the codes to invest in securities that may be purchased by the Funds, subject to the restrictions of the code. The codes are filed as exhibits to the Trust's registration statement.


## TRANSFER AGENT, FUND ACCOUNTING AGENT AND ADMINISTRATOR

Gemini Fund Services, LLC ("GFS"), which has its principal office at 80 Arkay Drive., Hauppauge, New York 11788, serves as administrator, fund accountant and transfer agent for the Fund pursuant to a Fund Services Agreement (the "Agreement") with the Trust and subject to the supervision of the Board. GFS is primarily in the business of providing administrative, fund accounting and transfer agent services to retail and institutional mutual funds. GFS is an affiliate of the Distributor.

GFS may also provide persons to serve as officers of the Fund. Such officers may be directors, officers or employees of GFS or its affiliates.

The Agreement became effective on April 30, 2012 and will remain in effect for an initial term of three years from the applicable effective date for the Fund, and will continue in effect for successive twelve-month periods provided that such continuance is specifically approved at least annually by a majority of the Board. The Agreement is terminable by the Board or GFS on 90 days' written notice and may be assigned by either party, provided that the Trust may not assign this agreement without the prior written consent of GFS. The Agreement provides that GFS shall be without liability for any action reasonably taken or omitted pursuant to the Agreement.

Under the Agreement, GFS performs administrative services, including: (1) monitor the performance of administrative and professional services rendered to the Trust by others service providers; (2) monitor Fund holdings and operations for post-trade compliance with the Fund's registration statement and applicable laws and rules; (3) prepare and coordinate the printing of semi-annual and annual financial statements; (4) prepare selected

76

management reports for performance and compliance analyses; (5) prepare and disseminate materials for and attend and participate in meetings of the Board; (6) determine income and capital gains available for distribution and calculate distributions required to meet regulatory, income, and excise tax requirements; (7) review the Trust's federal, state, and local tax returns as prepared and signed by the Trust's independent public accountants; (8) prepare and maintain the Trust's operating expense budget to determine proper expense accruals to be charged to each Fund to calculate its daily net asset value; (9) assist in and monitor the preparation, filing, printing and where applicable, dissemination of periodic reports to the Trustees, shareholders and the SEC, notices pursuant to Rule 24f-2, proxy materials and reports to the SEC on Forms N-SAR, N-CSR, N-Q and N-PX; (10) coordinate the Trust's audits and examinations by assisting each Fund's independent public accountants; (11) determine, in consultation with others, the jurisdictions in which shares of the Trust shall be registered or qualified for sale and facilitate such registration or qualification; (12) monitor sales of shares and ensure that the shares are properly and duly registered with the SEC; (13) monitor the calculation of performance data for the Fund; (14) prepare, or cause to be prepared, expense and financial reports; (15) prepare authorization for the payment of Trust expenses and pay, from Trust assets, all bills of the Trust; (16) provide information typically supplied in the investment company industry to companies that track or report price, performance or other information with respect to investment companies; (17) upon request, assist each Fund in the evaluation and selection of other service providers, such as independent public accountants, printers, EDGAR providers and proxy solicitors (such parties may be affiliates of GFS); and (18) perform other services, recordkeeping and assistance relating to the affairs of the Trust as the Trust may, from time to time, reasonably request.

GFS also provides the Funds with accounting services, including: (i) daily computation of net asset value; (ii) maintenance of security ledgers and books and records as required by the 1940 Act; (iii) production of the Funds' listing of portfolio securities and general ledger reports; (iv) reconciliation of accounting records; (v) calculation of yield and total return for the Funds; (vi) maintaining certain books and records described in Rule 31a-1 under the 1940 Act, and reconciling account information and balances among the Funds' custodian and Advisor; and (vii) monitoring and evaluating daily income and expense accruals, and sales and redemptions of shares of the Funds.

GFS also acts as transfer, dividend disbursing, and shareholder servicing agent for the Funds pursuant to the Agreement. Under the agreement, GFS is responsible for administering and performing transfer agent functions, dividend distribution, shareholder administration, and maintaining necessary records in accordance with applicable rules and regulations.

For these services, each of the Funds pay GFS an annual asset-based fee of 0.13% of net assets up to $50 million, with lower fees at higher asset levels, plus reimbursement of out-of-pocket expenses. The Funds paid the following amounts to GFS for the period April 30, 2012 to June 30, 2012, fiscal year ended June 30, 2013 and fiscal year ended June 30, 2014:

| Fund | Fiscal Period Ended June 30, 2012 | Fiscal Year Ended June 30, 2013 | Fiscal Year Ended June 30, 2014 |
|---|---|---|---|
| Small-Cap Insider Buying Fund | $6,755 | $45,625 | $52,398 |
| Hedged Insider Buying Fund | $4,144 | $9,601 | $18,853 |
| Insider Buying | $3,197 | $1,848 | $68,279 |
| Insider Long/Short Fund | $1,057 | $7,853 | $4,811 |
| Activist Insider Fund | N/A | N/A | N/A |
| Insider Income Fund | N/A | N/A | N/A |
| Absolute Total Return Fund | N/A | N/A | N/A |
| Event Arbitrage Fund | N/A | $20,220 | $17,911 |

77

| | | | |
|---|---|---|---|
| Hedged Futures Strategy Fund | N/A | N/A | $27,780 |
| High Income Fund | $23,792 | $119,460 | $69,191 |
| TRI Fund | $12,629 | $53,362 | $41,505 |
| GOI Fund | $4,470 | $17,405 | $16,208 |
| Aggressive Growth Fund | N/A | N/A | N/A |
| Global TRI | $3,719 | $19,874 | $20,700 |
| Global Appreciation Fund | $4,181 | $14,897 | $19,646 |
| Hedged Premium Return Fund | N/A | N/A | $2,033 |
| Tactical Allocation Fund | N/A | $9,690 | $45,472 |
| Dynamic Alpha Fund | $5,187 | $23,296 | $23,438 |
| Floating Rate Income Fund | N/A | $2,162 | $53,771 |
| Macro Strategy Fund | N/A | N/A | $8,486 |
| Equity/Compass Buyback Strategies Fund | N/A | N/A | $6,362 |

The Activist Insider Fund, Insider Income Fund, Aggressive Growth Fund, Absolute Total Return Fund and Hedged Premium Return Fund were not in operation during the periods indicated in the table above.

Prior to April 30, 2012, Matrix 360 Administration, LLC ("MFS") provided the Funds with transfer agent, accounting, compliance and administrative services. MFS is located at 630 Fitzwatertown Road, Building A, 2nd Floor, Willow Grove, PA 19090. MFS maintained the records of the shareholder's account, answered shareholders' inquiries concerning their accounts, processed purchases and redemptions of the Funds' shares, acted as dividend and distribution disbursing agent and performed other transfer agent and shareholder service functions. In addition, MFS provided the Funds with fund accounting services, which included certain monthly reports, record-keeping and other management-related services and administrative services. For these services, the Funds paid MFS the greater of $9,000 per year or an annual asset-based fee of 0.15% of net assets up to $50 million, with lower fees at higher asset levels, plus reimbursement of out-of-pocket expenses. Until March 15, 2012, MFS also provided the Funds with the services of a Chief Compliance Officer. For these compliance services, the Fund paid MFS $7,000 annually.

The Funds paid the following amounts to MFS for its services during the periods indicated:

| | Period July 1, 2012 to April 27, 2012 |
|---|---|
| Small-Cap Insider Buying Fund | $102,103 |
| Hedged Insider Buying Fund | $17,494 |
| Insider Buying | $15,917 |
| High Income Fund | $132,620 |
| TRI Fund | $91,118 |
| GOI Fund | $22,207 |
| Global TRI | $15,849 |

78

| | |
|---|---|
| Global Appreciation Fund | $15,855 |
| Dynamic Alpha Fund | $13,585 |

The Insider Long/Short, Event Arbitrage, Tactical Allocation, Hedged Futures Strategy Fund, Activist Insider, Insider Income, Absolute Total Return, Aggressive Growth and Hedged Premium Return Funds were not in operation during the periods indicated in the table above.

Pursuant to the Management Services Agreement between the Trust and MFund Services LLC ("MFund") dated January 26, 2012, MFund provides the Funds with various management and administrative services.  For these services, the Funds pay MFund $5,000 annually and an annual asset-based fee in accordance with the schedule set forth below applied at the Fund family level (i.e., all the Funds in the Trust advised by Catalyst Capital Advisors LLC):

0.10% of net assets up to $50 million;

0.07% of net assets from $50 million to $100 million;

0.05% of net assets from $100 million to $250 million;

0.04% of net assets from $250 million to $500 million;

0.03% of net assets from $500 million to $1 billion;

0.02% of net assets from $1 billion

In addition, the Funds reimburse MFund for any reasonable out- of- pocket expenses incurred in the performance of its duties under the Management Services Agreement. Prior to July 1, 2014, MFund Services waived its fee due from the Funds.

Between March 15, 2012 and July 26, 2012, MFund provided Chief Compliance Officer services to the Funds. For these services, the Funds paid MFund $10,000 annually for the first fund in the Catalyst Family of Funds and $5,000 for each additional fund. The Funds paid MFund the following fees for its Chief Compliance Officer services during the periods indicated below:

| Fund | March 15, 2012 to June 30, 2012 | July 1, 2012 to July 26, 2012 |
|---|---|---|
| Small-Cap Insider Buying Fund | $1,597 | $376 |
| Strategic Insider Fund | $1,597 | $376 |
| Insider Buying | $1,597 | $376 |
| Insider Long/Short Fund | $909 | $376 |
| Event Arbitrage Fund | N/A | $376 |
| Hedged Futures Strategy Fund | N/A | N/A |
| High Income Fund | $1,597 | $376 |
| TRI Fund | $1,597 | $376 |
| GOI Fund | $1,597 | $376 |
| Global TRI | $1,597 | $376 |
| Global Appreciation Fund | $1,597 | $376 |
| Tactical Allocation Fund | N/A | $376 |
| Core Equity Fund | $1,597 | $376 |
| Floating Rate Income Fund | N/A | N/A |

79

The Event Arbitrage, Tactical Allocation and Floating Rate Income Funds had not yet commenced operations as of June 30, 2012. The Hedged Futures Strategy and Floating Rate Income Funds had not yet commenced operations as of July 26, 2012.  The Activist Insider, Insider Income, Absolute Total Return, Aggressive Growth, Hedged Premium Return, Buyback Strategy and Macro Strategy Funds had not yet commenced operations during periods shown.

From December 10, 2010 to January 26, 2012, Abbington Capital Group LLC ("Abbington") provided the Funds with the management and administrative services currently provided by MFund. The Funds did not pay Abbington for these services.  Jerry Szilagyi is the controlling member of MFund, Abbington, the Advisor, and a Trustee of the Trust.

## COMPLIANCE SERVICES

CCO Compliance Services, LLC ("CCO3") provides a Chief Compliance Officer and related services to the Trust pursuant to a Compliance Services Agreement between the Trust and CCO3 dated July 24, 2012. CCO3, an affiliate of SEC Compliance Consultants, Inc. provides independent Chief Compliance Officers for mutual fund boards of directors. For the fiscal years ended June 30, 2013 and June 30, 2014, the Funds paid CCO3 the following amounts pursuant to the Compliance Services Agreement:

| Fund | Fiscal Year Ended June 30, 2013 | Fiscal Year Ended June 30, 2014 |
|---|---|---|
| Small-Cap Insider Buying Fund | $5,862 | $5,812 |
| Hedged Insider Buying Fund | $5,862 | $5,812 |
| Insider Buying | $5,862 | $5,812 |
| Insider Long/Short Fund | $5,862 | $5,812 |
| Activist Investor Fund* | N/A | N/A |
| Insider Income Fund* | N/A | N/A |
| Absolute Total Return Fund* | N/A | N/A |
| Event Arbitrage Fund | $5,862 | $5,812 |
| Hedged Futures Strategy Fund | N/A | $5,239 |
| High Income Fund | $6,423 | $6,385 |
| TRI Fund | $6,423 | $6,385 |
| GOI Fund | $6,985 | $6,957 |
| Aggressive Growth* | N/A | N/A |
| Global TRI | $6,423 | $6,385 |
| Global Appreciation Fund | $6,423 | $6,385 |
| Hedged Premium Return Fund | N/A | $3,658 |
| Tactical Allocation Fund | $6,985 | $6,672 |
| Dynamic Alpha Fund | $6,985 | $6,957 |
| Floating Rate Income Fund | $4,173 | $6,957 |
| Macro Strategy Fund | N/A | $2,661 |
| Equity/Compass Buyback Strategies Fund | N/A | $4,039 |

*The Activist Insider, Insider Income, Absolute Total Return and Aggressive Growth Funds had not yet commenced operations as of June 30, 2014.

## CUSTODIAN

The Huntington National Bank, 41 South High Street, Columbus, OH 43215, serves as the custodian of the Funds.  The custodian has custody of all securities and cash of a Fund.  The custodian, among other things, attends to the collection of principal and income and payment for and collection of proceeds of securities bought and sold by the Funds.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Funds' independent registered public accounting firm is BBD, LLP, 1835 Market Street, 26th Floor, Philadelphia, PA 19103.  Shareholders will receive annual financial statements, together with a report of independent accountants, and semiannual unaudited financial statements of the Funds.  BBD, LLP will report on the Funds' annual financial statements, review certain regulatory reports and the Funds' income tax returns, and perform other professional accounting, auditing, tax and advisory services when engaged to do so by the Funds.

## COUNSEL

Thompson Hine LLP, 41 South High Street, Suite 1700, Columbus, OH 43215, serves as counsel for the Trust and the independent Trustees.

## DISTRIBUTOR

Northern Lights Distributors, LLC, located at 17605 Wright Street, Omaha, Nebraska 68130 (the "Distributor"), serves as the principal underwriter and national distributor for the shares of the Funds pursuant to an Underwriting Agreement with the Trust (the "Underwriting Agreement"). The Distributor is registered as a broker-dealer under the Securities Exchange Act of 1934 and each state's securities laws and is a member of FINRA. The offering of the Funds' shares is continuous. The Underwriting Agreement provides that the Distributor, as agent in connection with the distribution of Fund shares, will use reasonable efforts to facilitate the sale of the Funds' shares.

The Underwriting Agreement provides that, unless sooner terminated, it will continue in effect for two years initially and thereafter shall continue from year to year, subject to annual approval by (a) the Board or a vote of a majority of the outstanding shares, and (b) by a majority of the Trustees who are not interested persons of the Trust or of the Distributor by vote cast in person at a meeting called for the purpose of voting on such approval.

The Underwriting Agreement may be terminated by a Fund at any time, without the payment of any penalty, by vote of a majority of the entire Board of the Trust or by vote of a majority of the outstanding shares of a Fund on 60 days' written notice to the Distributor, or by the Distributor at any time, without the payment of any penalty, on 60 days' written notice to the Fund. The Underwriting Agreement will automatically terminate in the event of its assignment.

**12b-1 Plans**

The Funds have adopted Distribution and Shareholder Servicing Plans pursuant to Rule 12b‑1 under the 1940 Act (the "Plans"). Rule 12b‑1 provides that any payments made by a Fund in connection with the distribution of its shares may be made only pursuant to a written plan describing all material aspects of the proposed financing of the distribution and also requires that all agreements with any person relating to the implementation of a plan must be in writing.  Under each Funds' Plan related to the Class A Shares, the Funds incur an annual fee of up to 0.50% of the average daily net assets of the respective Fund's Class A Shares (the "Class A 12b-1 Fee").  Class A Shares of the Funds are currently incurring an annual fee of up to 0.25% of its average daily net assets. If authorized by the Board of Trustees and upon notice to shareholders, the Funds may increase the percentage paid under the Plan up to the Class A 12b-1 Fee amount. Under each Funds' Plan related to the Class C Shares, the Funds incur an annual fee of up to 1.00% of the average daily net assets of the respective Fund's Class C Shares (the "Class C 12b-1 Fee") (the Class A 12b-1 Fee and Class C 12b-1 Fee are collectively referred to as the "12b-1 Fees").

Each 12b‑1 Fee may be used to pay a fee on a quarterly basis to broker-dealers, including the Distributor and affiliates of the Distributor, the Advisor, banks and savings and loan institutions and their affiliates and associated broker-dealers that have entered into Service Agreements with the Distributor ("Service Organizations") of annual amounts of up to 0.25% of the average net asset value of all shares of the respective Fund owned by

81

shareholders with whom the Service Organization has a servicing relationship. The 12b-1 Fees may also be used to reimburse parties for shareholder services and distribution related expenses.

Each Fund's Plan continues in effect from year to year, provided that each such continuance is approved at least annually by a vote of the Trust's Board of Trustees, including a majority of the trustees who are not "interested persons" of the Trust and have no direct or indirect financial interest in the operation of the Plan or in any agreements entered into in connection with the Plan (the "Qualified Trustees"). Each Fund's Plan may be terminated at any time, without penalty, by vote of a majority of the Qualified Trustees of a Fund or by vote of a majority of the outstanding shares of the Fund. Any amendment to a Plan to increase materially the amount the Fund is authorized to pay thereunder would require approval by a majority of the outstanding shares of the respective Fund. Other material amendments to a Funds' Plan would be required to be approved by vote of the Board of Trustees, including a majority of the Qualified Trustees. The Distributor may at its own discretion waive a portion of its fees from time to time, although such waiver is not required.

Dealers who are holders or dealers of record for accounts in one or more of the Funds may receive payments from 12b-1 Fees. A dealer's marketing support services may include business planning assistance, educating dealer personnel about the Funds and shareholder financial planning needs, placement on the dealer's preferred or recommended fund list, and access to sales meetings, sales representatives and management representatives of the dealer. Dealers are compensated differently depending upon, among other factors, the level and/or type of marketing support provided by the dealer. From time to time, the Advisor or Sub-Advisor, at its expense, may provide additional compensation to dealers that sell or arrange for the sale of shares of a Fund. Such compensation provided by the Advisor or Sub-Advisor may include financial assistance to dealers that enable the Advisor or Sub-Advisor to participate in and/or present at conferences or seminars, sales or training programs for invited registered representatives and other employees, client and investor events and other dealer-sponsored events. Other compensation may be offered to the extent not prohibited by state laws or any self-regulatory agency, such as the FINRA. The Advisor or Sub-Advisor make payments for events they deem appropriate, subject to applicable law. These payments may vary depending upon the nature of the event.

The table below states the amounts paid by each Fund's Class A and Class C shares under the distribution plan for the year ended June 30, 2014.

| Fund | Class A Shares | Class C Shares |
|------|---------------|----------------|
| Small-Cap Insider Buying Fund | $121,880 | $120,799 |
| Hedged Insider Buying Fund | $49,201 | $28,337 |
| Insider Buying Fund | $197,990 | $130,103 |
| Insider Long/Short Fund | $6,534 | $5,511 |
| Event Arbitrage Fund | $41,338 | $4,117 |
| Hedged Futures Strategy Fund | $50,782 | $44,426 |
| High Income Fund | $133,698 | $253,976 |
| TRI Fund | $58,515 | $227,644 |
| GOI Fund | $36,466 | $6,098 |
| Global TRI Fund | $31,827 | $32,080 |
| Global Capital Appreciation Fund | $35,073 | $46,715 |
| Tactical Allocation Fund | $108,523 | $151,385 |
| Dynamic Alpha Fund | $67,860 | $4,522 |
| Floating Rate Income Fund | $35,200 | $53,058 |
| Macro Strategy Fund | $3,536 | $74,790 |
| EquityCompass Buyback Strategies Fund | $5,247 | $17,919 |
| Hedged Premium Return | $3,074 | $40 |

82

The table below states the principal types of activities for which each Fund made payments under the distribution plan for the year ended June 30, 2014.

| Fund | Advertising & Sales Literature | Printing & Mailing of Prospectuses | Compensation to Underwriters | Compensation to Broker Dealers | Reimbursement to the Advisor for other distribution related expenses | Interest, Carrying or other Financial Charges | Other- Accrued and Unpaid Expenses |
|---|---|---|---|---|---|---|---|
| **Small-Cap Insider Buying** | | | | | | | |
| Class A | - | - | - | $59,258 | $25,197 | - | $37,424 |
| Class C | - | - | - | $109,061 | - | $17,993 | ($6,256) |
| **Hedged Insider Buying** | | | | | | | |
| Class A | - | - | - | $13,136 | $7,719 | | $28,885 |
| Class C | - | - | - | $12,165 | - | $13,576 | $2,595 |
| **Insider Buying** | | | | | | | |
| Class A | - | - | - | $52,176 | $52 | - | $145,762 |
| Class C | - | - | - | $53,448 | - | $51,372 | $25,282 |
| **Insider Long/Short** | | | | | | | |
| Class A | - | - | - | $2,044 | $685 | - | $3,804 |
| Class C | - | - | - | $2,232 | - | $2,191 | $1,088 |
| **Activist Investor\*** | | | | | | | |
| Class A | - | - | - | - | - | - | - |
| Class C | - | - | - | - | - | - | - |
| **Insider Income\*** | | | | | | | |
| Class A | - | - | - | - | - | - | - |
| Class C | - | - | - | - | - | - | - |
| **Absolute Total Return\*** | | | | | | | |
| **Class A** | - | - | - | - | - | - | - |
| Class C | - | - | - | - | - | - | - |
| **Event Arbitrage** | | | | | | | |
| Class A | - | - | - | $2,989 | $12,431 | - | $25,917 |
| Class C | - | - | - | $807 | - | $3,005 | $304 |
| **Hedged Futures Strategy** | | | | | | | |
| Class A | - | - | - | $6,274 | - | - | $44,508 |
| Class C | - | - | - | $25,175 | - | $10,676 | $8,574 |
| **High Income** | | | | | | | |
| Class A | - | - | - | $105,777 | $12,570 | - | $15,351 |
| Class C | - | - | - | $261,383 | - | $37,488 | ($44,896) |

83

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **TRI** | | | | | | | |
| Class A | - | - | - | $22,172 | $5,928 | - | $30,414 |
| Class C | - | - | - | $241,831 | - | $21,264 | ($35,452) |
| **GOI** | | | | | | | |
| Class A | - | - | - | $40,388 | $1,485 | - | ($5,408) |
| Class C | - | - | - | $5,452 | - | $1,353 | ($708) |
| **Aggressive Growth*** | | | | | | | |
| Class A | - | - | - | - | - | - | - |
| Class C | - | - | - | - | - | - | - |
| **Global TRI** | | | | | | | |
| Class A | - | - | - | $25,557 | - | - | $6,270 |
| Class C | - | - | - | $21,816 | - | $11,092 | ($829) |
| **Global Capital Appreciation** | | | | | | | |
| Class A | - | - | - | $29,300 | - | - | $5,773 |
| Class C | - | - | - | $24,976 | - | $21,263 | ($2,524) |
| **Hedged Premium Return** | | | | | | | |
| Class A | - | - | - | $103 | - | - | $2,970 |
| Class C | - | - | - | $28 | - | - | $11 |
| **Tactical Allocation** | | | | | | | |
| Class A | - | - | - | $22,997 | $2,775 | - | $82,750 |
| Class C | - | - | - | $64,712 | - | $69,687 | $16,985 |
| **Dynamic Alpha** | | | | | | | |
| Class A | - | - | - | $56,465 | $1,225 | - | $10,169 |
| Class C | - | - | - | $2,427 | - | $1,476 | $618 |
| **Floating Rate Income** | | | | | | | |
| Class A | - | - | - | $9,806 | - | - | $25,393 |
| Class C | - | - | - | $38,708 | - | $7,802 | $6,547 |
| **Macro Strategy** | | | | | | | |
| Class A | - | - | - | $69 | - | - | $3,466 |
| Class C | - | - | - | $50,859 | - | - | $23,930 |
| **EquityCompass Buyback Strategies** | | | | | | | |
| Class A | - | - | - | $3,665 | - | - | $1,582 |
| Class C | - | - | - | $13,801 | - | - | $4,118 |

Since the Activist Insider, Insider Income, Absolute Total Return and Aggressive Growth Funds had not yet commenced operations as of June 30, 2014, the Funds paid no distribution plan fees.

84

The Distributor for the Funds received the following commissions and other compensation during the fiscal year ended June 30, 2014.

| | Net Underwriting Discounts and Commissions | Compensation on Redemptions and Repurchases | Brokerage Commissions | Other Compensation |
|---|---|---|---|---|
| Small-Cap Insider Buying Fund | $40,168 | $0 | $251,375 | $0 |
| Hedged Insider Buying Fund | $14,018 | $0 | $109,675 | $0 |
| Insider Buying | $207,979 | $0 | $1,410,252 | $0 |
| Insider Long/Short Fund | $5,352 | $0 | $31,787 | $0 |
| Activist Investor Fund* | N/A | N/A | N/A | N/A |
| Insider Income Fund* | N/A | N/A | N/A | N/A |
| Absolute Total Return Fund* | N/A | N/A | N/A | N/A |
| Event Arbitrage Fund | $3,997 | $0 | $22,858 | $0 |
| Hedged Futures Strategy Fund | $35,026 | $0 | $232,447 | $0 |
| High Income Fund | $7,085 | $0 | $37,312 | $0 |
| TRI Fund | $7,770 | $0 | $46,274 | $0 |
| GOI Fund | $920 | $0 | $5,935 | $0 |
| Aggressive Growth Fund* | N/A | N/A | N/A | N/A |
| Global TRI Fund | $8,806 | $0 | $55,503 | $0 |
| Global Capital Appreciation Fund | $16,227 | $0 | $100,271 | $0 |
| Hedged Premium Return Fund* | $0 | $0 | $0 | $0 |
| Tactical Allocation Fund | $60,820 | $0 | $394,620 | $0 |
| Dynamic Alpha Fund | $670 | $0 | $4,465 | $0 |
| Floating Rate Income Fund | $26,438 | $0 | $180,078 | $0 |
| Macro Strategy Fund | $0 | $0 | $0 | $0 |
| EquityCompass Buyback Strategies Fund | $43,790 | $0 | $267,458 | $0 |

Since the Activist Insider, Insider Income, Absolute Total Return and Aggressive Growth Funds had not yet commenced operations as of June 30, 2014, the Funds paid no commissions.

## ADDITIONAL COMPENSATION TO FINANCIAL INTERMEDIARIES

The Funds may directly enter into agreements with "financial intermediaries" pursuant to which a Fund will pay the financial intermediary for services such as networking or sub-transfer agency, including the maintenance of "street name" or omnibus accounts and related sub-accounting, record-keeping and administrative services provided to such accounts. Payments made pursuant to such agreements are generally based on either: (1) a percentage of the average daily net assets of clients serviced by such financial intermediary, or (2) the number of accounts serviced by such financial intermediary. Any payments made pursuant to such agreements are in addition to, rather than in lieu of, Rule 12b-1 or shareholder service fees the financial intermediary may also be receiving. From time to time, the Advisor or its affiliates may pay a portion of the fees for networking or sub-transfer agency at

85

its or their own expense and out of its or their legitimate profits. These payments may be material to financial intermediaries relative to other compensation paid by the Funds and/or the Underwriter, the Advisor and their affiliates. The payments described above may differ and may vary from amounts paid to the Fund's transfer agent or other service providers for providing similar services to other accounts. The financial intermediaries are not audited by the Funds, the Advisor or their service providers to determine whether such intermediaries are providing the services for which they are receiving such payments.

The Advisor or affiliates of the Advisor may also, at their own expense and out of their own legitimate profits, provide additional cash payments to financial intermediaries who sell shares of the Fund. These additional cash payments are payments over and above sales commissions or reallowances, distribution fees or servicing fees (including networking, administration and sub-transfer agency fees) payable to a financial intermediary which are disclosed elsewhere in the prospectus or this SAI. These additional cash payments are generally made to financial intermediaries that provide sub- accounting, sub-transfer agency, shareholder or administrative services or marketing support. Marketing support may include: (i) access to sales meetings or conferences, sales representatives and financial intermediary management representatives; (ii) inclusion of the Fund on a sales list, including a preferred or select sales list, or other sales programs to which financial intermediaries provide more marketing support than to other sales programs on which the Advisor or its affiliates may not need to make additional cash payments to be included; (iii) promotion of the sale of the Fund's shares in communications with a financial intermediary's customers, sales representatives or management representatives; and/or (iv) other specified services intended to assist in the distribution and marketing of the Fund's shares. These additional cash payments also may be made as an expense reimbursement in cases where the financial intermediary provides shareholder services to Fund shareholders. The Advisor and its affiliates may also pay cash compensation in the form of finders' fees or referral fees that vary depending on the dollar amount of shares sold.

The amount and value of additional cash payments vary for each financial intermediary. The availability of these additional cash payments, the varying fee structure within a particular additional cash payment arrangement and the basis for and manner in which a financial intermediary compensates its sales representatives may create a financial incentive for a particular financial intermediary and its sales representatives to recommend the Fund's shares over the shares of other mutual funds based, at least in part, on the level of compensation paid. A financial intermediary and its sales representatives may have similar financial incentives to recommend a particular class of the Fund's shares over other classes of the Fund's shares. You should consult with your financial advisor and review carefully any disclosure by the financial firm as to compensation received by your financial advisor.

Although the Fund may use financial firms that sell its shares to effect portfolio transactions for the Fund, the Fund and the Advisor will not consider the sale of Fund shares as a factor when choosing financial firms to effect those transactions.

**PROXY VOTING POLICY**

The Board of Trustees of the Trust has delegated responsibilities for decisions regarding proxy voting for securities held by the Funds to the respective Fund's Advisor or Sub-Advisor, as follows:

| Fund | Responsible Party |
|------|-------------------|
| Small-Cap Insider Buying | Catalyst |
| Hedged Insider Buying | Catalyst |
| Insider Buying | Catalyst |
| Insider Long/Short | Catalyst |
| Activist Investor | Catalyst |
| Insider Income | Catalyst |

86

| Absolute Total Return | ATR |
|---|---|
| Event Arbitrage | Catalyst |
| Hedged Futures Strategy Fund | Catalyst |
| High Income | SMHCA |
| TRI | SMHCA |
| GOI | GIM |
| Aggressive Growth | GIM |
| Global TRI | MAP |
| Global Appreciation | MAP |
| Hedged Premium Return | Lyons |
| Tactical Allocation | Lyons |
| Dynamic Alpha | CP |
| Floating Rate Income Fund | Princeton |
| Macro Strategy Fund | Catalyst |
| EquityCompass Buyback Strategies Fund | Catalyst |

The proxy voting delegates may further delegate such proxy voting to a sub-advisor or a third party proxy voting service provider. The proxy voting delegates will vote such proxies in accordance with their proxy policies and procedures. In some instances, the proxy voting delegates may be asked to cast a proxy vote that presents a conflict between its interests and the interests of a Fund's shareholders. In such a case, the Trust's policy requires that the proxy voting delegate abstain from making a voting decision and to forward all necessary proxy voting materials to the Trust to enable the Board of Trustees to make a voting decision. When the Board of Trustees of the Trust is required to make a proxy voting decision, only the Trustees without a conflict of interest with regard to the security in question or the matter to be voted upon shall be permitted to participate in the decision of how the Fund's vote will be cast. Each proxy voting delegate has developed a detailed proxy voting policy that has been approved by the Board of Trustees. A copy of the proxy voting policies are attached hereto as Appendix B through Appendix I.

Information on how the Funds voted proxies relating to portfolio securities is available without charge, upon request, by calling 1-866-447-4228 or on the SEC's Internet site at www.sec.gov. In addition, a copy of the Funds' proxy voting policies and procedures is also available by calling 1-866-447-4228 and will be sent within three business days of receipt of a request.

## PORTFOLIO TURNOVER

Turnover rates are primarily a function of the Funds' response to market conditions. The portfolio turnover rate of the Funds for the fiscal periods ended June 30 were as follows:

| Fund | 2013 | 2014 |
|---|---|---|
| Small-Cap Insider Buying | 117% | 231% |
| Hedged Insider Buying | 277% | 255% |
| Insider Buying | 168% | 185% |
| Insider Long/Short | 253% | 207% |
| Activist Investor | N/A | N/A |
| Insider Income | N/A | N/A |
| Absolute Total Return | N/A | N/A |

87

| | | |
|---|---|---|
| Event Arbitrage | 568% | 692% |
| Hedged Futures Strategy | N/A | 0% |
| High Income | 54% | 63% |
| TRI | 60% | 72% |
| GOI | 15% | 25% |
| Aggressive Growth | N/A | N/A |
| Global TRI | 53% | 42% |
| Global Appreciation | 28% | 50% |
| Hedged Premium Return | N/A | 38% |
| Tactical Allocation | 126% | 165% |
| Dynamic Alpha | 97% | 108% |
| Floating Rate Income | 90% | 92% |
| Macro Strategy | N/A | 204% |
| EquityCompass Buyback Strategies | N/A | 384% |

The Activist Insider, Insider Income, Absolute Total Return and Aggressive Growth Funds were not in operations during the periods indicated in the table above.

The increase in the portfolio turnover of the Small-Cap Insider Fund was the result the significant increase is assets of the Fund, market conditions and the change in the investment strategies of the Fund.

## PORTFOLIO TRANSACTIONS

Purchases and sales of securities on a securities exchange are effected by brokers, and the Funds pay a brokerage commission for this service. In transactions on stock exchanges, these commissions are negotiated. In the over-the-counter market, securities (e.g., debt securities) are normally traded on a "net" basis with dealers acting as principal for their own accounts without a stated commission, although the price of the securities usually includes a profit to the dealer. In underwritten offerings, securities are purchased at a fixed price, which includes an amount of compensation to the underwriter, generally referred to as the underwriter's concession or discount.

The primary consideration in placing portfolio security transactions with broker-dealers for execution is to obtain and maintain the availability of execution at the most favorable prices and in the most effective manner possible. The Advisor and Sub-Advisors attempt to achieve this result by selecting broker-dealers to execute portfolio transactions on behalf of each Fund on the basis of the broker-dealers' professional capability, the value and quality of their brokerage services and the level of their brokerage commissions.

Although commissions paid on every transaction will, in the judgment of the Advisor or Sub-Advisors, be reasonable in relation to the value of the brokerage services provided, under each Management Agreement and as permitted by Section 28(e) of the Securities Exchange Act of 1934, the Advisor or Sub-Advisor may cause a Fund to pay a commission to broker-dealers who provide brokerage and research services to the Advisor or Sub-Advisor for effecting a securities transaction for a Fund. Such commission may exceed the amount other broker-dealers would have charged for the transaction, if the Advisor or Sub-Advisor determines in good faith that the greater commission is reasonable relative to the value of the brokerage and the research and investment information services provided by the executing broker-dealer viewed in terms of either a particular transaction or the Advisor's or Sub-Advisor's overall responsibilities to the Funds and to their other clients. Such research and investment information services may include advice as to the value of securities, the advisability of investing in, purchasing or selling securities, the availability of securities or of purchasers or sellers of securities, furnishing analyses and reports concerning issuers, industries, securities, economic factors and trends, portfolio strategy and the performance of accounts, and effecting securities transactions and performing functions incidental thereto such as clearance and settlement.

88

Research provided by brokers is used for the benefit of all of the clients of the Advisor or Sub-Advisor and not solely or necessarily for the benefit of the Funds. The Advisor's or Sub-Advisor's investment management personnel attempt to evaluate the quality of research provided by brokers. Results of this effort are sometimes used by the Advisor or Sub-Advisor as a consideration in the selection of brokers to execute portfolio transactions.

The investment advisory fees that the Funds pay to the Advisor or Sub-Advisor will not be reduced as a consequence of the Advisor's or Sub-Advisor's receipt of brokerage and research services.  To the extent a Fund's portfolio transactions are used to obtain such services, the brokerage commissions paid by the Fund will exceed those that might otherwise be paid, by an amount, which cannot be presently determined. Such services would be useful and of value to the Advisor or Sub-Advisor in serving both the Funds and other clients and, conversely, such services obtained by the placement of brokerage business of other clients would be useful to the Advisor or Sub-Advisor in carrying out its obligations to the Funds.

Certain investments may be appropriate for the Funds and also for other clients advised by the Advisor or Sub-Advisor. Investment decisions for the Funds and other clients are made with a view to achieving their respective investment objectives and after consideration of such factors as their current holdings, availability of cash for investment and the size of their investments generally. To the extent possible, Fund transactions are traded separately from trades of other clients advised by the Advisor or Sub-Advisor. Occasionally, a particular security may be bought or sold for one or more clients in different amounts. In such event, and to the extent permitted by applicable law and regulations, such transactions with respect to the Advisor or Sub-Advisor, will be allocated among the clients in a manner believed to be equitable to each. Ordinarily, such allocation will be made on the basis of the weighted average price of such transactions effected during a trading day.

Each Fund has no obligation to deal with any broker or dealer in the execution of its transactions.  However, each Fund may place a significant portion of its transactions, both in stocks and options, with affiliates of the Advisor. As the level of option writing or stock trading increases, the level of commissions paid by each Fund to the affiliates increases. Such transactions will be executed at competitive commission rates through the affiliated broker's clearing broker. Because the affiliates receive compensation based on the amount of transactions completed, there could be an incentive on the part of the Advisor to effect as many transactions as possible, thereby maximizing the commissions and premiums it receives. In connection with the execution of transactions, subject to its policy of best execution, a Fund may pay higher brokerage commissions to the affiliate than it might pay to unaffiliated broker-dealers.

In order for the affiliated broker to effect any portfolio transactions for the Funds on an exchange, the commissions, fees or other remuneration received by the affiliated broker must be reasonable and fair compared to the commissions, fees or other remuneration paid to other brokers in connection with comparable transactions involving similar securities being purchased or sold on an exchange during a comparable period of time.  This standard would allow the affiliated broker to receive no more than the remuneration that would be expected to be received by an unaffiliated broker in a commensurate arms-length transaction.

Under the Investment Company Act of 1940, persons affiliated with the Advisor, the Distributor or an affiliate of the Advisor or Distributor, may be prohibited from dealing with the Funds as a principal in the purchase and sale of securities.

The Management Agreements provide that affiliates of affiliates of the Advisor may receive brokerage commissions in connection with effecting such transactions for the Funds.  In determining the commissions to be paid to an affiliated broker, it is the policy of the Trust that such commissions will, in the judgment of the Trust's Board of Trustees, be (a) at least as favorable to a Fund as those which would be charged by other qualified brokers having comparable execution capability and (b) at least as favorable to a Fund as commissions contemporaneously charged by the affiliated broker on comparable transactions for its most favored unaffiliated customers, except for customers of the affiliated broker considered by a majority of the Trust's disinterested Trustees not to be comparable to the Fund.  The disinterested Trustees from time to time review, among other things, information relating to the commissions charged by an affiliated broker to a Fund and its other customers, and rates and other information concerning the commissions charged by other qualified brokers.

89

The Agreement does not provide for a reduction of the Distributor's or Advisor's fee by the amount of any profits earned by an affiliated broker from brokerage commissions generated from portfolio transactions of the Funds.  While other brokerage business may be given from time to time to other firms, the affiliated brokers will not receive reciprocal brokerage business as a result of the brokerage business placed by the Funds with others.

A Fund will not acquire portfolio securities issued by, or enter into repurchase agreements or reverse repurchase agreements with, the Advisor, Sub-Advisor, the Distributor or their affiliates.

The Funds paid the following amounts in commissions (including amounts paid to Matrix Capital Group) on the purchase and sale of securities for fiscal periods ended June 30. No commissions were paid to the Distributor.

| Fund | 2014 | 2013 | 2012 |
|---|---|---|---|
| Small-Cap Insider Buying | $716,751 | $286,718 | $195,344 ($37,860 paid to Matrix) |
| Hedged Insider Buying | $115,361 | $20,380 | $17,191 ($1,362 paid to Matrix) |
| Insider Buying | $181,150 | $0 | $309 ($0 paid to Matrix) |
| Insider Long/Short | $27,218 | $17,565 | $1,734 ($0 paid to Matrix) |
| Activist Investor | N/A | N/A | N/A |
| Insider Income | N/A | N/A | N/A |
| Absolute Total Return | N/A | N/A | N/A |
| Event Arbitrage Fund | $146,945 | $146,200 | N/A |
| Hedged Futures Strategy Fund | $372,293 | N/A | N/A |
| High Income | $0 | $0 | $0 |
| TRI | $12,563 | $14,628 | $25,468 ($0 paid to Matrix) |
| GOI | $1,159 | $1,069 | $3,800 ($3,301 paid to Matrix) |
| Aggressive Growth | N/A | N/A | N/A |
| Global TRI | $13,387 | $4,031 | $55,872 ($0 paid to Matrix) |
| Global Appreciation | $25,358 | $5,480 | $74,563 ($0 paid to Matrix) |
| Hedged Premium | $1,374 | N/A | N/A |
| Tactical Allocation | $60,888 | $17,296 | N/A |
| Dynamic Alpha | $10,357 | $13,363 | $7,858 ($0 paid to Matrix) |
| Floating Rate Income | $8,789 | $1,507 | N/A |
| Macro Strategy | $31,121 | N/A | N/A |
| EquityCompass Buyback Strategies | $50,032 | N/A | N/A |

The Insider Buying, Long/Short Insider Buying, Global TRI, Global Appreciation and Core Equity Funds had not yet commenced operations as of June 30, 2011. The Event Arbitrage, Floating Rate Income and Tactical Allocation Funds had not yet commenced operations as of June 30, 2012. The Hedged Futures Strategy, Macro Strategy and Buyback Funds had not yet commenced operations as of June 30, 2013. The Activist Insider, Insider Income, Absolute Total Return and Aggressive Growth Fund had not yet commenced operations as of June 30, 2014.

## PURCHASE AND REDEMPTION OF SHARES

Fund shares may be purchased from investment dealers who have sales agreements with a Fund's Distributor or from the Distributor directly. As described in the Prospectus, the Funds provide you with alternative ways of purchasing Fund shares based upon your individual investment needs and preferences by offering Class A shares as described below.

**Class A Shares**

You may purchase Class A shares at a public offering price equal to the applicable net asset value per share plus an up-front sales charge imposed at the time of purchase as set forth in the Prospectus. Set forth below is an example of the method of computing the offering price of the Class A shares of the Funds.

Shares may be purchased at the public offering price through any securities dealer having a sales agreement with the Distributor. Shares may also be purchased through banks and certain other financial institutions that have agency agreements with the Distributor. These financial institutions will receive transaction fees that are the same as the commissions to dealers and may charge their customers service fees relating to investments in a Fund. Purchase requests should be addressed to the dealer or agent from which this Prospectus was received which has a sales agreement with the Distributor. Such dealer or agent may place a telephone order with the Distributor for the purchase of Fund shares. It is a dealer's or broker's responsibility to promptly forward payment and registration instructions (or completed applications) to the Transfer Agent for shares being purchased in order for investors to receive the next determined net asset value (or public offering price). Reference should be made to the wire order to ensure proper settlement of the trade. Payment for redemptions of shares purchased by telephone should be processed within three business days. Payment must be received within seven days of the order or the trade may be canceled, and the dealer or broker placing the trade will be liable for any losses.

**18f-1 Election**

The Trust has elected to be governed by Rule 18f-1 under the 1940 Act pursuant to which the Trust is obligated during any 90 day period to redeem shares for any one shareholder of record solely in cash up to the lesser of $250,000 or 1% of the NAV of a Fund at the beginning of such period. The Trust has made this election to permit certain funds of the Trust to deliver, in lieu of cash, readily marketable securities from its portfolio should a redemption exceed such limitations. The securities delivered will be selected at the sole discretion of such Fund, will not necessarily be representative of the entire portfolio and may be securities, which a Fund would otherwise sell. The redeeming shareholder will usually incur brokerage costs in converting the securities to cash. The method of valuing securities used to make the redemptions in kind will be the same as the method of valuing portfolio securities and such valuation will be made as of the same time the redemption price is determined. However, the Board of Trustees of the Trust has determined that, until otherwise approved by the Board, all redemptions in the Funds be made in cash only. If the Board determines to allow the Funds to redeem in kind in the future, the Funds will provide shareholders with notice of such change to the redemption policy.

## REDUCTION OF UP-FRONT SALES CHARGE ON CLASS A SHARES

**Letters of Intent**

An investor may qualify for a reduced sales charge on Class A shares immediately by stating his or her intention to invest in Class A shares of one or more of the Funds, during a 13-month period, an amount that would qualify for a reduced sales charge shown in the Funds' Prospectus under "How to Buy Shares — Class A Shares" and by signing a non-binding Letter of Intent, which may be signed at any time within 90 days after the first

91

investment to be included under the Letter of Intent.  After signing the Letter of Intent, each investment in Class A shares made by an investor will be entitled to the sales charge applicable to the total investment indicated in the Letter of Intent.  If an investor does not complete the purchases under the Letter of Intent within the 13-month period, the sales charge will be adjusted upward, corresponding to the amount actually purchased.  When an investor signs a Letter of Intent, Class A shares of a Fund with a value of up to 5% of the amount specified in the Letter of Intent will be restricted.  If the total purchases of Class A shares made by an investor under the Letter of Intent, less redemptions, prior to the expiration of the 13-month period equals or exceeds the amount specified in the Letter of Intent, the restriction on the shares will be removed.  In addition, if the total purchases of Class A shares exceed the amount specified and qualify for a further quantity discount, the Distributor will make a retroactive price adjustment and will apply the adjustment to purchase additional Class A shares at the then current applicable offering price.  If an investor does not complete purchases under a Letter of Intent, the sales charge is adjusted upward, and, if after written notice to the investor, he or she does not pay the increased sales charge, sufficient Class A restricted shares will be redeemed at the current net asset value to pay such charge.

**Rights of Accumulation**

A right of accumulation ("ROA") permits an investor to aggregate shares owned by the investor, his spouse, children and grandchildren under 21 (cumulatively, the "Investor") in some or all of the Funds to reach a breakpoint discount.  This includes accounts held with other financial institutions and accounts established for a single trust estate or single fiduciary account, including a qualified retirement plan such as an IRA, 401(k) or 403(b) plan (some restrictions may apply).  The value of shares eligible for a cumulative quantity discount equals the cumulative cost of the shares purchased (not including reinvested dividends) or the current account market value; whichever is greater.  The current market value of the shares is determined by multiplying the number of shares by the previous day's net asset value.

(a)     Investor's current purchase of Class A shares in the Fund; and

(b)     The net asset value (at the close of business on the previous day) of the Class A shares of the Fund held by Investor.

For example, if Investor owned Class A shares worth $40,000 at the current net asset value and purchased an additional $10,000 of Class A shares, the sales charge for the $10,000 purchase would be at the rate applicable to a single $50,000 purchase.

To qualify for a ROA on a purchase of Class A shares through a broker-dealer, when each purchase is made, the individual investor or the broker-dealer must provide the respective Fund with sufficient information to verify that the purchase qualifies for the discount.

**Investments of $1 Million or More**

For each Fund, with respect to Class A shares, if you invest $1 million or more, either as a lump sum or through our rights of accumulation quantity discount or letter of intent programs, you can buy Class A shares without an initial sales charge.  However, you may be subject to a 1% CDSC on shares redeemed within two years of purchase (excluding shares purchased with reinvested dividends and/or distributions).

## WAIVERS OF UP-FRONT SALES CHARGE ON CLASS A SHARES

The Prospectus describes the classes of persons that may purchase shares without an up-front sales charge.  The elimination of the up-front sales charge for redemptions by certain classes of persons is provided because of anticipated economies of scale and sales related efforts.

To qualify for a waiver of the up-front sales charge on a purchase of Class A shares through a broker-dealer, when each purchase is made, the individual investor or the broker-dealer must provide the respective Fund with sufficient information to verify that the purchase qualifies for the discount.

92

The Funds make available, free of charge, more information about sales charge reductions and waivers through the prospectus or through your financial advisor.

## EXCHANGE PRIVILEGE

As described in the Funds' Prospectus under "How To Redeem Shares—Exchange Privilege," each Fund offers an exchange privilege pursuant to which a shareholder in a Fund may exchange some or all of his shares in any of the funds in the Trust, in the same class shares at net asset value. The exchange privilege may be changed or discontinued upon 60 days' written notice to shareholders and is available only to shareholders where such exchanges may be legally made. A shareholder considering an exchange should obtain and read the prospectus of the Fund and consider the differences between it and the Fund whose shares he owns before making an exchange. For further information on how to exercise the exchange privilege, contact the Transfer Agent.

## NET ASSET VALUE

For each Fund, net asset value ("NAV") per share is determined by dividing the total value of that Fund's assets, less any liabilities, by the number of shares of that Fund outstanding.

The net asset value per share of each Fund is determined by the Administrator as of the close of regular trading on the New York Stock Exchange (normally 4:00 p.m., Eastern Time) on each day when the New York Stock Exchange is open for trading. The New York Stock Exchange is closed on the following holidays: New Year's Day, Martin Luther King, Jr. Day, Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, as observed.

Assets for which market quotations are available are valued as follows: (a) each listed security is valued at its closing price obtained from the respective primary exchange on which the security is listed, or, if there were no sales on that day, at its last reported current bid price; (b) each unlisted security is valued at the last current bid price obtained from the National Association of Securities Dealers Automated Quotation System; (c) United States Government and agency obligations are valued based upon bid quotations from the Federal Reserve Bank for identical or similar obligations; (d) short-term money market instruments (such as certificates of deposit, bankers' acceptances and commercial paper) are most often valued by bid quotation or by reference to bid quotations of available yields for similar instruments of issuers with similar credit ratings. All of these prices are obtained by the Administrator from services, which collect and disseminate such market prices. Bid quotations for short-term money market instruments reported by such a service are the bid quotations reported to it by the major dealers.

When approved by the Trustees, certain securities may be valued on the basis of valuations provided by an independent pricing service when such prices the Trustees believe reflect the fair value of such securities. These securities would normally be those, which have no available recent market value, have few outstanding shares and therefore infrequent trades, or for which there is a lack of consensus on the value, with quoted prices covering a wide range. The lack of consensus would result from relatively unusual circumstances such as no trading in the security for long periods of time, or a company's involvement in merger or acquisition activity, with widely varying valuations placed on the company's assets or stock. Prices provided by an independent pricing service may be determined without exclusive reliance on quoted prices and may take into account appropriate factors such as institutional-size trading in similar groups of securities, yield, quality, coupon rate, maturity, type of issue, trading characteristics and other market data.

In the absence of an ascertainable market value, assets are valued at their fair value as determined by the Fund's Advisor using methods and procedures reviewed and approved by the Trustees.

Short-term securities with remaining maturities of sixty days or less for which market quotations and information pricing service are not readily available are valued either at amortized cost or at original cost plus accrued interest, both of which approximate current value.

93

## TAX INFORMATION

Each Fund intends to qualify as a regulated investment company, or "RIC", under the Internal Revenue Code of 1986, as amended (the "Code"). Qualification generally will relieve the Fund of liability for federal income taxes. If for any taxable year the Fund does not qualify for the special tax treatment afforded regulated investment companies, all of its taxable income will be subject to federal tax at regular corporate rates (without any deduction for distributions to its shareholders). In such event, dividend distributions would be taxable to shareholders to the extent of the Fund's earnings and profits, and would be eligible for the dividends-received deduction for corporations.

Each Fund's net realized capital gains from securities transactions will be distributed only after reducing such gains by the amount of any available capital loss carryforwards. Capital losses incurred in tax years beginning after December 22, 2010 may now be carried forward indefinitely and retain the character of the original loss. Under previously enacted laws, capital losses could only be carried forward to offset any capital gains for eight years, and carried forward as short-term capital, irrespective of the character of the original loss. Capital loss carryforwards are available to offset future realized capital gains. To the extent that these carryforwards are used to offset future capital gains it is probable that the amount offset will not be distributed to shareholders.

For taxable years beginning after December 31, 2012, certain U.S. shareholders, including individuals and estates and trusts, will be subject to an additional 3.8% Medicare tax on all or a portion of their "net investment income," which should include dividends from the Fund and net gains from the disposition of shares of the Fund. U.S. shareholders are urged to consult their own tax advisors regarding the implications of the additional Medicare tax resulting from an investment in the Fund.

## INVESTMENTS IN FOREIGN SECURITIES

**The Funds may be subject to foreign withholding taxes on income from certain foreign securities. This, in turn, could reduce the Fund's income dividends paid to you.**

*Pass-Through of Foreign Tax Credits* .. A Fund may be subject to certain taxes imposed by the countries in which it invests or operates. If a Fund qualifies as a regulated investment company and if more than 50% of the value of the Fund's total assets at the close of any taxable year consists of stocks or securities of foreign corporations, that Fund may elect, for U.S. federal income tax purposes, to treat any foreign taxes paid by the Fund that qualify as income or similar taxes under U.S. income tax principles as having been paid by the Fund's shareholders. *It is not likely that the Funds will be able to do so.* For any year for which a Fund makes such an election, each shareholder will be required to include in its gross income an amount equal to its allocable share of such taxes paid by the Fund and the shareholders will be entitled, subject to certain limitations, to credit their portions of these amounts against their U.S. federal income tax liability, if any, or to deduct their portions from their U.S. taxable income, if any. No deduction for foreign taxes may be claimed by individuals who do not itemize deductions. In any year in which it elects to "pass through" foreign taxes to shareholders, the Fund will notify shareholders within 60 days after the close of the Fund's taxable year of the amount of such taxes and the sources of its income. Furthermore, the amount of the foreign tax credit that is available may be limited to the extent that dividends from a foreign corporation qualify for the lower tax rate on " qualified dividend income .."

*Effect of Foreign Debt Investments and Hedging on Distributions* .. Under the Code, gains or losses attributable to fluctuations in exchange rates , which occur between the time a Fund accrues receivables or liabilities denominated in a foreign currency, and the time the Fund actually collects such receivables or pays such liabilities, generally are treated as ordinary income or ordinary loss. Similarly, on disposition of debt securities denominated in a foreign currency and on disposition of certain options and futures contracts, gains or losses attributable to fluctuations in the value of foreign currency between the date of acquisition of the security or contract and the date of disposition also are treated as ordinary gain or loss. These gains when distributed are taxable to you as ordinary income, and any losses reduce the Fund's ordinary income otherwise available for distribution to you. *This treatment could increase or decrease the Fund's ordinary income distributions to you, and may cause some or all of the*

94

*Fund's previously distributed income to be classified as a return of capital.* A return of capital generally is not taxable to you, but reduces the tax basis of your shares in the Fund. Any return of capital in excess of your basis, however, is taxable as a capital gain.

**PFIC securities** .. Each Fund may invest in securities of foreign entities that could be deemed for tax purposes to be passive foreign investment companies (PFICs ). In general, a foreign corporation is classified as a PFIC if at least one-half of its assets constitute investment-type assets, or 75% or more of its gross income is investment-type income. When investing in PFIC securities, each Fund may elect to mark-to-market a PFIC and recognize any gains at the end of its fiscal and excise (described above) tax years. Deductions for losses are allowable only to the extent of any current or previously recognized gains. These gains (reduced by allowable losses) are treated as ordinary income that the Fund is required to distribute, even though it has not sold the securities. You should also be aware that distributions from a PFIC are generally not eligible for the reduced rate of tax on "qualified dividend income."    In the alternative, the Fund may elect to treat the PFIC as a "qualified electing fund" (a "QEF election"), in which case the Fund would be required to include its share of the company's income and net capital gains annually, regardless of whether it receives distributions from the company. The QEF and mark-to-market elections may require the Fund to sell securities it would have otherwise continued to hold in order to make distributions to shareholders to avoid any Fund-level tax. Income from investments in PFICs generally will not qualify for treatment as qualified dividend income.

## BACKUP WITHHOLDING

The Fund may be required to withhold U.S. federal income tax at the fourth lowest tax rate applicable to unmarried individuals (currently 28%) of all reportable payments, including dividends, capital gain distributions and redemptions payable to shareholders who fail to provide the Fund with their correct taxpayer identification number or to make required certifications, or who have been notified by the IRS that they are subject to backup withholding. Corporate shareholders and certain other shareholders specified in the Code generally are exempt from such backup withholding. Backup withholding is not an additional tax. Any amounts withheld may be credited against the shareholder's U.S. federal income tax liability.

*Other Reporting and Withholding Requirements.* Payments to a shareholder that is either a foreign financial institution ("FFI") or a non-financial foreign entity ("NFFE") within the meaning of the Foreign Account Tax Compliance Act ("FATCA") may be subject to a generally nonrefundable 30% withholding tax on: (a) income dividends paid by a Fund after June 30, 2014 and (b) certain capital gain distributions and the proceeds arising from the sale of Fund shares paid by the Fund after December 31, 2016. FATCA withholding tax generally can be avoided: (a) by an FFI, subject to any applicable intergovernmental agreement or other exemption, if it enters into a valid agreement with the IRS to, among other requirements, report required information about certain direct and indirect ownership of  foreign financial accounts held by U.S. persons with the FFI and (b) by an NFFE, if it: (i) certifies that it has no substantial U.S. persons as owners or (ii) if it does have such owners, reports information relating to them. A Fund may disclose the information that it receives from its shareholders to the IRS, non-U.S. taxing authorities or other parties as necessary to comply with FATCA. Withholding also may be required if a foreign entity that is a shareholder of a Fund fails to provide the Fund with appropriate certifications or other documentation concerning its status under FATCA.

## FOREIGN SHAREHOLDERS

The United States imposes a withholding tax (at a 30% or lower treaty rate) on all Fund dividends of ordinary income. Capital gain dividends paid by a Fund from its net long-term capital gains and exempt-interest dividends are generally exempt from this withholding tax.  The American Jobs Creation Act of 2004 (2004 Tax Act) amends these withholding tax provisions to exempt most dividends paid by a Fund from short-term capital gains and U.S. source interest income to the extent such gains and income would be exempt if earned directly by the non-U.S. investor. Under 2004 Tax Act, ordinary dividends designated as short-term capital gain dividends and interest-related dividends designated as a payment out of qualified interest income will generally not be subject to a U.S. withholding tax, *provided* you certify you are a non-U.S. investor.  These exemptions from withholding are effective for distributions of income earned by a Fund in its fiscal years beginning after December 31, 2004 and ending before January 1, 2008.

95

The 2004 Tax Act also provides a partial exemption from U.S. estate tax for shares in a Fund held by the estate of a non-U.S. decedent. The amount treated as exempt is based on the proportion of assets in the Fund at the end of the quarter immediately preceding the decedent's death that would be exempt if held directly by the non-U.S. investor.  This provision applies to decedents dying after December 31, 2004 and before January 1, 2008.

### FINANCIAL STATEMENTS

The financial statements of each Fund, except the Activist Investor, Insider Income, Absolute Total Return and Aggressive Growth Fund, and the independent registered public accounting firm's report appearing in the Annual Report for the fiscal year ended June 30, 2014 are incorporated herein by reference. You can obtain the Annual and Semi-Annual Reports without change by calling the Funds at 1-866-447-4228. Once produced, you can obtain a copy of the financial statements of the Activist Insider, Insider Income, Absolute Total Return and Aggressive Growth Fund contained in the Fund's Annual or Semi-Annual Report without charge by calling the Fund at 1-888-499-2321.

96

### Appendix A—Description of Commercial Paper and Bond Ratings

Description of Moody's Investors Service, Inc. ("*Moody's*"), Short-Term Debt Ratings

Prime-1. Issuers (or supporting institutions) rated Prime-1 ("*P-1*") have a superior ability for repayment of senior short-term debt obligations. P-1 repayment ability will often be evidenced by many of the following characteristics: leading market positions in well-established industries; high rates of return on funds employed; conservative capitalization structure with moderate reliance on debt and ample asset protection; broad margins in earnings coverage of fixed financial charges and high internal cash generation; well-established access to a range of financial markets and assured sources of alternate liquidity.

Prime-2. Issuers (or supporting institutions) rated Prime-2 ("*P-2*") have a strong ability for repayment of senior short-term debt obligations. This will normally be evidenced by many of the characteristics cited above but to a lesser degree. Earnings trends and coverage ratios, while sound, may be more subject to variation. Capitalization characteristics, while still appropriate, may be more affected by external conditions. Ample alternate liquidity is maintained.

Description of Standard & Poor's Ratings Group ("*Standard & Poor's*"), Commercial Paper Ratings

A. Issues assigned this highest rating are regarded as having the greatest capacity for timely payment. Issues in this category are delineated with the numbers 1, 2, and 3 to indicate the relative degree of safety. A-1. This designation indicates that the degree of safety regarding timely payment is strong. Those issues determined to possess extremely strong safety characteristics are denoted with a plus (+) sign designation. A-2. Capacity for timely payment on issues with this designation is satisfactory. However, the relative degree of safety is not as high for issues designated A-1.

Description of Moody's Long-Term Debt Ratings

Aaa. Bonds which are rated Aaa are judged to be of the best quality. They carry the smallest degree of investment risk and are generally referred to as "gilt edged." Interest payments are protected by a large or by an exceptionally stable margin, and principal is secure. While the various protective elements are likely to change, such changes as can be visualized are most unlikely to impair the fundamentally strong position of such issues; Aa. Bonds which are rated Aa are judged to be of high quality by all standards. Together with the Aaa group they comprise what are generally known as high-grade bonds. They are rated lower than the best bonds, because margins of protection may not be as large as in Aaa securities or fluctuation of protective elements may be of greater amplitude or there may be other elements present which make the long-term risk appear somewhat larger than the Aaa securities; A. Bonds which are rated A possess many favorable investment attributes and are considered as upper-medium-grade obligations. Factors giving security to principal and interest are considered adequate, but elements may be present which suggest a susceptibility to impairment some time in the future; Baa. Bonds which are rated Baa are considered as medium-grade obligations (*i.e.*, they are neither highly protected nor poorly secured). Interest payments and principal security appear adequate for the present, but certain protective elements may be lacking or may be characteristically unreliable over any great length of time. Such bonds lack outstanding investment characteristics and in fact have speculative characteristics as well; Ba. Bonds which are rated Ba are judged to have speculative elements; their future cannot be considered as well-assured. Often the protection of interest and principal payments may be very moderate and thereby not well safeguarded during both good and bad times over the future. Uncertainty of position characterizes bonds in this class; B. Bonds which are rated B generally lack characteristics of the desirable investment. Assurance of interest and principal payments or of maintenance of other terms of the contract over any long period of time may be small; Caa. Bonds which are rated Caa are of poor standing. Such issues may be in default or there may be present elements of danger with respect to principal or interest; Ca. Bonds which are rated Ca represent obligations which are speculative in a high degree. Such issues are often in default or have other marked shortcomings; C. Bonds which are rated C are the lowest rated class of bonds, and issues so rated can be regarded as having extremely poor prospects of ever attaining any real investment standing.

Note: Moody's applies numerical modifiers 1, 2, and 3 in each generic rating classification from Aa to B. The modifier 1 indicates that the company ranks in the higher end of its generic rating category; the modifier 2 indicates a mid-range ranking; and the modifier 3 indicates that the company ranks in the lower end of its generic rating category.

Description of Standard & Poor's Corporate Debt Ratings

AAA. Debt rated AAA has the highest rating assigned by Standard & Poor's. Capacity to pay interest and repay principal is extremely strong; AA. Debt Rated AA has a very strong capacity to pay interest and repay principal and differs from the higher rated issues only in small degree; A. Debt rated A has a strong capacity to pay interest and repay principal although it is somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions than debt in higher rated categories; BBB. Debt rated BBB is regarded as having an adequate capacity to pay interest and repay principal. Whereas it normally exhibits adequate protection parameters, adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity to pay interest and repay principal for debt in this category than in higher rated categories; BB, B,

97

CCC, CC, C.  Debt Rated BB, B, CCC, CC, and C is regarded, on balance, as predominantly speculative with respect to capacity to pay interest and repay principal in accordance with the terms of the obligation.  BB indicates the lowest degree of speculation and C the highest degree of speculation.  While such debt will likely have some quality and protective characteristics, these are out-weighed by large uncertainties or major risk exposures to adverse conditions; BB.  Debt rated BB has less near-term vulnerability to default than other speculative issues.  However, it faces major ongoing uncertainties or exposure of adverse business, financial, or economic conditions which could lead to inadequate capacity to meet timely interest and principal payments.  The BB rating category is also used for debt subordinated to senior debt that is assigned an actual or implied BBB- rating; B.  Debt rated B has a greater vulnerability to default but currently has the capacity to meet interest payments and principal repayments.  Adverse business, financial, or economic conditions will likely impair capacity or willingness to pay interest and repay principal.  The B rating category is also used for debt subordinated to senior debt that is assigned an actual or implied BB or BB- rating; CCC.  Debt rated CCC has a currently identifiable vulnerability to default and is dependent upon favorable business, financial, and economic conditions to meet timely payment of interest and repayment of principal.  In the event of adverse business, financial, or economic conditions, it is not likely to have the capacity to pay interest and repay principal.  The CCC rating category is also used for debt subordinated to senior debt that is assigned an actual or implied B or B- rating; CC.  The rating CC is typically applied to debt subordinated to senior debt that is assigned an actual or implied CCC rating; C.  The rating C is typically applied to debt subordinated to senior debt which is assigned an actual or implied CCC- debt rating.  The C rating may be used to cover a situation where a bankruptcy petition has been filed, but debt service payments are continued; CI.  The rating CI is reserved for income bonds on which no interest is being paid; D.  Debt rated D is in payment default.  The D rating category is used when interest payments or principal payments are not made on the date due even if the applicable grace period has not expired, unless Standard & Poor's believes that such payments will be made during such grace period.  The D rating also will be used upon the filing of a bankruptcy petition if debt service payments are jeopardized.

98

**Appendix B**
**CATALYST CAPITAL ADVISORS LLC**
**PROXY VOTING POLICIES AND PROCEDURES**

Pursuant to the recent adoption by the Securities and Exchange Commission (the "Commission") of Rule 206(4)-6 (17 CFR 275.206(4)-6) and amendments to Rule 204-2 (17 CFR 275.204-2) under the Investment Advisors Act of 1940 (the "Act"), it is a fraudulent, deceptive, or manipulative act, practice or course of business, within the meaning of Section 206(4) of the Act, for an investment advisor to exercise voting authority with respect to client securities, unless (i) the advisor has adopted and implemented written policies and procedures that are reasonably designed to ensure that the advisor votes proxies in the best interests of its clients, (ii) the advisor describes its proxy voting procedures to its clients and provides copies on request, and (iii) the advisor discloses to clients how they may obtain information on how the advisor voted their proxies.

In order to fulfill its responsibilities under the Act, Catalyst Capital Advisors LLC (hereinafter "we" or "our") has adopted the following policies and procedures for proxy voting with regard to companies in investment portfolios of our clients.

## KEY OBJECTIVES

The key objectives of these policies and procedures recognize that a company's management is entrusted with the day-to-day operations and longer term strategic planning of the company, subject to the oversight of the company's board of directors. While "ordinary business matters" are primarily the responsibility of management and should be approved solely by the corporation's board of directors, these objectives also recognize that the company's shareholders must have final say over how management and directors are performing, and how shareholders' rights and ownership interests are handled, especially when matters could have substantial economic implications to the shareholders.

Therefore, we will pay particular attention to the following matters in exercising our proxy voting responsibilities as a fiduciary for our clients:

*Accountability*. Each company should have effective means in place to hold those entrusted with running a company's business accountable for their actions. Management of a company should be accountable to its board of directors and the board should be accountable to shareholders.

*Alignment of Management and Shareholder Interests*. Each company should endeavor to align the interests of management and the board of directors with the interests of the company's shareholders. For example, we generally believe that compensation should be designed to reward management for doing a good job of creating value for the shareholders of the company.

*Transparency*. Promotion of timely disclosure of important information about a company's business operations and financial performance enables investors to evaluate the performance of a company and to make informed decisions about the purchase and sale of a company's securities.

## DECISION METHODS

No set of proxy voting guidelines can anticipate all situations that may arise. In special cases, we may seek insight from our managers and analysts on how a particular proxy proposal may impact the financial prospects of a company, and vote accordingly.

We believe that we invest in companies with strong management. Therefore we will tend to vote proxies consistent with management's recommendations. However, we will vote contrary to management's recommendations if we believe those recommendations are not consistent with increasing shareholder value.

## SUMMARY OF PROXY VOTING GUIDELINES

**Election of the Board of Directors**

We believe that good corporate governance generally starts with a board composed primarily of independent directors, unfettered by significant ties to management, all of whose members are elected annually. We also believe that turnover in board composition promotes independent board action, fresh approaches to governance, and generally has a positive impact on shareholder value. We will generally vote in favor of non-incumbent independent directors.

99

The election of a company's board of directors is one of the most fundamental rights held by shareholders.  Because a classified board structure prevents shareholders from electing a full slate of directors annually, we will generally support efforts to declassify boards or other measures that permit shareholders to remove a majority of directors at any time, and will generally oppose efforts to adopt classified board structures.

**Approval of Independent Auditors**

We believe that the relationship between a company and its auditors should be limited primarily to the audit engagement, although it may include certain closely related activities that do not raise an appearance of impaired independence.

We will evaluate on a case-by-case basis instances in which the audit firm has a substantial non-audit relationship with a company to determine whether we believe independence has been, or could be, compromised.

**Equity-based compensation plans**

We believe that appropriately designed equity-based compensation plans, approved by shareholders, can be an effective way to align the interests of shareholders and the interests of directors, management, and employees by providing incentives to increase shareholder value.  Conversely, we are opposed to plans that substantially dilute ownership interests in the company, provide participants with excessive awards, or have inherently objectionable structural features.

We will generally support measures intended to increase stock ownership by executives and the use of employee stock purchase plans to increase company stock ownership by employees.  These may include:

1.  Requiring senior executives to hold stock in a company.
2.  Requiring stock acquired through option exercise to be held for a certain period of time.

These are guidelines, and we consider other factors, such as the nature of the industry and size of the company, when assessing a plan's impact on ownership interests.

**Corporate Structure**

We view the exercise of shareholders' rights, including the rights to act by written consent, to call special meetings and to remove directors, to be fundamental to good corporate governance.

Because classes of common stock with unequal voting rights limit the rights of certain shareholders, we generally believe that shareholders should have voting power equal to their equity interest in the company and should be able to approve or reject changes to a company's by-laws by a simple majority vote.

We will generally support the ability of shareholders to cumulate their votes for the election of directors.

100

**Shareholder Rights Plans**

While we recognize that there are arguments both in favor of and against shareholder rights plans, also known as poison pills, such measures may tend to entrench current management, which we generally consider to have a negative impact on shareholder value.  Therefore, while we will evaluate such plans on a case by case basis, we will generally oppose such plans.

**<u>CLIENT INFORMATION</u>**

A copy of these Proxy Voting Policies and Procedures is available to our clients, without charge, upon request, by calling 1-866-447-4228. We will send a copy of these Proxy Voting Policies and Procedures within three business days of receipt of a request, by first-class mail or other means designed to ensure equally prompt delivery.

In addition, we will provide each client, without charge, upon request, information regarding the proxy votes cast by us with regard to the client's securities.

101

**Appendix C**
**SMH CAPITAL ADVISORS, INC.**
**PROXY VOTING POLICIES AND PROCEDURES**

**Proxy Voting Policies**

Under normal circumstances, a client is responsible for voting proxies for securities held for a client account.  Under normal circumstances, if a client does not vote the proxies then SMH Capital Advisors may exercise its right to vote the securities if allowed by the advisory agreement.  If SMHCA votes the securities, the SMHCA will consider only those factors that relate to a client investment, including how the vote will economically impact and affect the value of the client's investment.

Proxy votes generally will be cast in favor of proposals that maintain or strengthen the shared interest of shareholders and management, increase shareholder value, maintain or increase shareholder influence over the issuer's board of directors and management, and maintain or increase the rights of shareholders; proxy votes generally will be cast against proposals having the opposite effect.  In voting on each and every issue, SMHCA and its employees will vote in a prudent and diligent fashion and only after a careful evaluation of the issue presented on the ballot.

In the event that a proxy involves a tender offer for the company consent to a change in bond indenture covenants, votes to restructure debt obligations of the company, or a tender offer for bonds held, the SMHCA intends to exercise its right to vote unless specifically prohibited by client advisory agreement.


**Proxy Voting Procedures**

In the event that SMH Capital Advisors exercises its right to vote a proxy, all proxies and ballots will be logged in upon receipt and the materials will be forwarded to the appropriate parties.

Prior to voting, the investment advisor representative will verify that he or she has the authority to vote, and if so, will determine whether his or her voting is subject to guidelines issued by the client (or in the case of an employee benefit plan, the plan's trustee or other fiduciaries).  The investment advisor representative will promptly vote proxies received in the manner consistent with the Proxy Voting Policies and Procedures stated above and guidelines (if any) issued by client (or in the case of an employee benefits plan, the plan's trustee or other fiduciaries). The investment advisor representative will keep records on how he or she voted on each issue.  The proxy will then be filed in the proper client's file and becomes a permanent part of the records of SMHCA.

102

**Appendix D**
**GROESBECK INVESTMENT MANAGEMENT CORP.**
**PROXY VOTING POLICIES AND PROCEDURES**

**Proxy Voting Policies**

The act of managing assets of clients may include the voting of proxies related to such managed assets. Where the power to vote in person or by proxy has been delegated to the investment advisor, the investment advisor has the fiduciary responsibility for (a) voting in a manner that is in the best interests of the client, and (b) properly dealing with potential conflicts of interest arising from proxy proposals being voted upon.

The policies and procedures of Groesbeck Investment Management ("the Advisor") for voting proxies received for accounts managed by the Advisor are set forth below and are applicable if:

• The underlying advisory agreement entered into with the client expressly provides that the Advisor shall be responsible to vote proxies received in connection with the client's account; or
• In case of an employee benefit plan, the client (or any plan trustee or other fiduciary) has not reserved the power to vote proxies in either the underlying advisory agreement entered into with the client or in the client's plan documents.

These Proxy Voting Policies and Procedures are designed to ensure that proxies are voted in an appropriate manner and should complement the Advisor's investment policies and procedures regarding its general responsibility to monitor the performance and/or corporate events of companies which are issuers of securities held in managed accounts.

Proxy Voting Guidelines

It is the policy of the firm to encourage our clients to vote their own proxies. In the event that a client directs in writing that we are to handle that responsibility, the following guidelines will apply.

• The portfolio manager will vote proxies in an informed, responsible and timely manner in the best interests of the client.
• The firm will keep adequate voting records, as well as any documents used in making voting decisions.
• If the portfolio manager has a material conflict of interest in a proxy issue, he/she will disclose such conflict to the client and request instruction from the client, clearly indicating the timeframe for a response. In the absence of client instruction, the portfolio manager may delegate the voting to an informed, neutral third party or may convene a committee to discuss and vote on the issue.
• When requested to do so in writing by the client, the firm will provide a record of proxy voting to the client for whom we perform that service.
• Written procedures have been developed to comply with this policy and will be reviewed and revised, if necessary, on a regular basis.
• Groesbeck Investment Management reserves the right to amend these policies and procedures at any time and may do so without prior notice to clients.

Proxy Voting Policies

In the absence of specific voting guidelines from a client, Groesbeck Investment Management will vote proxies in a manner that is in the best interest of the client, which may result in different voting results for proxies for the same issuer. The Advisor shall consider only those factors that relate to the client's investment or dictated by the client's written instructions, including how its vote will economically impact and affect the value of the client's investment (keeping in mind that, after conducting an appropriate cost-benefit analysis, not voting at all on a presented proposal may be in the best interest of the client). Groesbeck Investment Management believes that voting in accordance with the following policies is in the best interests of its clients.

A. Specific Voting Policies

1. Routine Items:

• The Advisor will generally vote for the election of directors (where no corporate governance issues are implicated).
• The Advisor will generally vote for the selection of independent auditors.
• The Advisor will generally vote for increases in or reclassification of common stock.
• The Advisor will generally vote for management recommendations adding or amending indemnification provisions in charter or by-laws.
• The Advisor will generally vote for changes in the board of directors.
• The Advisor will generally vote for outside director compensation.
• The Advisor will generally vote for proposals that maintain or strengthen the shared interests of shareholders and management.
• The Advisor will generally vote for proposals that increase shareholder value.

103

• The Advisor will generally vote for proposals that will maintain or increase shareholder influence over the issuer's board of directors and management.

• The Advisor will generally vote for proposals that maintain or increase the rights of shareholders.

2. Non-Routine and Conflict of Interest Items:

• The Advisor will generally vote for management proposals for merger or reorganization if the transaction appears to offer fair value.

• The Advisor will generally vote against shareholder resolutions that consider non-financial impacts of mergers, corporate governance issues, or non-financial matters in general.

• The Advisor will generally vote against anti-greenmail provisions.

B. General Voting Policy

If the proxy includes a Routine Item that implicates corporate governance changes, a Non-Routine Item where no specific policy applies or a Conflict of Interest Item where no specific policy applies, then the Advisor may engage an independent third party to determine how the proxies should be voted. In voting on each and every issue, the Advisor and its employees shall vote in a prudent and timely fashion and only after a careful evaluation of the issue(s) presented on the ballot. In exercising its voting discretion, the Advisor and its employees shall avoid any direct or indirect conflict of interest raised by such voting decision. The Advisor will provide adequate disclosure to the client if any substantive aspect or foreseeable result of the subject matter to be voted upon raises an actual or potential conflict of interest to the Advisor or

• any affiliate of the Advisor. For purposes of these Proxy Voting Policies and Procedures, an affiliate means:

(i) any person directly, or indirectly through one or more intermediaries, controlling, controlled by or under common control with the Advisor;

(ii) any officer, director, principal, partner, employer, or direct or indirect beneficial owner of any 10% or greater equity or voting interest of the Advisor; or

(iii) any other person for which a person described in clause (ii) acts in any such capacity;

• any issuer of a security for which the Advisor (or any affiliate of the Advisor) acts as a sponsor, advisor, manager, custodian, distributor, underwriter, broker, or other similar capacity; or

• any person with whom the Advisor (or any affiliate of the Advisor) has an existing, material contract or business relationship that was not entered into in the ordinary course of the Advisor's (or its affiliate's) business.

(Each of the above persons being an "Interested Person.")

After informing the client of any potential conflict of interest, the Advisor will take other appropriate action as required under these Proxy Voting Policies and Procedures, as provided below. The Advisor shall keep certain records required by applicable law in connection with its proxy voting activities for clients and shall provide proxy-voting information to clients upon their written request.

***Consistent with SEC Rule 206(4)-6, as amended, the Advisor shall take reasonable measures to inform its clients of (1) its proxy voting policies and procedures, and (2) the process or procedures clients must follow to obtain information regarding how the Advisor voted with respect to assets held in their accounts. This information may be provided to clients through the Advisor's Form ADV (Part II or Schedule H) disclosure or by separate notice to the client (or in the case of an employee benefit plan, the plan's trustee or other fiduciaries).***


<u>Proxy Voting Procedures</u>


A. The assigned portfolio manager (the "Responsible Party") shall be designated by the Advisor to make discretionary investment decisions for the client's account and will be responsible for voting the proxies related to that account. The Responsible Party should assume that he or she has the power to vote all proxies related to the client's account if any one of the circumstances set forth in Section 1 above regarding proxy voting powers is applicable.

B. Prior to voting, the Responsible Party will verify whether his or her voting power is subject to any limitations or guidelines issued by the client (or in the case of an employee benefit plan, the plan's trustee or other fiduciaries).

C. Prior to voting, the Responsible Party will verify whether an actual or potential conflict of interest with the Advisor or any Interested Person exists in connection with the subject proposal(s) to be voted upon. The determination regarding the presence or absence of any actual or potential conflict of interest shall be adequately documented by the Responsible Party (i.e., comparing the apparent parties affected by the proxy proposal being voted upon against the Advisor's internal list of Interested Persons and, for any matches found, describing the process taken to determine the anticipated magnitude and possible probability of any conflict of interest being present), which shall be reviewed and signed off on by the Responsible Party's direct supervisor.

D. If an actual or potential conflict is found to exist, written notification of the conflict (the "Conflict Notice") shall be given to the client or the client's designee (or in the case of an employee benefit plan, the plan's trustee or other fiduciary) in sufficient detail and with sufficient time to reasonably inform the client (or in the case of an employee benefit plan, the plan's trustee or other fiduciary) of the actual or potential conflict involved.

Specifically, the Conflict Notice should describe:

• the proposal to be voted upon;

• the actual or potential conflict of interest involved;

• the Advisor's vote recommendation (with a summary of material factors supporting the recommended vote); and

104

• if applicable, the relationship between the Advisor and any Interested Person.

The Conflict Notice will either request the client's consent to the Advisor's vote recommendation or may request the client to vote the proxy directly or through another designee of the client. The Conflict Notice and consent thereto may be sent or received, as the case may be, by mail, fax, electronic transmission or any other reliable form of communication that may be recalled, retrieved, produced, or printed in accordance with the record-keeping policies and procedures of the Advisor. If the client (or in the case of an employee benefit plan, the plan's trustee or other fiduciary) is unreachable or has not affirmatively responded before the response deadline for the matter being voted upon, the Advisor may:

• convene a committee of its choosing to discuss and vote on the material issue. The committee shall consist of parties who have knowledge in proxy voting matters.

• cast its vote as recommended if the vote recommendation would fall against the Advisor's interest (or the interest of an Interested Person) and such vote recommendation is in the best interest of the client under the circumstances; or

• abstain from voting if such action is determined by the Advisor to be in the best interest of the client under the circumstances.

E. The Responsible Party will promptly vote proxies received in a manner consistent with the Proxy Voting Policies and Procedures stated above and guidelines (if any) issued by client (or in the case of an employee benefit plan, the plan's trustee or other fiduciaries if such guidelines are consistent with ERISA).

F. In accordance with SEC Rule 204-2(c)(2), as amended, the Responsible Party shall retain in the respective client's file, the following:

• A copy of the proxy statement received (unless retained by a third party for the benefit of the Advisor or the proxy statement is available from the SEC's Electronic Data Gathering, Analysis, and Retrieval (EDGAR) system);

105

**Appendix E**
**Managed Asset Portfolios, LLC**
**PROXY VOTING POLICIES AND PROCEDURES**

**Proxy Voting Policies**

<u>**POLICY**</u>

Managed Asset Portfolios, LLC (the "Advisor") acts as discretionary investment advisor to high net worth individuals and institutional accounts ("clients"). Our policy is to exercise voting authority with respect to clients' securities only if a client has authorized us to exercise such discretion pursuant to the client's advisory contract or otherwise in writing.

Our policy is to vote proxies in the best interests of clients. In pursuing this policy, we vote in a manner that is intended to maximize the value of client's assets. Our investment strategies are predicated on the belief that the quality of management is often the key to ultimate success or failure of a business. Because we generally make investments in companies in which we have confidence in management, proxies generally are voted in accordance with management's recommendation. We may vote a proxy in a manner contrary to management's recommendation if, in our judgment, the proposal would not enhance shareholder value.

The procedures and guidelines described below are intended to implement this proxy voting policy.

<u>**PROCEDURES**</u>

Michael Dzialo, President, is responsible for monitoring corporate actions and ensuring that (a) proxies are received and forwarded to the appropriate decision makers; and (b) proxies are voted in a timely manner upon receipt of voting instructions. The Advisor is not responsible for voting proxies it does not receive, but will make reasonable efforts to obtain missing proxies.

Daniel Patterson, Client Relations Manager, shall implement procedures to identify and monitor potential conflicts of interest that could affect the proxy voting process, including (a) significant client relationships; (b) other potential material business relationships; and (c) material personal and family relationships.

Proxy voting decisions will be determined by the applicable portfolio manager for each account. Issues not covered by these guidelines or any deviations from these guidelines must be discussed with and reviewed by two (2) portfolio managers, at least one of which must be the President.

The Advisor may determine not to vote a particular proxy if the costs and burdens exceed the benefits of voting (e.g., when securities are subject to loan or to share blocking restrictions).

<u>**VOTING GUIDELINES**</u>

The following guidelines will be used for each of the following four categories of issues:
**Routine Proposals**

Routine proposals are those which do not change the structure, bylaws, or operations of the corporation to the detriment of the shareholders. Given the routine nature of these proposals, proxies will nearly always be voted with management. Traditionally, these issues include:
- Approval of auditors
- Election of directors
- Indemnification provisions for directors
- Liability limitations of directors
- Name changes
- General updating/corrective amendment to charter

**Non-Routine Proposals**

Issues in this category are more likely to affect the structure and operations of the corporation and therefore will have a greater impact on the value of a shareholder's investment. We will review and vote on each issue in this category on a case-by-case

106

basis.  As previously stated, voting decisions will be made based on the economic interest of our clients.  Non-routine matters include:

- Mergers and acquisitions
- Restructuring
- Re-incorporation
- Changes in capitalization
- Increase in number of directors
- Increase in preferred stock
- Increase in common stock
- Stock option plans

**Corporate Governance Proposals**

We will generally vote against any management proposal that clearly has the effect of restricting the ability of shareholders to realize the full potential value of their investment.  Proposals in this category include:

- Poison pills
- Golden parachutes
- Greenmail
- Supermajority voting
- Dual class voting
- Classified boards

**Shareholder Proposals**

Proposals submitted by shareholders for vote usually include issues of corporate governance and other non-routine matters.  We will review each issue on a case-by-case basis in order to determine the position that best represents the financial interest of the Fund.  Shareholder matters include:

- Annual election of directors
- Anti-poison pill
- Anti-greenmail
- Confidential voting
- Cumulative voting

**CONFLICTS OF INTEREST**

The Advisor is sensitive to conflicts of interest that may arise in the proxy decision-making process and has identified the following potential conflicts of interest:

- A principal of the Advisor or any person involved in the proxy decision-making process who currently serves on the company's Board.

- An immediate family member of a principal of the Advisor or any person involved in the proxy decision-making process who currently serves as a director or executive officer of the company.

- The company is a client of the Advisor (or an affiliate of a client), provided that any client relationship that represents less than 2.5% of the firm's revenues or less than $75,000 in annual revenues shall be presumed to be immaterial.

This list is not intended to be exclusive.  All employees of the Advisor are obligated to disclose any potential conflict to the Chief Compliance Officer.

If a material conflict is identified, proxies will be voted for that company in the following manner:

- If our Voting Guidelines indicate a vote "For" or "Against" a specific issue, we will vote in accordance with such predetermined guidelines.

- If the Guidelines do not cover an issue or indicate a "case-by-case" analysis, we will either seek the consent of applicable clients or the written recommendation of an independent third party.

**RECORDKEEPING**

Members of the Compliance department are responsible for maintaining the following records:

107

- proxy voting policies and procedures;

- proxy statements (provided, however, that the Advisor may rely on the Securities and Exchange Commission's (the "SEC") EDGAR system if the company filed its proxy statements via EDGAR or may rely on a third party as long as the third party has provided the Advisor with an undertaking to provide a copy of the proxy statement promptly upon request);

- records of votes cast;

- records of client requests for voting information; and

- any records prepared by the Advisor that were material to a proxy voting decision or that memorialized a decision.

## DISCLOSURE

The Advisor will describe these Policies and Procedures in Part II of its Form ADV and indicate that these Policies and Procedures are available to clients upon request. The Advisor will also advise clients in Part II of its Form ADV how a client may obtain information on how the Advisor voted with respect to that client's securities. The Advisor will send the initial summary of these Policies and Procedures and the other information described in this Section to existing clients by separate notice.

108

**Appendix F**
**COOKSON, PEIRCE & Co., Inc.**
**PROXY VOTING POLICIES AND PROCEDURES**

**Objective**

Cookson, Peirce & Co., Inc. (Advisor) recognizes that corporate governance and shareholder proposals can directly affect shareholder values. The purpose of this policy is to ensure that the Advisor proxies for shares held in their mutual fund are voted in the best interest of the Advisor's clients so as to maximize portfolio values over time.

**Delegation**

The Chief Investment Officer (CIO) has the responsibility for proxy voting and administration.

The CIO may delegate such responsibility to professional members of the investment staff who are qualified to analyze proxy issues and exercise prudence when discretion is required to vote proxies. The CIO or designees are responsible for insuring that they understand thoroughly the issues that arise in how proxies are voted. When appropriate, the CIO or the designee may consult with consultants or advisors.

**Control**

The CIO or the designee will vote proxies in a timely manner in accordance with this policy unless it is in the best interest of the Advisor's clients to vote otherwise. The staff will maintain a record of votes on all proxy issues. If a proxy item on a substantial issue is voted for which no standard exists in this policy, a proxy exceptions report will be prepared and maintained in the proxy file. The exceptions report will document the reasons behind the vote and date of each corporate meeting at which the exception votes were cast. For the purposes of this policy, an issue is considered "substantial" when an outcome of the proposal could reasonably be expected or perceived to have a probable impact on the longtime value of the Advisor's clients' holdings in the company. The following items shall be maintained in a readily accessible record in the form of the proxy-voting file:

    1. A record of all proxies voted during the preceding five years will be maintained in an easily accessible place, to include two years of records retained in the proxy-voting file onsite in the Advisor's offices. The file will contain a copy of how a proxy was voted.

    2. Any exceptions to the proxy policy will also be contained in this file.

    3. A record of any proxies received but not voted due to special circumstances, including untimely receipt, re-registration, or blocking.

**Use of Independent Service(s)**

Use of an outside service(s) to administer and vote proxies in accordance with the Advisor's proxy voting policy is authorized. The contract with such an agency will incorporate the Advisor's proxy voting policy.

**Specific Voting Standards**

The following proxy issues are governed by a "For or Against" standard:

**Corporate Governance Issues**

| | |
|---|---|
| • Approve classified board | Against |
| • Submit Shareholder Rights Plan (Poison Pill) to Shareholder Vote | For |
| • Eliminate or Limit Shareholders' Right to Call a Special Meeting | Against |
| • Eliminate of Limit Shareholders' Right to Act By Written Consent | Against |
| • Adopt or Increase Super Majority Vote Requirement | Against |
| • Allow Board to Consider Non-financial Effect of Merger | Against |
| • Adopt Fair Price Provision | Against |

**Board of Directors Related Corporate Governance Issues**

| | |
|---|---|
| • Restore or Provide for Cumulative Voting | For |
| • Require Majority of Independent Directors on Board | For |
| • Adopt Director Indemnification Provision | For |
| • Adopt Director Liability Provision | For |
| • Vote for Director(s) Missing 75% or More of Meetings | Against |

**Compensation Issues**

| | |
|---|---|
| • Allow for Repricing or Exchange of Underwater Options | Against |

**Routine Corporate Administrative Issues**

| | |
|---|---|
| • Ratification or Appointment of Auditors | For |

109

**Stock-related Corporate Governance Issues**
- Eliminate Pre-emptive Rights                                                    For

**General Voting Standards**
Certain proxy issues involve complex business matters that require subjective decision-making.  These proxy issues will be voted on a case-by-case basis using the standards outlined below.  Other proxy issues not mentioned in this policy will be voted in the best interest of the Advisor's clients.

**Board of Directors-related Corporate Governance Issues**
- Election of Directors and Compensation of Corporate Boards & Committees
The Advisor will generally vote with management but will monitor the make up of corporate boards of directors, as well as the relative numbers of inside and independent directors serving on the audit, compensation, and nominating committees of such boards. If it is perceived that it is in the shareholders' best interest to seek a greater number of independent directors on a board or its committees, the Advisor will vote in a manner to encourage an increase in the number of independent directors required on the board or committees.

- Increase or Reduce Size of Board
The Advisor will generally vote for management proposals related to the size of boards given a reasonable explanation for the change.

**Compensation Issues**
- All other compensation issues including stock options, stock purchase plans, bonus plans
The Advisor generally supports compensation packages which represent long-term incentives, are related to objective performance measures, and which reflect the requirements and best practices of the current marketplace. The Advisor generally supports integrated, competitive compensation packages, which are governed by objective, performance-based standards for setting executive compensation levels.

**Restructurings**
- Mergers, Acquisitions, Restructurings, or Sale of Assets
Proposals to restructure, merge with, be acquired by, or sell significant assets, or acquire significant assets of other companies submitted for shareholder approval will be evaluated individually, using the assistance of the Advisor's investment staff to determine whether the transaction is in the best interest of the Advisor's clients.
- Reincorporation
The Advisor's proxies will be voted against proposals to reincorporate in a different jurisdiction if a reincorporation would likely result in a significant adverse effect on shareholder rights or values. The Advisor's proxies may be voted for proposals to reincorporate that would likely result in more effective and less costly corporate governance without significantly affecting shareholder rights or values.

**Stock-related Corporate Governance Issues**
- Increase, decrease, amend, authorize common or preferred stock
The Advisor will support proposed changes in capital structure so long as the number of shares that would be authorized to be issued is reasonable in relation to the purposes for which the authorization is requested, a legitimate business purpose exists, and the proposal is not opposed to the best interest of the Advisor's clients. As an example, it is often reasonable for a company to increase the number of authorized shares to implement a stock split, pay a stock dividend, raise new capital, effect a merger or acquisition, or make shares available for stock option plans. The Advisor will specifically not support shareholder proposals involving a) private issues of additional equity or equity type securities that would be issued as an anti-takeover measure, b) a change of control that is reasonably expected not to be in the best interest of the Advisor's clients, c) excessive dilution of common shares providing no clear benefit to the company, d) any new issue or increase in previously issued blank check preferred stock (preferred stock with rights to be determined by the board at the time of issuance), or e) an increase in dual class shares.

- Approved Common/Preferred Stock Issuance
a) Authorization of preferred stock
The Advisor will support a new class of preferred stock only if the issuance has a specific business purpose and only after evaluation of the rights and preferences of holders of the new preferred stock including any limitations on payments to the common shareholders. The Advisor proxies will not be voted in favor of issuing blank check preferred stock.
b) Authorization of common stock
The Advisor will vote proxies in favor of issuing new classes of common stock when there is a clearly specified rationale that promotes the interest of existing shareholders or at least not opposed to such interests. Because the creation of new classes of common stock may affect dividend, conversion, or other rights of existing shareholders, the proposal will be evaluated considering all relevant facts and circumstances.

110

c) Share repurchases

The Advisor will generally support share repurchase plans so long as they have a rationale that promotes long term interest of the shareholders.

d) Approve or reverse stock split

The Advisor will generally support stock split proposals so long as they have a rationale that promotes the long-term interest of existing shareholders.

**Social/Political Issues**

- Social or political proposals

The Advisor's proxy voting decisions may not be based on personal views concerning social or political issues. Cookson, Peirce & Co., Inc. may have or require consideration of such matters when the investment staff could reasonably believe that adoption or rejection of social or political proposals submitted to shareholders might be expected to have a significant adverse effect on the value of a portfolio security. The Advisor will generally support management recommendation on social or political shareholder proposals so long as they are not, in the reasonable opinion of the CIO or the designee in light of all relevant circumstances, opposed to the best long-term interests of the company and do not diminish significantly the rights or prerogatives of shareholders. Because the duty of the Advisor is to obtain the highest investment return commensurate with acceptable levels of risk, social or political considerations should not take precedence over economic risk and return considerations.

**Conflicts of Interest**

Where a proxy proposal raises a material conflict between the Advisor's interests and a client's interest, including a mutual fund client, the Advisor will resolve such a conflict in the manner described below:

1. Vote in Accordance with the Guidelines. To the extent that the Advisor has little or no discretion to deviate from the Guidelines with respect to the proposal in question, the Advisor shall vote in accordance with such pre-determined voting policy.

2. Obtain Consent of Clients. To the extent that the Advisor has discretion to deviate from the Guidelines with respect to the proposal in question, the Advisor will disclose the conflict to the relevant clients and obtain their consent to the proposed vote prior to voting the securities. The disclosure to the client will include sufficient detail regarding the matter to be voted on and the nature of the Advisor's conflict that the client would be able to make an informed decision regarding the vote. If a client does not respond to such a conflict disclosure request or denies the request, the Advisor will abstain from voting the securities held by that client's account. The Advisor will review the proxy proposal for conflicts of interest as part of the overall vote review process. All material conflict of interest so identified by the Advisor will be addressed as described above.

Adopted: April 25, 2005

111

Appendix G
**Princeton Advisory Group, Inc.**
**Catalyst/Princeton Floating Rate Income Fund**
**Proxy Voting Policy and Procedures**

Princeton Advisory Group, Inc. ("PAG") has adopted written proxy voting policies and procedures ("Proxy Policy") as required by Rule 206(4)-6 under the Investment Advisors Act of 1940 ("Advisors Act"). The Proxy Policy has been adopted as the policies and procedures that PAG will use when voting proxies on behalf of the Catalyst/Princeton Floating Rate Income Fund (the "Fund"). In addition to covering the voting of equity securities and ERISA matters, the Proxy Policy also applies generally to voting and/or consent rights of PAG, on behalf of the Fund, with respect to debt securities, including but not limited to, plans of reorganization, and waivers and consents under applicable indentures. The Proxy Policy does not apply, however, to consent rights that primarily entail decisions to buy or sell investments, such as tender or exchange offers, conversions, put options, redemption and Dutch auctions. The Proxy Policy is designed and implemented in a manner reasonably expected to ensure that voting and consent rights are exercised in the best interests of the Fund and its shareholders.

**Equity Securities:** Although making direct investments in equity securities is not considered to be a primary strategy of the Fund, the Fund may receive equity securities as the result of capital restructurings of portfolio assets. With respect to the voting of proxies relating to equity securities, PAG will research the individual facts and circumstances with respect to the proposal and ensure that voting and consent rights are exercised in the best interests of the Fund and its shareholders.

**ERISA Matters:**  Investment advisors to employee benefit plans have special fiduciary responsibilities under the Employee Retirement Income Security Act of 1974 (ERISA).  These responsibilities are not governed solely by the SEC or the Advisors Act, but include the U.S. Department of Labor's rules for ERISA accounts.   Typically, an employee benefit plan is covered by ERISA unless it is (1) an individual retirement account or annuity established by an individual employee to which his/her employer does not contribute; (2) a plan which covers only the sole owner of a business (incorporated or unincorporated) and/or his/her spouse; (3) a partnership pension plan which covers only partners and their spouses; or (4) a governmental plan.  ERISA accounts include those established by pension plans, profit sharing and 401(k) plans and their trusts.

Under ERISA section 404(a)(1), plan fiduciaries, including persons to whom named fiduciaries delegate certain fiduciary responsibilities, such as investment managers, must discharge their duties solely in the interest of the participants and beneficiaries and,

a) For the exclusive purpose of providing benefits and defraying reasonable administrative expenses;
b) With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims (the prudent man rule);
c) By diversifying plan investments so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
d) In accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of title I of ERISA.

In a release from the Department of Labor (Interpretive Bulletin #94-2, July 28, 1994), investment advisors (investment managers as defined under ERISA) were provided further guidance about their responsibilities under ERISA, including  proxy voting, compliance with written statements of investment policy, and active monitoring of corporate management by plan fiduciaries.

The bulletin discusses:

a) Where the authority to manage plan assets has been delegated to an investment manager, only the investment manager has authority to vote proxies, except when the named fiduciary has reserved to itself or to another named fiduciary (as authorized by the plan document) the right to direct a plan trustee regarding the voting of proxies.
b) Investment managers, as plan fiduciaries, have a responsibility to vote proxies on foreign issues that may affect the value of the shares in the plan's portfolio.

112

c)    An investment manager is required to comply with the statements of investment policy, unless compliance with the guidelines in a given instance would be imprudent and therefore failure to follow the guidelines would not violate ERISA.  ERISA does not shield the investment manager from liability from imprudent actions taken in compliance with a statement of investment policy.

d)    Several other areas including pooled accounts with multiple investment policies; the named fiduciary's responsibilities in monitoring the investment manager activity and shareholder activism.

Additionally, the Department of Labor has indicated that an investment advisor with a duty to vote proxies has an obligation to take reasonable steps under the circumstances to ensure that it receives the proxies.  Failure of the advisor to take any action to reconcile proxies would cause the manager to fail to satisfy ERISA's fiduciary responsibility provisions.  It is believed that appropriate steps would include informing the plan sponsor and its trustees, bank custodian or broker-dealer custodian of the requirement that all proxies be forwarded to the advisor and making periodic reviews during the proxy season, including follow-up letters and phone calls if necessary.

When voting proxies, an investment manager must consider proxies as a plan asset and vote only in the best economic interests of the plan participants, vote consistently among clients, and avoid specific client voting instructions about voting proxies, e.g., social voting is not appropriate.

Having voted the proxies, the Department of Labor has also indicated that the advisor must properly document its voting by keeping adequate records and that the named fiduciary has a duty to monitor the proxy voting process of the advisor.  Advisors should be prepared to issue proxy voting reports to clients.  Records of "solicitation" activities by issuers (or others) should be maintained.  Records should reflect a verification of each proxy to each share to each account.  (Records should be maintained in such a manner that it is easy to backtrack).  Hard copies of each ballot should be maintained.

For additional information please refer to the "AVON letter"  (released 2/23/88) and the "MONKS letter" which relates to clarification of fiduciary requirements for proxy voting (released 1/23/90).

**Debt Securities:** PAG exercises voting and consent rights directly with respect to debt securities held by the Fund. PAG considers each proposal regarding a debt security on a case-by-case basis taking into consideration any relevant contractual obligations as well as other relevant facts and circumstances at the time of the vote. In general, PAG reviews and considers corporate governance issues related to proxy matters and generally supports proposals that foster good corporate governance practices. PAG may vote proxies as recommended by management on routine matters related to the operation of the issuer and on matters not expected to have a significant economic impact on the issuer and/or its shareholders.

PAG may determine not to vote a proxy for a debt or equity security if: (1) the effect on the Fund's economic interests or the value of the portfolio holding is insignificant in relation to the Fund's portfolio; (2) the cost of voting the proxy outweighs the possible benefit to the Fund, including, without limitation, situations where a jurisdiction imposes share blocking restrictions which may affect the ability of the portfolio managers to effect trades in the related security; or (3) PAG otherwise has determined that it is consistent with its fiduciary obligations not to vote the proxy.

For all debt security proxies, PAG will review the proxy to determine whether there is a material conflict between PAG and the Fund or between the Fund and another fund or PAG-advised account. If no material conflict exists, the proxy will be voted according to the portfolio managers' recommendation. If a material conflict does exist, PAG will seek to resolve the conflict in good faith and in the best interests of the Fund, as provided by the Proxy Policy.

The Proxy Policy permits PAG to seek to resolve material conflicts of interest by pursuing any one of several courses of action. With respect to material conflicts of interest between PAG and the Fund, the Proxy Policy permits PAG to either: (i) convene a committee to assess and resolve the conflict (the "Proxy Conflicts Committee"); or (ii) vote in accordance with protocols previously established by the Proxy Conflicts Committee with respect to specific types of conflicts. With respect to material conflicts of interest between the Fund and one or more other funds or PAG-advised accounts, the Proxy Policy permits PAG to: (i) designate a PAG portfolio manager who is not subject to the conflict to determine how to vote the proxy if the conflict exists between the Fund and funds or accounts with at least one portfolio manager in common; or (ii) permit the respective portfolio managers to vote the proxies in

113

accordance with the Fund and fund's or account's best interests if the conflict exists between the Fund and funds or accounts managed by different portfolio managers.

PAG will supervise and periodically review its proxy voting activities and the implementation of the Proxy Policy. Information about how the Fund voted proxies relating to portfolio securities it held during the most recent twelve month period ended June 30th will be available no later than the following August 31st without charge, upon request, by visiting the Catalyst/Princeton Floating Rate Income Fund's website at www.pag-funds.com, and on the SEC's website at http://www.sec.gov.

114

Appendix H
**Lyons Wealth Management, LLC**
**Proxy Voting Policy and Procedures**

### Background

In Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (January 31, 2003), the SEC noted that, "The federal securities laws do not specifically address how an adviser must exercise its proxy voting authority for its clients.  Under the Advisers Act, however, an adviser is a fiduciary that owes each of its clients a duty of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting.  The duty of care requires an adviser with proxy voting authority to monitor corporate events and to vote the proxies."

Rule 206(4)-6 under the Advisers Act requires each registered investment adviser that exercises proxy voting authority with respect to client securities to:

- Adopt and implement written policies and procedures reasonably designed to ensure that the adviser votes client securities in the clients' best interests.  Such policies and procedures must address the manner in which the adviser will resolve material conflicts of interest that can arise during the proxy voting process;

- Disclose to clients how they may obtain information from the adviser about how the adviser voted with respect to their securities; and

- Describe to clients the adviser's proxy voting policies and procedures and, upon request, furnish a copy of the policies and procedures.

Additionally, paragraph (c)(2) of Rule 204-2 imposes additional recordkeeping requirements on investment advisers that execute proxy voting authority, as described in the *Maintenance of Books and Records* section of this Manual.

The Advisers Act lacks specific guidance regarding an adviser's duty to direct clients' participation in class actions.  However, many investment advisers adopt policies and procedures regarding class actions.

### Risks

In developing these policies and procedures, LWM considered numerous risks associated with the proxy voting process.  This analysis includes risks such as:

- LWM lacks written proxy voting policies and procedures;

- Proxies are not identified and processed in a timely manner;

- Proxies are not voted in Clients' best interests;

115

- Conflicts of interest between LWM and a Client are not identified or resolved appropriately;

- Third-party proxy voting services do not vote proxies according to LWM's instructions and in Clients' best interests; and

- Proxy voting records, Client requests for proxy voting information, and LWM's responses to such requests, are not properly maintained;

- LWM lacks policies and procedures regarding Clients' participation in class actions; and

- LWM fails to maintain documentation associated with Clients' participation in class actions.

LWM has established the following guidelines as an attempt to mitigate these risks.

**Policies and Procedures**

Proxy Voting

LWM does not have the authority to vote Client proxies for all Clients, only the Mutual Funds that LWM sub-advises, as disclosed in LWM's standard advisory contract and Part 2 of Form ADV.  If LWM inadvertently receives any proxy materials on behalf of a Client, the Company will promptly forward such materials to the Client.

For the purpose of the funds LWM sub-advises, proxies must be voted with diligence, care, and loyalty.  LWM will vote each proxy in accordance with its fiduciary duty to its Clients.  LWM will generally seek to vote proxies in a way that maximizes the value of Clients' assets.  However, LWM will document and abide by any specific proxy voting instructions conveyed by a Client with respect to that Client's securities.  The Managing Director, Operations coordinates LWM's proxy voting process.

Paragraph (c)(ii) of Rule 204-2 under the Advisers Act requires LWM to maintain certain books and records associated with its proxy voting policies and procedures.  LWM's recordkeeping obligations are described in the *Maintenance of Books and Records* section of this Manual.  The Managing Director, Operations will ensure that LWM complies with all applicable recordkeeping requirements associated with proxy voting.

Absent specific Client instructions, LWM has adopted the following proxy voting procedures designed to ensure that proxies are properly identified and voted, and that any conflicts of interest are addressed appropriately:

<u>**DECISION METHODS**</u>

No set of proxy voting guidelines can anticipate all situations that may arise. In special cases, we may seek insight from our managers and analysts on how a particular proxy proposal may impact the financial prospects of a company, and vote accordingly.

116

We believe that we invest in companies with strong management.  Therefore we will tend to vote proxies consistent with management's recommendations. However, we will vote contrary to management's recommendations if we believe those recommendations are not consistent with increasing shareholder value.

## SUMMARY OF PROXY VOTING GUIDELINES

### Election of the Board of Directors

We believe that good corporate governance generally starts with a board composed primarily of independent directors, unfettered by significant ties to management, all of whose members are elected annually.  We also believe that turnover in board composition promotes independent board action, fresh approaches to governance, and generally has a positive impact on shareholder value.  We will generally vote in favor of non-incumbent independent directors.

The election of a company's board of directors is one of the most fundamental rights held by shareholders.  Because a classified board structure prevents shareholders from electing a full slate of directors annually, we will generally support efforts to declassify boards or other measures that permit shareholders to remove a majority of directors at any time, and will generally oppose efforts to adopt classified board structures.

### Approval of Independent Auditors

We believe that the relationship between a company and its auditors should be limited primarily to the audit engagement, although it may include certain closely related activities that do not raise an appearance of impaired independence.

We will evaluate on a case-by-case basis instances in which the audit firm has a substantial non-audit relationship with a company to determine whether we believe independence has been, or could be, compromised.

### Equity-based compensation plans

We believe that appropriately designed equity-based compensation plans, approved by shareholders, can be an effective way to align the interests of shareholders and the interests of directors, management, and employees by providing incentives to increase shareholder value.  Conversely, we are opposed to plans that substantially dilute ownership interests in the company, provide participants with excessive awards, or have inherently objectionable structural features.

We will generally support measures intended to increase stock ownership by executives and the use of employee stock purchase plans to increase company stock ownership by employees.  These may include:

1. Requiring senior executives to hold stock in a company.
2. Requiring stock acquired through option exercise to be held for a certain period of time.

117

These are guidelines, and we consider other factors, such as the nature of the industry and size of the company, when assessing a plan's impact on ownership interests.

**Corporate Structure**

We view the exercise of shareholders' rights, including the rights to act by written consent, to call special meetings and to remove directors, to be fundamental to good corporate governance.

Because classes of common stock with unequal voting rights limit the rights of certain shareholders, we generally believe that shareholders should have voting power equal to their equity interest in the company and should be able to approve or reject changes to a company's by-laws by a simple majority vote.

We will generally support the ability of shareholders to cumulate their votes for the election of directors.

**Shareholder Rights Plans**

While we recognize that there are arguments both in favor of and against shareholder rights plans, also known as poison pills, such measures may tend to entrench current management, which we generally consider to have a negative impact on shareholder value. Therefore, while we will evaluate such plans on a case by case basis, we will generally oppose such plans.

- The Managing Director, Portfolio Management will retain the following information in connection with each proxy vote:

  - The Issuer's name;
  - The security's ticker symbol or CUSIP, as applicable;
  - The shareholder meeting date;
  - The number of shares that LWM voted;
  - A brief identification of the matter voted on;
  - Whether the matter was proposed by the Issuer or a security-holder;
  - Whether LWM cast a vote;
  - How LWM cast its vote (for the proposal, against the proposal, or abstain); and
  - Whether LWM cast its vote with or against management.

- If LWM votes the same proxy in two directions, the CCO will maintain documentation describing the reasons for each vote (e.g., LWM believes that voting with management is in Clients' best interests, but Client X gave specific instructions to vote against management).

- Any attempt to influence the proxy voting process by Issuers or others not identified in these policies and procedures should be promptly reported to the CCO. Similarly, any

118

Client's attempt to influence proxy voting with respect to other Clients' securities should be promptly reported to the CCO.

- Proxies received after a Client terminates its advisory relationship with LWM will not be voted. The Managing Director, Operations will promptly return such proxies to the sender, along with a statement indicating that LWM's advisory relationship with the Client has terminated, and that future proxies should not be sent to LWM.

**Class Actions**

LWM does not direct Clients' participation in class actions, as disclosed in Part 2 of Form ADV. The CCO will determine whether to return any documentation inadvertently received regarding Clients' participation in class actions to the sender, or to forward such information to the appropriate Clients.

Employees must notify the CCO if they are aware of any material conflict of interest associated with Clients' participation in class actions. The Proxy Voting Committee will evaluate any such conflicts and determine an appropriate course of action for LWM.

LWM generally does not serve as the lead plaintiff in class actions because the costs of such participation typically exceed any extra benefits that accrue to lead plaintiffs.

**Disclosures to Clients and Investors**

LWM includes a description of its policies and procedures regarding proxy voting and class actions in Part 2 of Form ADV, along with a statement that Clients and Investors can contact the CCO to obtain a copy of these policies and procedures and information about how LWM voted with respect to the Client's securities.

Any request for information about proxy voting or class actions should be promptly forwarded to the CCO, who will respond to any such requests.

As a matter of policy, LWM does not disclose how it expects to vote on upcoming proxies. Additionally, LWM does not disclose the way it voted proxies to unaffiliated third parties without a legitimate need to know such information.

119

Appendix I
**ATR Advisors, LLC**
**Proxy Voting Policy and Procedures**

**Background**:  Pursuant to Rule 206(4)-6 and Rule 204-2 under the Advisers Act, it is a fraudulent, deceptive, or manipulative act, practice or course of business, within the meaning of Section 206(4) of the Advisers Act, for an investment adviser to exercise voting authority with respect to client securities, unless (i) the adviser has adopted and implemented written policies and procedures that are reasonably designed to ensure that the adviser votes proxies in the best interests of its clients, (ii) the adviser describes its proxy voting procedures to its clients and provides copies on request, and (iii) the adviser discloses to clients how they may obtain information on how the adviser voted their proxies.

**Policy:**  The Adviser will vote proxies on behalf of its individual clients or designate a third party provider to do so.  In order to fulfill its responsibilities under the Advisers Act, the Adviser has adopted the following policies and procedures for proxy voting:

*Voting Proxies*

1.      All proxies sent to clients that are actually received by the Adviser (to vote on behalf of the client) will be provided to the portfolio manager or designated third-party provider (the "Designee").

2.      The Advisor and Designee will generally adhere to the following procedures (subject to limited exception):

    (a)      A written record of each proxy received by the Adviser or Designee (on behalf of its clients) will be kept in the Adviser's or Designee's files. ;

    (b)       Prior to voting any proxies, the Advisor or Designee will determine if there are any conflicts of interest related to the proxy in question in accordance with the general guidelines set forth below.  If a conflict is identified, the Designee will then make a determination (which may be in consultation with outside legal counsel) as to whether the conflict is material.

    (c)      If no material conflict is identified pursuant to these procedures, the Advisor or Designee will vote the proxy in accordance with the guidelines set forth below.  The Designee will deliver the proxy in accordance with instructions related to such proxy in a timely and appropriate manner.

*Conflicts of Interest*

1.      As stated above, in evaluating how to vote a proxy, the Designee will first determine whether there is a conflict of interest related to the proxy in question between Adviser and its Advisory Clients.  This examination will include (but will not be limited to) an

1

evaluation of whether the Adviser (or any affiliate of the Adviser) has any relationship with the company (or an affiliate of the company) to which the proxy relates outside of an investment in such company by a client of the Adviser.

2    If a conflict is identified and deemed "material" by the Designee, the Adviser will determine whether voting in accordance with the proxy voting guidelines outlined below is in the best interests of the client (which may include utilizing an independent third party to vote such proxies).

3    With respect to material conflicts, the Adviser will determine whether it is appropriate to disclose the conflict to affected clients give such clients the opportunity to vote the proxies in question themselves.

However, with respect to:

1. ERISA clients whose advisory contract reserves the right to vote proxies when the Adviser has determined that a material conflict exists that affects its best judgment as a fiduciary to the ERISA client, the Adviser will:

(a)    Give the ERISA client the opportunity to vote the proxies in question themselves; or

(b)    Follow designated special proxy voting procedures related to voting proxies pursuant to the terms of the investment management agreement with such ERISA clients (if any).

2. The Funds whose Proxy Voting Policies and Procedures provides that in the event a conflict of interest between the interests of the Fund's shareholders and those of the Advisor, the Advisor is instructed to abstain from making a voting decision and to forward all necessary voting materials to the Trust to enable the Board of Trustees to make the voting decision. The Advisor shall make a written recommendation of the voting decision to the Board of Trustees, which shall include: (i) an explanation of why it has a conflict of interest; (ii) the reason for its recommendation; and (iii) an explanation of why the recommendation is consistent with the Advisors proxy voting guidelines.

*Proxy Voting Guidelines*

See Proxy Voting Policies and Procedures under separate cover.

*Disclosure of Procedures*

A summary of above these proxy voting procedures will be included in Part II of the Adviser's Form ADV and will be updated whenever these policies and procedures are updated. Clients will be provided with contact information as to how they can obtain information about: (a) the Adviser's proxy voting procedures (i.e., a copy of these procedures); and (b) how the Adviser voted proxies that are relevant to the affected client.

*Record-keeping Requirements*

2

The Designee will be responsible for maintaining files relating to the Adviser's proxy voting procedures.  Records will be maintained and preserved for five years from the end of the fiscal year during which the last entry was made on a record, with records for the first two years kept in the offices of the Adviser.  Records of the following will be included in the files:

1.     Copies of these proxy voting policies and procedures, and any amendments thereto;

2.     A copy of each proxy statement that the Adviser actually received; provided, however, that the Adviser may rely on obtaining a copy of proxy statements from the SEC's EDGAR system for those proxy statements that are so available;

3.     A record of each vote that the Adviser casts;

4.     A copy of any document that the Adviser created that was material to making a decision how to vote the proxies, or memorializes that decision (if any); and

5.     A copy of each written request for information on how the Adviser voted such client's proxies and a copy of any written response to any request for information on how the Adviser voted proxies on behalf of clients.


**ATR Advisors, LLC**
**PROXY VOTING POLICIES AND PROCEDURES**

Pursuant to the recent adoption by the Securities and Exchange Commission (the "Commission") of Rule 206(4)-6 (17 CFR 275.206(4)-6) and amendments to Rule 204-2 (17 CFR 275.204-2) under the Investment Advisers Act of 1940 (the "Act"), it is a fraudulent, deceptive, or manipulative act, practice or course of business, within the meaning of Section 206(4) of the Act, for an investment adviser to exercise voting authority with respect to client securities, unless (i) the adviser has adopted and implemented written policies and procedures that are reasonably designed to ensure that the adviser votes proxies in the best interests of its clients, (ii) the adviser describes its proxy voting procedures to its clients and provides copies on request, and (iii) the adviser discloses to clients how they may obtain information on how the adviser voted their proxies.

In order to fulfill its responsibilities under the Act, ATR Advisors, LLC (hereinafter "we" or "our") has adopted the following policies and procedures for proxy voting with regard to companies in investment portfolios of our clients.

**KEY OBJECTIVES**

The key objectives of these policies and procedures recognize that a company's management is entrusted with the day-to-day operations and longer term strategic planning of the company, subject to the oversight of the company's board of directors.  While "ordinary business matters" are primarily the responsibility of management and should be approved solely by the corporation's board of directors, these objectives also recognize that the company's shareholders must have final say over how management and directors are performing, and how shareholders'

3

rights and ownership interests are handled, especially when matters could have substantial economic implications to the shareholders.

Therefore, we will pay particular attention to the following matters in exercising our proxy voting responsibilities as a fiduciary for our clients:

*Accountability*.  Each company should have effective means in place to hold those entrusted with running a company's business accountable for their actions.  Management of a company should be accountable to its board of directors and the board should be accountable to shareholders.

*Alignment of Management and Shareholder Interests*.  Each company should endeavor to align the interests of management and the board of directors with the interests of the company's shareholders. For example, we generally believe that compensation should be designed to reward management for doing a good job of creating value for the shareholders of the company.

*Transparency*.  Promotion of timely disclosure of important information about a company's business operations and financial performance enables investors to evaluate the performance of a company and to  make informed decisions about the purchase and sale of a company's securities.

## DECISION METHODS

No set of proxy voting guidelines can anticipate all situations that may arise. In special cases, we may seek insight from our managers and analysts on how a particular proxy proposal may impact the financial prospects of a company, and vote accordingly.

We believe that we invest in companies with strong management.  Therefore we will tend to vote proxies consistent with management's recommendations. However, we will vote contrary to management's recommendations if we believe those recommendations are not consistent with increasing shareholder value.

## SUMMARY OF PROXY VOTING GUIDELINES

### Election of the Board of Directors

We believe that good corporate governance generally starts with a board composed primarily of independent directors, unfettered by significant ties to management, all of whose members are elected annually.  We also believe that turnover in board composition promotes independent board action, fresh approaches to governance, and generally has a positive impact on shareholder value.  We will generally vote in favor of non-incumbent independent directors.

The election of a company's board of directors is one of the most fundamental rights held by shareholders.  Because a classified board structure prevents shareholders from electing a full slate of directors annually, we will generally support efforts to declassify boards or other measures that permit shareholders to remove a majority of directors at any time, and will generally oppose efforts to adopt classified board structures.

4

**Approval of Independent Auditors**

We believe that the relationship between a company and its auditors should be limited primarily to the audit engagement, although it may include certain closely related activities that do not raise an appearance of impaired independence.

We will evaluate on a case-by-case basis instances in which the audit firm has a substantial non-audit relationship with a company to determine whether we believe independence has been, or could be, compromised.

**Equity-based compensation plans**

We believe that appropriately designed equity-based compensation plans, approved by shareholders, can be an effective way to align the interests of shareholders and the interests of directors, management, and employees by providing incentives to increase shareholder value. Conversely, we are opposed to plans that substantially dilute ownership interests in the company, provide participants with excessive awards, or have inherently objectionable structural features.

We will generally support measures intended to increase stock ownership by executives and the use of employee stock purchase plans to increase company stock ownership by employees. These may include:

1. Requiring senior executives to hold stock in a company.
2. Requiring stock acquired through option exercise to be held for a certain period of time.

These are guidelines, and we consider other factors, such as the nature of the industry and size of the company, when assessing a plan's impact on ownership interests.

**Corporate Structure**

We view the exercise of shareholders' rights, including the rights to act by written consent, to call special meetings and to remove directors, to be fundamental to good corporate governance.

Because classes of common stock with unequal voting rights limit the rights of certain shareholders, we generally believe that shareholders should have voting power equal to their equity interest in the company and should be able to approve or reject changes to a company's by-laws by a simple majority vote.

We will generally support the ability of shareholders to cumulate their votes for the election of directors.

**Shareholder Rights Plans**

5

While we recognize that there are arguments both in favor of and against shareholder rights plans, also known as poison pills, such measures may tend to entrench current management, which we generally consider to have a negative impact on shareholder value.  Therefore, while we will evaluate such plans on a case by case basis, we will generally oppose such plans.

## CLIENT INFORMATION

A copy of these Proxy Voting Policies and Procedures is available to our clients, without charge, upon request, by calling 1-866-447-4228. We will send a copy of these Proxy Voting Policies and Procedures within three business days of receipt of a request, by first-class mail or other means designed to ensure equally prompt delivery.

In addition, we will provide each client, without charge, upon request, information regarding the proxy votes cast by us with regard to the client's securities.

6