FILED
CLERK

1:02 pm, Jun 25, 2019

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
ROGER EMERSON, MARY EMERSON,
ROBERT CAPLIN and MARTHA J.
GOODLETT, Individually and on Behalf of
All Others Similarly Situated,

               Plaintiff,

           -against-

MUTUAL FUND SERIES TRUST,
CATALYST CAPITAL ADVISORS LLC,
NORTHERN LIGHTS DISTRIBUTORS LLC,
JERRY SZILAGYI, TOBIAS CALDWELL,
TIBERIU WEISZ, BERT PARISER, and
ERIK NAVILOFF,

               Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION & ORDER**
2:17-cv-02565 (ADS)(GRB)

<u>**APPEARANCES:**</u>

**Robbins Geller Rudman & Dowd, LLP**
*Attorneys for Co-Lead Plaintiffs the Folk Group and Plaintiffs Roger Emerson, Mary Emerson,*
*Robert Caplin and Martha J. Goodlett*
58 South Service Road Suite 200
Melville, NY 11747
       By:    David Avi Rosenfeld, Esq.,
               Samuel H. Rudman, Esq.,
               Evan Jay Kaufman, Esq.,
               William John Geddish, Esq., Of Counsel.

**Labaton Sucharow & Rudoff LLP**
*Attorneys for Co-Lead Plaintiff Jeffrey Berkowitz*
100 Park Avenue 12th Flr.
New York, NY 10017
       By:    Christopher Joseph Keller, Esq.,
               James W. Johnson, Esq.,
               Michael H. Rogers, Esq.,
               Francis P. McConville, Esq.,
               John Julian Esmay, Esq., Of Counsel.,

**Levi & Korsinsky, LLP**
*Attorneys for Catalyst Futures Fund Investor Group Plaintiffs*
1111 Summer Street Suite 403
Stamford, CT 06905
    By:    Shannon Lee Hopkins, Esq., Of Counsel.

**Rosen Law Firm, P.A. P.C.**
*Attorneys for the Farmers Group Plaintiffs*
275 Madison Avenue Suite 3400
New York, NY 10116
    By:    Philip Kim, Esq.,

**Lazare Potter Giacovas & Moyle LLP**
*Attorneys for Defendant Mutual Fund Series Trust, Catalyst Capital Advisors LLC, Jerry Szilagyi, and Erik Naviloff,*
875 Third Avenue, 28th Floor
New York, NY 10022
    By:    James F. Moyle, Esq.,
            Jacob Ari Englander, Esq., Of Counsel.

**Goodwin Procter LLP**
*Attorneys for Northern Lights Distributors LLC*
620 8th Ave
New York, NY 10018
    By:    Elizabeth S. David, Esq.,
            Mark Holland, Esq., Of Counsel.

**Blank Rome LLP**
*Attorneys for Defendants Tobias Caldwell, Tiberiu Weisz and Bert Pariser*
405 Lexington Avenue
New York, NY 10174-0208
    By:    Michelle Gitlitz Courtney, Esq., Of Counsel.

**SPATT, District Judge**:

On April 28, 2017, the Plaintiffs brought this putative class action on behalf of certain persons who purchased shares of the Catalyst Hedged Futures Strategy Fund (the "Fund") seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77a *et seq.*, against the registrant for the Fund, certain of the Fund's executive officers and/or trustees, the investment advisor to the Fund, and the underwriter for the ongoing offering of Fund shares to the public.

Presently before the Court is a motion by the Defendants to dismiss the Amended Complaint for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure ("Rule" or "Fed. R. Civ. P.") 12(b)(6).

For the following reasons, the Court grants the Defendants' motion to dismiss the Amended Complaint in its entirety and dismisses the Plaintiffs' claims with prejudice.

# I.  BACKGROUND

The Fund is an open-end mutual fund that invests in cash, and cash equivalents, such as high-quality short-term fixed income securities, and long and short call and put options on Standard & Poor's 500 Index ("S&P 500") futures contracts. The Plaintiffs allege that the Defendants sold shares of the Fund pursuant to misrepresentations in publicly filed registration statements and prospectuses that the Fund was a low-risk investment suitable for capital preservation in all market conditions. Contrary to these representations, the Fund purportedly made numerous highly speculative investments that exposed the Fund to potentially unlimited losses of capital in rising markets. Giving rise to this action, the Fund had a "melt down" when the S&P 500 experienced a steady and rapid increase in value during the first two weeks of February 2017.

## A.  THE PARTIES.

The Plaintiffs are a putative class of persons or entities who purchased or otherwise acquired shares of the Fund in continuous offerings pursuant to registration statements and prospectuses for the Fund filed on November 1, 2014, November 13, 2014, November 1, 2015, November 5, 2015, November 1, 2016, November 3, 2016, April 6, 2017 and April 13, 2017 (the "Relevant Period").

Defendant Mutual Fund Series Trust (the "Trust"), the Fund's registrant, is registered under the Investment Company Act of 1940 (the "ICA") as an open-end investment company with several investment funds marketed under the Catalyst brand.

Defendant Catalyst Capital Advisors LLC ("Catalyst Advisors") is the investment advisor for the Fund. Under the terms of a management agreement, Catalyst Advisors is responsible for formulating the Fund's investment policies, making ongoing investment decisions and engaging in portfolio transactions.

Defendant Northern Lights Distributors LLC (the "Distributor") is the principal underwriter and the national distributor for the shares of the Fund.

Defendant Jerry Szilagyi ("Szilagyi") was at all relevant times the Chairman of the Board of Trustees of the Fund, as well as the Fund's President and Principal Executive Officer. At all relevant times, Szilagyi was also the Chief Executive Officer and co-founder of Catalyst Advisors.

Defendants Tobias Caldwell ("Caldwell"), Tiberiu Weisz ("Weisz"), and Bert Pariser ("Pariser") were at all relevant times members of the Board of Trustees of the Fund.

Defendant Erik Naviloff ("Naviloff") was at all relevant times the Treasurer and Principal Financial Officer for the Fund.

Collectively, the Court will refer to Szilagyi, Caldwell, Weisz and Pariser as the "Trustee Defendants," and with Naviloff as the "Individual Defendants."

B. THE FUND AND RELEVANT OFFERING DOCUMENTS.

The Fund has three share classes, each sharing the same underlying portfolio of assets, but with each bearing different associated fees and expenses. All shares can be purchased at the Fund's net asset value, but Class A shares generally require buyers to pay an additional sales charge. Class A Shares (ticker "HFXAX") charged a maximum sales charge of 5.75%, a deferred sales charge

4

of 1%, and annualized operating expenses of 2.35%; Class C Shares (ticker "HFXCX") charged annualized operating expenses of 3.10%; and Class I Shares (ticker "HFXIX") charged annualized operating expenses of 2.10%. Even though each class of shares experienced slightly different returns based on their varying expenses, all three classes were invested in and represented an interest in the same portfolio of assets during the Relevant Period.

The Fund operated as an open-ended mutual fund wherein shares of the Fund could be purchased only from the Trust in continuous, open-ended offerings pursuant to the Fund's registration statements. There was no secondary market for the Fund shares. At any time during the Relevant Period, investors could redeem their shares or purchase more shares from the Trust. Thus, each member of the putative class purchased shares of the Fund from the Trust pursuant to and traceable to the Fund's Registration Statements.

Throughout the Relevant Period, the Defendants annually filed nearly identical registration statements and prospectuses in connection with the continuous offerings of the Fund's shares. The Fund's shares were issued to investors pursuant to a series of registration statements and prospectuses that formed part of the registration statements filed with the Securities and Exchange Commission, which are referred to collectively herein as the "Registration Statements," including the following:

(a) Prospectus and Summary Prospectus dated November 1, 2014;

(b) Registration Statement dated November 13, 2014;

(c) Prospectus and Summary Prospectus dated November 1, 2015;

(d) Registration Statement dated November 5, 2015;

(e) Prospectus and Summary Prospectus dated November 1, 2016;

(f) Registration Statement dated November 3, 2016;

(g) Prospectus and Summary Prospectus dated April 6, 2017; and

(h) Registration Statement dated April 13, 2017.

The Prospectuses expressly incorporated by reference a Statement of Additional Information ("SAI") and the Fund's Annual Report for that year, each of which provided investors with additional guidance about, *inter alia*, the Fund's investment strategies and limitations. The Fund filed Annual Reports with the SEC on Form N-CSR dated September 9, 2015 and September 8, 2016. The Fund filed Semi-Annual Reports with the SEC on Form NCSRS dated March 11, 2015, March 10, 2016, and March 10, 2017, which were also incorporated into the Registration Statements by reference.

The Registration Statements referred investors seeking more information to the SAI, which "contain[] detailed information on Fund policies and operations." The defendants reissued and updated the SAIs throughout the Relevant Period. The Registration Statements directed investors to review the SAIs, Annual Reports and Semi-Annual Reports for additional information, including "management's discussion of market conditions and investment strategies." Disclosure of each Fund's complete holdings was required to be made quarterly within 60 days of the end of each fiscal quarter in the Annual Report and Semi-Annual Report to Fund shareholders and in the quarterly holdings report on Form N-Q. The Forms N-Q were also part of the Registration Statements. The following Forms N-Q, identifying the holdings of the Fund, were filed during the Relevant Period:

(a) Form N-Q dated December 1, 2014, relating to the period ending September 30, 2014;

(b) Form N-Q dated May 28, 2015, relating to the period ending March 31, 2015;

(c) Form N-Q dated November 27, 2015, relating to the period ending September 20, 2015;

(d) Form N-Q dated May 31, 2016, relating to the period ending March 31,

2016; and

(e) Form N-Q dated November 29, 2016, relating to the period ending September 30, 2016.

In addition, the Defendants periodically issued a Fund "Fact Sheet," which also solicited purchasers of Fund shares.

When discussing to the aforementioned documents as a collective, the Court will refer to them as the "Offering Documents." Because most of the alleged misrepresentations and relevant disclosures are substantively identical throughout the Relevant Period, the Court conducts its review of the facts based on the statements in the November 1, 2014 Prospectus and Summary Prospectus. If referring to another document (or if the representation at issue changes), the Court will specifically note the document.

## C. FACTUAL BACKGROUND.

In December 2005, Ed Walczak ("Walczak") launched the hedge fund Harbor Assets LLC ("Harbor Assets"), and from the beginning served as its portfolio manager. After nearly seven years, Walczak partnered with Catalyst Advisors to turn his investment vehicle into a mutual fund. On September 3, 2013, Harbor Assets converted into the Fund, which Catalyst Advisors marketed alongside the other mutual funds in its portfolio. The Fund then grew rapidly, so rapidly that it had to close itself off to outside investors and limit additional share purchases to then current investors as of October 31, 2015. By late 2016, the Fund's net assets reached over $4 billion, contrasted with the $10 million it held while operating as a hedge fund. The Fund's staggering growth was short-lived, however, as it suffered enormous losses over the first half of 2017.

Before diving further into the facts, the Court must first introduce a few basic investment concepts. Options are financial derivatives representing a contract sold by one party (the option writer) to another party (the option holder). The contract offers the holder the right, but not the

obligation, to buy or sell a security or other financial asset at an agreed upon price (the strike price) during a certain period of time or on a specific date (exercise date).

Call options give the option to buy at a certain price, while put options give the option to sell at a certain price. In the case of a call option, the holder bets the stock price will increase above the strike price by the time of the exercise date, while the writer wants the price to remain below the strike price, so the option expires worthless and the writer retains the premium paid. For put options, the holder bets the price of the stock will fall below the strike price, allowing it to sell the stock at a profit, while the writer wants the stock to stay above the strike price, so the option expires worthless and the writer retains the premium paid.

In some instances, writers of call options will own or purchase the asset subject to the option at the time that they write the option. Such options are considered "covered." Covering an option permits the writer to limit the downside risk associated with the transaction in exchange for diminished potential profits. The maximum loss for the writer of a covered call option that triggers, after accounting for the premium received, is the difference between the strike price and the purchase price. But the upside is lower because the writer of a covered call option must actually purchase the underlying asset, cutting against the profits if the option expires.

A "naked" or "uncovered" call, on the other hand, occurs when an investor writes a call option without owning the asset subject to the option. The writer of a profitable naked call option receives a greater return because they recoup the premium without having to purchase the underlying asset. However, if the strike price exceeds the purchase price, the writer is subject to potentially unlimited losses because there is no cap on how high the price of the underlying security can rise, which the seller would need to buy on the open market to satisfy the contract on the expiration date.

Returning to the facts at hand, the Fund wrote a significant number of naked call options that "shorted" the S&P 500 – meaning that the Fund made a directional bet that the index would not rise significantly in value. Unfortunately for the Fund and its investors, the S&P 500 rose dramatically during the first half of February 2017 – ten of the eleven trading days between February 1 and February 15; and over 2.3% in the five trading days from February 9 through the close of trading on February 15, 2017. Because the Fund did not hold any underlying futures contracts on the index, it had to purchase the securities during a rapidly rising market to satisfy its obligations under the call options it wrote, effectively "buying high and selling low."

Unsurprisingly, the Fund suffered accelerating losses. Between February 2 and February 15, 2017, the NAV for the Fund's HFXAX share class fell from $10.59 per share to $8.98 per share, a decline of more than 15%. By March 10, 2017, the NAV of the Fund's HFXAX share class, HFXCX share class and HFXIX share class each declined approximately 21%, or $2.17 per share, $2.11 per share and $2.18 per share, respectively. And by June 30, 2017, the Fund's NAV fell to a closing price of $8.61. Put in total dollar amount, the Fund lost $600 million in value over a matter of days, which increased to more than $1 billion over a longer timeframe.

The Plaintiffs theorize that the losses suffered by the Fund occurred because it became too big to successfully implement risk controls relied on when operating as the Harbor Assets hedge fund. Because the Fund lacked coverage for its written options, it had to actively, and continuously, trade futures contracts to hedge against market movements. In other words, the Fund could sell the options before the exercise date to avoid any losses it might suffer if it believed the market would fall above or below the strike price. As a small hedge fund with only $10 million in assets, the Fund faced no difficulty doing so.

But as a larger mutual fund, it could not exit derivative positions quickly enough to mitigate its exposure. Derivative contracts only exist by nature of the agreement between the buyer and writer of the contract, which inherently limits the number of available derivatives that can be traded. The Fund's size and positions grew so large that its options made up the vast majority of the market for certain futures contracts. For instance, the Fund held 89% of the written or purchased call options for March 2016 S&P futures, expiring March 18, 2018. Moreover, at various strike prices, the Fund held 100% of the open interest – meaning that at various strike prices, the entire market of the call option was controlled by the Fund. Because the Fund controlled so much of the market, it took the Fund several days to enter or unwind from a given position. It thus became difficult, if not impossible, to enter and exit positions quickly enough to hedge against risk or employ other risk management strategies.

**D.  THE ALLEGED MISREPRESENTATIONS IN THE OFFERING DOCUMENTS.**

The Plaintiffs allege the Defendants made four distinct categories of misrepresentations in the Offering Documents, namely, statements regarding the Fund's: (1) stated objective of capital preservation and portrayal as a low-risk, low-volatility investment with low correlation to equity markets; (2) options strategies and risks; (3) purportedly robust risk management procedures; and (4) past performance.

**1.  Statements Regarding Capital Preservation and Low Risk, Volatility, and Market Correlation**.

According to the Plaintiffs, the Defendants marketed the Fund as a low-risk mutual fund aimed at capital preservation with low correlation to trends in equity markets.

The Fund's stated investment objective in the Prospectuses throughout the Relevant Period was "capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market." ECF 65-1 at 43.

The Fund's December 31, 2014 Fact Sheet provided an identical disclosure, although it was slightly modified in the December 31, 2015 and December 31, 2016 Fact Sheets to provide that the Fund's investment objective was "[c]apital appreciation and capital preservation in all market conditions, with low standard deviation and low correlation to the U.S. equity market." ECF 65-25 at 2; ECF 65-29 at 2.

The Fund, when discussing its investment strategy in the Offering Documents, stressed that "the strategy does not depend on a prediction of equity market direction, and is designed to produce returns that are not correlated with equity market returns." ECF 65-1 at 44.

In its December 31, 2015 and 2016 Fact Sheets, the Fund stated that it was "managed as an absolute return, market neutral strategy." ECF 65-25 at 2; ECF 65-29 at 2.

According to the Plaintiffs, these aforementioned representations either constituted untrue statements of material fact or omitted material information rendering those statements misleading in light of the Fund's actual investment strategy. Specifically, the Plaintiffs contend that the Fund's significant investment in naked call options rendered the Fund susceptible to large losses in rapidly rising equity markets, such that the Fund's actual strategy was inconsistent with the obtaining the objectives of capital preservation, low volatility, and market neutrality.

**2. Statements Regarding the Fund's Options Strategies and Risks.**

The section of the Prospectus addressing the "Principle Investment Risks" of the Fund, discussed "Options Risk," stating:

> There are risks associated with the sale and purchase of call and put options. As the seller (writer) of a covered call option, the Fund assumes the risk of a decline in the market price of the underlying security below the purchase price of the underlying security less the premium received, and gives up the opportunity for gain on the underlying security above the exercise option price. As the buyer of a put or call option, the Fund risks losing the entire premium invested in the option if the Fund does not exercise the option. As a seller (writer) of a put option, the Fund will lose money if the value of the security falls below the strike price.

11

ECF 65-1 at 46.

The SAI to the Prospectus contained a section titled "Additional Information About Investments and Risks." It stated in pertinent part that each Catalyst fund "may also write call options and put options on stocks only if they are covered, as described below, and such options must remain covered so long as the Fund is obligated as a writer." ECF 65-5 at 10. On the same page, three paragraphs later, the SAI stated in pertinent part: "A Fund may write only call options that are 'covered' or for which the Fund has segregated liquid assets equal to the exercise liability of the option that are adjusted daily to the option's current market value." *Id.* A position is covered, "if the Fund either owns the underlying security or has an absolute and immediate right (such as a call with the same or a later expiration date) to acquire that security." *Id.*

According to the Plaintiffs, these aforementioned representations either constituted untrue statements of material fact or omitted material information rendering those statements misleading because they conveyed that the Fund did not write uncovered call options. The Plaintiffs allege that, contrary to these statements, the Fund utilized an uncovered call options strategy, subjecting the Fund to potentially unlimited risk.

### 3. Statements Regarding Risk Management.

The Offering Documents highlighted the Fund's robust risk management procedures, which supposedly minimized risks for its investors and mitigated the extent of any losses.

The Prospectus, in a section regarding the Fund's "Principal Investment Strategies," stated in pertinent part:

> The Fund places a strong focus on risk management that is intended to provide consistency of returns and to mitigate the extent of losses. Positions are entered on a continuous basis across different option exercise prices and expiration months. Supported by sophisticated options analysis software, the Fund employs strict risk

management procedures to adjust portfolio exposure as necessitated by changing market conditions.

ECF 65-1 at 44.

Later in the Prospectus, in the section entitled "Additional Information about the Fund's Investment Strategies and Related Risks," the Fund made a similar disclosure, stating, in pertinent part:

> The Fund uses an extensive historical database of stock index price movement to assist in determining high probability exercise prices at which to enter option spreads. In addition, the Fund employs various technical analyses including studies of price, volume, momentum and sentiment to further optimize position entries. The Fund regularly evaluates market volatility and other technical behavior and adapts the strategy's entry, adjustment, and position sizing criteria to current market conditions The Fund places a strong focus on risk management intended to provide consistency of returns and to mitigate the extent of losses. Positions are entered on a continuous basis across different option exercise prices and expiration months. Supported by sophisticated options analysis software, the Fund employs strict risk management procedures to adjust portfolio exposure as necessitated by changing market conditions.

ECF 65-1 at 121.

The Fund's Annual Reports also emphasized that these risk management strategies allowed the Fund to mitigate its losses to no more than 8%. For example, the Annual Report dated September 9, 2015, stated, in pertinent part:

> Unfortunately, the mean reversion of volatility that followed October's spike was accompanied by not just a "normal" price rebound but a parabolic advance covering more than 10% in the space of 5 weeks. For perspective, this represents an annualized compound return of more than 160%. Because the Fund is consciously positioned to accept upside risk in exchange for eliminating most downside exposure, this is the worst scenario for our strategy. The Fund suffered a drawdown of more than 8% during this time. While disappointing, there were two positives to this period. One, the Fund's risk controls were successful in limiting the drawdown to roughly 8% which is the number they are designed to control to. Second, the extreme nature of the price advance provided a real time stress test to our position management protocols. From that experience we were able to make some modifications that I believe can improve performance in future, like environments.

ECF 65-13 at 5.

The Fund's Annual Report dated September 8, 2016, stated that the Fund's risk management strategies continued to be effective, stating, in pertinent part:

> Following both corrections the S&P experienced 10-15% snap back rallies within a 4-6 week period, a pattern which has become common to the current bull market. Because the Fund is consciously positioned to accept upside risk in exchange for eliminating most downside exposure, this is the worst scenario for our strategy. Last year I described how similar price action (Q4 of CY2014) lead to an 8% drawdown for the fund. I also reported that "the extreme nature of the price advance provided a real time stress test to our position management protocols. From that experience we were able to make some modifications that I believe can improve performance in future, like environments". I am pleased to report that although the two FY2016 snapback rallies actually exceeded the prior year's occurrence in both magnitude and duration, the Fund was able to limit drawdowns to 1.5 and 4.6 percent respectively.

ECF 65-17 at 5

According to the Plaintiffs, these aforementioned representations either constituted untrue statements of material fact or omitted material information rendering those statements misleading because they conveyed that the Fund's risk management procedures enabled the Fund to mitigate losses caused by changes in market conditions. The Plaintiffs allege that, contrary to the Fund's representations: (a) the Fund was unable to ensure meaningful risk controls or loss mitigation due to the potentially unlimited risk involved with the uncovered call options strategy employed by the Fund; (b) the various hedging activities employed by the Fund were themselves a source of significant risk for Fund investors and significantly increased the extent of losses in the event of a rapidly rising equity market; (c) the Fund lacked adequate risk controls to limit the losses experienced in February 2017, despite its foreseeable nature; (d) due to the size of the Fund, and the fact that it controlled nearly the entire options market on many S&P 500 futures in which it traded, it was unable to adjust its portfolio exposure as necessitated by changing market conditions.

### 4.  Statements Regarding Past Performance.

The section of the Prospectus regarding the Fund's "Performance" highlighted returns of the Fund that pre-dated its existence as a mutual fund and covered the period when it existed as a hedge fund:



ECF 65-1 at 47. The Fund introduced the chart by stating:

> The prior performance shown below is for the Fund's predecessor limited company (Harbor Assets, LLC) from December 15, 2005 through August 29, 2013 and Class A shares of the Fund beginning August 30, 2013. . . . From its inception through August 29, 2013, the predecessor limited liability company was not subject to certain investment restrictions, diversification requirements and other restrictions of the 1940 Act . . . which, if they had been applicable, might have adversely affected the Fund's performance. The information below provides some indications of the risks of investing in the Fund. The bar chart shows you how the performance for the predecessor limited liability company varied from year to year. Past performance is not necessarily an indication of how the Fund will perform in the future.

*Id.* at 46–47.

According to the Plaintiffs, these representations either constituted untrue statements of material fact or omitted material information rendering those statements misleading because the performance of the predecessor hedge fund was an unreliable indicator of the Fund's performance as a mutual fund. Specifically, the Plaintiffs contend: (a) the predecessor hedge fund managed only

a small fraction of the assets managed by the Fund; (b) the large amount of options traded by the Fund consisted of a huge portion of the outstanding options market for those securities; and (c) the Fund employed different strategies throughout its existence, both as a hedge fund and once it converted into a mutual fund.

### E. ADDITIONAL DISCLOSURES IN THE OFFERING DOCUMENTS.

The Offering Documents contained a number of additional disclosures regarding the Fund's portfolio and investment strategy.

#### 1. Disclosures Regarding Investment Strategy.

In the section of the Prospectus concerning the Fund's "Principal Investment Strategies," the Fund stated that it "invests primarily in long and short call and put options on Standard & Poor's 500 Index ('S&P') futures contracts and in cash and cash equivalents, including high-quality short-term (3 months or less) fixed income securities such as U.S. Treasury securities." ECF 65-1 at 44.

On the next page, the Prospectus also contained a section entitled "Principle Risks of Investing in the Fund." The section discussed "Index Risk," stating "If the derivative is linked to the performance of an index, it will be subject to the risks associated with changes in that index." *Id.* at 45. The section also discussed "Market Risk," stating "Overall stock market risks may also affect the value of the Fund. Factors such as domestic economic growth and market conditions, interest rate levels and political events affect the securities markets." *Id.* at 46.

#### 2. Disclosures Regarding Options Strategies and Risk.

The section of the Prospectus addressing the "Principle Investment Risks" of the Fund, discussed "Hedging Risk," stating: "Hedging is a strategy in which the Fund uses an option to offset the risks associated with other Fund holdings. There can be no assurance that the Fund's

hedging strategy will reduce risk or that hedging transactions will be either available or cost effective. The Fund is not required to use hedging and may choose not to do so." ECF 65-1 at 45.

In a section discussing the "Principle Investment Risks" for the Catalyst/EquityCompass Buyback Strategies Fund, the Prospectus discussed "Options Risk," stating:

> There are risks associated with the sale and purchase of call and put options. As the seller (writer) of a call option, the Fund assumes the risk of a decline in the market price of the underlying security below the purchase price of the underlying security less the premium received, and gives up the opportunity for gain on the underlying security above the exercise option price. As the buyer of a put or call option, the Fund risks losing the entire premium invested in the option if the Fund does not exercise the option. As a seller (writer) of a put option, the Fund will lose money if the value of the security falls below the strike price. If unhedged, a Fund's written calls expose the Fund to potentially unlimited losses.

*Id.* at 143.

The "Additional Information About Investments and Risks" section of the SAI added supplemental policies regarding the investments by the Catalyst family of funds, which included the Fund.

> Under the policy regarding, "Stock Index Options," the SAI stated:

> Stock Index Options. Except as described below, a Fund will write call options on stock indexes only if on such date it holds a portfolio of stocks at least equal to the value of the index times the multiplier times the number of contracts or the Fund arranges with its Custodian to segregate cash or other liquid assets equal in value to the exercise liability of the call option adjusted daily to the option's current market value. When a Fund writes a call option on a broadly-based stock market index, it will segregate with its custodian, and/or pledge to a broker as collateral for the option, any combination of "qualified securities" (which consists of cash, U.S. Government securities or other liquid securities) with a market value at the time the option is written of not less than 100% of the current index value times the multiplier times the number of contracts.

ECF 65-5 at 12. The SAI also stated the risks regarding transactions in stock options and options on stock indexes:

> Risks of Transactions in Stock Options. Purchase and sales of options involves the risk that there will be no market in which to effect a closing transaction. An option

position may be closed out only on an exchange that provides a secondary market for an option of the same series or if the transaction was an over-the-counter transaction, through the original broker-dealer. Although a Fund will generally buy and sell options for which there appears to be an active secondary market, there is no assurance that a liquid secondary market on an exchange will exist for any particular option, or at any particular time, and for some options no secondary market on an exchange may exist. If the Fund, as a covered call or put option writer, is unable to effect an offsetting closing transaction in a secondary market, and does not arrange with its Custodian to segregate cash or other liquid assets equal in value to the Fund's exercise liability of the option adjusted daily to the option's current market value, it will, for a call option it has written, not be able to sell the underlying security until the call option expires and, for a put option it has written, not be able to avoid purchasing the underlying security until the put option expires.

Risks of Options on Stock Indexes. Each Fund's purchase and sale of options on stock indexes will be subject to risks described above under "Risks of Transactions in Stock Options". In addition, the distinctive characteristics of options on stock indexes create certain risks that are not present with stock options.

Since the value of a stock index option depends upon the movements in the level of the stock index, rather than the price of a particular stock, whether a Fund will realize a gain or loss on the purchase or sale of an option on a stock index depends upon movements in the level of stock prices in the stock market generally or in an industry or market segment rather than movements in the price of a particular stock. Accordingly, successful use by a Fund of options on stock indexes is subject to the advisor's ability to correctly predict movements in the direction of the stock market generally or of a particular industry or market segment. This requires skills and techniques different from predicting changes in the price of individual stocks.

*Id.* at 13. Under the policy regarding "Futures Contracts," the SAI stated:

As required by the 1940 Act, a Fund may purchase or sell futures contracts or options thereon only if the Fund's liability for the futures position is "covered" by an offsetting position in a futures contract or option thereon, or by the Fund's segregating liquid assets equal to the Fund's liability on the futures contract or option thereon, which are adjusted daily to equal the current market value of Fund's liability on the futures contract or option thereon.

*Id.* at 19. Under the policy regarding, "Foreign Currency Options," the SAI stated:

A Fund may write only foreign currency options that are "covered" or for which the Fund has segregated liquid assets equal to the exercise liability of the option that are adjusted daily to the option's current market value. A call option is "covered" if the Fund either owns the underlying currency or has an absolute and immediate right (such as a call with the same or a later expiration date) to acquire that currency. A Fund may write put options on a fully covered basis on a currency

the Fund intends to purchase or where the Fund arranges with its Custodian to segregate cash or other liquid asset equal in value to the exercise liability of the put option adjusted daily to the option's current market value. In addition, a Fund will not permit the option to become uncovered without segregating liquid assets as described above prior to the expiration of the option or termination through a closing purchase transaction as described in "Options on Securities" above.

*Id.* at 21. Under the policy regarding, "Stock Index Futures," the SAI stated:

A Fund's successful use of stock index futures contracts depends upon the advisor's ability to predict the direction of the market and is subject to various additional risks. The correlation between movement in the price of the stock index future and the price of the securities being hedged is imperfect and the risk from imperfect correlation increases as the composition of a Fund's portfolio diverges from the composition of the relevant index. In addition, if a Fund purchases futures to hedge against market advances before it can invest in common stock in an advantageous manner and the market declines, there may be a loss on the futures contracts. In addition, the ability of a Fund to close out a futures position or an option on futures depends on a liquid secondary market. There is no assurance that liquid secondary markets will exist for any particular futures contract or option on a futures contract at any particular time. The risk of loss to a Fund is theoretically unlimited when the Fund sells an uncovered futures contract because there is an obligation to make delivery unless the contract is closed out, regardless of fluctuations in the price of the underlying security.

*Id.* at 20.

### 3. Disclosures Regarding the Fund's Investments.

The Fund issued a public disclosure every quarter that published an itemized list of every single investment and option in the Fund's portfolio. Each schedule was divided into categories such as "Call Options Written," "Put Options Written," "Call Options Purchased," "Put Options Purchased," and "Short-Term Investments," and listed every outstanding asset and option held or written by the Fund as of the reporting date. For each option, the schedule identified: (a) the number of options held or written; (b) the expiration date; (c) the exercise price; and (d) the current market value. They also included additional charts that tracked the number of options written by the Fund during the reporting period, including how many new options were written, how many were exercised or expired, and how many were outstanding at the end of the period.

As an example, the Court has provided an excerpt of the Fund's portfolio as of December 31, 2015, which the Plaintiffs cite in their briefs.

## ECF 65-15, Englander Decl. Ex. O

**CATALYST FUNDS**
**CATALYST HEDGED FUTURES STRATEGY FUND**
**PORTFOLIO OF INVESTMENTS (Unaudited)**
**December 31, 2015**

| Contracts (a) | | Expiration Date - Exercise Price | Value |
|---|---|---|---|
| | **PURCHASED OPTIONS - 1.2% \*** | | |
| | **PUT OPTIONS PURCHASED - 0.7%** | | |
| 7,500 | S&P 500 Index Future | 01/15/2016 - $1,500 | $ 281,250 |
| 12,700 | S&P 500 Index Future | 02/19/2016 - $1,500 | 3,333,750 |
| 14,500 | S&P 500 Index Future | 03/18/2016 - $1,500 | 9,425,000 |
| 3,000 | S&P 500 Index Future | 04/15/2016 - $1,500 | 3,637,500 |
| | **TOTAL PUT OPTIONS PURCHASED (Cost - $45,225,625)** | | 16,677,500 |
| | | | |
| | **CALL OPTIONS PURCHASED - 0.5%** | | |
| 600 | S&P 500 Index Future | 03/18/2016 - $2,165 | 1,125,000 |
| 500 | S&P 500 Index Future | 03/18/2016 - $2,170 | 825,000 |
| 1,250 | S&P 500 Index Future | 03/18/2016 - $2,175 | 1,812,500 |
| 1,925 | S&P 500 Index Future | 03/18/2016 - $2,190 | 1,804,687 |
| 75 | S&P 500 Index Future | 03/18/2016 - $2,195 | 60,000 |
| 2,750 | S&P 500 Index Future | 03/18/2016 - $2,200 | 1,856,250 |
| 4,075 | S&P 500 Index Future | 03/18/2016 - $2,205 | 2,343,125 |
| 520 | S&P 500 Index Future | 03/18/2016 - $2,210 | 253,500 |
| 500 | S&P 500 Index Future | 04/15/2016 - $2,165 | 1,500,000 |
| | **TOTAL CALL OPTIONS PURCHASED (Cost - $47,298,125)** | | 11,580,062 |
| | | | |
| | **TOTAL PURCHASED OPTIONS (Cost - $92,523,750)** | | 28,257,562 |

| Principal | | | |
|---|---|---|---|
| | **UNITED STATES GOVERNMENT SECURITIES - 4.5%** | | |
| $ 100,000,000 | United States Treasury Note, 0.750%, 10/31/2017 | | 99,468,800 |
| | **TOTAL UNITED STATES GOVERNMENT SECURITIES (Cost - $99,862,133)** | | 99,468,800 |

| Shares | | | |
|---|---|---|---|
| | **SHORT-TERM INVESTMENTS - 82.5%** | | |
| | **MONEY MARKET FUNDS - 82.5%** | | |
| 1,702,576,691 | Fidelity Institutional Money Market Portfolio, Class I, 0.32% (b) \*\* | | 1,702,576,691 |
| 13,105,001 | TCG Cash Reserve Government Money Market Fund, Institutional Class, 0.26% (b) | | 13,105,001 |
| 13,104,989 | TCG Daily Liquidity Government Money Market Fund, Institutional Class, 0.25% (b) | | 13,104,989 |
| 13,104,948 | TCG Liquid Assets Government Money Market Fund, Institutional Class, 0.25% (b) | | 13,104,948 |
| 13,104,961 | TCG Liquidity Plus Government Money Market Fund, Institutional Class, 0.25% (b) | | 13,104,961 |
| 13,105,158 | TCG US Government Advantage Money Market Fund, Institutional Class, 0.25% (b) | | 13,105,158 |
| 13,105,005 | TCG US Government Max Money Market Fund, Institutional Class, 0.25% (b) | | 13,105,005 |
| 13,104,997 | TCG US Government Premier Money Market Fund, Institutional Class, 0.25% (b) | | 13,104,997 |
| 13,104,971 | TCG US Government Primary Liquidity Money Market Fund, Institutional Class, 0.25% (b) | | 13,104,971 |
| 13,104,992 | TCG US Government Select Money Market Fund, Institutional Class, 0.25% (b) | | 13,104,992 |
| 13,105,005 | TCG US Government Ultra Money Market Fund, Institutional Class, 0.25% (b) | | 13,105,005 |
| | **TOTAL SHORT-TERM INVESTMENTS (Cost - $1,833,626,718)** | | 1,833,626,718 |
| | | | |
| | **TOTAL INVESTMENTS - 88.2% (Cost - $2,026,012,601) (c)** | | $1,961,353,080 |
| | **OTHER ASSETS LESS LIABILITIES - 11.8%** | | 262,267,535 |
| | **NET ASSETS - 100.0%** | | $2,223,620,615 |

The accompanying notes are an integral part of these financial statements.

| Contracts (a) | | Expiration Date - Exercise Price | Value |
|---|---|---|---|
| | **WRITTEN OPTIONS - (0.7)% *** | | |
| | **PUT OPTIONS WRITTEN - (0.3)%** | | |
| 2,000 | S&P 500 Index Future | 01/15/2016 - $1,640 | $ 150,000 |
| 1,000 | S&P 500 Index Future | 01/15/2016 - $1,710 | 125,000 |
| 1,000 | S&P 500 Index Future | 01/15/2016 - $1,715 | 125,000 |
| 1,000 | S&P 500 Index Future | 01/15/2016 - $1,720 | 125,000 |
| 1,000 | S&P 500 Index Future | 01/15/2016 - $1,725 | 125,000 |
| 2,000 | S&P 500 Index Future | 01/15/2016 - $1,730 | 250,000 |
| 1,000 | S&P 500 Index Future | 01/15/2016 - $1,740 | 137,500 |
| 2,000 | S&P 500 Index Future | 01/15/2016 - $1,750 | 275,000 |
| 1,500 | S&P 500 Index Future | 02/19/2016 - $1,610 | 731,250 |
| 1,000 | S&P 500 Index Future | 02/19/2016 - $1,620 | 525,000 |
| 2,000 | S&P 500 Index Future | 02/19/2016 - $1,625 | 1,100,000 |
| 1,000 | S&P 500 Index Future | 02/19/2016 - $1,640 | 612,500 |
| 1,000 | S&P 500 Index Future | 02/19/2016 - $1,705 | 937,500 |
| 1,500 | S&P 500 Index Future | 02/19/2016 - $1,710 | 1,462,500 |
| 500 | S&P 500 Index Future | 02/19/2016 - $1,715 | 506,250 |
| | **TOTAL PUT OPTIONS WRITTEN (Premiums Received - $24,329,375)** | | 7,187,500 |
| | | | |
| | **CALL OPTIONS WRITTEN - (0.4)%** | | |
| 3,000 | S&P 500 Index Future | 02/19/2016 - $2,225 | 262,500 |
| 45 | S&P 500 Index Future | 03/18/2016 - $2,210 | 21,937 |
| 50 | S&P 500 Index Future | 03/18/2016 - $2,215 | 20,625 |
| 5,775 | S&P 500 Index Future | 03/18/2016 - $2,240 | 1,155,000 |
| 225 | S&P 500 Index Future | 03/18/2016 - $2,245 | 36,563 |
| 8,250 | S&P 500 Index Future | 03/18/2016 - $2,250 | 1,237,500 |
| 12,225 | S&P 500 Index Future | 03/18/2016 - $2,255 | 1,528,125 |
| 14,925 | S&P 500 Index Future | 03/18/2016 - $2,260 | 1,679,062 |
| 7,500 | S&P 500 Index Future | 03/18/2016 - $2,265 | 750,000 |
| 1,500 | S&P 500 Index Future | 04/15/2016 - $2,215 | 1,481,250 |
| | **TOTAL CALL OPTIONS WRITTEN (Premiums Received - $82,760,625)** | | 8,172,562 |
| | | | |
| | **TOTAL WRITTEN OPTIONS (Premiums Received - $107,090,000) (c)** | | $ 15,360,062 |

\* Non-income producing security.

\*\* Rate shown represents the rate at December 31, 2015, is subject to change and resets daily.

(a) Each contract is equivalent to one of the underlying futures contract.

(b) An affiliate of the Advisor.

(c) Represents cost for financial purposes. Aggregate cost for federal tax purposes, including put and call options written, is $1,933,488,851 and differs from value by net unrealized appreciation (depreciation) of securities as follows:

| | |
|---|---|
| Unrealized appreciation: | $ — |
| Unrealized depreciation: | (393,333) |
| Net unrealized depreciation: | $ (393,333) |

The "Portfolio of Investments" schedules also show that the Fund always maintained liquid assets (such as U.S. Treasury Notes and money market funds) that exceeded the market value of its written call options on S&P Futures. For instance:

- As of December 31, 2014, the Fund's written call options on S&P Futures were a liability of approximately $26.7 million, yet the Fund held over $376 million in money market funds;

- As of December 31, 2015, the Fund's written call options on S&P Futures were a liability of approximately $8.2 million, yet the Fund held roughly $99.5 million in U.S. Treasury Notes and $1.8 billion in money market funds;

- As of March 31, 2016, the Fund's written call options on S&P Futures were a liability of approximately $221.8 million, yet the Fund held nearly $1.2 billion in U.S. Treasury Notes and $1.1 billion in money market funds; and

- As of December 31, 2016, the Fund's written call options on S&P Futures were a liability of approximately $550.1 million, yet the Fund held nearly $1.8

The schedules also noted that "all or a portion of" certain liquid assets were "segregated as collateral for options written."

## F. PROCEDURAL BACKGROUND.

On April 28, 2017, Roger Emerson, Mary Emerson, Robert Caplin, and Martha J. Goodlett filed a complaint on behalf of the putative class asserting violations of: (1) Section 11 of the Securities Act, 15 U.S.C. §77k, by the Trust, the Distributor, and the Trustee Defendants; (2) Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), by the Defendants; and (3) Section 15 of the 1933 Act, 15 U.S.C. § 77o, by Catalyst Advisors and the Individual Defendants.

On January 8, 2018, the Court appointed the Folk Group and Jeffrey Berkowitz Co-Lead Plaintiffs to represent the putative class.

On March 30, 2018, the Co-Lead Plaintiffs filed an amended complaint asserting the same causes of actions but adding additional factual allegations.

On June 5, 2018, the Defendants filed a joint motion, pursuant to Rule 12(b)(6), to dismiss the Amended Complaint in its entirety with prejudice.

## II. DISCUSSION.

## A. THE LEGAL STANDARD.

Under the now well-established Twombly standard, a complaint should be dismissed pursuant to Rule 12(b)(6) only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

The Second Circuit has explained that, after *Twombly*, the Court's inquiry under Rule 12(b)(6) is guided by two principles. *Harris v. Mills*, 572 F.3d 66 (2d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009))."First, although 'a court must accept as true all of the allegations contained in a complaint' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" *Id.* at 72 (quoting Iqbal, 129 S.Ct. at 1949). "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* (quoting *Iqbal*, 129 S.Ct. at 1950). Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and ... determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 129 S.Ct. at 1950. This plausibility standard is applicable to securities fraud pleadings. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (observing that to survive 12(b)(6) dismissal, securities fraud plaintiffs "must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level'") (quoting *Twombly*, 127 S.Ct. at 1965).

The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

**B. As to the Timeliness of the Plaintiffs' Claims.**

Under Section 13 of the Securities Act, plaintiffs must assert any Securities Act claims "within one year after the discovery of the untrue statement or the omission, or after such discovery

should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The statute of limitations begins to run on federal securities claims when the plaintiff has actual or constructive notice. *Dodds v. Cigna Secs., Inc.*, 12 F.3d 346, 350 (2d Cir.1993).

Inquiry notice is a type of constructive notice that exists when uncontroverted evidence clearly demonstrates that the plaintiff should have discovered the violation. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir.2008). The limitations period does not begin to run once the plaintiff has facts that would lead a reasonable investor to investigate, but rather only when "when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir.2011). In other words, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint." *Id.* at 175.

In order for the statute of limitations to begin running, disclosures do not have to "perfectly match the allegations that a plaintiff chooses to include in its complaint." *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F.Supp.3d 278, 302 (S.D.N.Y. 2014). However, the disclosures still must "relate [ ] directly to the misrepresentations and omissions" that are alleged. *Staehr*, 547 F.3d at 427 (quoting *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 193 (2d Cir. 2003)).

The Defendants argue that the Plaintiffs should have discovered the alleged misstatements well-before initiating this action due to the disclosures in the Offering Documents. Whether those disclosures placed the plaintiffs on inquiry notice depends primarily on whether they contained sufficient information for the Plaintiffs to discover the risks associated with their investment. In that regard, the Court's analysis here significantly overlaps with its assessment of whether the Amended Complaint contains facts sufficient to allege any misrepresentations occurred. For a

more detailed discussion regarding the content of the disclosures in the Offering Documents, the Court refers the parties to the following section. *See infra* II.C. Ultimately, the Court determines that a reasonable investor conducting a timely investigation would have uncovered the fact of the Fund's significant investment in uncovered call options, and the potential inconsistency between such investments and the alleged misrepresentations in the Offering Documents.

Generally, courts find plaintiffs on inquiry notice when the offering documents disclose the risks forming the basis of the underlying fraud claim. *See Dodds*, 12 F.3d at 347, 350–52 (holding "when an investor is provided prospectuses that disclose that certain investments are risky and illiquid, she is on notice for purposes of triggering the statute of limitations that several such investments might be inappropriate in a conservative portfolio"); *In re Integrated Res., Inc. Real Estate Ltd. Partnerships Sec. Litig.*, 851 F. Supp. 556, 568–69 (S.D.N.Y. 1994) (finding plaintiff was on inquiry notice regarding misrepresentations regarding the riskiness of investments when "[t]he content of the Defendants' alleged misrepresentations [were] contradicted by documents received by the Plaintiffs in connection with the sale of the[] securities").

Here, each and every prospectus revealed that the Fund could write uncovered call options and articulated the associated risks. Moreover, the prospectuses specifically incorporated the Fund's portfolio of investments, which disclosed the Fund did write uncovered call options. Many of the facts Plaintiffs cite to demonstrate the alleged fraud come directly from the Offering Documents. *See*, *e.g.*, ECF 61 at ¶¶ 70–83, 90–98, 100–105. As a result, the limitations period for each plaintiff began to run at the date they purchased their securities, at the earliest, or at the date of first publishing of the Fund's quarterly holdings after the initial purchase.

The Plaintiffs rebut that Defendants continuously reassured investors of its conservative preservation of capital strategy and adequate risk mitigation processes, thereby delaying the

accrual of their claims. Of course, "[t]here are occasions when, despite the presence of some ominous indicators, investors may not be considered to have been placed on inquiry notice because the warning signs are accompanied by reliable words of comfort from management." *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 155 (2d Cir. 2003). At the same time, however, plaintiffs cannot rely on "mere expressions of hope, devoid of any specific steps" or "vague and general" statements as a matter of law. *In re MBIA Inc.*, No. 05-cv-03514, 2007 WL 473708, at *8 (S.D.N.Y. Feb. 14, 2007). Moreover, "[a]n investor may not reasonably rely on words of comfort from management 'when there are direct contradictions between defendant's representations and the other materials available to plaintiffs regarding the possibility of fraud." *In re Zyprexa Prod. Liab. Litig.*, 549 F. Supp. 2d 496, 541 (E.D.N.Y. 2008). As the Court will explain in the next section, the Plaintiffs base their claim of reassurance on unreasonable interpretations on the statements in the Offering Documents, precluding reliance on those statements to delay accrual of the statute of limitations. *See infra* II.C.1., II.C.3.

Lastly, the Plaintiffs object that "determining whether a plaintiff had sufficient facts to place it on inquiry notice is often inappropriate for resolution on a motion to dismiss." *Staehr*, 547 F.3d 412. Putting the boiler plate nature of the Plaintiffs' argument aside, the Second Circuit has "also stated that courts can 'readily resolve the issue' of inquiry notice as a matter of law on a motion to dismiss—as has been done in 'a vast number of cases' in this circuit—where 'the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers ... integral to the complaint." *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)).

With all that in mind, the Court notes that its determination in this regard does not require dismissal of the action. The Plaintiffs filed the Complaint on April 28, 2017, meaning that live

claims remain for every security purchased on or after April 28, 2016. *See Pontiac Gen. Employees' Ret. Sys.*, 637 F.3d at 176 ("[I]f the statute of limitations cannot begin to run until a claim has accrued, and a securities fraud claim does not accrue until the plaintiff has bought or sold the relevant security, then the statute of limitations cannot begin to run until after the plaintiff's transaction."). Although some of the Plaintiffs purchased shares in the Fund outside that window, all purchased at least one within it. ECF 31-2; ECF 33-1. Therefore, assuming the Plaintiffs stated a claim, the Court's ruling would only limit the size of the potential class and the amount of damages available to the Plaintiffs. Therefore, the Court will proceed to the Defendants' substantive grounds for dismissing the Amended Complaint.

## C. AS TO WHETHER THE PLAINTIFFS ALLEGED ANY MATERIAL MISSTATEMENTS OR OMISSIONS.

The Plaintiffs allege claims under sections 11, 12(a)(2), and 15 of the Securities Act. Each of these provisions of the federal securities laws have somewhat different elements, but all of them share the common requirement that the plaintiff identify "a materially misleading statement made by the defendant." *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 57–58 (2d Cir. 1996); *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991). Section 11 creates a cause of action when any part of a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." *Lasker*, 85 F.3d at 58. Section 12(a)(2) "imposes liability on any person who offers or sells securities by means of a prospectus containing material misstatements." *Yung v. Lee*, 432 F.3d 142, 147 (2d. Cir. 2005). Finally, claims under Section 15 of the Securities Act are necessarily predicated on a primary violation of securities law and impose "control person" liability on individual defendants. *Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004).

"Collectively, the language of [these provisions] creates three potential bases for liability based on registration statements and prospectuses filed with the SEC: (1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; and (3) an omission of information that is necessary to prevent existing disclosures from being misleading." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010).

"In judging whether an alleged omission was material in light of the information already disclosed to investors, [courts in this Circuit] consider whether there is a substantial likelihood that the disclosure of the omitted material would have been viewed by the reasonable investor as having significantly altered the total mix of information already made available." *In re ProShares Trust Secs. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (emphasis in original). The court's inquiry should not focus on whether "the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor about the nature of the [securities]." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).

Materiality is a mixed question of law and fact, and thus "will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley*, 592 F.3d at 358 at 360 (quoting *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2009)); *see also ProShares*, 728 F.3d at 102 (dismissal is appropriate "where the alleged omission was so obviously unimportant to a reasonable investor that reasonable minds would agree on that omission's unimportance.") (quotation marks omitted). Because "[t]he materiality determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw[,] ... a complaint may not properly be dismissed on the ground that the alleged misstatement or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds

could not differ on the question of their importance." *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 239 (S.D.N.Y. 2012) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) and *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000)) (alterations and internal quotation marks omitted). At the same time, "the materiality hurdle remains a meaningful pleading obstacle," and "the Supreme Court has been 'careful not to set too low a standard of materiality,' for fear that management would 'bury the shareholders in an avalanche of trivial information.'" *ProShares*, 728 F.3d at 102 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 131 S.Ct. 1309, 1318, 179 L.Ed.2d 398 (2011)).

The Defendants argue that, in light of the relevant disclosures in the Offering Documents, the Plaintiffs fail to allege any material misstatements or omissions as a matter of law. The representations at issue fall into four categories, namely, statements regarding the Fund's: (1) stated objective of capital preservation and portrayal as a low-risk, low-volatility investment with low correlation to equity markets; (2) options strategies and risks; (3) purportedly robust risk management procedures; and (4) past performance. The Court will discuss each category of representations in turn. Ultimately, the Court concurs with the Defendants that no actionable misstatements or omissions occurred.

### 1. As to the Statements Regarding the Fund's Investment Objectives.

The Plaintiffs contend that the Defendants misrepresented the Fund as a low-risk investment aimed at capital preservation with low correlation to trends in equity markets. The Plaintiffs point primarily to the characterizations of the Fund's investment objective as "capital appreciation and capital preservation in all market conditions, with low volatility and low correlation to the US equity market" and "[c]apital appreciation and capital preservation in all market conditions, with low standard deviation and low correlation to the U.S. equity market."

The Offering Documents made additional representations that the Fund's strategy was "market neutral," *i.e.*, that it was "designed to produce returns that are not correlated with equity market returns." According to the Plaintiffs, these representations are inconsistent with the Fund's significant investment in naked call options, which rendered the Fund susceptible to large losses in rapidly rising equity markets.

The Court finds these statements non-actionable because they merely articulate the goals of the Fund, rather than promise a particular investment strategy. *See In re All. N. Am. Gov't Income Tr., Inc. Sec. Litig.*, No. 95-cv-0330, 1996 WL 551732, at \*4 (S.D.N.Y. Sept. 27, 1996) ("The investment objective is not the type of statement that a reasonable investor would consider important in deciding whether or not to invest. Such general, forward looking statements, which make no promise to investors, are not actionable under the securities laws.").

The representations are highly analogous to the statements at issue in *In re TCW/DW North American Government Income Trust Securities Litigation*, 941 F. Supp. 326 (S.D.N.Y. 1996). The plaintiffs claimed that a statement in the prospectus that the "investment objective [of the Fund] is to earn a high level of current income while maintaining relatively low volatility of principal" was a misrepresentation because the defendant failed to fully disclose the risks of its actual investments. *Id.* at 338. The court dismissed the allegation because the "investment objective is simply not the kind of statement which a reasonable investor would consider important in deciding whether or not to invest." *Id.* at 339. It reasoned: "if it were reasonable for an investor to consider such a statement, . . . many, if not most securities offerings would expose their issuers to federal securities law liability." *Id.* In the Court's view, the investment objectives in the Offering Documents similarly made general and indefinite statements about the Fund's intentions, which reasonable investors would consider unimportant.

The Court gives some credence to the case relied on by the Plaintiffs, *In re Oppenheimer Rochester Funds Group Security Litigation*, 838 F. Supp. 2d 1148 (D. Colo. 2012), which found that an investment objective of "capital preservation" could be actionable because the term has a set meaning that an investor's principal will be protected from erosion or loss. *Id.* at 1161. The investment objective in *Oppenheimer*, however, is not on all fours with the representations here. The Offering Documents did not merely characterize the fund's objective as "capital preservation," instead stating the fund targeted "capital appreciation *and* capital preservation." ECF 65-1 at 43 (emphasis added). The Fund thus presented itself as a vehicle to protect the absolute monetary value of an investment while simultaneously increasing the value of the investment. Put another way, the Fund sought to generate returns on investments while avoiding losses – the aspiration of nearly all mutual funds. The Court cannot fathom how any mutual fund could escape liability if such vacuous pronouncements became actionable simply because the Fund suffered losses against its best wishes.

Indeed, *Oppenheimer* recognized as much, stating it did not find that the "'capital preservation' objectives were materially misleading standing alone." *Id.* at 1161. Rather, the court found "they were so given the totality of other actionable or misleading statements and omissions," which "suggest[ed] the capital preservation' pitch went beyond the vague or aspirational to describe an essential feature of the Funds." *Id.* at 1160–61. The Amended Complaint lacks similar unequivocal affirmative representations describing capital preservation as a core feature of the Fund, as opposed to an abstract ideal that it aspired to.

Further, the Offering Documents more than adequately disclosed the reality that the Fund might fail to achieve its goals. They broadly noted market and index-related risks. *See* ECF 65-1 at 45 ("Index Risk. If the derivative is linked to the performance of an index, it will be subject to

the risks associated with changes in that index."), 46 ("Market Risk. Overall stock market risks may also affect the value of the Fund. Factors such as domestic economic growth and market conditions, interest rate levels and political events affect the securities markets."). Other representations cited by Amended Complaint indicated the Fund's strategy "accept[ed] upside risk in exchange for eliminating most downside exposure," or in other words that the Fund might suffer losses in bull markets. ECF 65-13 at 5; ECF 65-17 at 5. And as the Court will explain in the following section, the Offering Documents specifically noted that the types of options the Fund invested in relied on the Fund's ability to correctly predict the direction of the market. *See infra* II.B.2; ECF 65-5 at 13 ("[S]uccessful use by a Fund of options on stock indexes is subject to the advisor's ability to correctly predict movements in the direction of the stock market generally or of a particular industry or market segment."). It was thus apparent that the Fund faced risks potentially correlated with upward market movements, as opposed to total market neutrality under all circumstances.

In *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996), the Second Circuit recognized that:

> [A]ny investment that turns out badly can appear to be-in hindsight-a low return, high risk investment. Not every bad investment is the product of misrepresentation. The fact that interest rates did not rise, and that therefore the Trusts for a period decreased in value as the prospectuses indicated they might, only shows that the investment may have turned out to be a bad one. To show misrepresentation, the complaint must offer more than allegations that the portfolios failed to perform as predicted. It is in the very nature of securities markets that even the most exhaustively researched predictions are fallible.

*Id.* at 8. Accordingly, it established that misrepresentation claims fail as a matter of law when the language in the offering documents "fully disclosed the risk of investment and was specific enough to warrant a reasonable investor's attention." *Id.* at 9. Further, "[t]he Second Circuit recognizes that 'up to a point, companies must be permitted to operate with a hopeful outlook,' and that as a result,

executives 'are not required to take a gloomy, fearful or defeatist view of the future.'" *In re New York Cmty. Bancorp, Inc., Sec. Litig.*, 448 F. Supp. 2d 466, 480 (E.D.N.Y. 2006) (Spatt, J.) (quoting *In re Nokia Oyj (Nokia Corp.) Secs. Litig.*, 423 F.Supp.2d 364, 397–98 (S.D.N.Y.2006)).

Here, the Prospectus provided more-than-boilerplate disclosures that the Fund's returns could be affected by equity markets, defeating any potential claim that the Fund misrepresented its investment objectives. *See Vaccaro v. New Source Energy Partners L.P.*, No. 15-cv-8954, 2016 WL 7373799, at *8 (S.D.N.Y. Dec. 19, 2016) (granting motion to dismiss where defendants "repeatedly emphasized that [the company's] financial condition was, and would remain, tied to the health of the global oil market").

Therefore, the Amended Complaint fails to allege an actionable misrepresentation or omission based on the Funds statements regarding investment objectives and market correlation.

## 2. As to the Statements Regarding the Fund's Options Strategies and Risks.

In sum, the Plaintiffs contend that the Defendants conveyed that the Fund did not write uncovered call options. As a preliminary matter, no such affirmative representation exists in the Offering Documents. The Plaintiffs instead allege that the Defendants communicated that message by implication through various statements. However, the Court's review of the Offering Documents reveals that the Defendants adequately disclosed that the Fund could and did write uncovered call options.

To the Plaintiffs' credit, the Offering Documents contain two statements which might imply that the Fund could not write uncovered call options. First, the "Options Risk" section of the Fund's prospectus articulated the risk of a covered call option but failed to mention the risks associated with uncovered call options. ECF 65-1 at 46. A reasonable implication of that omission is that those risks were not pertinent to the Fund. Second, the SAI to the Prospectus, in a section

titled "Additional Information About Investments and Risks," stated in pertinent part that Each Catalyst Fund "may also write call options and put options on stocks only if they are covered, as described below, and such options must remain covered so long as the Fund is obligated as a writer." ECF 65-5 at 10. A reasonable investor could read the statement in conjunction with the previous statement and conclude that the Fund only wrote call options if they were covered.

Although either conclusion may be reasonable in a vacuum, they do not hold water when read in conjunction with the totality of the disclosures in the Offering Documents. Importantly, the Court must consider the representations in context of the "total mix of information made available" to investors. *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1198 (2d Cir. 1993). The "total mix" includes "information already in the public domain and facts known or reasonably available to the shareholders." *Id.* at 1199. Here, the Offering Documents are replete with disclosures regarding the Fund's investment in uncovered call options and the associated risks.

The same section of the SAI discusses the policies for the particular investment at issue – stock index options – and provides no limitation requiring coverage as described by the Plaintiffs. ECF 65-5 at 12 ("[A] Fund will write call options on stock indexes only if on such date it holds a portfolio of stocks at least equal to the value of the index times the multiplier times the number of contracts or the Fund arranges with its Custodian to segregate cash or other liquid assets equal in value to the exercise liability of the call option adjusted daily to the option's current market value."). Several paragraphs after the statement in the SAI cited by the Plaintiffs, the Offering Documents stated: "A Fund may write only call options that are 'covered' *or* for which the Fund has segregated liquid assets equal to the exercise liability of the option that are adjusted daily to the option's current market value." *Id.* at 10 (emphasis added). This statement expressly

communicates that covering an option is not the only method by which the Fund may write one. The SAI repeats the same message – that Catalyst funds may write naked call options so long as they segregated sufficient liquid assets – in several other locations. *See, e.g.*, *Id.* at 19 ("[A] Fund may purchase or sell futures contracts or options thereon . . . if the Fund's liability for the futures position is 'covered' by . . . the Fund's segregating liquid assets equal to the Fund's liability on the futures contract or option thereon."), 21 ("A Fund may write only foreign currency options that are 'covered' or for which the Fund has segregated liquid assets equal to the exercise liability of the option that are adjusted daily to the option's current market value.").

In addition, the Offering Documents explained that investments in stock index options could trigger losses as a result of incorrect predictions about the direction of the market:

> Since the value of a stock index option depends upon the movements in the level of the stock index rather than the price of a particular stock, whether a Fund will realize a gain or loss on the purchase or sale of an option on a stock index depends upon movements in the level of stock prices in the stock market generally or in an industry or market segment rather than movements in the price of a particular stock. Accordingly, successful use by a Fund of options on stock indexes is subject to the advisor's ability to correctly predict movements in the direction of the stock market generally or of a particular industry or market segment.

*Id.* at 13. They characterized the writing of uncovered call options as a distinct investment technique from covered call options, carrying greater risk. *See id.* ("The writing of covered call options is a conservative investment technique believed to involve relatively little risk (in contrast to the writing of naked or uncovered options[)].")." They also specifically noted the potentially unlimited exposure created by writing naked call options and other similar uncovered derivative instruments. *See* ECF 65-1 at 143 ("As a seller (writer) of a put option, the Fund will lose money if the value of the security falls below the strike price. If unhedged, a Fund's written calls expose the Fund to potentially unlimited losses."); ECF 65-5 at 20 (describing the potential for "theoretically unlimited" losses when writing uncovered stock index futures contracts if the writer

makes incorrect predictions about the direction of the index). The totality of these disclosures reveal that the Fund could engage in an investment technique, namely, the writing of uncovered call options on stock indexes, which carried potentially significant risks stemming from the overall performance of the associated index.

The Plaintiffs, citing *In re Flag Telecom Holdings, Ltd. Securities Litigation*, 618 F. Supp. 2d 311 (S.D.N.Y. 2009), object that piecemeal statements scattered throughout the Offering Documents cannot as a matter of law establish that the Fund adequately disclosed it could invest in uncovered call options. The Plaintiffs' argument fails to account for the nature of the alleged misrepresentation. As previously mentioned, the Fund never affirmatively stated that it would not invest in uncovered call options. The Plaintiffs only pieced together that representation through various statements strewn throughout the Offering Documents. Indeed, many of the alleged misrepresentations came from the same section, entitled "Additional Information About Investments and Risks," as the relevant disclosures. The Plaintiffs cannot credibly argue that the Defendants "buried" the relevant disclosures while simultaneously maintaining that the same section of the SAI contains actionable misrepresentations. *See ProShares*, 728 F.3d at 108 n.7 ("Plaintiffs argue that the district court impermissibly relied upon the wedge graphs 'buried' in the SAI in analyzing the complaint while simultaneously maintaining that this same buried information misled them about ETF risks. . . . It's curious that Plaintiffs could not find this information to get a more in-depth understanding of the funds but have no trouble using that same information to shoulder ProShares with liability.").

The facts are thus distinguishable from *Flag Telecom Holdings, Ltd.* The disclosures at issue in that case "should have appeared, but did not appear, in several key sections of the Prospectus or in sections of the Prospectus that contained" the misrepresentations. *Flag Telecom*

*Holdings, Ltd.*, 618 F.Supp.2d at 324. It is true that *all* of the disclosures here are not cabined in the same section as the alleged misrepresentation. But the dispersed nature of the underlying statements at issue – and the absence of an affirmative statement that the Fund would not write uncovered call options anywhere in the prospectus – leads the Court to conclude that a reasonable investor would consider these disclosures to be part of the total mix of information.

Additionally, and perhaps most importantly, the Fund issued a public disclosure every quarter publishing an itemized list of every single investment in its portfolio. The Fund included the schedules in the Fund's Annual Reports, Semi-Annual Reports, and Form N-Q filings, all of which the Fund incorporated by reference into the Offering Documents. In the Court's view, it was plainly apparent from these itemized lists that the Fund's portfolio consisted of a significant number of uncovered call options. It finds the Plaintiffs' objections to this conclusion unpersuasive.

First, just like the aforementioned risk disclosures, the Plaintiffs contend the information in the schedules was outside the total mix of information that would be considered by a reasonable investor. As an initial matter, courts routinely find the information contained in annual and quarterly reports filed with the SEC within the purview of what a reasonable investor would consider. *See, e.g.*, *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 378 (E.D.N.Y. 2003) (dismissing allegations premised on the nondisclosure of information that was actually disclosed in Forms 8–K, 10–K, and 10–Q); *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 268 (S.D.N.Y. 2004) (finding that a "a reasonable investor with knowledge of the FTC action would have examined Cross Media's 10–K and 10–Q reports filed with the SEC"). Further, the Plaintiffs' suggestion that a reasonable investor would not consider an itemized list of the Fund's actual investments strains credulity. The content of a fund's portfolio is one of the most, if not the

most, consequential pieces of information about the fund. No reasonable investor would ignore such information if made available to them.

Second, the Plaintiffs contend that the list of investments did not plainly reveal that the Fund was invested in uncovered call options, because the market value of the call contracts Defendants purchased was comparable to, and often exceeded, the value of the contracts written by the Defendants. This argument similarly lacks merit. The schedule of investments identified all of the options written by expiration date and exercise price. If the Fund "covered" an option, the underlying S&P futures contract or offsetting call option would have also appeared in the schedule of investments. The fact that no S&P futures contracts appeared in the schedules *in and of itself* communicated that the Fund's options were uncovered. The fact that the "market value" of the call contracts purchased exceeded the value of the call options written only conveyed the value of the premium paid under the option contract, not that the Fund actually owned the underlying security. ECF 65-5 at 11 ("The premium received is the market value of an option.").

Taking a look at the examples provided by the Plaintiffs, it is apparent that their interpretation of the investment schedules is unreasonable. Although the market value of the options purchased exceeded the market value of the options written as of March 31, 2015 and December 31, 2015, neither of the relevant schedules listed underlying assets in the S&P 500 that would cover the written options. Moreover, the schedules provided the exact number of options written and reveal, in the Plaintiffs' own words, that "[t]he number of written call options vastly outnumbered the amount of purchased options." ECF 61 ¶¶ 74 ("The Fund's uncovered written call position, and its exposure to sharply rising equity markets, can be seen through its Portfolio of Investments"); *see also* ECF 64-2 (compiling totals of call options purchased and written in portfolio of investments during the Relevant Period); ECF 65-12 (8,400 call options purchased

compared to 25,530 written as of March 31, 2015); ECF 65-15 (12,195 call options purchased compared to 53,495 written as of December 31, 2015). As a result, a reasonable investor would have determined that the Fund did not cover its written options with purchased options by simply comparing the two numbers. The Plaintiffs cannot allege the Fund failed to disclose its investment in uncovered call options when it could have "discovered" the truth purely through simple arithmetic. *See Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 547–48 (S.D.N.Y. 2017) ("Since simple arithmetic computation based on the information disclosed would have revealed [the necessary disclosure], it is not substantially likely that further specific disclosure . . . would have significantly altered the total mix of information already made available to investors.").

The Plaintiffs attempt to revive their argument by contending that a reasonable investor could not fully appreciate the Fund's exposure by merely knowing the number of options held and written. In their view, the disclosures were insufficient because they only realized the true nature of the risks after obtaining the assistance of a financial derivatives expert to test the potential liability under each option in a rising market. The essence of the Plaintiffs' argument appears to be that the disclosures in the investment schedules are insufficient because they did not understand how to interpret the disclosures – *i.e.*, they incorrectly believed that the "market value" of the options conveyed information regarding the coverage of those options that it did not.

However, the Securities Act creates liability for *misleading* statements, not statements that an investor simply misunderstood. Courts are to "bear in mind that disclosure requirements are not intended to attribute to investors a child-like simplicity. Rather, investors are presumed to have the ability to be able to digest varying reports and data." *Nokia Oyj*, 423 F. Supp. 2d at 397. Having disclosed all of the material information necessary for a reasonable investor to appraise himself or

herself of the pertinent risks, the Defendants did not need to explain to the Plaintiffs how to read its portfolio. Nor were the Defendants required to numerically specify the Fund's exposure under all potential market contingencies. *See Vaccaro*, 2016 WL 7373799, at *8 ("Defendants are not required to present an overly gloomy or cautious picture of current performance and future prospects. Furthermore, once a risk is disclosed, defendants are not required to predict the precise manner in which risks will manifest themselves.").

The Court thus views the Plaintiffs' suggestion that they lacked the necessary information or knowledge to adequately understand the risks to be specious at best. They cannot simultaneously assert they knew the risks associated with writing uncovered call options, such that the alleged misrepresentation that the Fund only wrote "covered" options was material, while claiming that they could not discover the existence of those options by looking at the investment schedules. What is more, they cannot suggest that naked call options are on one hand so obviously risky that they are inherently inconsistent with a low-volatility investment objective but on the other hand that they required a complex analysis by a derivatives expert to unearth the Fund's potential exposure.

*Kuriakose v. Federal Home Loan Mortgage Corporation*, 897 F. Supp. 2d 168 (S.D.N.Y. 2012) is instructive. The Defendants "in annual and quarterly statements, . . . routinely detailed the credit characteristics of the loans in its guarantee portfolio, divulged the specific credit scores of borrowers in its guarantee portfolio, and disclosed loan-to-value ratios." *Id.* at 182. The Plaintiffs alleged that the disclosures misled investors as to the number of risky loans in its portfolio by failing to label them as "subprime." The Court rejected the argument because the defendant's "broad disclosure [of] all of its loan characteristics was an accurate way to relay information to investors." *Id.* That "method of disclosing information made it possible for a reasonable investor

to, with little effort, take his own measure of risk in [the defendant's] loan portfolio." *Id.* For instance, an investor could "through simple arithmetic" ascertain the percentage of the defendant's portfolio consisting of subprime loans. *Id.* at 183.

Similarly, in *La Pietra v. RREEF America, L.L.C.,* 738 F. Supp. 2d 432 (S.D.N.Y. 2010), the court found there was "no basis for the plaintiffs to claim that the defendants failed to disclose the Funds' strategies or their riskiness" when the prospectuses described "the nature and extent of the Funds' leveraging strategy and the possibility that the Funds would be required to redeem the preferred shares." *Id.* at 443. In particular, the court relied on the fact that the offering documents "identif[ied] the approximate leverage target that the Funds maintained; discuss[ed] the risks of both the Funds' leveraging strategy and their specific focus on the real estate market; and explain[ed] that a failure to maintain 200% asset coverage could lead to redemption of the preferred shares and would preclude declaring cash dividends or distributions on the common shares." *Id.* Due to the disclosure of such information, the offering documents did not need to include additional explanatory language. *Id.*

Just like these cases, it sufficed that the Fund provided investors a detailed accounting of its investments and accompanied the portfolio with an explanation of the potential risks for certain derivative instruments in that portfolio, as well as the general risks associated with derivatives linked to the performance of an index. Armed with such information, a reasonable investor could make his or her own assessment of the risks, including the risks arising from the Fund's writing of a significant number of uncovered call options.

Therefore, the Amended Complaint fails to allege an actionable misrepresentation or omission based on the Fund's statements regarding options strategy and risks.

### 3. As to the Statements Regarding Risk Management.

The Plaintiffs argue that the Fund's statements about its risk protocols were misleading given the Fund's uncovered call options strategy. Specifically, they contend that the potentially unlimited risk associated with writing naked call options meant that the Fund could not ensure meaningful loss mitigation and that the Fund became too large for any risk mitigation procedure to be effective. These allegations fail for the same reason the Plaintiffs' claims regarding the Fund's investment objectives fail.

The primary representation at issue states that the Fund "places a strong focus on risk management that is *intended* to provide consistency of returns and to mitigate the extent of losses." ECF 65-1 at 44 (emphasis added). As with the Fund's investment objectives, the Fund's representations merely announced the goal of mitigating losses, rather than providing a guarantee that the Fund would, in fact, avoid such losses. *See All. N. Am. Gov't Income Tr., Inc.*, 1996 WL 551732, at *4. Moreover, "[g]eneralized statements regarding a company's . . . risk management amount to no more than inactionable puffery." *New York Cmty. Bancorp, Inc.*, 448 F. Supp. 2d at 478–79; *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632–33 (S.D.N.Y. 2005) (finding statements that defendant "misrepresented itself as an institution of integrity with sound risk-management procedures . . . amount[ed] to no more than puffery.") No reasonable investor would consider an abstract promise to mitigate losses, untethered from any specific form of hedging, material to their investment decision in light of the numerous disclosures discussed in the previous sections. *See id.* ("No reasonable investor would . . . have relied on such statements if they had examined the numerous disclosures NYCB made regarding the magnitude of its investment in mortgage-backed securities and the risk associated with such investments.").

The Plaintiffs rely on *Hunt v. Alliance North American Government Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998), in which the Second Circuit ruled "[t]hat the prospectuses disclosed the possible inefficacy of hedges does not shield the Fund from liability for misrepresenting the availability of hedging opportunities." *Id.* at 729. The prospectuses at issue set forth specific hedging devices the defendants would use to mitigate risk—such as "futures contracts and options on futures contracts, options on foreign currencies, forward foreign currency exchange contracts, and options on U.S. and Foreign Government securities"—even though the defendants were unable to avail themselves of those hedging devices because they were too costly. *Id.* at 725, 728.

Here, on the other hand, the Plaintiffs do not allege that the Defendants failed to employ a hedging method they presumed was available. Instead, the Plaintiffs claim the Fund could not *effectively* execute its preferred method of risk management due to its size. Indeed, the Fund expressly disclaimed any guarantee that it would hedge its positions, let alone use a particular strategy. *See* ECF 65-1 at 45 ("There can be no assurance that the Fund's hedging strategy will reduce risk or that hedging transactions will be either available or cost effective. The Fund is not required to use hedging and may choose not to do so."). What is more, the Fund specifically disclosed the possibility that it might be unable to exit its positions once invested in an option:

> An option position may be closed out only on an exchange that provides a secondary market for an option of the same series or if the transaction was an over-the-counter transaction, through the original broker-dealer. Although a Fund will generally buy and sell options for which there appears to be an active secondary market, there is no assurance that a liquid secondary market on an exchange will exist for any particular option, or at any particular time, and for some options no secondary market on an exchange may exist. . . . The ability to establish and close out positions on such options will be subject to the development and maintenance of a liquid secondary market. It is not certain that this market will develop in all stock index option contracts.

ECF 65-5 at 13; *see also id.* ("Each Fund's purchase and sale of options on stock indexes will be subject to risks described above under 'Risks of Transactions in Stock Options.'"). The only things

promised by the Defendants, if anything, were that the Fund would "employ strict risk management procedures to adjust portfolio exposure as necessitated by a changing market" by utilizing "an extensive historical database of stock index price movement," "various technical analyses including studies of price, volume, momentum and sentiment," "evaluat[ions] [of] market volatility and other technical behavior," "sophisticated options analysis software." Under *Hunt*, the Plaintiffs could perhaps allege a misrepresentation if the Fund did not actually use those techniques. They cannot, however, recover simply because those methods failed to actually minimize losses to the Plaintiffs' satisfaction. *See Olkey*, 98 F.3d at 9.

Therefore, the Amended Complaint fails to allege an actionable misrepresentation or omission based on the Fund's statements regarding risk management.

### 4. As to the Statements Regarding Past Performance.

The Plaintiffs argue that the Defendants' emphasis on past performance in the prospectus was materially false and misleading because it relied on the returns generated as a hedge fund managing a small fraction of the assets held by the Fund during the Relevant Period. The Court finds that the Fund adequately disclosed the material differences between the Fund's operation as Harbor Assets and as a larger mutual fund.

The Prospectus specifically noted that the Fund was subject to different legal requirements than Harbor Assets. The Plaintiffs object that the note is merely a boilerplate disclosure and failed to cure the Fund's omission that its "size effectively limited its ability to execute the stated strategy which had led to Harbor Assets' spectacular performance." ECF 66 at 24.

What the Plaintiffs fault the Defendants for "omitting," however, goes well beyond the requirements of the Securities Act. As the Court has now stated *ad nauseum*, the Fund adequately disclosed its exposure to market movements. If the Plaintiffs' theory served as an adequate basis

for attaching liability, then securities offerings would not only need to disclose the material risks associated with the investments, but they would also need to include language overtly criticizing the soundness of their investment strategy. Otherwise, the offeror would face liability every time they suffered a loss. However, is well-established that, "[a] company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock." *New York Cmty. Bancorp, Inc*, 448 F. Supp. 2d at 478–84 (*quoting In re Donna Karan Intern. Secs. Litig.*, No 97-cv-2011, 1998 WL 637547, at *13 (E.D.N.Y. Aug.14, 1998)).

Therefore, the Amended Complaint fails to allege an actionable misrepresentation or omission based on the Fund's statements regarding past performance.

### 5. As to the Disposition of the Motion.

Dismissal with prejudice is appropriate because "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," *Pincus*, 936 F.2d at 762. In sum, the Plaintiffs base their allegations on unreasonable assumptions regarding the meaning of the statements at issue. Those statements are either categorically non-actionable or are rendered non-actionable by the various risk disclosures repeated throughout the Offering Documents. As a result, no set of additional facts could prove the Plaintiffs' claims. For completeness' sake, the Court will now proceed to resolve the remainder of the arguments litigated in the Defendants' motion.

### D. AS TO WHETHER THE ABSENCE OF LOSS CAUSATION IS APPARENT FROM THE PLEADINGS.

The Defendants argue that the Plaintiffs' claims also fail because they cannot show that their losses were "caused" by the purported misrepresentations. Assuming the Plaintiffs retained a

viable misrepresentation claim, the Court cannot conclude that negative loss causation serves as an independent basis for dismissing the Plaintiffs' claims.

"Generally, loss causation is not an element of a claim under either Section 11 or 12." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 522 (S.D.N.Y. 2013) (collecting cases). "Plaintiffs are not required to plead loss causation in the Complaint." *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F.Supp.2d 562, 572 (S.D.N.Y.2009). However, "[d]efendants may assert the absence of loss causation as an affirmative defense . . . by proving that the allegedly misleading representations did not cause the depreciation in the stock's value." *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F.Supp.2d 404, 418 (S.D.N.Y. 2009). "The complaint, therefore, may be dismissed if a defendant can prove that it is apparent on the face of the complaint that the alleged loss is not causally connected to the misrepresentations at issue." *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588 (S.D.N.Y. 2011). "Defendants bear the burden of demonstrating that something other than the alleged omissions or misstatements at issue caused plaintiffs' loss." *Facebook, Inc.*, 986 F. Supp. 2d at 523.

The dispute here relates to whether Securities Act plaintiffs may recover for the diminished price of a mutual fund share. "Unlike an ordinary share of stock traded on the open market, the value of a mutual fund share is calculated according to a statutory formula. Share price is a function of 'Net Asset Value' ['NAV'], the pro-rata share of assets under management, minus liabilities such as fees." *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03-cv-8208, 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006). A fund's per-share NAV "is simply the fund's NAV divided by the total number of shares that the fund has outstanding that day." D. Geffen, *A Shaky Future for Securities Act Claims Against Mutual Funds*, Vol. 37 Securities Regulation Law Journal 20, at *23–24 (Spring 2009). "Because the NAV is so determined, alleged misrepresentations

regarding a fund's investment objective and holdings—rather than the inputs into the NAV calculation—can have no effect on a fund's share price." *State Street*, 774 F. Supp. 2d at 590. Therefore, any decline in any a mutual fund's NAV would result solely from changes in the value of the mutual fund's underlying investments, as opposed to any of the funds statements or omissions.

The question then is what effect this economic reality has on a plaintiff's ability to recover for Securities Act violations by mutual funds that implicate the principle of loss causation. The Second Circuit has not weighed in on this issue. Relying on *In re State Street Bank and Trust Co. Fixed Income Funds Investment Litigation*, 774 F. Supp. 2d 584 (S.D.N.Y. 2011), the Defendants posit that the inability for misrepresentations by a mutual fund to affect its NAV affirmatively establishes the absence of loss causation, and thus defeating the Plaintiffs' claims. The Plaintiffs, on the other hand, cite *Youngers v. Virtus Investment Partners Inc.*, 195 F. Supp. 3d 499 (S.D.N.Y. 2016) and *In re Oppenheimer Rochester Funds Group Security Litigation*, 838 F. Supp. 2d 1148 (D. Colo. 2012), both rejecting the loss causation reasoning in *State Street* on the ground that NAV is not the only means by which an investor may assign value to a mutual fund's shares. The Court finds both sets of cases well-reasoned but departs somewhat in methodology from each of them. Ultimately, the Court determines that the Amended Complaint sufficiently alleges a causal connection between the purported misrepresentations and the decline in the Fund's NAV to defeat negative loss causation.

The lodestar for the Court's decision is *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), in which the Second Circuit articulated the fundamental principles of loss causation. Loss causation, an analogue to the tort-law concept of proximate cause, "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Id.* at 172.

Under *Lentell*, a plaintiff establishes loss causation upon satisfying two conditions: first, that "the loss be foreseeable" and second, "that the loss be caused by the materialization of the concealed risk." *Id.* at 173. The foreseeability inquiry depends on whether "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Id.* (emphasis in original). When evaluating the latter prong, a court inquires into whether "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.*

*State Street* construes these requirements in conjunction with the text of the Securities Act to conclude that a plaintiff may only recover for decreases in price caused directly by the revelation of the truth regarding the misrepresentation to the market. *State Street*, 774 F. Supp. 2d at 593. Because damages under the statute are not recoverable to the extent that they represent amounts "other than the depreciation in value of such security *resulting from*" the misrepresentation or omission, 15 U.S.C. § 77k(e) (emphasis added), the court reasoned that the misrepresentation or omission itself must be the literal cause of the decreased value.

According to *State Street*, such a conclusion represented the only way to isolate losses caused by material misstatements from those caused by other market forces:

> Suppose two individuals, P1 and P2, purchase shares of a mutual fund for $50 a share at the same time. The fund's prospectus contains a material misrepresentation. P1 sells his shares on Tuesday for $55 a share. On Wednesday, the shares of the fund fall to $25. On Thursday, P2 sells his shares for $25 a share. P1 and P2 are analytically indistinct, except that P2 suffered a loss and P1 did not. If we say that the material misrepresentation "caused" P2's losses, this leads to a paradox: both P1 and P2 are subject to the same "proximate cause," yet one has a legal cause of action and one does not. Indeed, the measure of P1's damages under Section 11 would result in a negative number. *Lentell* and *Dura* first remove the paradox by distinguishing transaction causation and loss causation. P1 and P2 are both subject to the same "transaction cause," but not to the same "loss cause." *Lentell* and *Dura* then resolve the paradox by inserting the revelation of the information hidden by

48

the material misrepresentation on Wednesday, which analytically separates the causation analysis for P1 and P2. The material misrepresentation still "causes" P2's loss, however, in the sense that it is the revelation of information that the misrepresentation concealed that prompts the difference between P1 and P2's selling prices.

*State Street.*, 774 F. Supp. 2d at 593–94.

Although Court finds the analytical rigor of *State Street* impressive, and almost compelling, the Court cannot sign off on its ultimate outcome because it adopts an unnecessarily strained reading of the statute. The Court disagrees that the oblique use of "resulting from" to describe the damages recoverable for a violation means that the only cognizable damages are those caused by the market's reaction to the truth about the misstatements. "Resulting from" lends itself to various equally viable interpretations depending on the context. *Cf. In re Vivendi Universal, S.A. Sec. Litig.*, 634 F. Supp. 2d 352, 369 (S.D.N.Y. 2009) ("The word 'cause' takes on a variety of meanings at different levels of generality."). There is nothing inherent in the phrase that means that courts should adhere to the most narrow and literal interpretation chosen by *State Street*. For instance, losses caused by occurrences within the zone of risk concealed by the misrepresentation can "result from" the misrepresentation just the same, because the *subject* of the misrepresentation directly caused the loss suffered.

The Court is especially unwilling to concur with *State Street*, because its conclusion is shockingly broad when taken to its logical endpoint. Loss causation is not an element of a Section 11 or 12(a)(2) plaintiff's *prima facie* case that must be pled. And the Second Circuit has characterized a defendant's burden of showing the absence of loss causation in the Securities Act context as the "'heavy burden' of proving negative causation," *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35–36 (2d Cir.2009), because under the statute "the risk of uncertainty' is allocated to defendants." *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 408 (S.D.N.Y.2003)

(quoting Akerman, 810 F.2d at 341). By dismissing the complaint simply because the alleged misrepresentations could not affect the fund's NAV, *State Street* effectively found mutual funds categorically exempt from liability for misrepresentations under the Securities Act. If Congress intended such a sweeping loophole, it would have said so directly. *See United States v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004) ("A statute should be interpreted in a way that avoids absurd results.").

At the same time, however, the Court agrees with *State Street* that NAV appears to be the best vehicle for assessing the losses suffered by a mutual fund. Although the Court ultimately concurs with *Youngers* and *Oppenheimer* that plaintiffs must be able to recover against mutual funds for misrepresentations, both cases reached that endpoint by deciding that the "value" of a share in a mutual fund could consist of other considerations, such as expected future value, risk, and past performance. *See Youngers*, 195 F. Supp. 3d at 512 ("In situations where a change in value is not necessarily represented by a corresponding change in price, a court must shift its focus to something other than price in determining whether a misstatement 'negatively affected the <u>value</u> of the security.'); *Oppenheimer*, 838 F. Supp. 2d at 1176 ("The fact that the pro rata 'price' of a mutual fund's aggregate holdings is set by mathematical formula rather than the actual market does not mean that the underlying *value* of those aggregated holdings cannot be squandered or diminished."). Without ruling on the ultimate viability of showing loss causation through those other approximations of "value," the Court shares *State Street*'s concern that awarding damages for such losses might conflict with the statutorily prescribed damages formula for Section 11 and Section 12(a)(2) claims. Congress intended the provision to cover differences in the market price caused by the misrepresentation, rather than serve as a "catch-all" to protect investors from fraud. *See* Samuel L. Moultrie, *Loss Causation, Mutual Funds, and Securities Act Claims: An Uncertain*

*Future for Shareholders*, 25 Regent U. L. Rev. 443, 465 (2013). Under such an approach, it would be difficult, if not impossible, to apportion losses between an investor's qualitative estimates of the fund's "value" and those caused by normal market phenomenon.

In the Court's view, the most coherent way to address loss causation in the context of mutual funds would be through the "materialization of risk" framework discussed in *Lentell*. Throughout the opinion, the Second Circuit repeated that the materialization of a concealed risk constitutes a distinct method of establishing loss causation from a corrective disclosure, and that the undisclosed risk itself can cause a recoverable loss, not just the disclosure of the risk. *See Lentell*, 396 F.3d at 173 ("[I]t cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated."), 175 ("To plead loss causation, the complaints must allege facts that support an inference that Merrill's misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."), *id.* ("There is no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of Merrill's 'buy' and 'accumulate' recommendations4 and no allegation that Merrill misstated or omitted risks that did lead to the loss."), *id.* ("Nor do plaintiffs allege that Merrill Lynch concealed or misstated any risks associated with an investment in 24/7 Media or Interliant, some of which presumably caused plaintiffs' loss."), 176 ("Yet plaintiffs allege no loss resulting from the market's realization that the opinions were false, *or* that Merrill concealed any risk that could plausibly (let alone foreseeably) have caused plaintiffs' loss." (emphasis added)), 177 ("[A] plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that

proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment.").

Post-*Lentell* case law confirms that the literal cause of an investor's loss need not be the revelation of the misrepresentation to the market.

In *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160 (2d Cir. 2015), the Second Circuit described "three broad types of fraud complaints" actionable under the Securities Act:

> [A]ssume three houses are destroyed in an earthquake. The first is the one already encountered—the house that Lincoln was falsely said to have owned. . . . The second and third types of fraud involve, in contrast, misrepresentations as to the solidity of the house and thus differ in kind from the first in a way that bears directly on loss causation in the present case. In the second type of fraud complaint, the misrepresentation is that the house was well built. In the third—a further variation of the second—the buyer is told that the house was, in fact, "earthquake proof." It may turn out that shoddy and well-built houses alike were destroyed in the earthquake. It may even be that the earthquake was so vast as to destroy houses that were "earthquake proof," as "earthquake proof" is normally defined. In both such situations, however, it is enough at the pleading stage for the plaintiff to allege the particular misrepresentation and the destruction of the house in an earthquake.

*Id.* 187–88. The Second Circuit analogized statements regarding the risk of investments in collateralized debt obligations ("CDO") to representations that a house was "well built." It thus found the plaintiffs alleged loss causation by claiming their investment suffered losses due to the presence of toxic assets in each CDO, contrary to the representations in the offering documents. *Id.* at 188–89.

In *Financial Guaranty Insurance Company v. Putnam Advisory Co., LLC*, 783 F.3d 395 (2d Cir. 2015), the Second Circuit found the plaintiff adequately pled loss causation based on mismanagement of a CDO by a party other than the defendant. The plaintiff provided financial guarantee insurance for the CDO based on the defendant's representation that it would select the collateral independently and in the interests of long investors. In reality, the defendant permitted

the collateral selection and acquisition process to be controlled by a hedge fund with significant short positions in the CDO. The plaintiff adequately pled loss causation, even though the third-party hedge fund's selection of assets was the literal cause of the losses under the guarantee, because the losses would not have happened if the selection of assets occurred consistent with the defendant's representations. *Id.* at 403–04.

In *Charney v. Wilkov*, 734 F. App'x 6 (2d Cir. 2018), the Second Circuit found that the plaintiffs established loss causation with regard to losses resulting from the defendant's inducement to invest in a Ponzi scheme. Although the criminal conduct of the managers of the Ponzi scheme was the actual cause of the loss, loss causation arose from "the risk concealed by [defendant] that she had not conducted any due diligence," which "materialized when [the Ponzi scheme operators] absconded with plaintiffs' investments." *Id.* at 11.

These cases lead the Court to conclude that the Plaintiffs present an at least plausible basis for defeating loss causation. According to the Plaintiffs' theory of the case, the mutual fund issuer misrepresented the composition of the portfolio, concealing the fact that it had potentially unlimited exposure to rapid upward swings in the S&P 500—this constitutes the "risk." In February 2017, the S&P 500 rallied, causing a meltdown when the Fund could not exit its short positions quickly enough. The Fund's NAV dropped, thereby the risk "materialized." Just as the representation that a house was earthquake proof did not need to literally demolish the house described in *Loreley*, the Defendants' representations regarding the composition of the Fund's portfolio did not need to cause a market reaction devaluing the Fund. At this stage, it is enough that the Plaintiffs allege that the Defendants concealed the risk of the Fund's exposure to upward movements in the S&P 500. *See King Cty., Wash. v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010) ("[I]f a mutual fund holds itself out as investing no more than 25

percent in a single industry but then, as actually planned, invests fifty percent in a single industry, there is no escape by blaming the industry [upon its decline] rather than the promoter. The materialization of the concealed risk causes the loss."); *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 95 (D. Mass. 2010) ("Here, the plaintiffs allege that the defendants made false representations about the riskiness of the Fund's investments and artificially inflated the NAV throughout the Class Period. When the defendants' alleged misstatements were ultimately revealed, the NAV declined in value, resulting in losses to the Fund."); *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009) ("Here, plaintiffs certainly alleged that the subject of the fraudulent statements caused their losses—that defendants misrepresented or failed to disclose portfolio risks, the materialization of which caused (or exacerbated) the losses.")

*State Street* finds this formulation to be facile. The Court respectfully disagrees. *State Street* relies on the assumption that loss causation only occurs if the representation itself directly influences the price of the fund's shares. *State Street*, 774 F.Supp.2d at 595 ("Because there is no secondary market for a mutual fund's shares, statements by a fund's issuer have no ability to 'inflate' the price of the fund's shares."). That plainly is not required to show loss causation under *Lentell*. As another court put it:

> [p]roving actual causation, at least in the way *Lentell* uses the phrase, is part of plaintiffs' burden to show a causal connection between the materialization of the risk and the stock price declines, not the causal connection between the allegedly false and misleading statements and the materialization of the risk. Establishing the latter connection does not, as defendants appear to believe, require plaintiffs to establish a one-to-one correspondence between concealed facts and the materialization of the risk. In other words, if a company misrepresents fact A (we have plenty of free cash flow), which conceals risk X (liquidity), the risk can still materialize by revelation of fact B (a ratings downgrade), an indication of risk X (liquidity). As discussed above, to prove the causal connection between misrepresenting fact A and the revelation of fact B, plaintiffs must establish only that the revelation of fact B was foreseeable, i.e., within the zone of risk X, and that

> fact B reveals information about risk X. When fact B is revealed, the market need not be aware of fact A or that fact A had been previously misrepresented. The way defendants describe the law, only a corrective disclosure would prove loss causation.

*Vivendi Universal, S.A.*, 634 F. Supp. 2d at 367. Notably, the *Vivendi* formulation is distinct from "transaction" causation, because if the losses described in the example occurred because of cause Y (*e.g.*, an undisclosed government investigation) then the misrepresentation would not be the "proximate" cause of the loss even though it was the "but for" cause of the plaintiff's ownership of the underlying security.

This approach also resolves the supposed paradox identified by *State Street*'s hypothetical regarding P1, who sells a share in a mutual fund bought at $50 a share for $55 on a Tuesday, and P2, who sells the same share for $25 on a Thursday. P2 possesses a cause of action because the risk concealed by the misrepresentation materialized on Wednesday, such that P2 suffered a "loss cause." P1, on the other hand, suffered no "loss cause" due to the fact that the concealed risk never materialized. P1 thus lacks a viable cause of action because an "artificially inflated purchase price is not itself a relevant economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347, 125 S. Ct. 1627, 1634, 161 L. Ed. 2d 577 (2005) (finding plaintiffs failed to allege loss causation where complaint never alleged that the "share price fell significantly after the truth became known").

Returning to the facts at hand, the Court cannot say that the revelation of the Fund's overinvestment in naked call options had no causal connection to decline in the Fund's NAV. While it may not have resulted in the market "reacting" with a lower evaluation of the Fund's shares, the fund's over-exposure to upward movements in the S&P 500 was certainly intertwined with the diminution of the Fund's assets. Parsing out the extent to which the Fund's assets deteriorated because of the concealed risk – i.e., its writing of uncovered options – or something else seems better suited for a motion for summary judgment.

55

Therefore, the Court finds that the Defendants failed to establish negative loss causation based solely on the allegations in the Amended Complaint.

**E.  AS TO WHETHER THE INDIVIDUAL DEFENDANTS AND CATALYST ADVISORS ARE STATUTORY SELLERS UNDER SECTION 12.**

"A plaintiff has standing to bring a Section 12 claim only against a 'statutory seller' from which it 'purchased' a security." *In re Lehman Bros. Sec. & Erisa Litig.*, 799 F.Supp.2d 258, 310 (S.D.N.Y. 2011) (citing *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 344 (2d Cir. 1987)). A statutory seller is someone who "(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359 (quoting *Pinter v. Dahl*, 486 U.S. 622, 642, 647, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988)).

The Plaintiffs do not allege that the Individual Defendants and Catalyst Advisors transferred title of the Fund's shares to investors, so liability only attaches if the Amended Complaint contains facts sufficient to allege solicitation. The Defendants argue that no such facts exist in the Amended Complaint. The Court agrees.

As a preliminary matter, the Court notes that the Individual Defendants all signed the Fund's registration statements and that a long line of district court cases in this Circuit have held that alone suffices to allege solicitation. *See, e.g.*, *Briarwood Invs. Inc. v. Care Inv. Trust, Inc.*, No. 07-cv-8159, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009); *Flag Telecom Holdings, Ltd.*, 352 F.Supp.2d at 454; *Steed Finance LDC v. Nomura Sec. Int'l, Inc.*, No. 00-cv-8058, 2001 WL 1111508, at *7 (S.D.N.Y. Sept. 20, 2001). The Second Circuit has not directly addressed the issue.

However, the court in *Citiline Holdings, Inc. v. iStar Financial Inc.*, 701 F. Supp. 2d 506 (S.D.N.Y. 2010) found that these district court cases were out of step with the greater weight of authority:

> Every Court of Appeals to have considered the issue, however, has held that an individual's signing a registration statement does not itself suffice as solicitation under Section 12(a)(2). . . . The Court is persuaded that the decisions of the Courts of Appeals better reflect both the statutory scheme and the Supreme Court's decision in Pinter. While Section 11 expressly imposes liability upon every signer of the registration statement, Section 12 does not do so. Plaintiffs' position would render this distinction a nullity and is, in any event, inconsistent with Pinter's statement that Congress did not intend to impose liability under Section 12 "for mere participation in unlawful sales transactions." *Pinter*, 486 U.S. at 650, 108 S.Ct. 2063.

*Id.* at 512. Every court in this circuit to address the issue since *Citiline* has reached the same conclusion, except for one which appeared unaware of *Citiline*. *See, e.g.*, *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 646 (S.D.N.Y 2017) ("Courts in this District have consistently followed the rule from Citiline since the decision was issued."); *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 402–03 (S.D.N.Y. 2013) ("Plaintiffs cite various cases for the proposition that signing a registration statement or prospectus constitutes solicitation. However, more recent cases from this district have come to the opposite conclusion."). *But see In re Ply Gem Holdings, Inc.*, No. 14-cv-3577, 2016 WL 5339541, at *6 (S.D.N.Y. Sept. 23, 2016).

The Court joins the courts concurring with *Citiline*, finding it persuasive and seeing no reason to depart with the general trend of its sister courts. For the claims against the Individual Defendants to survive, as with their claims against Catalyst Advisors, the Plaintiffs must allege facts amounting to active solicitation beyond signing the registration statements. They did not. The only additional allegation regarding solicitation in the Amended Complaint states: "Catalyst Advisors', the Individual Defendants' and the Distributor's actions of solicitation included participating in the preparation of the false and misleading Prospectuses and participating in

marketing the shares of the Fund to investors." ECF 61 ¶ 179. Such a vague and conclusory allegation is plainly insufficient. *See Pahmer v. Greenberg*, 926 F. Supp. 287, 307–08 (E.D.N.Y. 1996) (dismissing section 12 claim because defendants were not statutory sellers, despite allegations that they assisted in the preparation of offering memoranda and made misrepresentations to induce investments); *Burke v. Dowling*, 944 F. Supp. 1036, 1064 (E.D.N.Y. 1995) (dismissing Section 12 claims against bank, despite allegations that it provided "substantial assistance" in drafting the subject PPMs, which alone did not render it a statutory seller). To the extent the Plaintiffs argue that additional facts show solicitation by Catalyst Advisors due to its role as manager of the fund, they are irrelevant because the Plaintiffs drew these facts from exhibits to the Defendants' brief rather than allegations in the Amended Complaint.

Therefore, the Court finds that the Amended Complaint lacks facts sufficient to confer standing upon the Plaintiffs to bring claims against the Individual Defendants and Catalyst Advisors under Section 12.

## F. AS TO WHETHER THE PLAINTIFFS ADEQUATELY ALLEGE CONTROL UNDER SECTION 15.

To establish liability under Section 15, a plaintiff must show a primary violation of the Securities Act by the controlled person and control of the primary violator. *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F.Supp.3d 441, 573 (S.D.N.Y.2015). To plead a control person violation, a plaintiff must allege that the defendant had "[a]ctual control over the wrongdoer and the transactions in question." *In re Alstom SA*, 406 F.Supp.2d 433, 487 (S.D.N.Y.2005); *see also In re Refco, Inc. Sec. Litig*., 503 F.Supp.2d 611, 663 (S.D.N.Y.2007) ("[A] claim under § 20(a) requires ... actual involvement in the making of the fraudulent statements by the putatively controlled entity."). The mere "exercise of influence ... is not sufficient to establish control*." H & H Acquisition Corp. v. Fin. Intranet Holdings*, 669 F.Supp.2d 351, 361 (S.D.N.Y.2009) (quoting

*Alstom SA*, 406 F.Supp.2d at 487). Rather, "[c]ontrol over a primary violator may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (citations omitted). Moreover, boilerplate allegations that a party controlled another based on officer or director status are insufficient. *Alstom SA*, 406 F.Supp.2d at 495, 488 n. 51.

As stated above, the Plaintiffs cannot recover under Section 15 due to their failure to allege a primary violation. In addition, the Amended Complaint's allegations regarding Catalyst Advisors are insufficient. The Plaintiffs allege that Catalyst Advisors "is the investment advisor for the Fund" and "is responsible for formulating the Fund's investment policies, making ongoing investment decisions and engaging in portfolio transactions." ECF 61 ¶ 29. As to "control," the Plaintiffs assert that "Catalyst Advisors managed and controlled the business affairs of the Fund and was a control person of the Fund. Catalyst Advisors and its directors and/or officers each had a series of direct and/or indirect business and/or personal relationships with the Trustees, directors and/or officers and/or major shareholders of the Fund." *Id.* ¶ 186. The fact that Catalyst Advisors managed the Fund's strategy, without more, fails to allege actual control and merely constitutes a boilerplate statement of control status. *See Youngers*, 195 F. Supp. 3d at 525 ("And Plaintiffs' allegation that Virtus Advisers, Euclid, Robinson, Present, or F-Squared caused Virtus Trust to adopt the AlphaSector strategy adds nothing because the "matter[ ] at issue" is the misstatements contained in the registration statement and marketing documents, not the adoption of the AlphaSector strategy.").

Therefore, the Court finds that the Amended Complaint lacks facts sufficient to plead control under Section 15.

### III.  CONCLUSION.

For the foregoing reasons, the Court grants the Defendants' motion to dismiss the Amended Complaint in its entirety and dismisses the Plaintiffs' claims with prejudice pursuant to Rule 12(b)(6). The Clerk of the Court is respectfully directed to close the case.

It is **SO ORDERED**:

Dated: Central Islip, New York

June 25, 2019

_____/s/ Arthur D. Spatt_____

ARTHUR D. SPATT

United States District Judge